UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------

EDREWEENE RAYMOND, ADHYL
POLANCO, PEDRO SERRANO, SANDY
GONZALEZ, RITCHIE BAEZ, JULIO
DIAZ, FELICIA WHITELY, ROMAN
GORIS, DERICK WALLER, KAREEM
ABDULLAH, OLAYOKUN OLAGOKE,
and WIDMARC PIERRE individually, and
on behalf of a class of all others similarly
situated,

                Plaintiffs,

    -against-

THE CITY OF NEW YORK, NEW YORK
CITY POLICE DEPARTMENT, THE
MAYOR OF THE CITY OF NEW YORK
BILL de BLASIO, in his individual and
and official capacity, POLICE
COMMISSIONER WILLIAM J. BRATTON,
In his individual and official capacity, NYPD
CHIEF OF DEPARTMENT JAMES P.
O'NEILL, in his individual and official
capacity, and NYPD COMMANDING OFFICER
OF PATROL SERVICES, BUREAU CHIEF
CARLOS M. GOMEZ, in his individual and
official capacity,

                Defendants.

------------------------------------------------------

Docket No.

**CLASS ACTION
COMPLAINT AND
JURY DEMAND**

Plaintiffs, Edreweene Raymond, Adhyl Polanco, Pedro Serrano, Sandy Gonzalez,

Ritchie Baez, Julio Diaz, Felicia Whitely, Roman Goris, Derick Waller, Kareem

Abdullah, Olayokun Olagoke, and Widmarc Pierre, for themselves individually and on

behalf of all others similarly situated, to wit, latino and black police officers within the

New York City Police Department, (hereinafter, "Plaintiffs") by and through their

attorneys, Nwokoro & Scola, Esquires, allege the following upon information and belief,

against the City of New York, New York City Police Department, the New York City
Police Commissioner William J. Bratton, NYPD Chief of Department James P. O'Neill,
and NYPD Bureau Chief Carlos M. Gomez.

## PRELIMINARY STATEMENT

1.      This is an action for declaratory and injunctive relief and for compensatory
damages to redress the deprivation of rights, and prevent future violations of the same
rights which are secured to the plaintiffs by the 1st. Amendment, (depriving plaintiff of the
right of free expression by punishing and retaliating against the plaintiff's for
complaining about and speaking out against the quota) the 5th, and 14th Amendments
(depriving plaintiff's of benefits without due process), and the 14th Amendment
(depriving plaintiff's of the equal protection of the laws by discriminating against the
plaintiff's on the basis of race and national origin in the administration of disciplinary
measures for failure to meet the quota) and for violations of the Civil Rights Act of 1866,
42 U.S.C. § 1981, 42 U.S.C. §1983, 42 U.S.C. §1985, the New York State Human Rights
Law, New York Executive Law §296; New York City Local Law 59 of 1986, as
amended by Local Rule 39 of 1991, §§8-101, et seq,; and multiple and systemic
violations of New York State Labor Law Section 215-a.

2.      Plaintiffs, Latino and African-American minority Police Officers employed by the
New York City Police Department, bring this action against the New York City Police
Department for violations of the 1st, 5th and 14th amendments to the United States
Constitution, and for multiple and systemic violations of New York State Labor law
Section 215-a, and consequent negative employment actions illegally taken against the

plaintiffs including negative evaluations, lost compensation, lost overtime, lost vacations days earned, punitive postings, punitive transfers, denial of upgrades and promotions, denial of overtime and denial of accrued time earned, and for discrimination in their employment on the basis of race and national origin, as a result of the imposition of illegal quotas and illegal penalties, which imposition has a disparate effect on the African-American and Latino minority police officers, and which discrimination is in violation of 42 U.S.C. §1981, 42 U.S.C. § 1985, the New York State Human Rights Law, New York Executive Law §296 and New York City Local Law 59 of 1986 as amended by Local Rule 39 of 1991, §§ 8-101, et seq.

3.      Over the past decade and continuing to the present, the NYPD has pursued an un-official policy of directing, instructing, compelling and mandating its employees to perform a mandatory number of arrests, issue a mandatory number of summons or write a mandatory number of tickets, (quotas) over a defined period of time, as a performance standard. Failure to meet the quota is punished while employees who meet the quota are rewarded. In the same period of time, the NYPD has stated officially that it does not maintain such quotas.

4.      Promotion or job security in the New York City Police Department depends on the number of arrests made or tickets issued. Although the NYPD has continuously denied the existence of quotas and asserts that it relies only on a set of 'productivity goals', or 'performance goals', those phrases are mere euphemisms for a quota system.

5.      Despite its official stance against quotas, there is conclusive proof that the NYPD has been using and is still using the quota system. Evidence adduced in the case of Floyd, et al v. The City of New York (2013 WL 4046209), a federal class action lawsuit filed

against the NYPD and the City of New York that challenged the NYPD's practices of racial profiling and unconstitutional stop and frisks, showed that 'performance goals' approximated to the appropriate enforcement activity numbers and an officers failure to engage in sufficient proactive enforcement activities resulted in negative performance evaluation and reassignment to a different command. In its ruling, the court stated "it is difficult to see any difference between a perfomance goal and quota" and further stated, "imposing numerical performance goals for enforcement activities, without providing effective safeguards to ensure the activities are legally justified, could result in an officer taking enforcement action for the purpose of meeting a 'performance goal' rather than because a violation of the law has occurred".

6.       During testimony in the Floyd case, Police Officer Adhyl Polanco, a named plaintiff in this action, who at the time was an eight-year veteran of the NYPD who worked in the Bronx, testified that he was told at a daily roll call that he had to log at least five stop-and-frisks, make one arrest and write 20 tickets each month. During the same trial, NYPD Officer Pedro Serrano (who is also a named plaintiff in this matter) testified that at roll call, supervisors would urge the gathered officers to make more arrests, make stop and frisk stops and write more summonses. He also testified that when he refused to make the quotas, his superiors punished him by giving him forced overtime on his days off, low performance evaluations and canceling his days off. Tape recordings made by Officer Serrano were introduced into evidence. In those recordings, NYPD Supervisors can be heard stating that they want more stops-and-frisks and arrests and warning the rank and file that if they didn't want to be on a 'foot post' (an undesirable transfer) they needed to make more 'collars' (arrests). At the same hearing, then NYPD

Deputy Chief Michael Marino, testified that when he was overseeing the 75th precinct in Brooklyn, he had to set a goal of 10 summonses and one arrest per month because officers were performing poorly.

7.      Plaintiff herein, Officer Polanco has asserted that his command, the 41st Precinct, regularly requires officers to make at least "one arrest and twenty summonses" per month. Polanco's assertions were confirmed by an audiotape obtained by the media. The contents of the tape reveal that these quotas are enforced through coercion and threats of job loss; to wit, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and twenty is breaking your balls, guess what you'll be doing. You are going to be doing a lot more, a lot more than what they are saying". The tape also reveals that another patrol supervisor chimed in and told the officers: "next week 25 and one, 35 and one, and until you decide to quit this job and go to work at Pizza Hut, this is what you are going to be doing till then".

8.      The New York Daily News obtained and published two internal memos which were posted inside the roll-call room at NYPD's 77th Precinct. The memos specifically instructed officers about the "number of tickets to give drivers for cell phone, seat belt, double-parking, bus stop, tinted windows and truck route violations" that they were expected to issue. The memos remained posted for several weeks inside the roll-call room until the media began inquiring. (James Fanelli, Cops at Brooklyn's crime-ridden 77th Precinct told to meet quotas for moving violations, memos say, N.Y. Daily News, Nov. 8, 2010).

9.      Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City

subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing." The officer explained that they needed to meet quotas. (Tom Namako and Kirsten Fleming, *Nightime Riders in Big Sit Fit*, The New York Post. December 26, 2009).

10.    In December of 2010 and in response to the pressure from their supervisors to issue baseless summonses pursuant to the policy and practice of quotas, police officers at the 79th Precinct considered organizing a so-called "daylong summons boycott." As one officer at the precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota." (Rocco Parascandola, *Irate cops at the 79th Precinct in Bedford-Stuyvesant threaten boycott over quotas*, N.Y. Daily News, Dec. 12, 2010). In response to the planned summons-boycott at the 79th Precinct on December 13, 2010, Deputy Chief Michael Marino marched into the precinct at roll call with a deputy inspector and read officers the riot act. "Just try it," a police source quoted Marino as saying. "I'll come down here and make sure you write them." Marino also vowed to transfer people, like he did when he was the commanding officer of the 75th Precinct in East New York. (Rocco Parascandola, *Deputy Chief Michael Marino threatens cops at the 79th Precinct who want to go on summons strike*, N.Y. Daily News December 15, 2010).

