UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

EDREWEENE RAYMOND, ADHYL
POLANCO, PEDRO SERRANO, SANDY
GONZALEZ, RITCHIE BAEZ, JULIO
DIAZ, FELICIA WHITELY, ROMAN
GORIS, DERICK WALLER, KAREEM
ABDULLAH, OLAYOKUN OLAGOKE, and
WIDMARC PIERRE, individually and on
behalf of a class of all others similarly
situated,

        Plaintiffs,

   -v-                              No.  15-CV-06885-LTS

THE CITY OF NEW YORK, MAYOR OF
THE CITY OF NEW YORK BILL DE
BLASIO, in his individual and official
capacity, FORMER POLICE
COMMISSIONER WILLIAM J. BRATTON,
in his individual capacity, POLICE
COMMISSIONER JAMES P. O'NEILL, in
his individual and official capacity, NYPD
CHIEF OF DEPARTMENT CARLOS
GOMEZ, in his individual and official
capacity, and BUREAU CHIEF NYPD
COMMANDING OFFICER OF PATROL
SERVICES TERENCE MONAHAN, in his
official capacity,[1]

        Defendants.

-------------------------------------------------------x

---

[1]    The captioned Defendants were named in the Amended Complaint, which has been dismissed.  In the instant motion for leave to file a Proposed Second Amended Complaint that is the subject of this Opinion and Order, Plaintiffs seek to assert claims against the City of New York, Mayor Bill de Blasio, Former Commissioner William J. Bratton, Police Commissioner James P. O'Neill, Inspector and Former Commanding Officer of the 40th Precinct Christopher McCormack, Deputy Inspector and former Commanding Officer of Transit District 32 Constantin Tsachas, First Deputy Commissioner Benjamin Tucker, and Deputy Commissioner, Department Advocate Kevin S. Richardson.

<u>OPINION AND ORDER</u>

APPEARANCES:

NWOKORO & ASSOCIATES, P.C.

By: Chukwuemeka Nwokoro, Esq.

30 Broad Street
Suite 1424
New York, NY 10004

*Attorneys for Plaintiffs*

ZACHARY W. CARTER
CORPORATION COUNSEL OF THE CITY
OF NEW YORK

By:
Kathleen Marie Comfrey, Esq.
Yuval Rubinstein, Esq.

100 Church Street
New York, NY 10007

*Attorneys for Defendants*

LAURA TAYLOR SWAIN, United States District Judge

Plaintiffs Edreweene Raymond ("Raymond"), Adhyl Polanco ("Polanco"), Pedro Serrano ("Serrano"), Sandy Gonzalez ("Gonzalez"), Ritchie Baez ("Baez"), Julio Diaz ("Diaz"), Felicia Whitely ("Whitely"), Roman Goris ("Goris"), Derick Waller ("Waller"), Kareem Abdullah ("Abdullah"), Olayokun Olagoke ("Olagoke"), and Widmarc Pierre ("Pierre") (collectively, "Plaintiffs") brought this civil rights action, individually and on behalf of a putative class of all others similarly situated, pursuant to New York Labor Law § 215-a; 42 U.S.C. §§ 1981, 1983, 1985, and 1986; the New York State Human Rights Law ("NYSHRL"), New York Executive Law §§ 290, 296; the New York City Human Rights Law ("NYCHRL"), New York City Local Law 59 of 1986 as amended by Local Rule 39 of 1991, § 8-207; and New York State Constitution Article 1, § 8, against Defendants the City of New York ("the City"), Mayor of the City of New York Bill de Blasio ("Mayor de Blasio"), Former Police Commissioner William J. Bratton ("Former Commissioner Bratton"), Police Commissioner James P. O'Neill ("Commissioner O'Neill"), NYPD Chief of Department Carlos M. Gomez ("Chief Gomez"), and Bureau Chief NYPD Commanding Officer of Patrol Services Terence Monahan ("Chief Monahan"), (Mayor de Blasio, Former Commissioner Bratton, Commissioner O'Neill, Chief Gomez, and Chief Monahan are, together, referred to herein as the "Individual Defendants") (collectively, "Defendants").  The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

In a 17-count Amended Complaint, Plaintiffs claimed that the NYPD maintains illegal arrest and citation quotas that are focused disproportionately on areas in which minorities reside, that minority officers are pressured to meet the quotas, and that minority officers suffer adverse and retaliatory employment actions when they refuse to enforce or complain about the quotas as discriminatory.  (Docket Entry No. 31.)  On March 6, 2017, this Court issued a

Memorandum Opinion and Order granting Defendants' motion to dismiss the Amended

Complaint (the "Motion to Dismiss Opinion"), and permitting Plaintiffs to move for leave to file

a Second Amended Complaint as to the claims and requests for relief asserted in the Amended

Complaint's Second, Fourth, Fifth, Sixth, Eighth, Tenth, Twelfth, Fourteenth, and Seventeenth

Causes of Action.  (Docket Entry No. 60.)  Those claims were for preliminary and permanent

injunctive relief, and alleged violations of the Civil Rights Act of 1866, 42 U.S.C. § 1981, New

York State and New York City Human Rights Laws, and of the First Amendment to the United

States Constitution and 42 U.S.C. § 1983 based on alleged retaliation.[2]  (Id.)

On April 7, 2017, Plaintiffs moved for leave to file a Second Amended

Complaint, appending their proposed Second Amended Complaint ("Proposed SAC") to their

motion papers.  (Docket Entry No. 64, Docket Entry No. 66-1.)  In the Proposed SAC, Plaintiffs

seek to assert claims against the City, Mayor de Blasio, Former Commissioner Bratton,

Commissioner O'Neill, Inspector and Former Commanding Officer of the 40th Precinct

Christopher McCormack ("Inspector McCormack"), Deputy Inspector and former Commanding

Officer of Transit District 32 Constantin Tsachas ("Deputy Inspector Tsachas"), First Deputy

Commissioner Benjamin Tucker ("First Deputy Commissioner Tucker"), and Deputy

Commissioner, Department Advocate Kevin S. Richardson ("Deputy Commissioner

Richardson," and, collectively with the aforementioned individuals, the "Proposed Individual

Defendants," and collectively with the City, the "Proposed Defendants") for employment

discrimination based on race, pursuant to 42 U.S.C. § 1983 and the New York State and New

---

[2]     The Motion to Dismiss Opinion dismissed with prejudice (1) Plaintiffs' claims based on alleged violations of New York Labor Law § 215-a, (2) claims based on an alleged conspiracy to deny Plaintiffs' rights in violation of 42 U.S.C. §§ 1985, 1986, and (3) New York State Constitution Article 1, § 8 Free Speech Retaliation claims by Plaintiffs Raymond, Polanco, Serrano, Waller, and Gonzalez.  (Id.)

York City Human Rights Laws; and violations of the First Amendment rights of Plaintiffs

Raymond, Polanco, Serrano, Waller, and Gonzalez, pursuant to 42 U.S.C. § 1983, seeking

damages and injunctive and declaratory relief.[3]  (Docket Entry No. 66-1.)

The Court has considered the parties' submissions carefully.  As explained below,

Plaintiffs' motion is granted in part and denied in part.

I.

BACKGROUND

The Court assumes the parties' familiarity with the background of this case as

recited in the Motion to Dismiss Opinion.  See Raymond v. City of New York, No. 15-CV-6885-

LTS-HBP, 2017 WL 892350 (S.D.N.Y. Mar. 6, 2017).  The following summary of Plaintiffs'

allegations is limited to those relevant to the claims asserted in the Proposed SAC.  Plaintiffs'

non-conclusory factual allegations are taken as true for purposes of this motion practice.

Plaintiffs allege that the NYPD maintains a policy that, in violation of a state law

prohibiting quotas for law enforcement activities, directs its employees to perform a mandatory

number of arrests or other police actions over a defined period of time as a performance

standard, effectively establishing quotas, and that the policy "has led to a pattern and practice of

discrimination against officers of Hispanic and African-American heritage on the basis of color,

race and national origin."  (Proposed SAC ¶¶ 3, 19.)  Plaintiffs allege that "failure to meet the

---

[3]     The Proposed SAC specifically recites that Tucker and Richardson are named as
defendants in their official and individual capacities (see Proposed SAC ¶¶ 65, 66) but is
silent as to the capacities in which the other Proposed Individual Defendants are named.
The Court assumes, however, for purposes of this motion practice that Plaintiffs intend to
sue each of the Proposed Individual Defendants in his individual and official capacities.
Chief Gomez, who was named as a Defendant in the Amended Complaint, is not named
as a defendant in the proposed SAC.

illegal quota[s] result[] in adverse employment consequences, including but not limited to negative evaluations, termination or threat of termination, lost compensation, lost overtime, denial of promotions and upgrades, denial of overtime, loss of vacation days earned, loss of accrued time earned, punitive postings and punitive transfers, suspension, investigations, charges, suspensions, formal and informal discipline, assignments to undesirable and/or particularly dangerous tasks, punitive postings and punitive transfers, all leading and contributing to a hostile working environment and racially disparate treatment of the minority police officers." (Id. ¶ 22.) Plaintiffs, who are Latino and African-American police officers currently or formerly employed by the NYPD, sue on behalf of themselves and of a putative class of "approximately 6,000" Black and Latino NYPD officers, "who will have been and will be affected by the imposition of the illegal quota system," pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2). (See id. ¶¶ 213-17.)

Plaintiffs characterize the roles of the Proposed Individual Defendants as follows. In his capacity as mayor, Defendant Mayor de Blasio "routinely met with the Police Commissioner[,] Deputy Police Commissioners[,] and other high[-]ranking members of the NYPD to set policy and make recommendations relating to the polic[i]es, administration, practices, customs[,] and procedure[s] of the NYPD and relating to the disciplinary system and implementation of penalties within the NYPD." (Id. ¶ 60.) In his capacity as Commissioner, Bratton was the "principal administrator" of the NYPD, "responsible for the application of the NYPD's enforcement and administrative polic[i]es[,] including its internal investigatory and disciplinary process." (See id. ¶ 61.) As Chief of Department, O'Neill was "the highest ranking non-civilian . . . uniformed police officer" and "in charge of all NYPD operations answering only to the Police Commissioner and the Mayor." (See id. ¶ 62.) Proposed Defendant Inspector

McCormack was the commanding officer of the NYPD's 40th Precinct from September 27, 2011, to May 2014, at which point the Plaintiffs allege "he was transferred out of the precinct" following media reports "that he was recorded pressuring a police officer to target young [B]lack males." (Id. ¶ 63.) Proposed Defendant Inspector Tsachas was the commanding officer of Transit District 32 from June 2015 to June 2016. (Id. ¶ 64.) Proposed Defendant Tucker is the First Deputy Police Commissioner of the NYPD, and he allegedly "set policy, directed personnel, approved penalties and made recommendations as to all penalties regarding all disciplinary matters within the NYPD," and chaired Steering Committee meetings where "penalties are discussed and recommendations made" regarding disciplinary actions against Black and Latino NYPD officers. (Id. ¶ 65.) Proposed Defendant Tucker also chairs the Special Monitoring Committee, a body within the NYPD that determines whether to place NYPD officers in a Performance Monitoring Program (the "PMP"). (Id.) Proposed Defendant Kevin S. Richardson is a Deputy Commissioner of the NYPD as well as the Commanding Officer of the NYPD's Advocate's office, and he allegedly "routinely met with other defendants to set policy, approve penalties, and make recommendations regarding disciplinary matters," and participates in Steering Committee meetings and the Special Monitoring Committee. (Id. ¶ 66.)

The Proposed SAC generally alleges that the Proposed Individual Defendants knew or should have known of the customs, practices, and policies described in the Proposed SAC, including but not limited to the maintenance of the illegal quota system by the NYPD and its racially discriminatory effect on the minority community and minority officers including the Plaintiffs, and "condoned, ratified and/or authorized" such practices, policies, and conduct. (See id. at ¶¶ 60-66.)

Plaintiffs proffer the following statistical allegations in support of their employment discrimination claims. According to Plaintiffs, as of June 2014, the NYPD had 35,000 members, of whom 51% were White, 26% were Latino, and 16% were Black. (Id. ¶ 245.) Plaintiffs allege that "the vast majority of the NYPD command structure[] are [W]hite males[,]" as 80% of captains and 82% "of the appointed ranks above the rank of Deputy Inspector" are White. (Id.) Plaintiffs also allege that, as of November 2014, Black and Latino police officers comprised 43% of the NYPD's uniform workforce, but held only 17% of appointed positions above the rank of Deputy Inspector. (Id. ¶ 246.)