11.    In the case of Carolyn Bryant v The City of New York, (Index Number 22011/07- Kings County Supreme Court), during the trial of an action for false arrest, malicious prosecution and police brutality brought against the NYPD, and after hearing testimony from Captain Alex Perez of the 81st Precinct of the NYPD to the effect that arrest numbers are a factor in the assessment of police officer performance, a jury in Kings County

sitting in February 2011, found as a matter of fact that the NYPD has an un-official quota

system. The jury verdict was reported in the New York Daily News of February 19, 2011.

(Oren Yaniv, *Court rules that cops do use quotas; woman injured in 2006 arrest settles*

*for $75,000*, N.Y. Daily News. February 19, 2011).

12.     In February 2012, NYPD Officer Craig Matthews, filed a lawsuit against the

NYPD alleging the use of a detailed quota system at the 42nd Precinct, in the Bronx, which

includes regular color-coded computer reports used to track compliance with the quotas.

Officers who fail to meet the quotas are highlighted in red ink on the reports and

subjected to a wide range of retaliatory actions. Officer Matthews alleges that he

repeatedly reported the use of the quota system to the Precinct's commanding officers and

instead of addressing that problem, they retaliated against him by giving him punitive

assignments, denying him overtime, denying him leave, giving him poor evaluations and

constantly harassing and threatening him.

13.     The New York City Office of Collective Bargaining concluded that officers in

Brooklyn's 75th Precinct were required to issue four parking tickets, three moving

violation citations; three "quality-of-life" summonses, make one arrest and two stop-and-

frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained

an illegal "summons quota for traffic violations in the precinct and penalized officers for

failing to meet the stated number of traffic citations." She ordered the city to cease and

desist from the practice. (New York City Ticket Quota Confirmed, Denied, The

Newspaper.Com, January 21, 2006).

14.     Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the

northern Bronx, was investigated for ordering officers to make a certain number of arrests

each month. According to The New York Daily News. The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said. 'You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News. Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said. Creighton then told the cops to finagle the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint states. Unbeknownst to Creighton, one officer had his NYPD radio switched on so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by the 911 dispatcher. (Allison Gendar; NYPD captain allegedly caught in arrest quota fixing, The New York Daily News, November 14, 2007).

15.     When defendant William Bratton took office as Police Commissioner in January, 2014, he promised an end to quotas and the numbers-driven policing culture championed by his predecessor, Raymond Kelly, stating "I want to focus on the quality of police actions, with less emphasis on our numbers and more emphasis on our actual impact". Mr. Bratton made the statement in an official video released by the NYPD and published on the website of the Patrolmen's Benevolent Association. (Daily News, January 28, 2014: Mark Morales, 'NYPD Commissioner bags bust quotas in favor of actual impact'). However, the reality is that one year later, quotas remain alive and well and the NYPD is aggressively pursuing a numbers driven agenda with regard to arrests, tickets and summonses.

16.     Recently, the New York Post newspaper obtained and reported a text sent by an NYPD Supervisor, Lieutenant Stevelle Brown of the 105th Precint in Queens, to an officer under her command. The officer had asked for permission to take the night off and Lieutenant Brown responded by asking for details on the officer's 'activity for last month', with the officer answering that it was just 'one moving violation and three parking summonses' Brown responded, "I believe, I will be seeing you at work then". Denying an officer time off for failure to make a certain number of arrests, tickets or summonses is indicative of the fact that the quota system is currently in use. (Shawn Cohen and Bruce Golding; Cop denied time off because of quotas, New York Post, February 20, 2015.)

17.     On November 16, 2013, the Daily News reported that four traffic enforcement agents, James Felder, Steven Douglas, Tracy Ellis and Joel Fernandez, along with and their union, Local 983, brought an action against the City and the NYPD alleging that they were being punished by denial of overtime, denial of shifts, denial of meal breaks, being given poor evaluations and threatened with termination, if they failed to tow-away three or four vehicles per shift. The plaintiffs alleged that they were being pressured by supervisors to tow vehicles they wouldn't normally tow in order to meet the quota. (Pete Donohue, Greg B. Smith and Corrine Lestch; "Traffic-enforcement agents sue NYPD, City over towing quotas" Daily News, November 16, 2013).

18.     Under the leadership of the named defendants, the named plaintiffs and all un-named members of the prospective class have been compelled, instructed, directed and or mandated to issue a certain number of summons, write a certain number of tickets, tow a certain number of vehicles, or write a certain number of violations. Similarly, the named

plaintiffs and all un-named members of the prospective class have been punished by the defendants, by being harassed, threatened with termination and other negative consequences, received negative evaluations, lost compensation, lost overtime, lost vacation days earned, punitive postings, punitive transfers, denial of upgrades and promotions, denial of overtime, and denial of accrued time earned; for their failure to meet the mandated numbers of summonses, tickets, tow-aways, and/or violations.

19.     The imposition of illegal quotas has led to a pattern and practice of discrimination against officers of Hispanic and African-American heritage on the basis of color, race and national origin by, inter alia; maintaining and allowing a hostile work environment; disparate treatment through an unfair and unreasonable perfomance evaluation system; unfounded, unwarranted and improperly conducted disciplinary investigations, including integrity tests and interrogations; the imposition of unfounded, unwarranted and overly disciplinary penalties, including but not limited to loss of vacation, suspension, termination, loss of pension, assignments to undesirable and/or particularly dangerous tasks. The disciplinary process of the NYPD, although neutral on its face, has had a disparate impact on minority officers.

20.     Upon information and belief, the defendants have enacted and enforced un-written "productivity standards" or de facto quotas of a certain number of arrests and a certain number of summonses and or violations per month for each NYPD officer. The officers who fail to meet the productivity standards face adverse employment consequences. Upon information and belief, in their efforts to satisfy the productivity standards (meet the quota), NYPD officers have engaged in widespread, suspicion less

stops and frisks, improper and baseless arrests, and improper and baseless summonses and/or violations.

21.     Upon information and belief, the improper stops, frisks, arrests, summonses and violations generated by the pressure to comply with illegal quotas, have a negative impact on the community, and a disparate and disproportionately negative impact on minority African-American and Latino community. Upon information and belief, the NYPD targets black and latino communities and black and latino individuals within the five boros of New York in order to obtain the numbers necessary to meet the illegal quotas.

22.     The named plaintiffs herein and the prospective class members are African-American and Latino officers who are under supervisory pressure to meet illegal quota standards by performing racially discriminatory and unwarranted enforcement actions against their own minority community. Plaintiff's failure to meet the illegal quota results in adverse employment consequences including but not limited to negative evaluations, termination or threat of termination, lost compensation, lost overtime, denial of promotions and upgrades, denial of overtime, loss of vacation days earned, loss of accrued time earned, punitive postings and punitive transfers, suspension, investigations, charges, suspensions, formal and informal discipline, assignments to undesirable and/or particularly dangerous tasks, punitive postings and punitive transfers, all leading and contributing to a hostile working environment and racially disparate treatment of the minority police officers.

23.     Plaintiffs herein and the prospective class members are disproportionately affected by the imposition of illegal quotas and the punitive consequences of the failure to meet the quotas, as opposed to white police officers, because plaintiffs being

minorities working in neighborhoods dominated by minority residents, are unwilling to perform racially discriminatory and unwarranted enforcement actions against the minority community. The efforts of the defendants to compel plaintiffs to comply with the illegal quota system has led to a racially unfair and unreasonable performance evaluation system and unfair and unwarranted disciplinary actions and penalties to which the plaintiffs are subjected and to which white police officers are not subjected.

24.     The named plaintiffs and prospective class members who have complained about the illegal quotas and its racially discriminatory application to the minority community face negative employment action from the defendants in the form of unwarranted and improperly conducted charges and disciplinary investigations, and unwarranted disciplinary penalties leading to a hostile working environment and racially disparate treatment of the minority police officers on the basis of their race, color and national origin.

25.     The performance evaluation system to which the plaintiffs are subjected by the defendants is unfair in that it is not evenly applied to all precincts depending on the location of the precinct. For instance, under the numbers determined performance evaluation system, a police officer from a precinct located in a predominantly white residential area will receive a positive evaluation while a police officer from a precinct located in a predominantly minority area will receive a negative evaluation for the same exact number of enforcement actions.

26.     The performance evaluation system to which the plaintiffs are subjected by the defendants although neutral on its face, is un-evenly applied in that minority officers are

more likely to be charged, investigated and receive more punishment, than their white counterparts for the same alleged offenses.