Plaintiffs allege that "the performance evaluation system to which the [P]laintiffs are subjected by the [Proposed D]efendants is unfair" because, despite being "neutral on its face, . . . minority officers are more likely to be charged, investigated and receive more punishment, than their [W]hite counterparts for the same alleged offenses." (Id. ¶ 26.) In support of that fact, Plaintiffs allege, on information and belief, that unspecified statistics from the Case Analysis and Tracking System ("CATS") for a three-year period spanning 2013 to 2016 "show a substantial disparity between the treatment of [B]lack and [L]atino police officers as opposed to their [W]hite counterparts," and that, over that period, such officers "[we]re more frequently written up for minor disciplinary infractions," for which the imposed penalties "[we]re more severe." (Id. ¶¶ 39, 241.)

Police officers' annual performance ratings, which range between 1.0 and 5.0, play an integral role in promotions and other employment actions, as a high annual performance rating of 4.0 or above is one of the requisite criteria for promotion to the next rank, while a "negative annual evaluation rating," or a score below 3.0, makes the officer "a candidate for placement into the probationary [PMP]". (See id. ¶¶ 27, 29.) Plaintiffs allege that "[]though

Black and Latino Police Officers constitute only 42% of the NYPD uniformed workforce, they make up 70% of all officers in the [PMP] as of December 31, 2016." (Id. ¶ 235.) The PMP comprises three different levels of performance monitoring, each of which has different consequences for the terms of an officer's employment. (See id. ¶ 31.)

Plaintiffs allege on information and belief that, from 2013 through 2015, Black and Latino officers were 50% and 70%, respectively, more likely than White officers to "receive formal charges and specifications," according to CATS data. (Id. ¶ 247.) Plaintiffs further allege on the same basis that Black and Latino officers were "substantially more likely to have been found guilty on departmental charges than [W]hite officers," that such officers, once found guilty, were more likely than White officers to be terminated or placed on probation, and that "in general, disparities in the treatment of Latino and Black officers as compared to [W]hite officers at each stage of the disciplinary process support the inference that race and ethnicity were motivating factors in the decisions." (Id.) Plaintiffs also allege that Blacks and Latinos are 25% overrepresented in "consultations," which are investigations to see if command discipline charges should be brought against an officer, and that such consultations involving Black and Latino officers are 25% more likely to result in charges than consultations involving White officers. (Id. ¶ 248.) Plaintiffs also allege that Black and Latino officers are 4% less likely to be offered a plea than White officers, and that dispositions of charges involving minority officers are harsher: Black and Latino officers are 40% more likely to receive a "guilty at trial" disposition and 84% more likely to receive a "charges filed" disposition, compared to White officers, and that Black and Latino officers are 659% more likely to be terminated, compared to White officers. (Id.)

All Plaintiffs allege that they "suffered negative employment consequences as a result of the failure to meet the illegal quotas" and that they were "racially discriminated against . . . with respect to performance evaluations, the [PMP], and the administration of discipline and punishment." (Id. ¶¶ 46-57.) They also allege that each "has been penalized for reporting and complaining about the illegal quotas and its racially discriminatory application against the minority community." (Id.) The Proposed SAC also proffers factual allegations specific to each named Plaintiff's NYPD experience, the details of which are discussed infra in connection with the question of the sufficiency of each Plaintiff's claims of discriminatory treatment, retaliation for complaints of discrimination, hostile work environment, and retaliation for engaging in activity protected by the First Amendment.

## II.
### DISCUSSION

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend should be freely granted when justice so requires. Fed. R. Civ. P. 15(a). While granting or denying such leave is within the discretion of the district court, Reisner v. General Motors Corp., 511 F. Supp. 1167, 1171 (S.D.N.Y. 1981), leave to amend will generally be granted unless: (1) there is evidence of undue delay, bad faith, dilatory motive, or repeated failures to cure deficiencies by amendments previously allowed; (2) allowing amendment would cause undue prejudice to the opposing party; or (3) the amendment would be futile. Foman v. Davis, 371 U.S. 178, 182 (1962). Defendants oppose Plaintiffs' motion, arguing that the proposed amendment would be futile. A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Ballard v. Parkstone Energy, LLC, No. 06 CV 13099, 2008 WL 4298572, at *3 (S.D.N.Y. Sept. 19, 2008).

Thus, "[l]eave to amend may be denied on grounds of futility if the proposed amendment fails to state a legally cognizable claim or fails to raise triable issues of fact." AEP Energy Servs. Gas Holding Co. v. Bank of America, N.A., 626 F.3d 699, 726 (2d Cir. 2010) (citation omitted).

When considering a Rule 12(b)(6) motion, the Court accepts as true all non-conclusory factual allegations in the complaint and draws all reasonable inferences in the Plaintiff's favor. Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007). To survive such a motion, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court is not, however, required to accept "conclusory statements" made by the plaintiff as true, nor do "legal conclusion[s] couched as [] factual allegation[s]" merit such deference. Twombly, 550 U.S. at 555.

A. Racial Discrimination Claims, asserted pursuant to 42 U.S.C. §§ 1981 and 1983, the NYSHRL, and the NYCHRL (Second, Fourth, and Fifth Causes of Action)

In the Proposed SAC's Second, Fourth, and Fifth Causes of Action, Plaintiffs assert that the Proposed Defendants are liable for inflicting or approving racially discriminatory employment practices that violate 42 U.S.C. §§ 1981, 1983, the NYSHRL, and NYCHRL. (Proposed SAC ¶¶ 222-72.) The Proposed Defendants oppose Plaintiffs' request for leave to file these claims, arguing that neither Plaintiffs' statistical evidence nor their individualized allegations, alone or in combination, are sufficient to support an inference of intentional discriminatory or retaliatory conduct, that insufficient facts are plead to support the requisite inference of personal involvement on the part of the Proposed Individual Defendants, and that

certain claims are time barred.  (See Defendants' Opposition to Plaintiffs' Motion to File a

Second Amended Complaint ("Opp. Br."), Docket Entry No. 72, at 2-18.)

1. Federal Claims

Section 1981 provides, in pertinent part, that "[a]ll persons within the jurisdiction

of the United States shall have the same right in every State and Territory to make and enforce

contracts . . . and to the full and equal benefit of all laws and proceedings for the security of

persons and property as is enjoyed by white citizens . . . ."  42 U.S.C.S. § 1981(a) (LexisNexis

2009).  "[T]he term 'make and enforce contracts' includes the making, performance,

modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms,

and conditions of the contractual relationship."  42 U.S.C.S. § 1981(b) (LexisNexis 2009).

Section 1981's protections apply to employment relationships.  See Patterson v. Cty. of Oneida,

375 F.3d 206, 224-25 (2d Cir. 2004).  However, "[w]hen the defendant is a state actor, Section

1983 is the exclusive remedy for violations of rights guaranteed under Section 1981 . . . [t]hus,

claims against . . . [i]ndividual [d]efendants in their official capacity or against the City, must be

brought under Section 1983."  Bermudez v. City of New York, 783 F. Supp. 2d 560, 576

(S.D.N.Y. 2011) (citing Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 (1989)) (additional

citations omitted).[4]  Accordingly, Plaintiffs' Second Cause of Action is construed as a claim

brought pursuant to Section 1983 to enforce the provisions of Section 1981.

"To establish a claim under [Section] 1981, [] plaintiff[s] must allege facts in

support of the following elements: (1) the plaintiff[s] [are] member[s] of a racial minority; (2) an

---

[4]     Section 1983 authorizes civil actions against individual state actors for relief from a
        "deprivation of any rights, privileges, or immunities secured by the Constitution." 42
        U.S.C.S. § 1983 (LexisNexis 2013).  Municipal entities may be held liable under Section
        1983 where violations are the product of municipal policies or customs.  Littlejohn v.
        City of New York, 795 F.3d 297, 314 (2d Cir. 2015) (quoting Patterson, 375 F.3d at 226)

intent to discriminate on the basis of race by the defendant[s]; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993) (citations omitted). "Although 'an employment discrimination plaintiff need not plead a prima facie case of discrimination' in order to survive a motion to dismiss," a plaintiff "must allege sufficient facts showing that she is entitled to relief." Bermudez, 783 F. Supp. 2d at 575 (quoting Swierkiewicz v. Sorema N. A., 534 U.S. 506, 515 (2002)).

"To state a discrimination claim under the Fourteenth Amendment Equal Protection Clause [of the Constitution of the United States] and/or § 1981, [P]laintiffs must sufficiently allege that [the Proposed D]efendants acted with discriminatory intent." Burgis v. N.Y.C. Dep't of Sanitation, 798 F.3d 63, 68 (2d Cir. 2015) (citing Gen. Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 391 (1982)). "Purposeful discrimination requires more than intent as volition or intent as awareness of consequences; it involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group." Iqbal, 556 U.S. at 663 (internal quotation marks, brackets, and citation omitted). To withstand "a motion to dismiss, the plaintiff[s] must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent." Yusuf v. Vassar Coll., 35 F.3d 709, 713 (2d Cir. 1994) (citation omitted); see also Andrews v. Fremantlemedia, N.A., Inc., 613 Fed. App'x 67, 69 (2d Cir. 2015).

---

(citing Jett, 491 U.S. at 733–36 (§ 1981) and citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692–94 (1978) (§ 1983)).

Plaintiffs allege that "[t]he NYPD's disciplinary system intentionally discriminates against Black and Latino police officers, and in favor of [W]hite police officers," through "three main interwoven ways[:] by racially unfair use of minor violations, command disciplines, and charges and specifications[;] by racially unfair use of annual and interim performance evaluations[;] and by racially disparate placement in the [PMP.]"  (Proposed SAC ¶ 222.)  Because a showing of intentional discrimination is fundamental to the statement of a racial or ethnic origin discrimination claim under Sections 1981 and 1983, the Court assumes that Plaintiffs use the term "unfair" in the Proposed SAC as a synonym for intentional discrimination.

      a.    <u>Statistical Evidence of Discriminatory Conduct</u>

"[T]o show discriminatory intent in a [Section] 1981 or Equal Protection case based on statistics alone, the statistics must not only be statistically significant in the mathematical sense, but they must also be of a level that makes other plausible non-discriminatory explanations very unlikely."  <u>Burgis</u>, 798 F.3d at 69 (citation omitted).  Thus, in <u>Burgis</u>, where the Plaintiffs alleged widespread race- and/or national origin-based discrimination in New York City Sanitation Department promotional decisions, the Second Circuit upheld the dismissal of the complaint because the plaintiffs' statistics lacked specificity, as they "show[ed] only the raw percentages of White, Black, and Hispanic individuals at each employment level, without providing any detail as to the number of individuals at each level, the qualifications of individuals in the applicant pool and of those hired for each position, or the number of openings at each level."  <u>See</u> <u>id.</u>

Here, the named Plaintiffs acknowledge that they did not make the alleged quotas and allege that they were disciplined more harshly, or subjected to more lenient quotas, than White NYPD officers.  The statistics that they proffer do not, however, provide any basis for

evaluation of the circumstances or charges on which disciplinary decisions were based.  They merely break down generic categories of discipline and consequences on racial lines, and in a similar fashion present such disparities in the proportion of officers of each group who are in the NYPD's workforce as a whole, and in its leadership, and do not constitute a factual proffer sufficient to push Plaintiffs' claim over the line from possible to plausible.  Cf. Iqbal, 556 U.S. at 678 ("[t]he plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully").  The allegations going to similarity of underlying offenses are plead in a conclusory fashion, on information and belief, with only a generalized reference to CATS statistics that are not presented in the Proposed SAC.  Such conclusory allegations and statistics are insufficient to support plausibly the key intentional conduct element of Plaintiffs' federal discriminatory treatment claim.  See Iqbal, 556 U.S. at 662 (quoting Twombly, 550 U.S. at 555) ("Although for the purposes of a motion to dismiss [a court] must take all of the factual allegations in the complaint as true, [a court is] 'not bound to accept as true a legal conclusion couched as a factual allegation'").  The Court notes further that the alleged experiences of the named Plaintiffs, who do not appear to have been brought up on formal charges or found guilty and subjected to termination or other harsh sanctions, are not supportive of a statistical inference that Black and Latino officers are deliberately targeted for the harshest charges and discipline. Cf. Burgis, 798 F.3d at 70 (concluding that "the fact that each of the plaintiffs ha[d] been promoted at some point to the position of supervisor undermine[d] their allegations of discrimination in the promotion of sanitation workers to supervisors").