## JURISDICTION

27.     Jurisdiction is conferred upon the Court pursuant to 28 U.S.C. §§ 1331 and 13343 (3) & (4) as this action seeks redress for the violation of plaintiffs civil rights. Plaintiffs further invoke the Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a) over any and all state law claims that are so related to the claims within the original jurisdiction of the Court that they form part of the same case or controversy. Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

## VENUE

28.     Venue is proper in the United District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## JURY DEMAND

29.     Plaintiffs demand trial by jury in this action and on each and every one of their claims.

## PARTIES

30.     Plaintiff Edreweene Raymond is an African American male Police Officer employed by the NYPD who has been under supervisory pressure to comply with the illegal quotas; has suffered negative employment consequences as a result of the failure to meet the illegal quotas; has been racially discriminated against in the imposition of

command disciplines for failing to meet the illegal quota; Has expressed his opposition to the illegal quotas and has been retaliated against in violation of his rights to free speech; and has been penalized for reporting, opposing and complaining about the illegal quotas and its racially discriminatory application against the minority community.

31.     Plaintiff Adhyl Polanco is a Hispanic male and police officer employed by the NYPD who has been under supervisory pressure to comply with the illegal quotas; has been racially discriminated against in the imposition of command disciplines for failing to meet the illegal quota; has suffered negative employment consequences as a result of his failure to meet the illegal quotas; has expressed his opposition to the illegal quotas and has been retaliated against in violation of his rights to free speech; has been compelled to work forced overtime, and has been penalized for reporting, opposing and complaining about the illegal quotas and its racially discriminatory application against the minority community

32.     Pedro Serrano is a Hispanic male and a police officer employed by the NYPD who has been under supervisory pressure to comply with the illegal quotas; has suffered negative employment consequences as a result of the failure to meet the illegal quota; has been racially discriminated against in the imposition of command disciplines for failing to meet the illegal quota; Has expressed his opposition to the illegal quotas and has been retaliated against in violation of his rights to free speech; and has been penalized for reporting and complaining about the illegal quotas and its racially discriminatory application against the minority community.

33.     Sandy Gonzalez is a Hispanic male and a police officer employed by the NYPD who has been under supervisory pressure to comply with the illegal quotas; has suffered

negative employment consequences as a result of the failure to meet the illegal quota; has been racially discriminated against in the imposition of command disciplines for failing to meet the illegal quota; has expressed his opposition to the illegal quotas and has been retaliated against in violation of his rights to free speech; and has been penalized for reporting and complaining about the illegal quotas and its racially discriminatory application against the minority community

34.     Plaintiff Ritchie Baez is a black male of Hispanic heritage and a police officer employed by the NYPD who has been under supervisory pressure to comply with the illegal quotas; has been racially discriminated against in the imposition of command disciplines for failing to meet the illegal quota; has suffered negative employment consequences as a result of the failure to meet the illegal quotas; has been penalized for reporting and complaining about the illegal quotas and its racially discriminatory application against the minority community.

35.     Plaintiff Julio Diaz is a Hispanic male and police officer employed by the NYPD who has been under supervisory pressure to comply with the illegal quotas; has been racially discriminated against in the imposition of command disciplines for failing to meet the illegal quota; has suffered negative employment consequences as a result of his failure to meet the illegal quotas; and has been penalized for reporting and complaining about the illegal quotas and its racially discriminatory application against the minority community.

36.     Plaintiff Felicia Whitely is a female African American Police Officer employed by the NYPD who has been under supervisory pressure to comply with the illegal quotas; has been racially discriminated against in the imposition of command disciplines for

failing to meet the illegal quota; has suffered negative employment consequences as a result of the failure to meet the illegal quotas; and has been penalized for reporting and complaining about the illegal quotas and its racially discriminatory application against the minority community.

37.     Plaintiff Roman Goris is a Hispanic male and police officer employed by the NYPD who has been under supervisory pressure to comply with the illegal quotas; has been racially discriminated against in the imposition of command disciplines for failing to meet the illegal quota; has suffered negative employment consequences as a result of his failure to meet the illegal quotas; and has been penalized for reporting and complaining about the illegal quotas and its racially discriminatory application against the minority community.

38.     Plaintiff Derick Waller is an African American male police officer employed by the NYPD who has been under supervisory pressure to comply with the illegal quotas; has been racially discriminated against in the imposition of command disciplines for failing to meet the illegal quota; has expressed his opposition to the illegal quotas and has been retaliated against in violation of his right to free speech; has suffered negative employment consequences as a result of his failure to meet the illegal quotas; and has been penalized for reporting and complaining about the illegal quotas and its racially discriminatory application against the minority community.

39.     Plaintiff Kareem Abdullah is an African American male police officer employed by the NYPD who has been under supervisory pressure to comply with the illegal quotas; has been racially discriminated against in the imposition of command disciplines for failing to meet the illegal quota; has suffered negative employment consequences as a

result of his failure to meet the illegal quotas; and has been penalized for reporting and complaining about the illegal quotas and its racially discriminatory application against the minority community.

40.     Plaintiff Olayokun Olagoke is an African American male police officer employed by the NYPD who has been under supervisory pressure to comply with the illegal quotas; has been racially discriminated against in the imposition of command disciplines for failing to meet the illegal quota; has suffered negative employment consequences as a result of his failure to meet the illegal quotas; and has been penalized for reporting and complaining about the illegal quotas and its racially discriminatory application against the minority community.

41.     Plaintiff Widmarc Pierre is an African American male police officer employed by the NYPD who has been under supervisory pressure to comply with the illegal quotas; has been racially discriminated against in the imposition of command disciplines for failing to meet the illegal quota; has suffered negative employment consequences as a result of his failure to meet the illegal quotas; and has been penalized for reporting and complaining about the illegal quotas and its racially discriminatory application against the minority community

42.     Defendant the City of New York (the City) is and was at all times relevant hereto, a municipal corporation duly organized and existing under the laws of the State of New York, exercising governmental authority. Defendant is an employer subject to Federal Laws and to the New York State Human Rights Law and New York City Local Law. Defendant City is a person for purposes of 42 U.S.C. §§ 1981 and 1985 and is and was

the employer of the named plaintiffs and prospective class members as well as the individually named defendants, at all relevant times.

43.     Defendant the New York City Police Department (NYPD) was and is a department, agency, bureau and /or subdivision of the Defendant City. Defendant NYPD is and was at all times relevant hereto, a local government agency of the City of New York and was or is the employer of all the individually named plaintiffs, the prospective class members and the individual defendants herein.

44.     Defendant Bill De Blasio is the Mayor of the City of New York. Upon information and belief, Defendant De Blasio has routinely met with the Police Commissioner; Deputy Police Commissioners and other high ranking members of the NYPD to set policy and make recommendations relating to the polices, administration, practices, customs and procedure of the NYPD and relating to the disciplinary system and implementation of penalties within the NYPD. Defendant DeBlasio knew or should have known of the customs, practices and policies described in this complaint, including but not limited to the maintenance of the illegal quota system by the NYPD and its racially discriminatory effect on the minority community and minority officers including the plaintiffs, and Mayor DeBlasio condoned, ratified and/or authorized such practices and policies.

45.     Defendant William J. Bratton has been the Police Commissioner for the City of New York from January 2014 to the present. Defendant Bratton is an employee of the City of New York and is the principal administrator of defendant NYPD. He is responsible for the application of the NYPD's enforcement and administrative polices including its internal investigatory and disciplinary process. He is the final authority in all

disciplinary matters within the NYPD. Police Commissioner William J. Bratton knew or should have known of the customs and practices described in this complaint, including but not limited to the maintenance of the illegal quota system by the NYPD and its racially discriminatory effect on the minority community and minority officers including the plaintiffs and Commissioner Bratton condoned, ratified and/or authorized such conduct.

46.     Defendant James P. O'Neill is the NYPD's Chief of Department and the highest ranking non-civilian police uniformed police officer. Defendant O'Neill is an employee of the City of New York. Upon information and belief, he is in charge of all NYPD operations answering only to the Police Commissioner and the Mayor. Defendant O'Neill, knew or should have known of the customs and practices described in this complaint, including but not limited to the maintenance of the illegal quota system by the NYPD and its racially discriminatory effect on the minority community and minority officers including the plaintiffs and Commissioner Bratton condoned, ratified and/or authorized such conduct.