Plaintiffs have "fail[ed] to allege statistics" that are "not only . . . statistically significant in the mathematical sense" but are "also . . . of a level that makes other plausible non-discriminatory explanations very unlikely."  See id. at 69.  Their figures lack specificity, "show

only the raw percentages of [minority and White] individuals" in the PMP and otherwise encountering the disciplinary system, and do not "provide any detail as to the" ways in which the minority officers were comparable to the White officers, such as whether the minority and White officers in the PMP or facing formal charges and specifications have similar roles, qualifications, or personnel records.  See Burgis, 798 F.3d at 69-70.  Without such facts, the statistics as alleged do not "make other plausible non-discriminatory explanations" for disparities between minority and White NYPD officers very unlikely.  See id.  Plaintiffs' statistical proffers are thus insufficient to support the inference of systemic intentional racial or ethnic discrimination in charging Black and Latino NYPD officers with discipline that is a key foundation stone of Plaintiffs' class-wide disparate treatment and hostile work environment claims.  For substantially the same reasons, they are insufficient to allege plausibly that any discipline or hostile work environment imposed on Black and Latino officers was the product of intentional discrimination carried out pursuant to official policies of the City.

      b.  <u>Allegations of Discrimination Against Plaintiffs</u>

      The Court now turns to the particularized evidence proffered in the Proposed SAC regarding the experiences of the named Plaintiffs.

*Individual Plaintiffs' Discrimination Claims*

      i.  <u>Raymond</u>

      Raymond alleges that he was warned repeatedly about his enforcement activity numbers, and that he was at risk of being placed in the PMP and losing the opportunity to get promoted.  (<u>See</u> Proposed SAC ¶¶ 68-69, 72, 78, 80.)  He also alleges that he was given negative or subpar performance ratings, disciplinary notices and punishments, and lost an endorsement for promotion; Raymond characterizes these incidents as "acts of intentional racial discrimination"

committed by the Proposed Defendants, including Proposed Individual Defendant Tsachas.  (See id. ¶¶ 81, 85, 89, 94.)  He alleges that Tsachas "punished minority officers more severely and more often than the [W]hite officers in his command for failure to meet the quota and any other disciplinary issue," specifically alleging that Raymond was disciplined for the untimely submission of a vacation request while two White officers were not disciplined for the same offense, and that he was disciplined for failure to meet the enforcement activity quota while a White officer with the same or a lower level of quota compliance was not punished in any way. (Id. ¶¶ 64, 88, 90.).  Raymond also pleads that, on December 10, 2015, his promotion to Sergeant was canceled by a deputy commissioner who then endorsed the promotion of a White police officer, following a Review Board session that was called "to discuss Raymond's lack of enforcement activity and anticipated promotion to Sergeant."  (Id. ¶¶ 93-94.)  Plaintiffs characterize the cancellation of the promotion as an "act of intentional racial discrimination," asserting that the promoted White officer was "comparable to Raymond in that he was also called before the [R]eview [B]oard."  (See id. ¶ 94.)  Raymond, however, fails to plead facts to support the inference that he was indeed "comparable" to the promoted White officer in relevant respects, such as whether the two officers had similar backgrounds, experiences, law enforcement activity statistics or performance ratings.  Appearing before the Review Board on the same day does not by itself support an inference that Raymond and the White officer were "comparable."

Raymond's allegations as to discipline for the denied vacation request and failure to discipline a White officer for failing to meet quotas at the same or a higher level of non-compliance are, however, just sufficient to frame claims for intentional discriminatory treatment. Plaintiff has identified alleged comparators and specified the conduct on which the alleged

disparate treatment was based.  While his allegations as to comparable status are relatively

conclusory, the proffer of information as to similar relevant violations and consequences (or lack

thereof) and the names of the White officers is sufficient in the context of the Proposed SAC to

state disparate treatment causes of action against Proposed Individual Defendant Tsachas with

respect to punishment for the late leave request and for failure to meet enforcement activity

quotas.  Raymond has failed, however, to allege the involvement of any of the other Proposed

Individual Defendants in these measures and to show that any such measures were imposed

pursuant to official policies of the City, so he will only be permitted to amend the complaint to

assert these claims as against Proposed Individual Defendant Tsachas.

Plaintiffs thus fail to plead that the Proposed Defendants as a group acted with

discriminatory intent as to Raymond.  Plaintiffs will, however, be permitted to plead Raymond's

individual discrimination claims against Tsachas based on the discipline for the late vacation

request and discipline for failure to meet enforcement quotas.

ii.    Gonzalez and Baez

Gonzalez' and Baez' claims of racially discriminatory actions taken against each

of them are similar.  Gonzalez claims that he was repeatedly chastised and punished for failing to

meet enforcement activity standards, and that it was "racially discriminatory" for Gonzalez to

receive a negative performance rating when "[W]hite police officers in the same command, unit,

squad, and shift as [Gonzalez], with equal or lower enforcement activity numbers, received

annual performance evaluation ratings" higher than his own negative rating.  (See Proposed SAC

¶ 108.)  Gonzalez alleges that the enforcement metrics were brought up in discussions of his

performance rating and names White officers who were allegedly in the same command and shift

who had at least equally low metrics and were not given ratings as low as Gonzalez'.  (Id. ¶¶

108-09.)  He alleges that the rating was imposed by a Lt. Hatki and upheld by Proposed

Individual Defendant McCormack.  (Id. ¶ 109.)

Plaintiffs allege generally that in the 40th Precinct, to which both Gonzalez and

Baez were assigned, all officers were subject to the same enforcement activity standards but that

White officers did not receive the same punishments as Black and Latino officers.  (Id. ¶ 133.)

They allege that it was "racially discriminatory" for Baez to receive a negative performance

rating in 2013 from Proposed Individual Defendant McCormack, "because in that year, [his]

actual performance as a police officer merited a score of at least 4.0," because Baez performed

"excellent police work" in 2013.  (See id. ¶¶ 135, 137.)  While Baez's subjective self-evaluation

of the quality of his police work is insufficient to raise an inference of discrimination, he also

alleges that "comparatively placed [W]hite police officers in the same unit, with similar activity

numbers for the same period[] . . . did not get the same punishment," and received higher annual

performance evaluation scores.  (Id. ¶ 136.)  On March 31, 2014, Baez was placed in the PMP

for a negative performance rating by Proposed Individual Defendant McCormack, which

Plaintiffs assert was "racially discriminatory" because McCormack specifically told Baez that his

negative rating was based on writing an insufficient number of Criminal Court summonses, and

because named White police officers "whose performance was at the same level or worse than

Baez were not placed" in the PMP.  (Id. ¶¶ 139-41.)

Plaintiffs have proffered sufficient facts to state claims against Proposed

Individual Defendant McCormack for discriminatory treatment as to low performance ratings

and PMP designations based on failure to meet enforcement performance metrics.  They have

not, however, alleged facts showing that any of the other Proposed Individual Defendants were

personally involved or that McCormack's conduct was undertaken pursuant to a City policy.

Baez' and Gonzalez' rating and PMP claims can therefore be pursued only as against McCormack in his individual capacity.

      iii.   <u>Serrano</u>

Serrano also fails to plead facts sufficient to support a general inference of discriminatory intent. He claims that he "experienced first[]hand the negative effect of the quotas imposed by his supervisors on the minority community [that] he patrolled in the South Bronx," when he "received a negative performance evaluation" due to "his failure to meet the quota" imposed by his supervisors. (<u>See</u> <u>id.</u> ¶¶ 148-49.) He alleges that he told a supervisor that the precinct's residents "are predominantly low[-]income and that he did not feel right" giving them summonses, and that his supervisor allegedly, on an unspecified date, "referred to the residents as 'animals,'" and Serrano "was deeply offended." (<u>See</u> <u>id.</u>)

To "determin[e] whether a comment evidences an intent to discriminate or whether it is a non-probative 'stray remark,' courts consider four factors: (1) who made the remark (<u>i.e.</u>[,] a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark; and (4) the context in which the remark was made (<u>i.e.</u>[,] whether it was related to the decision-making process)." <u>LaSalle v. City of N.Y.</u>, No. 13-CV-5109-PAC, 2015 WL 1442376, at *5 (S.D.N.Y. Mar. 30, 2015) (internal quotation marks, ellipses, and citation omitted). Serrano's allegation that his supervisor referred to residents of the 40th Precinct as "animals" constitutes such a "stray remark," and does not support an inference of discriminatory intent. (<u>See</u> Proposed SAC ¶¶ 148-49.) Plaintiffs allege that the remark was made in response to Serrano's expressing discomfort with giving low-income residents "spurious summons [<u>sic</u>]." (<u>See</u> <u>id.</u>) The comment was not made in relation to "the [employment] decision-making process" or the decision to give him a

negative performance evaluation, nor does its content suggest race or ethnicity-based animus against Serrano.  See LaSalle, 2015 WL 1442376, at *5.  Plaintiffs' allegation thus constitutes "a non-probative 'stray remark.'"  See id.

Serrano also alleges that "[i]t was unfair and racially discriminatory" for his supervisor to give him a 3.0 performance evaluation score for 2012, because certain of his metrics were comparable to his performance in earlier years and he received higher grades in those years, and that a basis for an inference of intent is present because "three [W]hite police officers who had the same as, similar to, or worse enforcement activity numbers" received higher evaluation scores.  (Proposed SAC ¶¶ 159-60.)  Although Plaintiffs do not plead how Serrano's enforcement metrics in 2012 and earlier years correlated to relevant benchmarks, Plaintiffs proffer that, when Serrano appealed the rating, Proposed Individual Defendant McCormack specifically stated that Serrano "did not stop enough black people."  (Id. ¶ 161.)  These facts, taken together and in the light most favorable to Serrano, are sufficient to support an inference of intentional discriminatory conduct by Proposed Individual Defendant McCormack in connection with the negative performance rating.

Plaintiffs' motion is therefore granted to the extent that they may plead a discriminatory treatment claim against Proposed Individual Defendant McCormack based on the negative 2012 performance rating given to Serrano.

iv.    Abdullah

Abdullah alleges that "[i]t was an act of racial discrimination" that he was kept in the PMP for 2012-14, "despite . . . consistent[] good performances" and his passing-grade annual performance evaluation ratings from 2012-14, "because typically a passing grade of 3.0 or above[] on an annual performance evaluation is enough to secure a police officer[']s removal

from the [PMP] if the officer was placed on the program for negative performance, as Abdullah was" and because "comparable [W]hite police officers who were placed on the program for similar reasons" to Abdullah were removed "after just one year of good performance." (See id. ¶¶ 192-94.)

Abdullah's conclusory allegations do not support an inference of discriminatory intent. The Proposed SAC alleges that he did not comply with quota requirements in a prior posting from at least 2007, and was put on performance monitoring for that reason from 2009. There is no allegation of compliance with metrics until 2012. (See id. ¶¶ 189-91.) He does not allege how the White police officers were "comparable" to him, such as whether they were originally placed in the PMP for similar reasons as he was, how long it took them to meet standards or how their performance measured up in the year they were removed from the PMP compared to Abdullah's.

Plaintiffs thus fail to allege facts sufficient to support the requisite inference of intentional discrimination as to Abdullah, and their request for leave to amend is denied as to Plaintiff Abdullah.

v.    Olagoke

Olagoke is "a minority [B]lack officer in a mostly [W]hite squad" and alleges that he was "disproportionately punished for not meeting the [imposed] quota while [W]hite police officers, who also failed to meet the quota, received less or no punishment." (Id. ¶ 195.) Although he alleges that he has long opposed the alleged quota requirement because he believes it is unfair, the only specific quota-related "problems with the [D]efendants" that he identifies in his complaint are attributed to his failure to meet the quotas in June 2011 when he deliberately refrained from making arrests in order to let his partner, who was getting married, write all of the

arrests and summonses for that month.  (Id. ¶¶ 198-99.)  His supervisor did not accept the

explanation and transferred Olagoke to another assignment in which he did not have

opportunities to make arrests, ensuring that his numbers would stay low.  (Id. ¶¶ 200-01.)  On the

basis of the poor numbers for June and July of 2011, he was taken off paid details, which

reduced his income significantly.  (Id. ¶¶ 201-03.)  He further alleges that his 2012 annual

performance evaluation score of 3.0, rendered in January 2013, "was racially discriminatory

because based on his performance, Olagoke deserved a score of at least[] 4.0[] but received a

lower score from his supervisors because he is [B]lack," and that White officers in his squad,

"who [had] lower enforcement activity numbers than Olagoke and who generally did not do as

much work as [he did]" received higher performance ratings "and were never kicked off paid

detail," as Olagoke alleges he was.  (Id. ¶¶ 205-07.)