47.     Defendant NYPD Patrol Bureau Chief Carlos M. Gomez is the NYPD's commanding officer of patrol services, which includes the precincts. Defendant Gomez exercised supervisory control over the plaintiffs at all relevant times and participated in making and executing the policy and practices complained of herein. Defendant Gomez, knew or should have known of the customs and practices described in this complaint, including but not limited to the maintenance of the illegal quota system by the NYPD and its racially discriminatory effect on the minority community and minority officers

including the plaintiffs and defendant Gomez condoned, ratified and/or authorized such conduct.

## STATEMENT OF FACTS
### (Experiences of the named plaintiffs)

48.      Plaintiff Edreweene Raymond is a police officer in the NYPD's Transit District. He was inducted in to the force in 2008. During his first year, he was told by his Supervisors at Transit District 32, in Crown Heights, Brooklyn, that his core duty was to get as many arrests as possible and issue as many summons as possible in order to make the quota.  After seven months on the job, he complained to his superiors about this requirement. He requested of his Sergeant that he be allowed to use his discretion and that he be excused from the quota. His request was denied. In 2010, for his lack of activity, an epheumism for not meeting the quota, he was given a punitive posting, the Coney Island Summer detail. As further punishment, he was posted to the midnight shift. On the mid-night shift, he was again given a quota and told by his superiors to make the quota. He was directed to make the quota by arresting people on the train at night for occupying more than one seat. He refused to do this and again failed to make the quota. He was chastised by his supervisors and told that his numbers were too low and he needed to make the numbers just like everyone else or be punished and possibly fired. In 2012, he was transferred out of the a Special Operations Unit because of not getting enough arrests to meet the quota, and told "to be in this unit, you have to produce the required numbers". Since 2012, he has been posted to the 3rd Platoon of the Transit District, and for not making the quota and for complaining about it, he has received below par evaluations and his superiors have threatened to place him on performance

monitoring. Although Officer Raymond is an excellent candidate for promotion to the rank of sergeant, and scored 93 in the qualifying examination, thus ranking him number 8th out of the 932 individuals who took the same examination, he has been threatened by his superiors that unless he increases the number of arrests and summons issued, he will not be promoted to the rank of sergeant. In July 2014, Officer Raymond wrote a memo to the Commanding Officer of Collaborative Initiatives, complaining about the strong pressure to increase arrests for low-level transit crimes and detailing his personal experience with this pressure.

49.     As a police officer within the Transit District, Officer Raymond was and is required by his supervisors to meet a quota of 1 arrest and 5 summons a month. Officer Raymond is unwilling to meet the quota because he believes that it is unfair, unreasonable, and racially discriminatory against the low-income minority riders of the public transit system.

50.     For not meeting the quota, plaintiff Raymond was penalized by punitive postings, low performance evaluations, denial of upgrades and promotions, denial of overtime, and denial of time off. His supervisors threatened to place him on performance monitoring and he was denied promotion that he qualified for.

51.     For complaining about the quota and expressing his opinion about it, Officer Raymond was penalized by punitive postings, low performance evaluations, denial of overtime, and denial of time off. His supervisors threatened to place him on performance monitoring and he was denied promotion.

52.     Plaintiff Sandy Gonzalez is a police officer within the NYPD's 40th precinct. Plaintiff Gonzalez was and is required by his precinct commander and other superiors to

meet a quota of one arrest and twenty summons per month. Plaintiff Gonzalez was unwilling to meet the quota because he believed that it was unfair, unreasonable, and racially discriminatory against residents of the south Bronx. In 2013, he was penalized for not meeting the quota by being given a low evaluation score of 2.5. He was also penalized by being forced to work, alone, on a fixed post in cold weather at a dangerous location at a time when the NYPD directives were for all patrolmen to have partners. During this posting, plaintiff Gonzalez fell and suffered injury and reported it to his superiors. For not writing enough summons, plaintiff Gonzalez was threatened with negative evaluations and chastised by his precinct commander, Deputy Inspector Christopher McCormack, who stated "on 128th Street, you can write 100 C summons, any day". ('C' is for criminal).

53.     For not meeting the quota, plaintiff Gonzalez was penalized by punitive postings, low performance evaluations, denial of overtime, forced overtime and denial of time off. He was placed on performance monitoring, which could have led to termination.

54.     Plaintiff Gonzalez made a formal complaint to his superiors and to the Internal Affairs Bureau of the NYPD regarding the imposition of the illegal quota. His superiors retaliated with threats and attempts to humiliate Mr. Gonzalez verbally and by instituting an un-warranted investigation against him regarding his fall. A white police officer who fell under the same circumstances as plaintiff Gonzalez, was not investigated.

55.     Plaintiff Ritchie Baez was employed by the NYPD as a police officer in 2004. He was posted to the 40th precinct in 2005 and remains there till today. In 2013, plaintiff Baez was required by his precinct commander and other superiors to meet a quota of one arrest and twenty summons per month. Plaintiff Baez was unwilling to meet the quota because

he believed that it was unfair, unreasonable, and racially discriminatory against residents of the south Bronx. Plaintiff did not meet the quota in 2013. Plaintiff Baez was penalized for not meeting the quota by being given a low performance evaluation of 2.5. In the year that he received the low evaluation of 2.5, plaintiff Ritchie Baez performed great police work in three instances; In May 2013, Officer Baez assisted a citizen of Spanish descent whose car had been stolen. Officer Baez used his knowledge of Spanish to interview the victim and realizing that time was of the essence, quickly performed a canvass of the immediate neighborhood for the missing vehicle with the result that he immediately found the stolen vehicle and arrested the perpetrator who was charged with Grand Larceny Auto; in October 2013, Officer Baez was helping Housing police provide crowd control duties at 152nd Street, when he recognized a face in the crowd as an accused robber from a wanted poster. During the robbery, the suspect was accused of slashing her victim several times in the face. Acting quickly, Officer Baez promptly apprehended and arrested the suspect; The same year, Officer Baez was assisting a Special Operations Unit during an automobile stop. He observed an individual being interrogated by the Sergeant of the Special Operations Unit. Officer Baez realized that he had seen this individual on a wanted poster as a known gang member being sought by the police. When the individual gave a fictitious name to the Sergeant, Officer Baez alerted the Sergeant and was proven correct by a check of the NYPD records, leading to the arrest of the wanted individual. Despite the above, Plaintiff Baez was given a low performance evaluation in 2013 because his arrest and summons numbers did not meet the quota.

56.     For not meeting the quota, plaintiff Baez was penalized by punitive postings, low performance evaluations, denial of overtime, forced overtime and denial of time off. He

was placed on performance monitoring, which could have led to termination. He was posted to the sky watch posting, which was used by his superiors at the precinct, solely as a punitive posting.

57.     Plaintiff Baez complained to his superiors about the imposition of illegal quotas and the penalties for not meeting the quota, to no avail.

58.     Plaintiff Adhyl Polanco was employed by the NYPD as a police officer in 2005. He was posted to the 41st Precinct in 2005. His supervisors required him to meet a quota of one arrest and twenty summons per month. Plaintiff Polanco was unwilling to meet the quota because he believed that it was unfair, unreasonable and racially discriminatory against the minority community. Plaintiff complained about the quota system and expressed his unwillingness to comply with it. Plaintiff Polanco was penalized for not meeting the quota with low performance evaluations, punitive postings, denial of time off, denial of overtime, punitive transfers and forced overtime.

59.     NYPD supervisors at the 41st Precinct enforced the quotas through coercion and threats of job loss. A supervisor was recorded saying about the quota "If you think one and twenty is breaking your balls, guess what you'll be doing. You are going to be doing a lot more, a lot more than what they are saying". Another supervisor then stated: "next week 25 and one, 35 and one, and until you decide to quit this job and go to work at Pizza Hut, this is what you are going to be doing till then". Officer Polanco recorded these comments.

60.     Officer Polanco spoke out publicly about the NYPD's maintenance of the quota system, and in 2009, testified in the Floyd case (federal class action law suit regarding unconstitutional "stop and frisks" by the NYPD. The defendants have punished Officer

Polanco with unwarranted and improperly conducted disciplinary investigations, including integrity tests and interrogations, and imposed unfounded, unwarranted and overly disciplinary penalties including, loss of vacation and suspension.

61.     Plaintiff Pedro Serrano is a police officer who was posted to the 40th precinct in 2005 and remains there till date. Officer Serrano's supervisors at the 40 precinct required and require him to write at least 20 summons and perform one arrest per month. Plaintiff Serrano is unwilling to meet the quota because he believes it to be unfair, unreasonable and racially discriminatory against the minority community. Plaintiff Serrano complained to his supervisors about the quota and failed to maintain the numbers required of him. As a consequence, his supervisors threatened him with negative consequences such as forced overtime on his weekends off, punitive postings, and then carried out those threats.