       Plaintiffs' conclusory pleading that Olagoke received a lower performance score

than he deserved "because he is [B]lack," in the context of factual allegations indicating that he

had been punished for choosing to forgo arrests in order to benefit his partner, is insufficient to

support an inference of discriminatory intent.  Although he pleads that his White colleagues

faced different employment actions, the alleged disparity is insufficient to support the inference

because he does not proffer facts showing that they were similarly situated in ways other than

their raw enforcement numbers, such as their reasons for noncompliance.  The assertion that he

is Black and they are White "is simply insufficient as a factual pleading to allege racially

motivated discrimination for purposes of a plausible section 1981 claim."  See, e.g., Johnson v.

City of New York, 669 F. Supp. 2d 444, 450 (S.D.N.Y. 2009).

Plaintiffs thus fail to allege facts sufficient to support an inference of intentional discriminatory conduct, and their motion will be denied with respect to Plaintiff Olagoke.

vi.      Goris, Diaz, Waller, Whitely, and Pierre

The Proposed SAC expressly attributes allegedly discriminatory punishment of these Plaintiffs to their failure or refusal to comply with the alleged quota requirements.  Because Plaintiffs have not plausibly framed their claim that the quotas and enforcement thereof are intentionally discriminatory against Black and Latino officers, these Plaintiffs fail to state viable claims for discriminatory treatment.

vii.      Conclusion – Federal Discriminatory Treatment Claims

For the foregoing reasons, Plaintiffs' motion for leave to file a Second Amended Complaint asserting federal discriminatory treatment claims is denied, except as to the following proposed claims:  Raymond's claims relating to his punishment for submitting a late vacation request and for failing to meet quotas, as against Proposed Individual Defendant Tsachas only; Gonzalez' and Baez' claims relating to negative performance evaluations and placement on PMP, as against Proposed Individual Defendant McCormack only; and Serrano's claim relating to his negative 2012 performance rating, as against Proposed Individual Defendant McCormack only.

c.      Hostile Work Environment Claim

Plaintiffs allege that "the imposition of illegal quotas has led to a practice and pattern of discrimination against officers of Hispanic and African-American heritage on the basis of color, race, and national origin by . . . maintaining and allowing a hostile work environment," experienced by Plaintiffs and the prospective class members.  (See Proposed SAC ¶¶ 19, 22, 24.).  The Court treats this claim as one brought pursuant to Section 1983 of Title 42 to enforce

Section 1981 of that Title.  The Proposed Defendants assert that the hostile work environment claim should be dismissed because only four of the Plaintiffs complain of a hostile work environment and none of them pleads allegations sufficient to satisfy the necessary elements of a hostile work environment or allege plausibly that the City has a policy or practice of maintaining such a hostile work environment.  (Opp. Br., at 12-13.)

"To establish a hostile work environment under [Section] 1981, or [Section] 1983, a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[,] and "[t]he incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Littlejohn, 795 F.3d at 320-21 (quotation marks and citations omitted).  To "determin[e] whether [] plaintiff[s] suffered a hostile work environment," a court "consider[s] the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 321 (quotation marks and citation omitted).

Plaintiffs' hostile work environment claims fail for the principal reason that, as explained above in connection with their discriminatory treatment claims, they have not plead plausibly that punishment for failure to meet the alleged quotas is motivated by racial or ethnic animus toward officers.  Furthermore, once the quota-based consequences are eliminated from the analysis, it is clear that Plaintiffs have not alleged facts demonstrating severe or pervasive discriminatory conduct.

For these reasons, the Proposed SAC fails to state any hostile work environment claim.

d.    Retaliation for Discrimination Complaints

Plaintiffs allege that Gonzalez was placed in the PMP in retaliation for filing complaints with the NYPD's Internal Affairs Bureau (the "IAB") and the Equal Employment Opportunity Commission (the "EEOC") that, among other things, detailed "racial discrimination against minorities by virtue of a hostile work environment" and "intensified retaliation that he was experiencing," and that Serrano experienced "a series of retaliatory action[s]" following his filing of a complaint with the EEOC, which was referred to the NYPD's Office of Equal Employment Opportunity (the "OEEO").  (See Proposed SAC ¶¶ 110-15, 120-30, 153-58.) Defendants assert that Plaintiffs fail to state a claim upon which relief can be granted, arguing that retaliation covered by Title VII is not actionable under Sections 1981 and 1983, Plaintiffs fail to assert the requisite causation, and that the complaints were not made in sufficient temporal proximity to the alleged retaliatory actions.  (See Opp. Br. at 13-15.)  Plaintiffs assert that Gonzalez and Serrano's retaliation claims are brought pursuant to the Equal Protection Clause and the Due Process Clause, rather than pursuant to Title VII.  (See Reply Memorandum of Law in Support of Plaintiff[s'] Motion for Leave to File a Second Amended Complaint ("Pl. Reply Br."), Docket Entry No. 73, at 8-10.)

Defendant's Title VII preclusion argument fails because "retaliation claims alleging an adverse action because of a complaint of discrimination are actionable under § 1983."  Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 80 (2d Cir. 2015).  "[F]or a retaliation claim under § 1983 to survive a . . . motion to dismiss, [a] plaintiff must plausibly allege that: (1) defendants acted under the color of state law, (2) defendants took [an] adverse

employment action against him, (3) because he complained of or otherwise opposed discrimination." Id. at 91. As "the elements of a retaliation claim based on an equal protection violation under § 1983 mirror those under Title VII[,]" an "adverse employment action [in a retaliation claim based on the Equal Protection Clause] is any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination[,] . . . [and] covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII." Id. at 90-91 (quotation marks and citation omitted). "Unlike Title VII discrimination claims, however, for an adverse retaliatory action to be 'because' a plaintiff made a charge, the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action[,]" or "that the adverse action would not have occurred in the absence of the retaliatory motive." Id. at 90 (quotation marks and citations omitted).

      "A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." Id. (citation omitted). Though "the Second Circuit Court of Appeals has declined to draw 'a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action,'" courts in this Circuit have inferred a causal relationship when three or fewer months have elapsed. See Lewis v. Roosevelt Island Operating Corp., 246 F. Supp. 3d 979, 991 (S.D.N.Y. 2017) (quoting Littlejohn, 795 F.4d at 319); see also Day v. City of New York, 2015 WL 10530081, at *13 (S.D.N.Y. Nov. 30, 2015) (citing Vega, 801 F.3d at 92) ("[T]he Second Circuit has held that an adverse action that occurs within two months or less of a protected activity . . . is sufficient to survive a motion to dismiss on the issue of causation."). Courts in the Second Circuit "have found a causal connection where there were even longer gaps [between the protected activity and

the adverse employment action] but it was plausible that there was no earlier opportunity to retaliate." EEOC v. Day & Zimmerman NPS, Inc., No. 15-CV-01416-VAB, 2016 WL 1449543, at *4 (D. Conn. Apr. 12, 2016) (internal quotation marks and citation omitted) (finding that the EEOC plausibly alleged retaliatory conduct under the Vega framework in a disability discrimination suit). The Court now turns to the retaliation allegations in the Proposed SAC.

       i.    Gonzalez

Gonzalez alleges that he made two principal complaints about alleged discrimination: written complaints to the IAB and the EEOC on February 6, 2014, detailing alleged violations by Proposed Individual Defendant McCormack and other supervisors in the 40th Precinct, including racial discrimination against minorities by virtue of a hostile work environment," and a September 7, 2015, complaint to the IAB and the OEEO "complaining about the intensified retaliation that he was experiencing." (Proposed SAC ¶¶ 110, 127.) Gonzalez alleges that the Proposed Defendants, including Proposed Individual Defendant McCormack, subsequently took numerous adverse employment actions against him, including placing him in the PMP in April 2014, denying an application for a transfer in December 2014, decreasing Gonzalez's assignments in July 2015, issuing him a minor violation and command disciplines ("CDs") in August 2015, denying a line of duty designation for a cardiac injury in August 2015, issuing a CD for allegedly recording a sergeant in October 2015 and finding him guilty of recording that sergeant in November 2015, and issuing him two minor violations in November 2015. (See id. ¶¶ 114-30.)

Gonzalez sufficiently pleads that the Proposed Defendants were acting under the color of state law in taking these actions, and these allegations meet the pleading standard for retaliatory "adverse employment action" under Section 1983. See Vega, 801 F.3d at 91.

Gonzalez, however, fails to plead facts plausibly supporting an inference that these actions were taken "<u>because</u> he complained of or otherwise opposed discrimination," <u>i.e.</u>, that these actions "would not have occurred in the absence of the retaliatory motive." <u>See</u> <u>id.</u> (citing <u>Univ. of Texas Sw. Med. Ctr. v. Nassar</u>, 570 U.S. 338, 361-63 (2013), which held that the common law but-for causation standard applies to claims, such as ones for retaliation, that are not covered by the statutory mixed-motive standard added to Title VII by the Civil Rights Act of 1991).

Gonzalez alleges that he was told at various points after June 2013 that he "needed to bring up his enforcement numbers;" advised on December 30, 2013, that he "was underperforming for the entire year of 2013;" had been punished on January 5, 2014, "for his low enforcement activity numbers;" and informed in January 2014 that his annual performance evaluation rating for 2013 was 2.5, a "negative evaluation rating [that] put [him] at the risk of being placed" in the PMP. (<u>See</u> Proposed SAC ¶¶ 99, 101-02, 107.) Gonzalez was clearly on notice of ongoing performance-related issues before he filed his first complaints in February 2014. Though his placement in the PMP in April 2014 "followed closely in time" the February 2014 complaint filings, Gonzalez was warned during his performance review in January 2014, before the February 2014 filings, that he was at risk of PMP placement, and thus Gonzalez has failed to "plausibly allege that the retaliation was a 'but-for' cause of" his placement in the PMP. <u>See</u> <u>Vega</u>, 801 F.3d at 90-91. The subsequent alleged incidents of retaliation occurred beginning in December 2014 (<u>see</u> Proposed SAC ¶¶ 115-26), over ten months after the filing of the complaints, a length of time which "does not allow for an inference of causation." <u>See</u> <u>Johnson v. NYS Office of Alcoholism & Substance Abuse Servs.</u>, 16-cv-09769-RJS, 2018 U.S. Dist. LEXIS 41986, at *13 (S.D.N.Y. March 13, 2018) (concluding that a period of "more than nine months" between the lodging of complaints and the commencement of adverse employment

actions is "a temporal gap that is too remote, by itself, to raise an inference of but-for causation").

Gonzalez alleges that he "complain[ed] about the intensified retaliation that he was experiencing" on September 7, 2015, to the IAB and OEEO, that he was issued a CD on October 10, 2015, "for allegedly recording" a sergeant on August 22, 2015, and that he was found guilty of doing so on November 25, 2015, after not being provided the opportunity to defend himself, nor an "adjudication or investigation." (Proposed SAC ¶¶ 122, 127-29.) He also alleges that he was "unfairly issued" two minor violations for having a cap device that did not match his shield and for having a defective holster. (Id. ¶ 130.) These allegedly retaliatory incidents occurred within close temporal proximity to Gonzalez's September 7, 2015, filing of a complaint, which constitutes protected activity. Plaintiffs have sufficiently plead facts in support of an inference of a "retaliatory purpose," as the allegedly retaliatory incidents "followed closely in time" these adverse employment actions. See Vega, 801 F.3d at 90-91.