62.     Plaintiff Serrano experienced first hand the negative effect of the quotas imposed by his supervisors on the minority community where he patrolled in the South Bronx. For his failure to meet the quota, he received a negative performance evaluation. One of his supervisors Executive Officer Materasso, told him that in order for him to get a better evaluation, he must arrest, summon and stop and frisk more people. Plaintiff Serrano explained to Officer Materasso, the deputy commandant of the 40th precinct, that the residents of the 40th precinct are predominantly low income and that he did not feel right about giving them spurious summons. She disagreed and referred to the residents of the 40th precinct as "animals". Plaintiff Serrano, of Puerto Rican origin similar to many residents of the South Bronx, was deeply offended.

63.     In the spring of 2012, while driving by Beekman Avenue and East 141 street, the commandant of the 40th precinct, defendant Christopher McCormack, saw a black person

standing against the wall. In the presence of plaintiff Serrano, Inspector McCormack got out of his car and walked up to this individual and proceeded to open the black man's pants. He opened the man's zipper, pulled down the man's pants and exposed the man's penis. He then grabbed the man's penis and passed his hands between the man's butt cheeks. Defendant McCormack then pulled out some narcotics and gave it to his driver. Upon information and belief, Defendant McCormack conducted himself in a similar manner at other times. Plaintiff Serrano was offended by this conduct.

64.     Plaintiff Serrano reported the illegal quotas and the harassment received from his superiors for not meeting the quotas, to the Internal Affairs Bureau of the NYPD but nothing was done about it. Plaintiff Serrano also testified in the Floyd federal class action lawsuit regarding the use of illegal quotas within his precinct. As punishment, he has received low performance evaluations, forced overtime, cancelled time off, threats of termination and punitive postings.

65.     Plaintiff Roman Goris is a police officer within the NYPD's 77th precinct.  Plaintiff Goris was and is required by his precinct commander and other superiors to meet a quota of one arrest and twenty summons per month. Plaintiff Goris is unwilling to meet the quota because he believes that it is unfair, unreasonable, and racially discriminatory against the minority residents of Brooklyn. Police Officer Goris believes that the quota system implemented by the Police Department is the main reason for the public's hostility towards police officers and that police officers should be allowed to use their discretion on a case by case basis.

66.     For not meeting the quota, plaintiff Goris was penalized by punitive postings, low performance evaluations, denial of overtime and denial of time off.

67.     Plaintiff Julio Diaz is a police officer within the NYPD's 75th precinct. Plaintiff Diaz was and is required by his precint commander and other superiors to meet a quota of one arrest and twenty summons per month. Plaintiff Diaz is unwilling to meet the quota because he believes that it is unfair, unreasonable, and racially discriminatory against minority residents of the city of Brooklyn.

68.     For not meeting the quota, plaintiff Diaz was penalized by punitive postings, low performance evaluations, denial of overtime, denial of upgrades or promotions, forced overtime and denial of time off. He was placed on performance monitoring, which could have led to termination.

69.     Plaintiff Derrick Waller was employed by the NYPD as a police officer in 1995. He is currently a police officer assigned to the 77th precinct in Brooklyn. Officer Waller is required by his precint commander and other superiors to meet a quota of one arrest and thirty summons per month. Such quotas were posted on the bulletin boards of the 77th precinct and officers who failed to meet the quota, including officer Waller, were identified on an list issued by Deputy Inspector Elvio Capocci, and threatened with disciplinary actions for failing to comply. Plaintiff Waller is unwilling to meet the quota because he believes that it is unfair, unreasonable, and racially discriminatory against minority residents of the City of Brooklyn. From 2006 to the present, plaintiff Waller has been under intense pressure by numerous members of the NYPD supervisory echelon to increase C summons, arrests and UF-250's (stops and frisks). Officer Waller on one occasion was told by a Sgt. Anthony Laroche of the performance monitoring division to "pick any dude walking across the street with his pants hanging down, underwear showing and write a jay walking summons" and "just write the damn summonses".

70.     For not meeting the quota, complaining about the quota, and expressing his opposition to the illegal quota, plaintiff Waller was penalized by punitive postings, low performance evaluations, denial of overtime, and denial of time off. He was placed on performance monitoring, which could have led to termination. He was posted to the sky watch posting, which was used by his superiors at the precinct, solely as a punitive posting.

71.     Plaintiff Waller complained to his supervisors within the NYPD including Lt. David Wittman, Inspector Cappocci and Lt. Cotton, on several occasions regarding the quota and the unfair punishment for not meeting the quota, to no avail. Officer Waller has been punished further by being excluded from any off duty employment which other officers are routinely allowed to engage in and being excluded from spike overtime, taken out of a squad patrol vehicle and assigned to foot posts although he is the most senior officer in his squad, and given steady tours of Skywatch, a solely punitive posting.

72.     Plaintiff Kareem Abdullah is a police officer within the NYPD's 43rd precinct. Officer Abdullah joined the force in 1993 and was posted to Transit District 11. While there, plaintiff Abdullah was required by his superiors to meet a quota of one arrest and twenty summonses a month, or one arrest and then summonses for those on the mid-nights shift. Plaintiff Abdullah was unwilling to meet the quota because he believed that it was unfair, unreasonable, and racially discriminatory against minority residents of the Bronx. For not making the quota, "refusing to arrest people solely to make up the numbers" he was transferred the 43rd precinct and placed on performance monitoring. He was told by his superiors that in order to be relieved from performance monitoring, he had to make two or three arrests a month at least. At the 43rd Precinct, the quota that

officer Abdullah currently has to meet is one arrest and ten summonses a month, although this is less rigorous than the quota imposed at the Transit District, it is still strictly enforced.

73.    For not meeting the quota, plaintiff Abdullah was penalized by punitive postings, low performance evaluations, denial of overtime, and denial of time off. He was placed on performance monitoring, which can lead to termination.

74.    Plaintiff Abdullah made a formal complaint to his PBA delegate and via his PBA delegate to his superiors at One Police Plaza regarding the quota imposition and his punishment for not meeting the quota. He has received no response.

75.    Plaintiff Olayokun Olagoke is a police officer within the NYPD's 66th Precinct. Officer Olagoke joined the force in 2008. As a minority black officer in a mostly white squad, plaintiff Olagoke was disproportionately punished for not meeting the quota while white police officers, who also failed to meet the quota, received less or no punishment. At the 66th Precinct, plaintiff Olagoke is required to meet a quota of ten A summons, one B summons, one C summons (16 summons) and one arrest per month. Plaintiff Olagoke is unwilling to meet the quota because he believes that it is unfair, unreasonable, and racially discriminatory against minority residents of Brooklyn.

76.    For not meeting the quota, plaintiff Olagoke was penalized by punitive postings, a punitive transfer, low performance evaluations, denial of overtime, and denial of time off. He was also suspended from paid detail.

77.    Plaintiff Olagoke made a formal complaint to his union representative and his commanding officer regarding the quota and his unfair punishment for failing to meet it and was told that he should bring his numbers up if he wants to escape punishment. In

retaliation for his complaints, plaintiff Olagoke was subjected to a hostile work environment wherein his Sergeant, Joe Chen, subjected him to verbal humiliation, at one time ordering him not to speak on the squad car radio, calling him "stupid" and a "moron" and threatening to and putting him on a punitive post at the boardwalk.

78.    Plaintiff Felicia Whitely is a police officer in the NYPD's Housing Burea, PSA 1 charged with patrolling the New York City Housing Developments. Officer Whitely is required to meet a quota of one arrest and five C summons every month. Plaintiff Whitely is unwilling to meet the quota because she believes that is is unfair, unreasonable, and racially discriminatory against minority residents of Brooklyn.

79.    For not meeting the quota, plaintiff Whitely was penalized by punitive postings, a punitive transfer, low performance evaluations, denial of overtime, and denial of time off. Plaintiff Whitely was banned from overtime and from paid detail as a result of her inability to meet the quota.

80.    Plaintiff Whitely has complained about the foregoing to her platoon commander, her union delegate, and her supervisor, to no avail.

81.    Plaintiff Widmarc Pierre is a police officer assigned to the NYPD's 66th Precinct located in Brooklyn. As an officer in the 66th precinct Officer Widmarc is required to meet a quota of ten A summons, one B summons, one C summons (16 summons) and one arrest per month. Plaintiff Widmarc is unwilling to meet the quota because he believes that it is unfair, unreasonable, and racially discriminatory against minority residents of Brooklyn.