Plaintiffs' motion is therefore granted to the extent they may plead that Gonzalez experienced retaliation for filing a complaint of racial discrimination and allegedly "intensified retaliation" following his September 7, 2015, complaint to the IAB and OEEO, against Proposed Individual Defendant McCormack only.

ii. Serrano

Serrano filed a written complaint with the EEOC, which was then referred to the OEEO, on June 1, 2012, stating that Proposed Individual Defendant McCormack and a captain were discriminating against him as a Latino by forcing him to work in a racially hostile environment. (Proposed SAC ¶ 153.) Serrano alleges that McCormack and the captain learned of Serrano's complaints over eight months later, on February 7, 2013, and thereafter

"commenced a series of retaliatory action[s] against" Serrano, including removing him from his usual patrol assignment and reassigning him to a solitary fixed foot post, where he was inspected by five different supervisors that night, which is allegedly "an indication that the object of the post [was] punishment" and allegedly was "intended to convey a threat to Serrano that he would be under increased scrutiny and would be punished for minor or pretextual infractions;" "sending him outside the precinct on details;" ransacking his locker and pasting stickers of rats, in reference to his complaint, on the locker; and denying him leave despite his alleged requesting of days off in the usual manner; and the receipt of a 3.0 out of 5.0 performance evaluation for the 2012 annual period. (Id. ¶¶ 154-58.)

The Proposed Defendants assert that, although the "protected activity is covered under Title VII," the allegedly adverse actions were too remote in time from the protected activity and thus Serrano fails to state a retaliation claim upon which relief may be granted. (See Opp. Br. at 14-15.) Plaintiffs argue that Serrano's claim was not too remote in time because the allegedly adverse employment actions occurred only after McCormack and the captain learned of Serrano's complaint, which had been filed over eight months earlier. (Pl. Reply Br. at 10.)

Plaintiffs have plausibly alleged facts to support an inference that the changes to Serrano's assignment, ransacking of his locker, and denial of timely requests to take leave were "adverse actions" taken in retaliation for Serrano's filing of a complaint with the EEOC and OEEO on June 1, 2012, which was a protected activity. See Vega, 801 F.3d at 90-91. As Plaintiffs plausibly plead that McCormack and the captain only learned of the complaint on February 7, 2013, and began to take retaliatory actions shortly thereafter, it is "plausible that there was no earlier opportunity to retaliate." See Day & Zimmerman NPS, Inc., 2016 WL 1449543, at *4. Plaintiff has thus plausibly plead that a "retaliatory purpose can be shown

indirectly by timing" here, as the "protected activity [was] followed closely in time by adverse employment action[s]." See Vega, 801 F.3d at 90.

Plaintiffs' motion for leave to file a further amended complaint for Section 1983 racial discrimination retaliation is therefore granted as to Serrano's retaliation claims, against Proposed Individual Defendant McCormack only.

2. State and City Law Claims
   (Fourth and Fifth Causes of Action and Vicarious Liability Claim)

Plaintiffs assert claims under the New York State and New York City Human Rights laws that parallel their Section 1981 and 1983 racial discrimination claims, and also bring a vicarious liability claim, asserting that "the City of New York is vicariously liable for the acts, omissions and conduct of its employees and agents." (Proposed SAC ¶¶ 256-72, 290.)

Pursuant to 28 U.S.C. § 1367(a), a district court has "supplemental jurisdiction over . . . claims that are so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C.S. § 1367(a) (LexisNexis 2012). "Although federal courts may exercise jurisdiction over related state-law claims where an independent basis of subject-matter jurisdiction exists . . . such a court may, for various reasons, nonetheless 'decline to exercise supplemental jurisdiction over a claim[.]'" Oneida Indian Nation v. Madison Cty., 665 F.3d 408, 436-37 (2d Cir. 2011) (quoting 28 U.S.C. § 1367(c)). One reason a court may "decline to exercise supplemental jurisdiction over a claim" is that the state and local "claim[s] substantially predominate[] over the claim or claims over which the district court has original jurisdiction." 28 U.S.C.S. § 1367(c)(2) (LexisNexis 2012).

As explained above in connection with the Second Cause of Action, Plaintiffs have failed to state viable federal discrimination, hostile work environment and retaliation claims

except as to (1) Raymond's federal discrimination claims relating to his punishment for submitting a late vacation request and for failing to meet quotas, as against Proposed Individual Defendant Tsachas only; (2) Gonzalez' and Baez' federal discrimination claims relating to negative performance evaluations and placement on PMP, as against Proposed Individual Defendant McCormack only; (3) Serrano's federal discrimination claim relating to his negative 2012 performance rating, as against Proposed Individual Defendant McCormack only; and (4) Gonzalez' and Serrano's discrimination-related retaliation claims, against Proposed Individual Defendant McCormack only. As to all other such claims asserted under both federal and state law, the state law claims are the only ones that remain, and thus substantially predominate. Consideration of the remaining state and local law claims would involve proof and disputes and analysis of facts that are not implicated by the few remaining federal employment law claims.

Plaintiffs' motion for leave to file a further amended complaint asserting claims for racial discrimination under NYSHRL and the NYCHRL is therefore granted only to the extent such claims parallel the aforementioned surviving federal claims and is denied as to all other NYSHRL and NYCHRL claims without prejudice to litigation of such claims in another forum of competent jurisdiction. See id. The Court declines to exercise supplemental jurisdiction over the remainder of Plaintiffs' NYSHRL and NYCHRL Claims, including Plaintiffs' related vicarious liability claims.

**B. Individual First Amendment Retaliation Claims by Plaintiffs Raymond, Polanco, Serrano, Waller and Gonzalez (Sixth, Eighth, Tenth, Twelfth, and Fourteenth Causes of Action)**

    1. Standard

Plaintiffs allege that the Proposed Defendants retaliated against Raymond, Polanco, Serrano, Waller, and Gonzalez for making internal and certain external complaints regarding the allegedly discriminatory quotas and racially discriminatory disciplinary system and

other alleged police practices, thereby violating these Plaintiffs' rights under the First

Amendment to the United States Constitution and 42 U.S.C. § 1983.  (Proposed SAC ¶¶ 273-87.)

"Where, as here," plaintiffs claim that they were "retaliated against in violation of

the First Amendment, [they] must plausibly allege that '(1) [their] speech or conduct was

protected by the First Amendment; (2) the defendant took an adverse action against [them]; and

(3) there was a causal connection between this adverse action and the protected speech.'"

Montero v. City of Yonkers, N.Y., 890 F.3d 386, 394 (2d Cir. 2018) (quoting Cox v. Warwick

Valley Cent. Sch. Dist., 654 F.3d 267, 272 (2d Cir. 2011)).

A public "employee may be protected from retaliation . . . when speaking in the

workplace when he or she is speaking 'as a citizen upon matters of public concern.'"  Id. at 395

(quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968) (ellipses omitted)).  The First

Amendment analysis of a public employee's claim "must proceed in two parts."  Id.  First, the

Court "'determin[es] whether the employee spoke as a citizen on a matter of public concern.  If

the answer is no, the employee has no First Amendment cause of action based on his or her

employer's reaction to the speech.'"  Id. (quoting Garcetti v. Ceballos, 547 U.S. 410, 418

(2006)).  "If the first component is present, an employer must then show that it 'had an adequate

justification for treating the employee differently based on his or her speech from any other

member of the general public.'"  Id. (quoting Garcetti, 547 U.S. at 418) (brackets and citation

omitted).

"The Supreme Court [has] stated that 'when public employees make statements

pursuant to their official duties, . . . the employees are not speaking as citizens for First

Amendment purposes, and the Constitution does not insulate their communications from

employer discipline.'"  Id. (quoting Garcetti, 547 U.S. at 421).  "The 'critical question . . . is

whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.'" Id. at 397-98 (quoting Lane v. Franks, 134 S. Ct. 2369, 2379 (2014) and concluding, based on a plaintiff's pleading, that his remarks at a union meeting "did not fall within his employment responsibilities" as a police officer, and, thus, that "the district court erred in concluding on a motion to dismiss that [the plaintiff] spoke as an employee"). In Montero v. City of Yonkers, the Second Circuit held that, when a plaintiff alleged facts showing that certain "speech was not composed of statements made as a 'means to fulfill' or 'undertaken in the course of performing' [the plaintiff's] responsibilities as a police officer," the plaintiff had plead sufficiently that he "engaged in citizen speech for purposes of the First Amendment." 890 F.3d at 399 (quoting Weintraub v. Bd. of Educ. of City School Dist. of City of N.Y., 593 F.3d 196, 203 (2d Cir. 2010)).

A "successful plaintiff" must demonstrate not only that he or she spoke as a citizen, but also "that the speech was on a matter of public concern." Id. (citing Garcetti, 547 U.S. at 418). "Whether speech is on a matter of public concern is a question of law, and 'is to be answered by the court after examining the content, form, and context of a given statement, as revealed by the whole record.'" Id. (quoting Jackler v. Byrne, 658 F.3d 225, 235 (2d Cir. 2011)) (quotation marks and citation omitted). "'To constitute speech on a matter of public concern, an employee's expression must be fairly considered as relating to any matter of political, social, or other concern to the community.'" Id. (quoting Jackler, 658 F.3d at 236) (internal quotation marks and citation omitted). Speech, however, "that principally focuses on an issue that is personal in nature and generally related to the speaker's own situation . . . or that is calculated to redress personal grievances—even if touching on a matter of general importance—does not qualify for First Amendment protection." Id. at 399-400 (quotation marks, citations, and

brackets omitted). "[A]n individual motivated by a personal grievance[,] however, "can simultaneously speak on a matter affecting the public at large." Id. (quoting Golodner v. Berliner, 770 F.3d 196, 203 (2d Cir. 2014)). In a nonprecedential decision, the Second Circuit has concluded that speech by a New York City police officer "about the quota system imposed on him [or her] and other officers by direct supervisors . . . addresse[s] a matter of public concern." Matthews v. City of N.Y., 488 Fed. App'x 532, 533 (2d Cir. 2012) (citing Jackler, 658 F.3d at 236–37).

 With respect to the adverse employment action prong of the inquiry, the Second Circuit has held that "[i]n the context of a First Amendment retaliation claim, . . . 'only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action.'" Zelnik v. Fashion Institute of Technology, 464 F.3d 217, 225 (2d Cir. 2015) (quoting Washington v. County of Rockland, 373 F.3d 310, 320 (2d Cir. 2004)) (brackets omitted). "In this context, 'adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand.' . . . This list of retaliatory conduct is certainly not exhaustive, however, and 'lesser actions may also be considered adverse employment actions.'" Id. at 226 (quoting Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)) (brackets omitted).

 To satisfy the "causal connection" prong, the allegation "' . . . must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech.'" Stajic v. City of N.Y., 214 F. Supp. 3d 230, 235 (S.DN.Y. 2016) (quoting Morris, 196 F.3d at 110). "'Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected

activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." Id. (quoting Mandell v. County of Suffolk, 316 F.3d 368, 383 (2d Cir. 2003)). Plaintiffs may sufficiently plead "a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action, . . . and generally, temporal proximity is strong circumstantial evidence of improper intent." Id. (quotation marks, citations, and brackets omitted). "When a party relies on 'the mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action, courts uniformly hold that the temporal proximity must be very close.'" Payson v. Bd. of Educ. of Mount Pleasant Cottage Sch., USFD, No. 14-cv-09696-JCM, 2017 WL 4221455, at *13 (S.D.N.Y. Sept. 20, 2017) (quoting Adams v. Ellis, No. 09-cv-01329-PKC, 2012 WL 693568, at *16 (S.D.N.Y. Mar. 2, 2012), aff'd, 536 F. App'x 144 (2d Cir. 2013)) (internal quotation marks, citations, and ellipses omitted). "[T]here is no hard and fast rule for the amount of time that must pass before a causal connection is necessarily broken, . . . but two years is far longer than" the periods held relevant in many cases, and "[i]ndeed, it is the rare case that finds a plausible claim when nearly a year rather than months have gone by." Birch v. City of N.Y., 184 F. Supp. 3d 21, 32 (E.D.N.Y. 2016) (citation omitted). Courts in this circuit "often finds a limit at two or three months and almost universally disapprove longer time periods." Adams, 2012 WL 693568, at *16 (citations omitted). Plaintiffs "may not rely on conclusory assertions of retaliatory motive to satisfy the causal link." Cobb v. Pozzi, 363 F.3d 89, 108 (2d Cir. 2003).

There is a three-year statute of limitations for First Amendment claims under 42 U.S.C. § 1983. See Smith v. Campbell, 782 F.3d 93, 99-100 (2d Cir. 2015).

The Court now turns to the Plaintiffs' individual First Amendment retaliation claims.