82.    For not meeting the quota, plaintiff Widmarc was penalized by punitive postings, a punitive transfer, low performance evaluations, denial of overtime, and denial of time

off. Plaintiff Widmarc was told by his superiors that he received a sub-par evaluation because he did not have enough stop and frisks and did not write enough C summonses. .

## CLASS ACTION ALLEGATIONS

83.     Plaintiffs bring this action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure on their own behalf and on behalf of all other persons similarly situated.

84.     Plaintiffs class consists of all Hispanic and African-American police officers who are being compelled and pressured to meet illegal quota numbers in the issuance of summonses, in the stop and or frisks of citizens and in the arrest of citizens, within the minority communities targeted by the NYPD, who have been penalized with negative employment consequences for not meeting said quotas, who have been penalized by being forced to work overtime on their time off, and who, upon information and belief, have been subjected to discrimination on the basis of color, race or national origin in the form of a hostile work environment, disparate performance evaluation treatment, and disparate disciplinary treatment for having challenged the illegal quota system in the department. Plaintiff's claims are typical of the claims of the other members of the class as they have all been forced, pressured and compelled to meet illegal quotas, have suffered negative employment consequences for not meeting the illegal quotas, and have suffered disparate performance evaluations and disparate disciplinary treatment for their failure to meet the desired quota numbers. Plaintiff's attorneys are qualified and generally able, with extensive experience in employment litigation. For these reasons, plaintiffs

will fairly and adequately protect the interests of the class in this action for declaratory and injunctive relief and for compensatory and punitive damages.

85.     The members of this class are too numerous to be joined in one action. Upon information and belief, there are approximately 6000 Hispanic and 5000 African-American police officers who will have been and will be affected by the imposition of the illegal quota system, the negative employment consequences of not meeting the illegal quota system, the imposition of forced overtime on their time off, disparate performance evaluations and disparate disciplinary actions for failure to meet the illegal quota numbers. Upon information and belief, thousands of these officers have already been subjected to the said unlawful conditions.

86.     The questions of law common to the above described class is whether or not the City of New York through the NYPD, compels police officers to comply with illegal quotas in the performance of arrests, stops and or stop and frisks, and the writing of summonses and tickets and in the performance of their duties contrary to New York State Labor Law § 215-a; whether the City of New York through the NYPD, penalizes police officers for failing to comply with illegal quotas contrary to New York State Labor Law § 215-a; whether as a result of being forced to meet illegal quota numbers in their own minority neighborhoods, the plaintiffs have suffered racially disparate performance evaluations and racially disparate disciplinary treatment and whether such conduct by the defendants constitute a deprivation of the rights conferred on the plaintiffs by the Civil Rights Act of 1866, 42 U.S.C. § 1981, 42 U.S.C. §1985, the New York State Human Rights Law, New York Executive Law §296; New York City Local Law 59 of 1986, as amended by Local Rule 39 of 1991, §§8-101, et seq.

87.     Plaintiffs and members of their class meet the requirements of Rule 23(a) of the

Federal Rules of Civil Procedure (F.R.C.P.).889.     The defendants have acted or refused

to act, on grounds generally applicable to the class, thereby making appropriate injunctive

relief and declaratory relief with respect to the class as a whole, meeting the requirements

of Rule 23(b)(2) of the FRCP.


## FACTUAL BACKGROUND COMMON TO ALL CLAIMS FOR RELIEF

88.     Section 215-a of New York State's Labor Law prohibits employers from

requiring quotas in the issuance of summons, tickets or number of arrests, and also

prohibits employers from penalizing employees for not meeting such illegal quotas or

measuring an employee productivity by a failure to meet a quota. Section 215 of the

Labor Law further prohibits employers from penalizing employees for reporting or

complaining about the employer's violation of the Labor Law. In direct violation of these

provisions, under the leadership of the named defendants, the named plaintiffs and all un-

named members of the prospective class have been compelled, instructed, directed and or

mandated to perform a certain number of arrests, perform a certain number of stops and

or stop and frisks, and issue a certain number of summons, per month. Similarly, the

named plaintiffs and members of the prospective class have been punished by the

defendants, by being harassed, threatened with termination and other negative

consequences, received negative evaluations, lost compensation, lost overtime, lost

vacation days earned, punitive postings, punitive transfers, denial of upgrades and

promotions, denial of overtime, and denial of accrued time earned, for failure to meet the

mandated numbers of arrests, stop and or stop and frisks, and the mandated number of summons.

89.     The illegal quota system is used in every work operational unit or sub-unit of the NYPD throughout the five boros of New York and affects all police officers who have to comply or face punitive consequences.

90.     The named plaintiffs and all members of the prospective class have suffered actual damages by being harassed, threatened with termination, given negative evaluations, lost compensation, lost overtime, lost vacation days earned, lost time off, denial of overtime, denial of upgrades, denial of promotions, punitive postings and punitive transfers, all for failure to meet the mandated quota of arrests, stops and summons.

91.     The named plaintiffs and all members of the prospective class have been subjected to disparate and racially discriminatory performance evaluations by the defendants as a means of compelling the Latino and African-American plaintiffs to enforce racially discriminatory quotas in the predominantly minority communities targeted by the NYPD.

92.     The named plaintiffs and all members of the prospective class have been subjected to disparate and racially discriminatory disciplinary treatment by the defendants as a means of compelling the Latino and African-American Plaintiffs to enforce racially discriminatory quotas in the predominantly minority communities targeted by the NYPD.

## 1ST CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Claims of named plaintiffs and class members for illegal quotas and penalties imposed on the plaintiffs contrary to Labor Law § 215-a)

93.    The allegations in paragraphs 1 through 92 above are incorporated herein as if fully set forth below.

94.    The defendant the City of New York, by its police department, the defendant NYPD, and through its agents, the named individual defendants, and the individual defendants in their personal and official capacities, have compelled, instructed, directed and mandated the plaintiffs to perform a certain number of arrests, perform a certain number of stops and stop and frisks, and issue a certain number of summons, per month. In other words, the defendants have maintained an illegal quota system for police officers for arrests and summonses, and in measuring the productivity of the plaintiffs.

95.    That the defendant, the City of New York, by its Police Department, the defendant, NYPD, and through its agents and employees, the named individual defendants and the individual defendants in their personal and official capacities, have penalized the plaintiffs for failure to meet the illegal quotas by threatening the plaintiffs with termination, giving the plaintiffs negative evaluations, denying the plaintiffs compensation, denying the plaintiffs overtime, denying the plaintiffs vacation days earned, denying the plaintiffs time off, denying the plaintiffs overtime, denying the plaintiffs upgrades, denying the plaintiffs promotions, subjecting the plaintiffs to punitive postings and punitive transfers, and otherwise illegally punishing the plaintiffs by subjecting the plaintiffs to negative employment conditions for failure to meet the illegal quota.

96.     That the defendants actions in maintaining the quota and penalizing the plaintiffs for failing to meet the quota are prohibited by New York State Labor Law, Section 215-a.

97.     That the named plaintiffs and prospective class members have suffered damages as a result of the imposition of the illegal quotas and the punitive actions taken against them for failure to meet the illegal quotas.

## 2ND CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Claims of named plaintiffs and class members against all defendants for racially discriminatory employment practices in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981)

98.     The allegations in paragraphs 1 through 97 above are incorporated herein as if fully set forth below.

99.     The named plaintiffs and members of the prospective class are Hispanic and African-American police officers patrolling in areas where the residents are predominantly minorities as in Latino and African-American.

100.    The illegal quota system maintained by the defendants has a negative effect on the community as it leads to unreasonable and un-warranted arrests, stops, stop and frisks, and summonses.

101.    The illegal quota system implemented by the defendants has a disproportionate and racially discriminatory effect on the minority community because the NYPD targets the minority community to obtain the numbers required by the quota system.

102.    The named plaintiffs and members of the prospective class are unwilling and unable to meet and enforce the illegal quotas on their own minority communities due to its racially discriminatory nature and the fact that it leads to unfair, unreasonable and un-warranted enforcement actions against their own minority community.

103.   The named plaintiffs and all members of the prospective class have been subjected to disparate and racially discriminatory performance evaluations by the defendants as a means of compelling the Latino and African-American plaintiffs to enforce racially discriminatory quotas in the predominantly minority communities targeted by the NYPD.

104.   The named plaintiffs and all members of the prospective class have been subjected to disparate and racially discriminatory performance evaluations by the defendants as a means of compelling the Latino and African-American plaintiffs to enforce racially discriminatory quotas in the predominantly minority communities targeted by the NYPD.