2. <u>Raymond</u>

In the Proposed SAC, Raymond alleges that he was "threatened" by Proposed Individual Defendant Inspector Tsachas, who said that he would "sabotage Raymond's anticipated promotion" for "continu[ing] to denounce the quota and fail[ing] to meet the quota," and that, over the course of a year, Raymond was passed over for promotion three times. (Proposed SAC ¶¶ 91-92, 95.)  Raymond recounts many instances in which he allegedly engaged in speech protected by the First Amendment and was retaliated against by the Proposed Defendants.

First, Raymond alleges that, in or around 2008, he "complain[ed] about being asked to arrest people without regard for the circumstances" and "asked his then supervisor… to be allowed to use more discretion."  (<u>Id.</u> ¶ 68.)  Raymond alleges that "he was punished" by being posted to an "undesirable" position in the summer of 2010 due to this request, but that the grounds cited for his punishment was low law enforcement activity.  (<u>Id.</u>)  The Proposed Defendants argue that claims based on alleged retaliatory actions taken against Raymond in 2010 are barred by the pertinent statute of limitations.  (Opp. Br. at 18-19.)  The instant action was commenced on August 31, 2015.  Thus, Defendants are correct, and the claims based on retaliatory actions allegedly taken against Raymond in 2010 are time-barred by the applicable three year statute of limitations.  <u>See</u> <u>Smith</u>, 782 F.3d at 99-100.

Raymond next alleges that, on July 23, 2014, he wrote a letter to the "Commanding Officer/Team Leader, Collaborative Initiatives 'Other City Agencies' Re-Engineering 2014 Group, Captain Pu-Folkes, and Transit Bureau Chief, Joseph Fox," "detail[ing] how the commanding officer of Transit District 32 . . . was putting pressure on supervisors to pressure police officers, including Raymond, to increase their enforcement activity

by making borderline arrests just to meet an arrest target, rather than focusing on the legitimate goals of reducing crime, and increasing public safety with respect to subway riders." (Proposed SAC ¶ 75.) Raymond had been selected for that internal focus group in March 2014, and alleges that Pu-Folkes had "inspired" him to put his ideas for re-engineering the NYPD into writing. (Id. ¶ 74.)

Raymond does not allege that Defendants engaged in any retaliatory conduct immediately following or soon after he submitted this letter. (See generally id.) Rather, Raymond alleges that he next engaged in protected speech on November 22, 2014, in a meeting with a Platoon Commander who was not an addressee of Raymond's July 23, 2014, communication. In the meeting, Raymond "denounce[ed] unlawful enforcement quotas that his supervisors were imposing on him, which he felt unfairly targeted [B]lack and [L]atino communities." (Id. ¶ 76.) Raymond alleges that, five days after that meeting, he was told by a supervisor that the Platoon Commander with whom Raymond had met on November 22, 2014, had "ordered" that supervisor "to lower Raymond's evaluation score and assign him to a punitive post, in retaliation for Raymond's stance [towards] the quota." (Id. ¶ 77.) His supervisor also allegedly told him that "an honest assessment of [his] performance would result in an annual evaluation score of 4.0." (Id.)

Since January 2015, Raymond has allegedly received "subpar interim and annual evaluation ratings of 2.5 out of 5.0," putting him at risk of being placed into [the PMP]" in alleged retaliation for speaking out against the quota. (Id. ¶ 78.) Raymond also alleges that, in retaliation for his alleged First Amendment-protected speech, he experienced the following events in January 2015: (1) the Platoon Commander denied his request to attend a presidential task force meeting on the basis of his subpar performance; (2) the commanding officer, whom

Raymond had identified as imposing the quota in the letter sent in July, issued Raymond a failing interim evaluation; and (3) he was given an annual evaluation rating of 2.5 out of 5.0 for 2014, which was finalized in August 2015 by Proposed Individual Defendant Tsachas as "retaliation for Raymond's expressed opposition to the quota." (Id. ¶¶ 79-84.)

The Proposed Defendants oppose Raymond's First Amendment claim, arguing that the Court need not examine whether the July 23, 2014, letter "was constitutionally protected" because the claim fails to allege causation, "as the first adverse action allegedly occurred four months later." (Opp. Br. at 19.) Defendants also assert that the November 22, 2014, conversation was not constitutionally protected speech because "it is essentially a personal grievance about the effect of [the] NYPD's productivity standards upon [Raymond's] standing within the NYPD." (Id.)

The Court first must determine whether Raymond alleges sufficiently that he spoke as a citizen on a matter of public concern. See Montero, 890 F.3d at 395. Raymond alleges plausibly that he spoke as a citizen when he submitted the July 23, 2014, letter and when he met with the Platoon Commander on November 22, 2014, as both incidents of speech "merely concerned" his duties as a police officer and were not "ordinarily within the scope of an employee's duties." See Montero, 890 F.3d at 398. The Proposed SAC does not include any facts to support an inference that commentary on the quota system was within the scope of a police officer's duties. Though each incident of speech about the quotas was made through internal NYPD channels to which a private citizen would not have access, such as through the internal Re-Engineering focus group, which was comprised of police officers and to which Raymond had been invited to participate as part of his role as an officer, and in conversations with his platoon commander and his individual supervisors (see Proposed SAC ¶¶ 74-76),

neither incident was "composed of statements made as a means to fulfill, or undertaken in the course of performing[,] [Raymond's] responsibilities as a police officer," as the role is described in the Proposed SAC.  See Montero, 890 F.3d at 399 (internal quotation marks and citations omitted).  Furthermore, Raymond's statements on July 23, 2014, and November 22, 2014, were "on a matter of public concern," as speech by a New York City police officer "about the quota system imposed on him and other officers by direct supervisors . . . addresse[s] a matter of public concern."  See Matthews, 488 Fed. App'x at 533.  Defendants' argument that Raymond was motivated by a personal grievance about the effect of the NYPD's productivity standards upon his standing within the NYPD is unavailing.  Even if Raymond was "motivated by a personal grievance," he alleges plausibly that, in his November 22, 2014, conversation, he was "simultaneously speak[ing] on a matter affecting the public at large" (the quota system), and therefore was speaking on a matter of public concern.  See Montero, 890 F.3d at 395.  Thus, Raymond has plead sufficiently that he engaged in speech in his capacity as a private citizen on a matter of public concern on July 23, 2014, and November 22, 2014.  See id.

       With respect to the adverse employment action prong of the inquiry, Raymond has alleged sufficiently that Defendants "took an adverse action against him."  See id.  His allegations of being passed over for promotions, the reduction of his evaluation score by a supervisor upon the Platoon Commander's instruction, assignments to a punitive posting, and receipt of failing and low evaluation scores despite a supervisor's admission that an "honest assessment" would have resulted in a higher evaluation score are plausible allegations of "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action.'"  See Zelnik, 464 F.3d at 225-26; (see also Proposed SAC ¶¶ 77-84).

Plaintiffs have alleged sufficiently that the timing of the November 22, 2014, conversation with the Platoon Commander "warrant[s] the inference that [that incident of speech was] a substantial motivating factor in the adverse employment action[s]" described above, and that such adverse actions "would not have been taken absent the employee's protected speech." See Stajic, 214 F. Supp. 3d at 235. Plaintiffs have plead plausibly that there is a causal connection by alleging that Raymond's November 22, 2014, incident of protected activity was "followed [close in time] by adverse treatment in employment," and by proffering direct evidence of retaliatory animus" in the form of the supervisor's alleged statement that the evaluation and punitive posting were imposed "in retaliation for Raymond's stance on the quota which Raymond had expressed to [the Platoon Commander]." See id.; (see also Proposed SAC ¶ 77.) Plaintiffs may sufficiently plead "a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action, . . . and generally, temporal proximity is strong circumstantial evidence of improper intent." Id. (quotation marks, citations, and brackets omitted). The adverse actions that occurred in November 2014, immediately following his November 22, 2014, conversation are in sufficient temporal proximity to support an inference of causal connection. Plaintiffs further allege that, after Proposed Individual Defendant Tsachas took over the command in 2015, he imposed a low performance rating to defeat Raymond's promotion and directed that Raymond be put on a punitive posting until he stopped resisting the quota. (See Proposed SAC ¶¶ 82-87.) This direct evidence of animus based on speech in opposition to the quota is sufficient to sustain a First Amendment retaliation claim against Proposed Individual Defendant Tsachas for the low rating, denial of promotion and punitive posting. The four-month period that elapsed between the first alleged adverse action, in November 2014, and the July 23, 2014, letter, however, is too attenuated to provide a plausible

basis for an inference of a causal connection based on temporal proximity.  See Adams, 2012 WL 693568, at *16.

For these reasons, Plaintiffs' motion for leave to file a further amended complaint thus is denied as to Raymond's First Amendment retaliation claim based on the incident of speech that occurred in 2008 and the July 23, 2014, letter, and granted as to the claim against Proposed Individual Defendant Tsachas based on the 2015 performance evaluation, promotion denial and punitive posting actions that followed the November 22, 2014, meeting with the Platoon Commander.  Plaintiff has not plausibly plead a retaliation claim against any of the other named Individual Defendants, nor has he alleged facts plausibly supporting a policy-based claim against the City in this connection.

3.  Polanco

Polanco alleges that he engaged in speech protected by the First Amendment by testifying about the NYPD's maintenance of the quota system in a deposition in 2009 in Floyd v. City of New York, a class action lawsuit in this district concerning unconstitutional "stop and frisk" activity by the NYPD, and that he was punished thereafter "with unwarranted and improperly conducted disciplinary investigations, including integrity tests and interrogations, and imposed unfounded, unwarranted and overly disciplinary penalties including, loss of vacation and suspension."  (See Proposed SAC ¶ 144.)  He does not allege specifics of incidents or dates. Defendants are correct that Polanco's claim, insofar as it is based on testimony made in 2009, is barred by the three-year statute of limitations, as this action was initiated in 2015, and claims based on any such retaliatory conduct occurring before 2012 is time-barred.  See Smith, 782 F.3d at 99-100.  Polanco has plead no causal connection between the 2009 testimony and any alleged retaliation occurring after 2012.

Polanco also alleges that, following his <u>Floyd</u> trial testimony in March 2013

regarding law enforcement quotas and a work environment hostile to Latinos, he experienced

retaliation by being placed in the PMP, suspended with pay, and placed on dismissal probation

from December 2013 to December 2014.  (<u>See</u> Proposed SAC ¶¶ 144-46.)

Plaintiff Polanco's testimony in the <u>Floyd</u> case in March 2013 was clearly

protected speech.  <u>See</u> <u>Lane</u>, 134 S. Ct. at 2378 (a public employee's speech consisting of sworn

testimony, compelled by subpoena, was speech as a citizen, protected by the First Amendment,

because it was outside the scope of the employee's ordinary responsibilities).  However, Polanco

"may not rely on conclusory assertions of retaliatory motive to satisfy the causal link" between

his March 2013 testimony and his placement in the PMP and suspension with pay, which

occurred at unspecified times, and his placement on dismissal probation from December 2013 to

December 2014, the circumstances of which are not specified in the Proposed SAC.  <u>See</u> <u>Cobb</u>,

363 F.3d at 108.  Polanco does not proffer facts as to who specifically retaliated against him or

when, but instead makes vague, generalized statements that he was placed in the PMP, was

suspended with pay, and placed on dismissal probation for one year.  (<u>See</u> Proposed SAC ¶ 146.)

His claims against the Proposed Individual Defendants in this regard fail because he has not

alleged facts demonstrating that any of them took any particular actions in reaction to his

testimony, and his reliance on vicarious liability as to the City is misplaced.  In the absence of

facts demonstrating a Proposed Individual Defendant's personal involvement in the alleged First

Amendment violation, Polanco cannot state a claim against any particular individual for such

retaliation.  He proffers no factual allegations plausibly linking the retaliation to any official

policy, so his claim against the City in this regard is futile.  Polanco's allegations concerning

retaliation for his March 2013 deposition testimony thus fail to state a claim upon which relief may be granted.

Plaintiffs' motion for leave to file a further amended complaint is therefore denied as to Polanco's First Amendment retaliation claim.