105.   The racially disparate performance evaluations and the racially disparate disciplinary actions to which the plaintiffs have been subjected to constitute a deprivation of the rights conferred on the plaintiffs by the Civil Rights Act of 1866, 42 U.S.C. § 1981. Section 1981 provides in pertinent part that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts…..and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens".

106.   A contract of employment exists between each of the plaintiffs and defendants NYPD and the City of New York, in that the NYPD and each plaintiff agreed that each plaintiff would be hired by the department to work for it in a specific position described in the complaint, at a specific average rate, for an indefinite period of time.

107.   Defendants actions as set forth herein prevented plaintiffs and prospective class members from enjoying and enforcing their employment contract rights on the same basis

as white persons, thereby denying said rights in violation of the Civil Rights Act of 1866, 42 U.S.C. Section 1981, as amended.

108.    Defendants actions had both the intention and effect of depriving plaintiffs of the rights and benefits of their contractual relationship with the Department on the basis of their race, color and or national origin.

109.    The named plaintiffs and members of the prospective class have suffered damages as a result of such deprivation including but not limited to loss of promotions and upgrades, loss of earned time off, punitive postings, punitive transfers, and the plaintiffs and class members have suffered distress, humiliation, great expense, embarrassment and damage to their reputations.

110.    The actions of defendants in depriving plaintiffs of their civil rights as hereinbefore stated, were willful and malicious. As a result of Defendant's reckless and intentional acts, plaintiff and members of their class are entitled to compensatory damages and punitive damages in an amount to be determined at trial.

### 3RD CAUSE OF ACTION AGAINST ALL DEFENDANTS
**(Claims of named plaintiffs and class members against all defendants for racially discriminatory employment practices in violation of 42 U.S.C. §1985 and §1986)**

111.    The allegations in paragraphs 1 through 110 above are incorporated herein as if fully set forth below.

112.    Upon information and belief, Defendants have and continue to conspire with and amongst each other to deny plaintiffs and members of their class the rights, privileges and immunities, and the equal protection of the laws to which they are entitled under the constitution and laws of the United States in violation of 42 U.S.C. Section 1985.

113.    As a direct result of this conspiracy, the defendants injured plaintiffs and deprived them of having and exercising their rights and privileges under the Constitution and laws of the United States.

114.    The actions and omissions of Defendants described herein were willful and malicious and based upon invidious racial and class based animus. The purpose of the aforementioned conspiracy was to violate the civil rights of the plaintiffs and as such, violated 42 U.S.C. Section 1985.

115.    All of the individual defendants, as public officials, had notice of the conspiracy set forth above, in violation of Section 1985 and failed and refused to prevent, prohibit and ameliorate the aforementioned conspiracies notwithstanding their abilities to do so. Said failure and/or refusal to prevent, prohibit and/or ameliorate constituted a violation of 42 U.S.C. § 1986.

116.    The actions of Defendants, in depriving plaintiffs of their constitutional and Civil Rights as hereinbefore stated, were willful and malicious. As a result of Defendants reckless and intentional acts, plaintiffs and members of their class are entitled to compensatory damages and punitive damages in an amount to be determined at trial.

## 4TH CAUSE OF ACTION AGAINST ALL DEFENDANTS
**(Claims of named plaintiffs and class members against all defendants for racially discriminatory employment practices in violation of New York State Human Rights Law, New York Executive Law §290 )**

117.    The allegations in paragraphs 1 through 116 above are incorporated herein as if fully set forth below.

118.    This claim is brought pursuant to the supplemental jurisdiction of the Court, under New York State Human Rights Law, Executive Law §§ 290 et seq.

119.    Executive Law §290 provides in pertinent part that "the opportunity to obtain employment without discrimination because of race or national origin is hereby recognized as and declared to be a civil right". Executive Law § 296 provides in part as follows "it shall be an unlawful discriminatory practice for an employer ….. because of an individual's age, race, creed, color, national origin…. to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

120.    Plaintiffs are members of a protected class as defined by New York Executive Law §296.

121.    The named plaintiffs and members of the prospective class are Hispanic and African-American police officers patrolling in areas where the residents are predominantly minorities as in Latino and African-American.

122.    The illegal quota system maintained by the defendants has a negative effect on the community as it leads to unreasonable and un-warranted arrests, stops, stop and frisks, and summonses.

123.    The illegal quota system implemented by the defendants has a disproportionate and racially discriminatory effect on the minority community because the NYPD targets the minority community to obtain the numbers required by the quota system.

124.    The named plaintiffs and members of the prospective class are unwilling and unable to meet and enforce the illegal quotas on their own minority communities due to its racially discriminatory nature and the fact that it leads to unfair, unreasonable and un-warranted enforcement actions against their own minority community.

125.   The named plaintiffs and all members of the prospective class have been subjected to disparate and racially discriminatory performance evaluations by the defendants as a means of compelling the Latino and African-American plaintiffs to enforce racially discriminatory quotas in the predominantly minority communities targeted by the NYPD.

126.   The named plaintiffs and all members of the prospective class have been subjected to disparate and racially discriminatory performance evaluations by the defendants as a means of compelling the Latino and African-American plaintiffs to enforce racially discriminatory quotas in the predominantly minority communities targeted by the NYPD.

127.   The racially disparate performance evaluations and the racially disparate disciplinary actions to which the plaintiffs have been subjected to constitute unlawful discrimination on the basis of race and national origin in the compensation, terms, conditions or privileges of employment contrary to the New York State Human Rights Law, New York Executive Law §296.

128.   The named plaintiffs and members of the prospective class have suffered damages as a result of such deprivation.

129.   Plaintiffs and members of the class they represent have suffered and will continue to suffer irreparable injury caused by defendant's illegal conduct.

130.   As a direct and proximate result of defendant's unlawful acts, plaintiffs and members of the class they represent have suffered and will continue to suffer loss income, loss of upgrades and promotions, loss of time earned, forced overtime during scheduled time off, loss of earned time off, and loss of other employment benefits and

plaintiffs have suffered and continue to suffer distress, humiliation, great expense, embarrassment and damage to their reputations.

131.    The actions of the defendants in depriving plaintiffs and members of the class they represent of their constitutional and civil rights as hereinbefore stated, were willful and malicious. As a result of defendants reckless and intentional acts, plaintiffs and members of their class are entitled to compensatory and punitive damages in an amount to be determined at trial.


## 5TH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Claims of named plaintiffs and class members against all defendants for racially discriminatory employment practices in violation of New York City Human Rights Laws)

132.    The allegations in paragraphs 1 through 131 above are incorporated herein as if fully set forth below.

133.    Defendants NYPD and the City of New York as employers, pursuant to New York City Human Rights Law, have unlawfully discriminated against plaintiffs and members of the class they represent because of their race and national origin in the terms, conditions, and privileges of employment and have penalized and disciplined and otherwise taken adverse action against Plaintiffs in violation of New York City Local Law 59 of 1986 as amended by Local Rule 39 of 1991, §8-207.

134.    Plaintiffs have served a copy of this complaint upon the New York City Commission of Human Rights and the New York City Corporation Counsel.

135.    Plaintiffs and members of the class they represent have suffered and will continue to suffer irreparable injury caused by defendant's illegal conduct.

136.    As a direct and proximate result of defendant's unlawful acts, plaintiffs and members of the class they represent have suffered and will continue to suffer loss income, loss of upgrades and promotions, loss of time earned, forced overtime during scheduled time off, loss of earned time off, and loss of other employment benefits and plaintiffs have suffered and continue to suffer distress, humiliation, great expense, embarrassment and damage to their reputations.

137.    The actions of the defendants in depriving plaintiffs and members of the class they represent of their constitutional and civil rights as hereinbefore stated, were willful and malicious. As a result of defendant's reckless and intentional acts, plaintiffs and members of their class are entitled to compensatory and punitive damages in an amount to be determined at trial.


## 6TH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Individual claim of Edreweene Raymond, against all defendants for violation of his first amendment rights to free expression)

138.    Defendants have violated the rights of Plaintiff Edreweene Raymond under the First Amendment to the United States Constitution and 42 U.S.C. §1983.

139.    As a result of this violation, plaintiff's Edreween Raymond is entitled to a declaration that his first amendment rights were violated, an injunction ordering the defendants to refrain from further violation, compensatory damages, punitive damages, and an award of attorney's fees.

## 7TH CAUSE OF ACTION AGAINST ALL DEFENDANTS
**(Individual claim of named plaintiff Edreweene Raymond against all defendants for violation of their right to free speech under Article 1, §8 of the New York State Constitution)**

140.   Defendants have violated the rights of plaintiff Edreweene Raymond under Article 1, §8 of the New York State Constitution.