4.  Waller

Waller alleges that he was retaliated against for engaging in protected speech (1) to his supervisors within the NYPD "on several [unspecified] occasions regarding the quota and the unfair punishment for not meeting the quota;" (2) on May 8, 2012, at a meeting with officers of the Performance Monitoring Division regarding his placement in the PMP, in which he "complained about being compelled to meet an illegal quota[;]" and (3) on March 31, 2016, in an interview with NBC News, regarding his claims of racial discrimination in the NYPD and the imposition of "illegal arrest and summons quotas on him."  (See Proposed SAC ¶¶ 174-75, 178.) He alleges that he was retaliated against for (1) the unspecified speech "by being excluded from any off duty employment which other officers are routinely allowed to engage in and . . . from spike overtime out of a squad patrol vehicle," receiving foot post assignments despite being "the most senior officer in his squad," and being "given steady tours of SKYWATCH, a solely punitive posting;" (2) the May 2012 speech by being "punitively posted to SKYWATCH 16 times" between June 9, 2013 and September 21, 2013; and (3) the March 2016 speech by being issued a CD seven days later for being fifteen minutes late to a shift despite notifying his platoon commander of his anticipated tardiness, and by being given a punitive reassignment to a less desirable posting in April 2016, where he was kept until his retirement in August 2016.  (See id. ¶¶ 174, 176, 179-84.)

Defendants assert that Waller fails to plead facts sufficient to support a First Amendment retaliation claim because certain of the allegedly retaliatory actions merely constitute the application of NYPD disciplinary policies, a CD does not constitute an adverse action under First Amendment jurisprudence, and Waller does not specify who was responsible for his April 2016 reassignment to foot patrol. (Opp. Br. at 22.)

Plaintiffs fail to allege that Waller's first incident of speech constitutes a protected activity because the Proposed SAC does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" See Iqbal, 556 U.S. at 678 (2009). Waller's pleading is vague and lacks specificity as to when and to whom within the NYPD he complained "regarding the quota and the unfair punishment for not meeting the quota," precluding the requisite assessments of whether he was speaking as a citizen on a matter of public concern and whether there was any causal link to the allegedly retaliatory measures.

Waller's allegations concerning his May 8, 2012, protest against being compelled to meet an illegal quota include sufficient facts to allege plausibly that the speech was protected by the First Amendment. Though he was meeting with officers of the Performance Monitoring Division regarding his placement in the PMP and his speech necessarily "concerned" his duties as a police officer, his statements about the illegality of the quota system was not "itself ordinarily within the scope of [a police officer's] duties." See Montero, 890 F.3d at 397-98. The illegality of the alleged quota system is a matter of public concern. See Matthews, 488 Fed. App'x at 533. Taking the facts proffered in the Proposed SAC as true, Waller's statements at this meeting were made as a citizen speaking on a matter of public concern, and thus were protected by the First Amendment. See Montero, 890 F.3d at 394. Sixteen postings to the SKYWATCH patrol, which Plaintiffs allege is a "solely punitive posting" (Proposed SAC ¶

174), could be considered an adverse employment action for purposes of a First Amendment claim, as such assignments "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action.'" See Zelnik, 464 F.3d at 225. Waller's claims insofar as they are based on the May 8, 2012, incident, however, fail because Plaintiffs do not plead facts to support an inference of a causal connection between the speech and the 16 SKYWATCH posting assignments. Plaintiffs do not plausibly plead facts showing that there is direct evidence of retaliatory conduct, and thus the Court considers whether Plaintiffs have plead sufficiently temporal proximity to support indirect causation. See Stajic, 214 F. Supp. 3d at 235. The one year, one month, and one day that elapsed between the May 8, 2012, meeting and Waller's first alleged assignment to a SKYWATCH posting on June 9, 2013, is far too attenuated a period to support an inference of a causal connection. See Payson, 2017 WL 4221455, at *13; Birch, 184 F. Supp. 3d at 32; Adams, 2012 WL 693568, at *16.

With respect to Waller's interview with NBC News on March 31, 2016, and his allegations of subsequent retaliatory conduct in violation of his First Amendment rights, even though these claims could be timely and construed as plausibly alleging adverse actions and causation, Plaintiffs' motion to assert these claims is denied as futile because Waller does not allege the involvement of any Proposed Individual Defendant, nor does he allege facts sufficient to support a Monell-based claim against the City.

Plaintiffs' motion for leave to file a further amended complaint is therefore denied as to Waller's First Amendment retaliation claim.

5. Gonzalez

Gonzalez alleges that he was retaliated against for engaging in speech protected by the First Amendment following his February 6, 2014, filing of written complaints with the

IAB and the EEOC, detailing alleged violations including "enforcement of an illegal quota, the misclassification of offen[s]es and downgrading of felonies[,] and racial discrimination against minorities by virtue of a hostile work environment," two days after his appeal of his annual performance evaluation score was denied. (Proposed SAC ¶¶ 109-10.) Plaintiffs allege that the complaints triggered investigations by each of those agencies into the misclassification of offenses and downgrading of felonies, and that Proposed Individual Defendant McCormack and Lt. Hatki were aware of those investigations and "believed that Gonzalez was the source of" them. (Id. ¶¶ 111-12.) The IAB interviewed Gonzalez on March 28, 2014, about his complaint, though the interview ultimately focused on Gonzalez' own enforcement activity. (Id. ¶ 113.) Plaintiffs allege that Gonzalez was placed in the PMP in April 2014 approximately two months following his IAB and EEOC complaints, and that, after he wrote to the IAB and the OEEO complaining about "intensified retaliation," he experienced a series of retaliatory actions throughout the second half of 2015. (Id. ¶¶ 114, 122, 127-30.)

Specifically, Plaintiffs allege that Proposed Individual Defendant McCormack and Hatki informed members of Gonzalez' precinct, including a supervisor, Sergeant Tameika Goode, that Gonzalez was a "rat" and he was "recording everyone in the precinct." (Id. ¶ 116.) Goode accused Gonzalez of recording his conversations with her in May 2015. (Id.) Following July 2015 media reports of an NYPD internal investigation that had revealed multiple cases of the downgrading of felonies in the 40th Precinct, nineteen police and ranked officers in that precinct "were charged with misconduct and faced disciplinary proceedings" and "were transferred out of the . . . Precinct." (Id. ¶ 117.) During an "extraordinary roll call" of the 40th Precinct, at which then Police Commissioner William Bratton and then Chief of Department and current Police Commissioner James O'Neill were in attendance, Proposed Individual Defendant

Bratton "stated to the entire precinct that a disgruntled officer among them had dropped the dime on the entire precinct," and that "[i]t was understood that" Bratton was referring to Gonzalez. (Id. ¶¶ 118-19.) Goode was also present at the roll call. (Id. ¶ 119.)

Beginning in July 2015, Gonzalez received unfavorable assignments from Goode and Hatki that "ensured that [he] would never be able to meet the monthly quota of summons or arrests," placing him "in a position of chronically underperforming with respect to his enforcement activity numbers." (Id. ¶ 120.) He also was issued an "unde[]served minor violation" and found guilty of recording Goode with a cell phone on August 22, 2015, and issued a CD, without the opportunity to defend himself. (Id. ¶¶ 121-22, 129.) During a roll call on or about August 26, 2015, Goode allegedly "stated that Gonzalez was not to be trusted because he was videotaping and recording everyone at the precinct," after which Gonzalez fainted and was admitted to the hospital, an injury for which Hatki allegedly destroyed necessary paperwork and denied Gonzalez a line of duty designation and, consequently, coverage for treatment. (Id. ¶¶ 123-26.) Gonzalez complained to the IAB and OEEO on September 7, 2015, "about the intensified retaliation that he was experiencing[,] including the incidents at roll call." (Id. ¶ 127.) In October 2015, Gonzalez was issued another CD for allegedly recording Goode again. (Id. ¶ 128.) On November 27, 2015, he was "unfairly issued with two minor violations for having a cap device that did not ma[t]ch his shield, and for a defective holster" by a Captain Girven "because Gonzalez was a target for punishment by the leadership of the precinct, and had been labeled a 'rat'." (Id. ¶ 130.)

Defendants assert that Gonzalez's speech was not protected because he was speaking as public employee and not as a citizen in filing a complaint with the IAB, and that, except for the April 2014 placement in the PMP, none of the alleged retaliatory conduct occurred

sufficiently close enough in time to his February 2014 complaints to support an inference of a causal connection.  (See Opp. Br. at 21.)  Defendants do not dispute that Gonzalez's complaint to the EEOC was protected speech.  (See id.)

Gonzalez has alleged plausibly that his complaints to the IAB and EEOC regarding the quota system and racial discrimination in the NYPD in February 2014 and on September 7, 2015, were protected speech, as he was speaking as a citizen on "a matter of public concern," and the speech was not "ordinarily within the scope of" his duties as a police officer. See Montero, 890 F.3d at 395-99; see also Schoolcraft v. City of N.Y., 103 F. Supp. 3d 465, 510-11 (S.D.N.Y. 2015) (concluding that complaints filed with the IAB have a civilian analogue and, as the speech was not "part-and-parcel" of plaintiff's role, it was "protected" for purposes of the First Amendment); Krzesaj v. New York City Dep't of Educ., No. 16-civ-2926-ER, 2017 WL 1031278, at *9 (S.D.N.Y. Mar. 15, 2017) (". . . courts have repeatedly emphasized a public employee's complaint to outside or external agencies as a factor weighing heavily in favor of finding that the employee was acting as a private citizen.").  Moreover, "[t]he Second Circuit . . . has 'held repeatedly that when a public employee's speech regards the existence of discrimination in the workplace, such speech is a matter of public concern.'"  Barone v. Judicial Branch Conn., No. 3:17-CV-00644-VAB, 2018 WL 1368906, at *6 (D. Conn. Mar. 16, 2018) (quoting Konits v. Valley Stream Cent. High Sch. Dist., 394 F.3d 121 (2d Cir. 2005) and citing Mandell, 316 F.3d at 383).

Gonzalez's placement in the PMP in April 2014 was an "adverse action" for purposes of a First Amendment retaliation claim, as it can be considered a "reprimand."  See Zelnik, 464 F.3d at 225.  Plaintiffs, however, have not alleged facts supporting an inference of the requisite "causal connection" between the February 2014 complaints and the PMP

placement, or that his IAB and EEOC complaints [were] "a substantial motivating factor in the" decision to place him in the PMP or that the decision "would not have been taken absent the" filing of the complaints.  See Stajic, 214 F. Supp. 3d at 235.  Plaintiffs plead that, before he filed the IAB and EEOC complaints, Gonzalez was warned repeatedly about the imminent risk of his placement in the PMP: in January 2014, during his annual performance review, and again on February 4, 2014, when Gonzalez appealed his annual performance evaluation rating.  (See Proposed SAC ¶¶ 107, 109.)  Even "draw[ing] all inferences in [Gonzalez's] favor," as the Court must at this stage, Plaintiffs have not alleged that Gonzalez "would not have been" placed in the PMP "absent" the filing of the IAB and EEOC complaints.  See Stajic, 214 F. Supp. 3d at 235.  Plaintiffs thus fail to state a First Amendment retaliation claim as to Gonzalez' placement in the PMP two months after filing complaints with the IAB and EEOC.

Plaintiffs sufficiently plead allegations of First Amendment retaliation for Gonzalez' IAB and EEOC complaints that allegedly occurred throughout 2015, beginning in May 2015.  The accusations of improper conduct, including Gonzalez' receipt of violations for recording Goode without her consent and undeserved violations for leaving his post, having a cap device that did not match his shield, and a defective holster, as well as the denial of coverage connected to the denial of a line of duty designation for his fainting episode and the public accusations of being a "rat" made by Bratton at the "extraordinary roll call," all constitute "adverse employment actions."  See Zelnik, 464 F.3d at 226.

Plaintiffs satisfy the "causal connection" prong of the analysis, as their allegations are "sufficient to warrant the inference that" Gonzalez' many statements to the IAB and EEOC, from February 2014 to September 2015, were "a substantial motivating factor in the adverse employment actions" he alleges.  See Stajic, 214 F. Supp. 3d at 235.  As Plaintiffs sufficiently

allege with specificity that the retaliation was ongoing from the time of Gonzalez' initial complaints, and that those complaints were the basis for the retaliatory actions, they have sufficiently plead a retaliatory motive as to certain Proposed Individual Defendants. Specifically, Plaintiffs sufficiently plead "causal connections" to Proposed Individual Defendants McCormack, O'Neill and Bratton, as Plaintiffs allege that those Defendants effectively communicated to the 40th Precinct that Gonzalez was the source of the IAB and EEOC investigations and, moreover, created an atmosphere that encouraged distrust and maltreatment of Gonzalez. Furthermore, since Bratton was the chief policy maker for the NYPD at the time, and O'Neill also exercised significant influence over the development and implementation of NYPD policy as the Chief of Department, Bratton and O'Neill's implicit instruction to crack down or retaliate against the person thought to be recording or reporting on others on July 20, 2015, supports a <u>Monell</u> claim against the City for the retaliatory conduct against Gonzalez.