141.   As a result of this violation, plaintiff Edreweene Raymond is entitled to a declaration that his New York Constitutional right to free speech was violated, an injunction ordering the defendants to refrain from further violation, compensatory damages, punitive damages, and an award of attorneys fees.

## 8TH CAUSE OF ACTION AGAINST ALL DEFENDANTS
**(Individual claim of plaintiff Adhyl Polanco against all defendants for violation of his first amendment rights to free expression)**

142.   Defendants have violated the rights of plaintiff Adhyl Polanco under the First Amendment to the United States Constitution and 42 U.S.C. §1983.

143.   As a result of this violation, plaintiff Adhyl Polanco is entitled to a declaration that his first amendment rights were violated, an injunction ordering the defendants to refrain from further violation, compensatory damages, punitive damages, and an award of attorney`s fees.

## 9TH CAUSE OF ACTION AGAINST ALL DEFENDANTS
**(Individual claim of plaintiff Adhyl Polanco against all defendants for violation of his right to free speech under Article 1, §8 of the New York State Constitution)**

144.   Defendants have violated the rights of plaintiff Adhyl Polanco under Article 1, §8 of the New York State Constitution.

145.   As a result of this violation plaintiff Adhyl Polanco is entitled to a declaration that his first New York Constitutional right to free speech was violated, an injunction ordering the defendants to refrain from further violation, compensatory damages, punitive damages, and an award of attorneys fees.

## 10TH CAUSE OF ACTION AGAINST ALL DEFENDANTS
**(Individual claim Pedro Serrano against all defendants for violation of his first amendment rights to free expression)**

146.   Defendants have violated the rights of Plaintiffs Pedro Serrano under the First Amendment to the United States Constitution and 42 U.S.C. §1983.

147.   As a result of this violation plaintiff Pedro Serrano is entitled to a declaration that his first amendment rights were violated, an injunction ordering the defendants to refrain from further violation, compensatory damages, punitive damages, and an award of attorneys fees.

## 11TH CAUSE OF ACTION AGAINST ALL DEFENDANTS
**(Individual claim of plaintiff Pedro Serrano against all defendants for violation of his right to free speech under Article 1, §8 of the New York State Constitution)**

148.   Defendants have violated the rights of plaintiff Pedro Serrano under Article 1, §8 of the New York State Constitution.

149.   As a result of this violation plaintiff Pedro Serrano is entitled to a declaration that his New York Constitutional right to free speech was violated; an injunction ordering the defendants to refrain from further violation compensatory damages; punitive damages; and an award of attorneys fees.

## 12TH CAUSE OF ACTION AGAINST ALL DEFENDANTS
**(Individual claims of plaintiff Derrick Waller against all defendants for violation of his first amendment rights to free expression)**

150.    Defendants have violated the rights of Plaintiff Derrick Waller under the First Amendment to the United States Constitution and 42 U.S.C. §1983.

151.    As a result of this violation, plaintiff Derrick Waller is entitled to a declaration that his first amendment rights were violated; an injunction ordering the defendants to refrain from further violation; compensatory damages; punitive damages; and an award of attorney's fees.

## 13TH CAUSE OF ACTION AGAINST ALL DEFENDANTS
**(Individual claim of plaintiff Derrick Waller against all defendants for violation of his right to free speech under Article 1, §8 of the New York State Constitution)**

152.    Defendants have violated the rights of plaintiff Derrick Waller under Article 1, §8 of the New York State Constitution.

153.    As a result of this violation plaintiff Derrick Waller is entitled to a declaration that their his New York Constitutional right to free speech was violated; an injunction ordering the defendants to refrain from further violation; compensatory damages; punitive damages; and an award of attorneys fees.

## 14TH CAUSE OF ACTION AGAINST ALL DEFENDANTS
**(Individual claim of plaintiff Sandy Gonzalez against all defendants for violation of his first amendment rights to free expression)**

154.    Defendants have violated the rights of plaintiff Sandy Gonzalez under the First Amendment to the United States Constitution and 42 U.S.C. §1983.

155.   As a result of this violation, plaintiff Sandy Gonzalez is entitled to a declaration that his first amendment rights were violated; an injunction ordering the defendants to refrain from further violation; compensatory damages; punitive damages; and an award of attorney's fees.

## 15TH CAUSE OF ACTION AGAINST ALL DEFENDANTS
**(Individual claim of plaintiff Sandy Gonzalez, against all defendants for violation of his right to free speech under Article 1, §8 of the New York State Constitution)**

156.   Defendants have violated the rights of plaintiff Sandy Gonzalez under Article 1, §8 of the New York State Constitution.

157.   As a result of this violation, plaintiff Sandy Gonzalez is entitled to a declaration that his New York Constitutional right to free speec were violated; an injunction ordering the defendants to refrain from further violation; compensatory damages; punitive damages; and an award of attorney's fees.

## 16TH CAUSE OF ACTION AGAINST ALL DEFENDANTS
**(Claims of named plaintiffs and class members for a declaratory judgment)**

158.   The allegations in paragraphs 1 through 157 above are incorporated herein as if fully set forth below.

159.   Plaintiffs and all putative class members are entitled to a declaratory judgment that the NYPD's current performance evaluation system and or productivity standards for police officers is an illegal quota system in violation of New York State's Labor Law § 215-a.

## 17TH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Claims of named plaintiffs and class members for a permanent injunction)

160.    The allegations in paragraphs 1 through 159 above are incorporated herein as if fully set forth below.

161.    Plaintiffs and all putative class members are entitled to a preliminary and permanent injunction, enjoining defendants the City of New York and the NYPD from using the number of arrests and or the number of summonses performed by a police officer as a performance evaluation standard or a productivity standard.

## VICARIOUS LIABILITY

162.    Defendant the City of New York is vicariously liable for the acts, omissions and conduct of its employees and agents, including but not limited to, all named individual defendants herein, performed within the scope of their employment, duties and responsibilities.

WHEREFORE, the named Plaintiffs and other members of the class they seek to represent, pray that the Court will:

1).     Issue an order certifying this action as a class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure in the manner described above herein, with the named Plaintiffs as class representatives;

2).     Issue a class-wide judgment declaring that the NYPD's current performance evaluation system and or productivity standards for police officers is an illegal quota system in violation of New York State's Labor Law § 215-a.

3).     Issue an order permanently enjoining the City of New York and the NYPD from

using the number of arrests and or the number of summonses performed by a police

officer as a performance evaluation standard or productivity standard.

4).     Issue an order permanently enjoining the City of New York and the NYPD from

continuing its racially disparate treatment of Hispanic and African-American police

officers in performance evaluations and disciplinary actions.

5).     Award compensatory damages in the first, second, third, fourth and fifth causes of

action, to the named plaintiffs individually, and their class members, against the

defendants for the unlawful negative employment actions taken against them including

loss of benefits, loss of earned time off, loss of upgrades and promotions, and loss of

overtime.

6).     Issue an order for damages requiring the defendants to reimburse and make

whole, any and all plaintiffs and members of their class for any and all benefits they

would have received had it not been for defendant's illegal actions including, back pay

with interest, benefits and seniority from the time of the Defendant's illegal actions taken

against them.

7).     With respect to the first, second, third, fourth and fifth causes of action, an award

of compensatory damages to the named plaintiff's individually and to their class

members for the pain, suffering, emotional distress, loss of dignity, humiliation and

damages to reputation and livelihood endured by named plaintiffs and members of the

class in amounts that are fair, just and reasonable, to be determined at trial;

8).     Awards of compensatory damages to plaintiffs Raymond, Polanco, Serrano,

Waller and Gonzalez, on the 6th, 7th, 8th, 9th, 10th, 11th, 12th, 13th, 14th, and 15th causes of

action for violations of their rights to free speech pursuant to the First Amendment of the United States and pursuant to the Article 1, §8 of the New York State Constitution.

9).    An award of punitive damages to plaintiffs and members of the class against the defendants, in an amount to be determined at trial.

10).    Award plaintiffs all costs of this action and reasonable attorneys' fees, as provided for in 42 U.S.C. § 1988 and 42 U.S.C. § 1920.

11).    An award to plaintiffs and their class members of such other and further relief as the Court deems appropriate and equitable, including injunctive and declaratory relief as may be required in the interest of justice.

New York, New York
August __31__, 2015

NWOKORO & SCOLA, ESQUIRES

By: _____
Chukwuemeka Nwokoro (CN-1038)
82 Wall Street – Suite 610
New York, New York 10005
(212) 785-1060