Plaintiffs' motion for leave to file a further amended complaint is granted as to Gonzalez' First Amendment retaliation claim against the City and Proposed Individual Defendants McCormack, O'Neill and Bratton, to the extent it is premised on the alleged retaliatory conduct from May to November 2015. Plaintiffs' motion is denied as to Gonzalez' First Amendment retaliation claim to the extent it is premised on his April 2014 placement in the PMP.

6. <u>Serrano</u>

Serrano alleges that he was retaliated against for engaging in speech protected by the First Amendment following his June 1, 2012, filing of an EEOC complaint, which was then referred to the OEEO, stating that he was being discriminated against "as a Latino" by Proposed Individual Defendant McCormack and a captain, who forced him "to work in a racially hostile environment" and "to downgrade felonies," and compelled him and others "to meet a quota of

law enforcement actions every month." (Proposed SAC ¶ 153.) He further alleges that he gave a summary of that complaint to the New York Civil Liberties Union and "made similar complaints in writing several times to his" union delegate. (Id.) Serrano alleges that McCormack and the captain first learned of his complaints against them on February 7, 2013, and that McCormack soon thereafter "commenced a series of retaliatory action[s]" against him, including a reassignment from his usual patrol assignment to a solitary fixed foot post, inspections by multiple supervisors (including, unusually, McCormack himself) during a single shift, sending him outside the precinct on details, and denying leave requests despite the fact he "requested days off in the usual manner." (Id. ¶¶ 155-57.) Serrano further alleges that, in February 2013, shortly before he was expected to testify in the Floyd trial, McCormack threatened that, if Serrano testified, McCormack would scrutinize Serrano's memo book and issue a CD for every mistake in the book. (Id. ¶ 164.) Serrano goes on to allege that, on or about April 5, 2013, following his March 2013 testimony in Floyd (in which he testified that McCormack and others had compelled him to racially profile Blacks and Latinos), he was transferred out of his precinct, where he was assigned the midnight tour, to a precinct where he was assigned the day tour, and thus "he lost his night differential pay," amounting to about $5,000 a year. (See id. ¶¶ 165-67.) Defendants do not address Serrano's allegations of retaliation for his June 1, 2012, complaints, but only argue that his claim is insufficiently plead because the transfer between precincts following Serrano's Floyd testimony was not an adverse employment action. (See Opp. Br. at 20.)

       For similar reasons to those discussed above with respect to Polanco's and Gonzalez's First Amendment claims, Serrano's proffers concerning his (1) complaints to the EEOC and the OEEO, and (2) testimony in Floyd allege plausibly that Serrano engaged in

protected activity.  See Montero, 890 F.3d at 394-99; Schoolcraft, 103 F. Supp. 3d at 510;

Krzesaj, 2017 WL 1031278, at *9; Lane, 134 S. Ct. at 2378; and Matthews, 488 Fed. App'x at

533.  Serrano's allegations that he complained in writing to his union delegate about the quota

system also plead sufficiently that he engaged in protected activity, because that speech is not

"itself ordinarily within the scope of [a police officer's] duties," even if it "merely concerns those

duties."  See Montero, 890 F.3d at 398-99 (quoting Weintraub, 593 F.3d at 203) (holding that a

police officer's union speech, spoken in his role as a union officer, and not made "as a means to

fulfill" or "undertaken in the course of performing" his responsibilities as a police officer was

citizen speech for purposes of the First Amendment).

       The conduct that Serrano alleges was undertaken in retaliation for his 2012

complaints is "retaliatory conduct that would deter a similarly situated individual of ordinary

firmness from exercising his or her constitutional rights" and thus supports an inference of an

"adverse action."  See Zelnik, 464 F.3d at 225 (2d Cir. 2015).  Plaintiffs plead that reassignment

to a solitary fixed foot post and inspections by supervising officers is "highly unusual and an

indication that the object of the post is punishment" and that the "inspections were intended to

convey a threat to Serrano that he would be under increased scrutiny and would be punished for

minor or pretextual infractions."  (See Proposed SAC ¶ 155.)  Such allegations describe conduct

in the nature of "reprimands" and thus are sufficient to plead adverse action.  See Zelnik, 464

F.3d at 226.  Finally, Plaintiffs sufficiently allege facts to support direct and indirect causal

connections.  Serrano's supervisors, including Proposed Individual Defendant McCormack,

commenced their allegedly retaliatory actions shortly after learning of Serrano's protected

activity in February 2013 and, as "there is no hard and fast rule for the amount of time that must

pass before a causal connection is necessarily broken," the temporal proximity as alleged in the

Proposed SAC is sufficient.  See Birch, 184 F. Supp. 3d at 32.  Serrano further alleges a specific threat and direct retaliatory action by McCormack.

The retaliatory conduct Plaintiffs allege that Serrano experienced in response to his Floyd testimony is also sufficient to support a claim of an "adverse action."  (Proposed SAC ¶¶ 165-67.)  Plaintiffs' allegations regarding Serrano's transfer from his midnight tour in the 40th Precinct to the day tour in the 33rd Precinct, resulting in a difference in pay of about $5,000 per year, support an inference that he experienced a "reduction in pay."  See Zelnik, 464 F.3d at 225-26.  Plaintiffs also satisfy the "causal connection" prong of the inquiry, as they have sufficiently plead allegations to warrant the inference that Serrano's Floyd trial testimony "was a substantial motivating factor" in his "reduction in pay," as the reassignment occurred within a month of Serrano's protected speech, and such "temporal proximity is strong circumstantial evidence of improper intent."  See Stajic, 214 F. Supp. 3d at 235.

Plaintiffs' motion for leave to amend their complaint is therefore granted as to Serrano's First Amendment retaliation claim against Proposed Individual Defendant McCormack only.

7.   Conclusion: First Amendment Retaliation Claims

Plaintiffs' motion for leave to file a further amended complaint with respect to First Amendment retaliation claims is thus granted as to Raymond's claim against Proposed Individual Defendant Tsachas based on the 2015 performance evaluation, promotion denial and punitive posting actions that followed the November 22, 2014, meeting with the Platoon Commander; Gonzalez' First Amendment retaliation claim against the City and Proposed Individual Defendants McCormack, O'Neill and Bratton, to the extent he alleges retaliatory conduct from May to November 2015; and Serrano's First Amendment retaliation claim against

Proposed Individual Defendant McCormack only.  Plaintiffs' motion to amend to reassert

Plaintiffs' First Amendment retaliation claims is denied in all other respects.


C.  <u>Individual and Municipal Liability under Sections 1981 and 1983</u>

The Court previously found the Amended Complaint insufficient "because the

named Individual Defendants, all of whom work in supervisory capacities, [were] not alleged to

have been involved personally in the alleged violations or to have personally approved or

authorized the challenged actions."  Motion to Dismiss Opinion, 2017 WL 892350, at *5.  In the

Proposed SAC, Plaintiffs seek to remove one named Defendant, Chief Carlos M. Gomez, and

add four new Defendants:  McCormack, Tsachas, Tucker, and Richardson.

"An individual may be held liable under [Sections 1981 and 1983] only if that

individual is personally involved in the alleged deprivation."  <u>Littlejohn</u>, 795 F.3d at 314 (2d Cir.

2015) (internal quotation marks and citations omitted).  "To lay a proper foundation for

individual liability, the plaintiff must plead specific, nonconclusory factual allegations to

establish the participation at the necessary mental state of the individual defendants, or [his or

her] claims against them will be dismissed."  <u>Bermudez</u>, 783 F. Supp. 2d at 602.

As for Plaintiffs' claims against the City and against Defendants in their official

capacities, when suing a municipality "for discrimination under §§ 1981 or 1983 . . . plaintiff[s]

[are] required to show that the challenged acts were performed pursuant to a municipal policy or

custom," and they "need not identify an express rule or regulation," but can instead establish

liability by showing "that a discriminatory practice of municipal officials was so persistent or

widespread as to constitute a custom or usage with the force of law, or that a discriminatory

practice of subordinate employees was so manifest as to imply the constructive acquiescence of

senior policy-making officials."  See Littlejohn, 795 F.3d at 314 (citing Patterson v. Cty. Of

Oneida, 375 F.3d 206, 226 (2d Cir. 2004); Monell, 436 U.S. at 692–94).  Respondeat superior

"cannot be the basis of municipal defendant liability under §§ 1981 or 1983."  Id. at 315.

 The Court has applied the foregoing standards in reaching the determinations set

forth above as to the extent to which Plaintiffs will be permitted to replead claims.  Because no

non-conclusory factual basis for liability has been plead plausibly against Proposed Individual

Defendants de Blasio, Tucker and Richardson, Plaintiffs are denied leave to plead all proposed

claims against those Proposed Individual Defendants in the SAC.  As to the City and the other

Proposed Individual Defendants, leave is granted only to the extent set forth above, for the

reasons set forth above.

### D.  Putative Class Claims

 Plaintiffs have not proffered plausible nonconclusory factual pleading indicative

of a viable cause of action based on classwide conduct of the City or of any of the Proposed

Individual Defendants.  Accordingly, the motion for leave to replead is denied to the extent

Plaintiffs seek to pursue a putative class action.

### E.  Permanent Injunction Claim (Seventeenth Cause of Action)

 Plaintiffs seek a permanent injunction prohibiting Defendants "from racially

discriminating against Black and Latino members of the NYPD in the performance evaluation

system, in placement into the Performance Monitoring Program, and in the administration of

[d]iscipline and [p]unishment."  (Proposed SAC ¶¶ 288-89.)

 To obtain a permanent injunction, a party seeking such relief must demonstrate,

among other things, that "'it has suffered an irreparable injury'."  World Wide Polymers, Inc. v.

Shinkong Synthetic Fibers Corp., 694 F.3d 155, 160-61 (2d Cir. 2012) (quoting eBay Inc. v.

MercExchange, L.L.C., 547 U.S. 388, 391 (2006)).  Plaintiffs have neither tied this claim for

injunctive relief to a sufficient claim on the merits nor plead facts indicative of a prospect of

irreparable harm.  Plaintiffs' motion is therefore denied with respect to the Seventeenth Cause of

Action.

CONCLUSION

For the foregoing reasons, Plaintiffs' motion for leave to file a Second Amended

Complaint is granted as to Raymond's federal discrimination claims relating to his punishment

for submitting a late vacation request and for failing to meet quotas, as against Proposed

Individual Defendant Tsachas only; Gonzalez' and Baez' federal discrimination claims relating

to negative performance evaluations and placement on PMP, as against Proposed Individual

Defendant McCormack only; Serrano's federal discrimination claim relating to his negative 2012

performance rating, as against Proposed Individual Defendant McCormack only; and Gonzalez'

and Serrano's claims of retaliation for complaining of discrimination, as against proposed

Individual Defendant McCormack only.  Plaintiffs' motion is also granted as to their NYSHRL

and NYCHRL claims that parallel the federal claims that are permitted to be asserted in the

Second Amended Complaint.  Plaintiffs' motion for leave to file a further amended complaint

with respect to First Amendment retaliation claims is granted as to Raymond's claim against

Proposed Individual Defendant Tsachas based on the 2015 performance evaluation, promotion

denial and punitive posting actions that followed the November 22, 2014, meeting with the

Platoon Commander; Gonzalez' First Amendment retaliation claim, to the extent he alleges

retaliatory conduct from May to November 2015, against the City and Proposed Individual

Defendants McCormack, O'Neill and Bratton; and Serrano's First Amendment retaliation claim

against Proposed Individual Defendant McCormack.  The motion is denied as to the remainder of the Proposed SAC.

Plaintiffs are directed to file a Proposed SAC consistent with this Opinion and Order no later than fourteen (14) days from the date of this Opinion and Order, or **Wednesday, July 11, 2018**.

This case will be referred to the designated magistrate judge for general pretrial management, and Plaintiffs' counsel are directed to contact that judge's chambers promptly to schedule an initial conference.  The July 10, 2018, pretrial conference is adjourned <u>sine</u> <u>die</u> in light of the referral.

This Opinion and Order resolves Docket Entry No. 64.


SO ORDERED.


Dated: New York, New York
        June 27, 2018


          /s/ Laura Taylor Swain  
        LAURA TAYLOR SWAIN
        United States District Judge