UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------
EDREWEENE RAYMOND, PEDRO
SERRANO, SANDY GONZALEZ, and
RITCHIE BAEZ,

Docket No. 15-CV-6885 (LTS)

**SECOND AMENDED COMPLAINT**

Plaintiffs,

-against-

THE CITY OF NEW YORK, WILLIAM
J. BRATTON, JAMES P. O'NEILL,
CHRISTOPHER McCORMACK, and
CONSTANTIN TSACHAS,

Defendants.
-----------------------------------------------------

Plaintiffs, Edreweene Raymond, Pedro Serrano, Sandy Gonzalez and Ritchie

Baez, (hereinafter, "Plaintiffs") by and through their attorneys, Nwokoro & Scola,

Esquires, allege the following upon information and belief, against the City of New York,

William J. Bratton (former Commissioner of Police of the City of New York), James P.

O'Neill, (former NYPD Chief of Department and current Police Commissioner),

Christopher McCormack (Inspector and Former Commanding Officer of the 40th

Precinct), and Constantin Tsachas (A Deputy Inspector and former Commanding Officer

of Transit District 32).

## PRELIMINARY STATEMENT

1.       This is an action for compensatory damages to redress the deprivation of rights,

which are secured to the plaintiffs by the 1st, Amendment, (depriving plaintiff of the right

of free expression by punishing and retaliating against the plaintiff's for complaining

about and speaking out against the quota) the 5th, and 14th Amendments (depriving

plaintiff's of benefits without due process), and the 14th Amendment (depriving plaintiff's of the equal protection of the laws by discriminating against the plaintiff's on the basis of race and national origin) and for violations of the Civil Rights Act of 1866, 42 U.S.C. § 1981, 42 U.S.C. §1983, 42 U.S.C. §1985, the New York State Human Rights Law, New York Executive Law §296; New York City Local Law 59 of 1986, as amended by Local Rule 39 of 1991, §§8-101, et seq,;

2.     Plaintiffs, Latino and African-American minority Police Officers employed by the New York City Police Department, bring this action against the New York City Police Department for violations of the 1st, 5th and 14th amendments to the United States Constitution, and for discrimination in their employment on the basis of race and national origin which discrimination is in violation of 42 U.S.C. §1981, 42 U.S.C. § 1983, 42 U.S.C. § 1985, the New York State Human Rights Law, New York Executive Law §296 and New York City Local Law 59 of 1986 as amended by Local Rule 39 of 1991, §§ 8-101, et seq.

3.     Under the complex performance evaluation system applicable to the plaintiffs, police officers can receive one of nine available rating scores from 1 to 5, as follows, 1.0, 1.5, 2.0, 2.5, 3.0, 3.5, 4.0, 4.5, 5.0, with 1 as the lowest and 5 as the highest possible score. A score is further classified to fall into one of the following five catergories; Extremely Competent, (EC) Highly Competent (HC), Competent (C), Low (L), and Very Low (VL).  A score of 4.5 and above is generally classified as extremely competent. A score of 4.0 is generally classified as highly competent. A score of 3.0 or 3.5 is a passing score and is generally classified as competent. Any score below 3.0 is a failing score. A score of 2.5 or 2.0 is a failing grade and is generally classified as low.

4.      Annual performance ratings are important in that a rating of 4.0 or highly competent is generally required, in addition to passing the requisite civil service examination, for promotion to the next rank. Additionally, most specialized units within the NYPD generally require a rating of 4.5 (Extremely Competent) or 4.0 (Highly Competent) for incoming transferees.  Transfers to specialized units within the NYPD are desirable because such units offer more opportunities for overtime pay and premium pay. Membership of such units also make it more likely that the police officer will be considered for promotions in rank and for supervisory and administrative positions within the same rank.

5.      Annual performance ratings are also important because any rating below a 3.0 out of 5.0 is a negative performance evaluation that makes the recipient a candidate for placement into the probationary Performance Monitoring Program.

6.      The Performance Program is a probationary program whereby police officers are placed for disciplinary purposes when they are deemed by the department to have engaged in a serious pattern of misconduct or have ongoing severe disciplinary problems or when they have a negative performance evaluation.

7.      There are three levels of performance monitoring, from the least serious to the most serious, as follows: Level I, Level II and Level III which includes all those on dismissal probation. The criteria for being placed on level I performance monitoring includes the following: Getting three or more CCRB complaints in a one year period; getting six of more CCRB complaints in the past five years; getting four or more excessive force complaints in the last two years or five or more excessive force complaints in the last four years; referral by competent authority such as the Integrity

Control Officer or the Commanding Officer; being on suspension or modified duty; and being administratively transferred. The criteria for being placed on Level II performance monitoring include; being the subject of three or more commenced lawsuits for police action within a one year period or six or more commenced lawsuits within a five year period; being the subject of one or more lawsuits for police action disposed for $100,000 or more within a one year period; being adjudged guilty of one set of departmental charges and specifications for excessive force action within five years, or of two or more substantiated civilian complaints within four years; serious misconduct resulting in a penalty of twenty days or more; or if performance or behavior remain sub-standard after one year of placement on Level I performance monitoring.

8.      The criteria for being placed on Level III performance monitoring includes; being placed in performance monitoring at the direction of the Special Monitoring Committee, (made up of the First Deputy Commissioner, the Deputy Commissioners of Personnel, Internal Affairs and the Department Advocate), or on the recommendation of a Commanding Officer of a Precinct or Squad, or Borough Commander, and approval of that recommendation by the Special Monitoring Committee; and being placed on dismissal probation.

9.      In practice, all it takes to have a police officer placed in the Performance Monitoring Program is the recommendation of the Commanding Officer (C.O.) or the Integrity Control Officer (I.C.O.).

10.     Police officers placed on performance monitoring are denied certain benefits of their employment as follows depending on the level of performance monitoring; they are not permitted to work paid detail (a source of premium pay or additional income); they

are not permitted off duty employment; they are not permitted to work in the first platoon

(the first platoon refers to the shift which starts from 11:15 p.m. and ends at 7:50 a.m.,

which pays a night differential in addition to the regular salary); they are not permitted to

commence their tour later than 18:00 hours (this also means they can never get the night

differential pay (which is a source of additional income); They are not permitted to

perform anti-crime duties (which eliminates any chance of a transfer to a specialized unit

or any other favorable transfer). In addition, police officers on performance monitoring

can be suspended, placed on modified assignment, or terminated at the discretion of the

commissioner.

11.    The lowest level of discipline applied to police officers such as the plaintiffs is

being written into the Minor Violations Log that is maintained in each Precinct or

Command. The log lists offenses that are not reported to the NYPD as a whole. A minor

offense might include, failure to report to an assignment on time or failure to abide by the

dress code.

12.    The next level of discipline is the Command Discipline (CD). The CD may be

issued by any supervisory officer from the rank of Sergeant and above. The CD is

investigated and adjudicated solely by the Commanding Officer or her Executive Officer

(XO) and is usually resolved solely within the precinct or command. In a typical precinct,

the rank of both the CO and the XO is Captain, or above.

13.    The CD is used for minor infractions of NYPD rules and regulations that are not

deemed serious enough to require formal Charges and Specifications. The CO has

considerable discretion concerning the decision to issue a CD in connection with minor

infractions and can impose any range of penalties including issuing up to 5 days of

suspension, deducting vacation time, ordering a change of assignment, ordering a transfer, limiting overtime, etc. In certain cases, (eg. Loss of one's shield, loss of a firearm, loss of NYPD property) disciplinary action is required, but there is discretion as to whether a CD will be imposed or formal charges and specifications brought. If a CO proposes a CD that exceeds what the officer involves believes is fair, the officer may reject the proposed discipline, and the alleged offense is then forwarded to the NYPD's Advocate's Office for an internal departmental hearing. There is great pressure on officers to accept a CD at the command level, because the penalty can be much greater, (up to and including termination) if the matter goes to the NYPD Advocate's Office and the Officer does not prevail at the subsequent hearing. In addition to receiving proposed charges and specifications from precincts and commands, the NYPD Advocates Office may receive them from the Internal Affairs Bureau (IAB) or other internal investigative bodies.

14.     The NYPD Advocate's Office investigates the charges sent to it, and a determination is made as to whether to issue Charges and Specifications which are prosecuted by an Assistant NYPD Advocate before a Trial Commissioner, an NYPD official with the rank of Deputy Chief or Chief, who answers to the Commissioner of Police.

## JURISDICTION

15.     Jurisdiction is conferred upon the Court pursuant to 28 U.S.C. §§ 1331 and 13343 (3) & (4) as this action seeks redress for the violation of plaintiffs civil rights. Plaintiffs further invoke the Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a)

over any and all state law claims that are so related to the claims within the original jurisdiction of the Court that they form part of the same case or controversy.

## VENUE

16.     Venue is proper in the United District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## JURY DEMAND

17.     Plaintiffs demand trial by jury in this action and on each and every one of their claims.

## PARTIES

18.     Plaintiff Edreweene Raymond is an African American male Police Officer employed by the NYPD who has been under supervisory pressure to comply with the illegal quotas; has suffered negative employment consequences as a result of the failure to meet the illegal quotas; has been racially discriminated against with respect to performance evaluations, the performance monitoring program, and the administration of discipline and punishment. Has expressed his opposition to the illegal quotas and has been retaliated against in violation of his rights to free speech; and has been penalized for reporting, opposing and complaining about the illegal quotas and its racially discriminatory application against the minority community.

19.     Plaintiff Pedro Serrano is a Hispanic male and a police officer employed by the NYPD who has been under supervisory pressure to comply with the illegal quotas; has suffered negative employment consequences as a result of the failure to meet the illegal quota; has suffered racial discrimination with respect to performance evaluations, the Performance Monitoring Program, and the administration of discipline and punishment;

Has expressed his opposition to the illegal quotas and has been retaliated against in violation of his rights to free speech; and has been penalized for reporting and complaining about the illegal quotas and its racially discriminatory application against the minority community.

20.     Plaintiff Sandy Gonzalez is a Hispanic male and a police officer employed by the NYPD who has been under supervisory pressure to comply with the illegal quotas; has suffered negative employment consequences as a result of the failure to meet the illegal quota; has suffered racial discrimination with respect to performance evaluations, the Performance Monitoring Program, and the administration of discipline and punishment; has expressed his opposition to the illegal quotas and has been retaliated against in violation of his rights to free speech; and has been penalized for reporting and complaining about the illegal quotas and its racially discriminatory application against the minority community

21.     Plaintiff Ritchie Baez is a black male of Hispanic heritage and a police officer employed by the NYPD who has been under supervisory pressure to comply with the illegal quotas; has suffered racial discrimination with respect to performance evaluations, the Performance Monitoring Program, and the administration of discipline and punishment; has suffered negative employment consequences as a result of the failure to meet the illegal quotas; has been penalized for reporting and complaining about the illegal quotas and its racially discriminatory application against the minority community.

22.     Defendant the City of New York (the City) is and was at all times relevant hereto, a municipal corporation duly organized and existing under the laws of the State of New York, exercising governmental authority. Defendant is an employer subject to Federal

Laws and to the New York State Human Rights Law and New York City Local Law. Defendant City is a person for purposes of 42 U.S.C. §§ 1981 and 1985 and is and was the employer of the named plaintiffs and prospective class members as well as the individually named defendants, at all relevant times.

23.     Defendant the City of New York contains within it, the New York City Police Department (NYPD) which was and is a department, agency, bureau and /or subdivision of the Defendant City. The New York City Police Department is and was at all times relevant hereto, a local government agency of the City of New York and as a result thereof, defendant City was or is the employer of all the individually named plaintiffs, the prospective class members and the individual defendants herein.

24.     Defendant William J. Bratton was the Police Commissioner for the City of New York from January 2014 to September 2016. Defendant Bratton was an employee of the City of New York and was the principal administrator of defendant NYPD. He was responsible for the application of the NYPD's enforcement and administrative polices including its internal investigatory and disciplinary process. He was the final authority in all disciplinary matters within the NYPD. Police Commissioner William J. Bratton knew or should have known of the customs and practices described in this complaint, including but not limited to the maintenance of the illegal quota system by the NYPD and its racially discriminatory effect on the minority community and minority officers including the plaintiffs and Commissioner Bratton condoned, ratified and/or authorized such conduct. As police commissioner, he promoted Deputy Inspector McCormack from Captain to Deputy Inspector and then to Inspector even though it had been demonstrated that McCormack engaged in illegal behavior such as misclassifying felonies, racial

profiling and imposing a quota on police officers in his command. Commissioner Bratton also promoted defendant Tsachas from Captain to Deputy Inspector and Commanding Officer of Transit Borough Brooklyn, although it had been demonstrated that Tsachas engaged in Illegal behavior such as officially instructing his surbordinates to target blacks and latinos and imposing a quota on police officers under his command. Defendant Bratton's visit to the 40th precinct on July 20, 2015, and the statement he made regarding the presence of an informer who had "dropped a dime" on the rest of the Department, contributed to named plaintiff Sandy Gonzalez being persecuted as a "rat".

25.     Defendant James P. O'Neill was the NYPD's Chief of Department and the highest ranking non-civilian police uniformed police officer until September 2016, when he became the Police Commissioner. Defendant O'Neill is an employee of the City of New York. Upon information and belief, as the Chief of Department, he was in charge of all NYPD operations answering only to the Police Commissioner and the Mayor, and as Police Commissioner, he is responsible for the application of the NYPD's enforcement and administrative polices including its internal investigatory and disciplinary process. He is the final authority in all disciplinary matters within the NYPD. Defendant O'Neill, knew or should have known of the customs and practices described in this complaint, including but not limited to the maintenance of the illegal quota system by the NYPD and its racially discriminatory effect on the minority community and minority officers including the plaintiffs and Chief O'Neill condoned, ratified and/or authorized such conduct. O'Neill's visit to the 40th precinct in July 2015 and his implied condemnation of officers who recorded other officers contributed to the persecution of plaintiff's Serrano

and Gonzalez and exposed them to the ridicule and hatred of their co-workers as informers or 'rats'.

26.     Defendant Inspector Christopher McCormack was the Commanding Officer of the 40th precinct of the NYPD from September 27, 2011 to May 2014, when he was transferred out of the precinct, after it was widely reported in the media that he was recorded pressuring a police officer to target young black males. Defendant McCormack used threats, slurs, low evaluations, punitive transfers, punitive postings and command disciplines to coerce black and latino police officers under his command to produce illegal law enforcement quotas, and he punished black and latino officers more severely and more often than the white officers under his command for failure to meet the quota and any other disciplinary issue. After named plaintiff's Gonzalez and Serrano complained about his racially discriminatory conduct, he retaliated against them with more punitive actions.

27.     Inspector Constantin Tsachas was the Commanding Officer of Transit District 32 from June 2015 to June 2016. Defendant Tsachas illegally pressured named plaintiff Raymond, and other police officers in his command to enforce illegal law enforcement quotas, and punished them with low evaluations, punitive postings and punitive transfers for failure to do so. He also punished minority officers more severely and more often than the white officers in his command for failure to meet the quota and any other disciplinary issue. After named plaintiff Raymond publicly and officially expressed his opposition to the quota, Tsachas retaliated against him with more punitive actions.

## STATEMENT OF FACTS

28.     Plaintiff Edreweene Raymond is a male black of Haitian origin. He became a police officer with the NYPD in July 2008. From January 2009 to January 2016, he was assigned to Transit District 32, located at 960 Carroll Street, Brooklyn, New York.

29.     As a rookie in 2008, during the initial assignment known a IMPACT, plaintiff Raymond was taught that the primary motive is to get the highest possible number of arrests and write the highest possible number of summons. If you wanted to have a successful career in the NYPD, the motto is 'arrest anyone for anything, then repeat the process'. After about seven months in IMPACT, Raymond began to complain about being asked to arrest people without regard for the circumstances. He asked his then supervisor, Sergeant David Ferruzola, to be allowed to use more discretion. For this request, he was punished by being posted to the Coney Island Summer detail in the summer of 2010, an undesirable posting, used primarily as punishment. He was told that he was being punished because he was low on law enforcement activity.

30.     Plaintiff Raymond was then transferred to the midnight shift from that summer until March 2012. While on the mid-night shift, he was constantly pressured to get more arrests. He was told to arrest people for such trivial offenses as 'sitting outstretched'. i.e. taking up more than one seat on the subway. Homeless riders of the subway were the demographic mostly affected by such minor offense arrests. His supervisor at the time, Sergeant Marcia Whitely, constantly pressured him and other police officers to get more and more of such arrests and keep their law enforcement activity numbers up.

31.     In March 2012, his then supervisors were replaced and new ones arrived. He requested a transfer to the Truancy Unit, which is a Special Operations Unit within Transit District 32. His request was granted and he was assigned to the Truancy Unit. The Special Operations Lieutenant, Lt. Haziq Reid, observed that Raymond's arrest numbers were low and spoke to Raymond's immediate Supervisor, Sergeant Scott Reiser of the Truancy Unit, who then spoke to Raymond about it during a meeting circa April 2012. Reiser stated "find out what everyone else is doing and do the same". Six weeks after being assigned to the Truancy Unit, Raymond was kicked out of the Truancy Unit by Lt. Haziq Reid who told him, "if you get weekends off for being in a Special Unit, then you have to bring in a lot more bodies". Raymond was then transferred to the 3rd platoon (the shift that works from 3:00 p.m. to 11:35 p.m.) and was in the 3rd platoon from May 2012 to January 2016.

32.     The quota that all police officers in the Transit District 32 had to meet was at least one arrest and five summonses every month. If you did not meet this quota, you will be verbally reprimanded by you supervisors, given retaliatory assignments, denied requests for leave, and denied opportunities to earn overtime. If you continued to not meet the quota, you would receive sub-par evaluation ratings and then be placed on the Performance Monitoring Program.

33.     In October 2013, Raymond took the civil service examination for promotion to the rank of sergeant, and passed with flying colors. He scored 93 out of 100 and was ranked #8 out of 932 examinees. However, after the scores were released in June 2014, Captain Natalie Maldonado, the Commanding Officer of Transit District 32, met with Raymond's immediate Supervisor, Sergeant Martin Campbell, and told Campbell that if

Raymond did not get his enforcement activity numbers up, he would not be promoted to sergeant and he would be placed on performance monitoring.

34.      In January 2014, Raymond received an evaluation score of 3.0 out of 5.0 for the year 2013, from Sergeant Shannon Stapleton.

35.      In March 2014, after meeting with Captain Oliver Pu-Folkes, Raymond was one of the police officers chosen for an NYPD Re-engineering Initiative Focus Group. Raymond was inspired by Captain Pu-Folkes to put his ideas regarding how to re-engineer the department, in writing.

36.      On July 23, 2014, Raymond wrote a letter addressed to the Commanding Officer/Team Leader, Collaborative Initiatives "Other City Agencies" Re-Engineering 2014 Group, Captain Pu-Folkes, and Transit Bureau Chief, Joseph Fox. In that letter, Raymond detailed how the commanding officer of Transit District 32, Captain Maldonado, was putting pressure on supervisors to pressure police officers, including Raymond, to increase their enforcement activity by making borderline arrests just to meet an arrest target, rather than focusing on the legitimate goals of reducing crime, and increasing public safety with respect to subway riders.

37.      On November 22, 2014, Raymond met with Platoon Commander Lt. Victoria Hayden, and he spoke out denouncing unlawful enforcement quotas that his supervisors were imposing on him, which he felt unfairly targeted black and latino communities.

38.      Immediately following that meeting, on November 27, 2014, Raymond had a meeting with Sergeant Campbell where Campbell told Raymond that he had been ordered by Lt. Hayden to lower Raymond's evaluation score and assign him to a punitive post, in retaliation for Raymond's stance on the quota which Raymond had expressed to Lt.

Hayden. Sergeant Campbell also stated that an honest assessment of Raymond's performance would result in an annual evaluation score of 4.0.

39.     Since January 2015, Raymond has been receiving sub-par interim and annual evaluation ratings of 2.5 out of 5.0. This is a negative score and means that Raymond can be placed into the Performance Monitoring Program, which can eventually lead to dismissal, and cannot be transferred to an elite or Special Unit. A transfer to a special unit is desirable because it is an opportunity for premium pay and more overtime so it effectively results in more income even without a promotion.

40.     On January 7, 2015, Raymond requested leave to go to Washington, D.C. to attend a presidential task force meeting on policing, to which he had been formally invited. Platoon Commander Lt. Hayden denied this request, stating that she will not authorize leave because Raymond is not making his numbers and therefore his performance is below par.

41.     On January 18, 2015, Raymond had a conversation with Sgt. Campbell where Campbell stated that he was being forced to issue a failing interim evaluation on Raymond, by Captain Maldonado.

42.     On January 18, 2015, Raymond received an interim evaluation score of 2.5 from Cpt. Maldonado and Sgt. Campbell.

43.     On January 21, 2015, Captain Maldonado ordered Sgt. Campbell to give Raymond an annual evaluation rating of 2.5 out of 5.0 for the year 2014. Raymond appealed this rating and it was never finalized. Soon after, Cpt. Maldonado was promoted and transferred and Captain Constantin Tsachas was appointed the Commanding Officer of Transit District 32.

44.     On August 3, 2015, Sgt. Campbell met with Raymond and his union representative, Police Officer Gentry Smith. Campbell told Raymond that Captain Tsachas had telephoned Campbell and given Campbell specific instructions on what to do to guarantee that Raymond's anticipated promotion to Sergeant would be cancelled. The instruction given to Campbell by Tsachas was to give Raymond a 2.5 annual performance rating for the 2014 calendar year.

45.     On August 5, 2015, Captain Tsachas completed Raymond's 2014 annual evaluation and ordered Sgt. Campbell to give Raymond a score of 2.5 out of 5.0. Raymond was then issued a failing annual evaluation score of 2.5 for the year 2014. This was a sub-par rating and was unfairly issued by Captain Tsachas to sabotage Raymond's promotion to Sergeant and give him a negative performance rating that would allow Tsachas to place Raymond on the performance monitoring program. Tsachas order to Campbell to issue a negative rating to Raymond irrespective of Raymond's actual performance, was improper not only because, Tsachas improperly usurped the role of Campbell as the direct supervisor who actually observed the performance, but also because Tsachas did not supervise Raymond in the year 2014.

46.     Tsachas issuance of a 2.5 annual performance rating to Raymond for the year 2014, was an act of intentional racial discrimination and retaliation for Raymond's expressed opposition to the quota.

47.     On August 19, 2015, in further retaliation, on the order of Cpt. Tsachas, Raymond was issued an interim evaluation score of 2.0 out of 5.0 for his continuing opposition to the quota.

48.      On September 2, 2015, Cpt. Tsachas further retaliated against Raymond by ordering Sgt. Campbell to assign Raymond to a punitive post until Raymond stopped resisting the quota. The punitive post was a fixed post at the Clark Street OMEGA booth. Raymond was given that assignment for an unprecedented 11 out of 19 days that Raymond worked in the month of August 2015. No other officer was assigned to that booth for more than 5 days in a month.

49.      On September 24, 2015, Cpt. Tsachas punished Raymond for not submitting a vacation leave request in a timely manner. Two white police officers in exactly the same position as Raymond who also failed to submit a vacation leave request, Officers Reddan and Sawyer, were not similarly punished or even reprimanded in any way. Raymond, however, was charged with a command discipline and was punished by having two days and four hours of earned vacation time being taken from him by Cpt. Tsachas.

50.      Captain Tsachas issuance of a CD to Raymond and the subsequent punishment was an act of intentional racial discrimination and retaliation.

51.      White police officer Michael Desrosiers who was assigned to Transit District 32, and under Captain Tsachas command at the same time as Raymond, and had enforcement activity numbers similar to or lower than Raymond's also failed to meet the enforcement activity quota, but unlike Raymond, Officer Desrosiers was never given a negative performance evaluation or punished in any way.

52.      On September 24, 2015, Captain Tsachas threatened Raymond by telling him that he, Tsachas, will prevent Raymond's anticipated promotion to sergeant if Raymond continues to denounce the quota and fail to meet the quota.

53.     On October 15, 2015, Cpt. Tsachas threatened again to sabotage Raymond's anticipated promotion to Sergeant. Cpt. Tsachas carried out this threat.

54.     On December 7, 2015, Raymond is summoned before a review board chaired by Deputy Commissioner of Personnel Michael Julian, to discuss Raymond's lack of enforcement activity and possible promotion to Sergeant.

55.     On December 10, 2015, Deputy Commissioner Michael Julian cancels Raymond's promotion to Sergeant yet endorses the promotion to Sergeant of white police officer Shaun Tanner who is comparable to Raymond in that he was also called before the review board. Officer Tanner was promoted while Raymond was not. The failure to promote Raymond under the circumstances was an act of intentional racial discrimination and retaliation.

56.     Police officer Raymond was passed over for promotion three times, on December 17, 2015, January 28, 2016 and May 2nd, 2016.

57.     On January 2, 2016, Raymond is punitively transferred from Transit District 32 to the 77th Precinct, by Deputy Commissioner Julian, in retaliation for denouncing the quota.

58.     Plaintiff Sandy Gonzalez, is a Hispanic male of Dominican Republic origin and a police officer currently posted to the 40th Precinct of the NYPD, located at 257 Alexander Avenue, Bronx, New York. P.O. Gonzalez joined the NYPD in 2002 and has been assigned to the 40th Precinct, since March 2004.

59.     In December 2013, Gonzalez was assigned to the Complaint Room of the 40th Precinct. He received this temporary non-patrol assignment at that time for a two day

period because he was on limited duty as a result of a digestive illness. At the time, his supervisor was Lt. Andrew Hatki, a white male.

60.     Lt. Hatki was assigned to the 40th Precinct in June 2013. Soon after he arrived, he told Gonzalez on various occasions that Gonzalez needed to bring up his enforcement numbers and that the target was at least one arrest and twenty summons a month. Gonzalez told Lt. Hatki that he was doing what he could do. Gonzalez explained to Lt. Hatki that he was responding to calls, the radio was busy, and he was not slacking off in any way.  Lt. Hatki then explained to Gonzalez that keeping up his enforcement activity numbers was something that Gonzalez had to do as a police officer, no matter the circumstances. Lt. Hatki bluntly told Gonzalez that if he did not get more enforcement activity, he would receive a low performance evaluation rating.

61.     On December 30, 2013, while Gonzalez was assigned to take complaints, he took a moment to call his five year old daughter who was celebrating her birthday on that day. While Gonzalez was on the phone and in the presence of other officers and some members of the public, Lt. Hatki addressed Gonzalez in a dis-respectful tone and stated, "Sandy, get your ass of that chair and go to the desk". Gonzalez obeyed but he was highly offended by the manner in which Lt. Hatki addressed him.

62.     Later on December 30, 2013, in a private discussion between Lt. Hatki and Gonzalez, Hatki stated that Gonzalez was underperforming for the entire year of 2013 because he had not made enough arrests or written enough summons. Gonzalez explained to Hatki that he could not write as many summons as Hatki desired because for two to three days out of the work week, he was assigned to critical response or sent downtown

on counter terrorism patrols or on hospital watch posts, which usually involves just standing and observing, and offers no opportunity to write summonses or make arrests.

63.     On January 5, 2014, Lt. Hatki punished plaintiff Gonzalez for his low enforcement activity numbers by separating him from his partner and assigning him to a fixed solitary foot post. Prior to January 5, 2014, PO Gonzalez's patrol partner was Police Officer Jorge Gonzalez. At roll call on January 5, 2014, Lt. Hatki announced that he was separating plaintiff Gonzalez from his partner, and withdrawing him from his regular patrol assignment. Instead, Lt. Hatki assigned plaintiff Gonzalez to a fixed solitary foot post at the intersection of Third Avenue and 138th Street, in the Bronx. The weather condition was bad on that day. There was an ongoing blizzard. The pavement was icy and the ground was slushy due to a mixture of snow and rain that fell throughout the day.

103.    Plaintiff Gonzalez's separation from his partner was an act of punishment because ordinarily established patrol partners are not separated unless it is un-avoidable. Also, Lt. Hatki told Gonzalez that his intention in separating the partners was to punish Gonzalez for not producing enough summons and arrests. Lt. Hatki also told PO Jorge Gonzalez that the reason for the separation was so that PO Jorge Gonzalez would not suffer from collateral damage while working with plaintiff Gonzalez. In other words, Lt. Hatki stated that he did not want PO Jorge Gonzalez to suffer or experience punishment specifically meant for PO Sandy Gonzalez.

64.     Plaintiff's Gonzalez's assignment to a fixed foot post especially in bad weather, was an act of punishment because there is no necessity for a constant police presence at that spot during a blizzard. Additionally, Lt. Hatki told Gonzalez that his intention in assigning Gonzalez to the foot post was to punish him for not producing enough

summons. Being assigned singly to an unnecessary fixed post, especially during bad weather, is a well-recognized punitive assignment in the 40th Precinct. The previous commander of the 40th Precinct, John Nicholson, once wrote a threatening note that was handed to plaintiff Gonzalez, which basically stated that under performing officers get assigned to a fixed foot post in the rain and snow.

65.    On January 5, 2014, while at his assigned fixed post, as he was walking around stamping his feet and trying to get warm, plaintiff Gonzalez slipped and fell and was injured. With the permission of Sergeant Quinones, his then direct supervisor, he was taken to Jacobi Hospital for treatment.

66.    Following this incident, Lt. Hatki accused officer Gonzalez of having pretended to fall and initiated an investigation into this alleged misconduct. Upon information and belief, Lt. Hatki personally conducted this investigation by reviewing surveillance camera footage from the area of the fixed foot post.

67.    In January 2014, plaintiff Gonzalez was informed by Lt. Hatki that his annual performance evaluation rating for the year 2013 was 2.5 out of 5. 2.5 is a negative evaluation rating and put officer Gonzalez at the risk of being placed on the performance monitoring program. Such a low rating was unfair and not based on Officer Gonzalez's actual performance.

68.    It was racially discriminatory for Lt. Hatki to give Gonzalez a negative performance evaluation rating based on his enforcement activity numbers because white police officers in the same command, unit, squad and shift as the plaintiff, with equal or lower enforcement activity numbers, received annual performance evaluation ratings

higher than 2.5 for the same annual rating period. Some of those white officers are Police

Officers, Moynihan, Sontag, Calandra, Lebrini and Warkenthen.

69.     Plaintiff Gonzalez appealed the annual performance evaluation score of 2.5 given

to him by Lt. Hatki. On February 4, 2014, Gonzalez met with the Commander of the 40th

Precinct, Deputy Inspector Chrisopher McCormack, a white male, to appeal the negative

rating. Lt. Batelli was also present at the meeting. During this meeting, both senior

officers yelled at Gonzalez for not meeting the targeted number of arrests and summons,

and threatened to place him on the performance monitoring program. DI McCormack

denied the appeal and upheld the negative performance rating score. Plaintiff Gonzalez

then appealed that determination to the Bronx Borough Command level and that appeal

was also denied.

70.     On February 6, 2014, plaintiff Gonzalez made a written complaint to the NYPD's

Internal Affairs Bureau (IAB) and simultaneously to the federal Equal Employment

Opportunity Commission (EEOC). The complaint detailed three categories of violations

within the 40th Precinct, all of which involved Gonzalez, as follows; enforcement of an

illegal quota; the misclassification of offences and downgrading of felonies; and racial

discrimination against minorities by virtue of a hostile work environment. The offenders

were primarily, DI Christopher McCormack, and Lt. Andrew Hatki, Gonzalez's platoon

commander. In the complaint, Gonzalez stated that he was being racially discriminated

against as a Latino male by being forced to work in a hostile environment by Lt. Hatki.

Gonzalez also complained that Lt. Hatki and DI McCormack were forcing him and other

police officers to meet a quota of at least 1 arrest and 20 summonses a month and

punishing him when he failed to reach that target. Gonzalez also detailed how DI

McCormack was ordering Gonzalez and other police officers to mis-classify offenses and downgrade felonies.

71.     As a result of this complaint, the IAB and the EEOC began investigations into the allegations made in Gonzalez's written complaint aforesaid.

72.     Upon information and belief, DI McCormack and Lt. Hatki both believed that Gonzalez was the source of the investigations.

73.     On March 28, 2014, Gonzalez was interviewed by the IAB over the allegations made in the complaint. Rather than an investigation into the allegations, the interview turned into an investigation of Gonzalez's law enforcement activity. The interviewing officer, a Captain Benjamin, questioned Gonzalez closely regarding his enforcement activity record.

74.     In April 2014, in retaliation for his complaint, DI McCormack placed Gonzalez in the performance monitoring program. The performance monitoring program put officer Gonzalez on a probationary status where he was no longer entitled to the full benefits of his employment, and could be terminated.

75.     In December 2014, Gonzalez applied for a transfer to the City wide Task Force but was denied because of his negative (2.5) annual performance evaluation score for the 2013 annual period, and the fact that he was on the performance monitoring program.

76.     In May 2015, while Gonzalez was on assigned duty at Lincoln Hospital, he was approached by a Supervisor, Sergeant Tameika Goode, who, in the presence of her driver, Police Officer Michael Gallow, accused Gonzalez of tape recording his conversations with her. Upon information and belief, this accusation was based on information Sgt. Goode had received from DI McCormack and Lt. Hatki who had told

Goode and other co-workers of plaintiff Gonzalez, that Gonzalez was "a rat" and was recording everyone in the precinct.

77.     In July 2015, it was widely reported in the media, including the Daily News of July 17, 2015, that an NYPD internal investigation had revealed multiple cases of downgrading of felonies in the 40th Precinct. As a result of the Investigation, nineteen police and ranked officers in the 40th Precinct were charged with misconduct and faced disciplinary proceedings. Those 19 members of the force were transferred out of the 40th Precinct.

78.     On or about July 20, 2015, then Police Commissioner William Bratton visited the precinct in the wake of the felony misclassification scandal. On this visit, Commissioner Bratton addressed an extraordinary roll call that included all platoons including midnights and all day tours.  During this roll call, Commissioner Bratton stated to the entire precinct that a disgruntled officer among them had dropped the dime on the entire precinct. It was understood that plaintiff Gonzalez was the officer that the Commissioner was referring to, because of the complaint that Gonzalez had made in February 2014, which appeared to have started the initial investigation. Upon information and belief, DI McCormack had stated to multiple members of the 40th Precinct that Gonzalez was recording their conversations and had leaked the story to the media.

79.     At the roll call on July 20, 2015, then Chief of Department, and current Commissioner of Police, James O'Neill, who was also present, asked if anyone was recording the roll call. No one responded. Sergeant Tameika Goode, was also present at this roll call.

80.     From July 2015, Sgt. Goode, under instructions from Lt. Hatki, now the

Administrative head of the Precinct, only assigned Gonzalez an average of 5 to 8 patrols

days per month. This ensured that Gonzalez would never be able to meet the monthly

quota of summons or arrests and thus would be in a position of chronically

underperforming with respect to his enforcement activity numbers. Instead, Gonzalez was

assigned to non-patrol tasks such as escorting hospitalized prisoners, prisoner transport

and critical response vehicles.

81.     On August 3, 2015, Sgt. Goode, under instructions from Lt. Hatki, in further

retaliation, issued Gonzalez with an underserved minor violation for not being on his

assigned post at Station House Security, when in fact, Gonzalez had left the post briefly

with permission, in order to write a written report for Sergeant Goode regarding an earlier

assignment.

82.     In further retaliation for his complaints, on August 22, 2015, Gonzalez was issued

a command discipline by Sgt. Goode under instructions from Lt. Hatki, for allegedly

recording Sergeant Goode with a cell phone. Plaintiff Gonzalez was improperly found

guilty of this charge by Lt. Hatki with no adjudication and without being given a chance

to defend himself.

83.     On or about August 26, 2015, during roll call, as Gonzalez and other officers

waited for their assignments to be announced, Desk Officer Sgt. Goode, speaking to the

entire platoon, stated that Gonzalez was not to be trusted because he was videotaping and

recording everyone at the precinct. Gonzalez was immediately and severely affected by

this announcement and he experienced a cardiac episode, and fainted. Gonzalez was

taken by ambulance to the New York and Presbyterian Hospital for emergency medical

treatment and was admitted with chest pains and loss of consciousness. He was discharged the next day.

84.     In further retaliation, Lt. Hatki denied Gonzalez line of duty designation for his cardiac injury and upon information and belief, destroyed and or failed to properly file an AIDED card regarding the incident, in order to support his improper denial of line of duty designation for the injury.

85.     Gonzalez's cardiac injury happened during roll call and an AIDED card was prepared by Police Officer Encarnacion. This AIDED card was hand delivered by PO Encarnacion to Lt. Hatki but was never filed and has disappeared from the record. As a consequence of denial of line of duty designation, neither officer Gonzalez's medical insurance, or the NYPD, paid for his medical bills from the cardiac injury which was approximately $10,000 (ten thousand dollars). Gonzalez was denied line of duty designation for the incident and denied authorization to see a cardiologist as part of line of duty medical treatment.

86.     The AIDED card that was suppressed by Lt. Hatki in order to retaliate against Gonzalez stated in sum that Gonzalez fainted as a result of Sgt. Goode's comments during roll call.

87.     On September 7, 2015, Gonzalez wrote to the IAB and the OEEO complaining about the intensified retaliation that he was experiencing including the incidents at roll call.

88.     On October 10, 2015, in further retaliation, Gonzalez was issued with another Command Discipline also for allegedly recording Sgt. Tameika Goode.

89.     On November 25, 2015, Gonzalez was found guilty of having recorded Sgt.

Goode on August 22, 2015, with no adjudication or investigation. Although Gonzalez

tried to appeal this determination, he was never given the opportunity to do so.

90.     On November 27, 2015, in further retaliation, Gonzalez was unfairly issued with

two minor violations for having a cap device that did not march his shield, and for a

defective holster. Captain Girven put Gonzalez on the minor violations log for both

violations because Gonzalez was a target for punishment by the leadership of the

precinct, and had been labeled a 'rat'.

91.     Plaintiff Ritchie Baez is a Latin American male originally from the Dominican

Republic. He joined the NYPD in the rank of police officer in July 2004, and was

assigned to the 40th precinct, in January 2005.

92.     In the 40th Precinct, since January 2013, police officers such as Ritchie Baez are

required to meet an enforcement activity target of at least 1 arrest and 20 summons, per

month. Failure to meet this quota resulted in a low evaluation, assignment to punitive

posts such as fixed foot posts, and placement in the Performance Monitoring Program,

which could lead to dismissal.

93.     In the 40th Precinct, although the enforcement activity target or quota, every

month, was the same for all police officers, black and latino police officers such as

Ritichie Baez received punishment for low numbers while white police officers in the

same squad with similar numbers or even worse numbers did not receive the same

punishment.

94.     In January 2014, plaintiff Baez was issued an unfair performance evaluation

rating of 2.5 out of 5.0 for the 2013 annual rating period by DI Christopher McCormack,

the Commanding Officer of the 40th Precinct. 2.5 is a negative performance score that

exposed Baez to placement into the performance monitoring program.

95.     It was racially discriminatory and unfair for DI McCormack to award Baez a

negative performance rating for the year 2013, because in that year, Baez's actual

performance as a police officer merited a score of at least 4.0.

96.     It was racially discriminatory and unfair for DI McCormack to award Baez a

negative performance rating for not meeting the quota, because comparatively placed

white police officers in the same unit, with similar activity numbers for the same period,

including police officers Andrew Pellegrino, Keith Moynihan, Sontag, Calandra, Lebrini

and Warkenthen, did not get the same punishment. The white police officers received

higher annual performance evaluation scores of 3.5 and above, and were not placed on

performance monitoring.

97.     Plaintiff Baez appealed the 2.5 rating. On January 27, 2014, Baez was called to

the office of DI McCormack to adjudicate the appeal. Lt. Batelli was also present at this

meeting. Plaintiff Baez explained to the two superior officers that in the year 2013, he

had actually done excellent police work as detailed in the following paragraph, and

expected a higher performance evaluation score.

98.     In the year 2013, plaintiff Ritchie Baez performed great police work in three

instances; In May 2013, Officer Baez assisted a citizen of Spanish descent whose car had

been stolen. Officer Baez used his knowledge of Spanish to interview the victim and

realizing that time was of the essence, quickly performed a canvass of the immediate

neighborhood for the missing vehicle with the result that he immediately found the stolen

vehicle and arrested the perpetrator who was charged with Grand Larceny Auto; in

October 2013, Officer Baez was helping Housing police provide crowd control duties at 152nd Street, when he recognized a face in the crowd as an accused robber from a wanted poster. During the robbery, the suspect was accused of slashing her victim several times in the face. Acting quickly, Officer Baez promptly apprehended and arrested the suspect; The same year, Officer Baez was assisting a Special Operations Unit during an automobile stop. He observed an individual being interrogated by the Sergeant of the Special Operations Unit. Officer Baez realized that he had seen this individual on a wanted poster as a known gang member being sought by the police. When the individual gave a fictitious name to the Sergeant, Officer Baez alerted the Sergeant and was proven correct by a check of the NYPD records, leading to the arrest of the wanted individual. Despite the above, Plaintiff Baez was given a low performance evaluation in 2013 because his arrest and summons numbers did not meet the quota.

99.    DI McCormack was not swayed by Baez's explanation and denied the appeal. McCormack stated that Baez could write 500 criminal court summons per day on East 138th Street, if he really wanted to. McCormack told Baez that the reason he received a negative evaluation was because he had not written enough criminal court summons.

100.   On March 31, 2014, plaintiff Baez was placed in the Performance Monitoring Program by DI McCormack due to his negative performance rating.

101.   It was racially discriminatory for DI McCormack to place police officer Baez in the performance monitoring program for negative performance because white police officers such as Police Officers, Pellegrino, Moynihan, Sontag, Calandra, Lebrini and Warkenthen, whose performance was at the same level or worse than Baez, were not placed into the performance monitoring program.

102.    Plaintiff Pedro Serrano is a Latino male originally from the commonwealth of Puerto Rico. He was hired by the NYPD as a police officer in 2004 and assigned to the 40th Precinct the same year.

103.    Plaintiff Serrano experienced first hand the negative effect of the quotas imposed by his supervisors on the minority community where he patrolled in the South Bronx. For his failure to meet the quota, he received a negative performance evaluation. One of his supervisors Executive Officer Materasso, told him that in order for him to get a better evaluation, he must arrest, summon and stop and frisk more people. Plaintiff Serrano explained to Officer Materasso, the deputy commandant of the 40th precint, that the residents of the 40th precint are predominantly low income and that he did not feel right about giving them spurious summons. She disagreed and referred to the residents of the 40th precint as "animals". Plaintiff Serrano, of Puerto Rican origin similar to many residents of the South Bronx, was deeply offended.

104.    As a police officer in the 40th precinct, Officer Serrano was constantly pressured by all his supervisors to produce at least 20 summons, 1 arrest, and 5 stop and frisks, a month. If he failed to meet this target, he would be punished with low performance evaluations, punitive foot posts and forced assignment of arrests. An assignment of arrest happens when a superior officer would take a police officer along on patrol, identify a vagrant or homeless person, and order the police officer to arrest that person immediately.

105.    Deputy Inspector Christopher McCormack, the Commanding Officer of the 40th Precinct from September 2011, and Captain Martine Materasso, an Executive Officer of the 40th Precinct in the years, 2011, 2012 and 2013, were the supervisors who constantly

put pressure on Serrano to meet the quota and punished him, if he failed to make the quota.

106.   On January 7, 2012, Serrano met with Captain Materasso to discuss his annual performance evaluation for the year 2011. Cpt. Materasso had scored Serrano a 3.0 out of 5.0 and Serrano felt that it was unfair, and appealed it. During this meeting, Materasso told Serrano that the reason he received a low evaluation was because his enforcement activity was too low, specifically, because he did not write enough summons and didn't get enough stop and frisks. Serrano attempted to explain to Cpt. Materasso that it was unreasonable to expect him to get the targeted number of summons and stop and frisks no matter the circumstances and that it constituted a quota. Captain Materasso responded by stating that she can do what she wants and threatened Serrano that if he does not get the required number of summons, he will receive an even lower performance evaluation score.

107.   In the spring of 2012, while driving by Beekman Avenue and East 141 Street, in the presence of police officer Serrano, and his partner, Police Officer Chae, DI McCormack saw a black male standing against a wall. DI McCormack got out of his car, walked up to the black male and accosted him. He opened the man's zipper, pulled down the man's pants and exposed the man's penis. He then grabbed the man's penis and passed his hands between the man's butt cheeks. DI McCormack then pulled out some narcotics and gave it to his driver. Serrano was deeply offended by his Commander's conduct and resolved to report it.

108.   On or about June 1, 2012, plaintiff Serrano wrote a written complaint to the United States Office of Equal Employment Opportunity, (EEOC), which was also

referred to the NYPD's Office of Equal Employment Opportunity (OEEO), by the
EEOC. In that complaint, Serrano stated that DI McCormack and Captain Materasso
were discriminating against him as a Latino by forcing him to work in a racially hostile
environment. Serrano also detailed that how DI McCormack and Capt. Materasso were
forcing him and other police officers to downgrade felonies, and also that they compelled
Serrano and other police officers to meet a quota of law enforcement actions every
month. Serrano also contacted the New York Civil Liberties Union and gave them a
summary of the complaint. Finally, Serrano at the same time made similar complaints in
writing several times to his Union (PBA) delegate.

109.    Upon information and belief, DI McCormack and Capt. Materasso became aware
of Serrano's complaints against them on or about February 7, 2013, at a COMSTAT
meeting. Immediately upon their return from this meeting, at a roll call on February 7,
2013, DI McCormack stated, "some people in this roll call are afraid of work and the tail
is wagging the dog instead of the dog wagging the tail".

110.    Upon his return from the COMSTAT meeting aforesaid, DI McCormack
commenced a series of retaliatory action against Officer Serrano. On February 7, 2013,
was taken of his usual patrol assignment and assigned to a solitary fixed foot post at 339
Exterior Avenue. While Serrano was at that post, that same night, at various times, five
different supervisors came to inspect him and make sure that he was at the post and sign
his memo book including Sgt. Monroe, Lt. Mack, Capt. Materasso, DI McCormack and
the Administrative Lieutenant. This is highly unusual and an indication that the object of
the post is punishment. While at the post, he was visited by Sergeant Monroe who
ordered him to return briefly to the precinct and bring Capt. Materasso a copy of his

memo book. After he returned to his post, both DI McCormack and Cpt. Materasso

approached him and observed him from an unmarked vehicle for a period of time. It is an

extra ordinary event for the Commander of a Precinct to visit a solitary police officer at a

fixed post in order to sign his memo book. The five inspections were intended to convey

a threat to Serrano that he would be under increased scrutiny and would be punished for

minor or pretextual infractions.

111.    In further retaliation, beginning February 7, 2013, DI McCormack punished

Serrano by sending him outside the precinct on details. That week, Serrano returned from

from his posting one day to find that his locker had been ransacked and someone had

pasted rat stickers on his locker.

112.    In further retaliation, in February 7, 2013, Serrano was denied leave even though

he requested days off in the usual manner.

113.    In February 2013, Cpt. Materasso gave plaintiff Serrano a performance evaluation

score of 3.0 out of 5.0 for the 2012 annual period.

114.    It was unfair and racially discriminatory for Cpt. Materasso to give Serrano a

performance evaluation score of 3.0 for 2012, because by any objective basis, Serrano

deserved a score of at least 4.0 or above for that year. In the year 2010, prior to falling

under Materasso's command, Serrano had a total of 8 arrests, 10 criminal court (C)

summons, multiple moving (B) summons, multiple parking (A) summons, and several

stop and frisks (250's), and he received a passing grade of 4.0 on the annual performance

evaluation for that year. In the year 2011, Serrano had a total of 5 arrests, 2 C summons,

multiple B and C summons, and three 250's and he received an annual performance

evaluation rating of 3.0 from Cpt. Materasso. For the year 2012, Serrano had 8 arrests,

and approximately double the number of C, B, and A summons and 250's from the previous year, and still received an annual performance rating of 3.0 from Cpt. Materasso.

115.     The evaluation score of 3.0 for the 2012 annual period was racially discriminatory because, in 2012, three white police officers who had the same as, similar to, or worse enforcement activity numbers than Serrano, all received annual evaluation scores of 4.0 or better. Two of those white police officers were Police Officers Sontag and Moynihan.

116.     Plaintiff Serrano appealed his 2012 annual evaluation score. In February 2013, he met with DI McCormack to adjudicate the appeal. DI McCormack told Serrano that Serrano did not stop enough black people. McCormack also told Serrano that in his opinion, Serrano purposely failed to write stop and frisks and didn't stop the right people at the right place and at the right time. According to McCormack, the right people were men of color between the ages of 14 and 21 years old. McCormack told Serrano that if he sees a crowd of people in front of a deli or building, he should stop and frisk them. Serrano explained that in order for him to properly stop and frisk the hypothetical people in front of the deli, they would have to be suspected of some penal law misdemeanor or felony rather than mere suspicion of blocking traffic, which is neither. McCormack disagreed. McCormack insisted that if Serrano asks a crowd of people to disperse, that amounted to a stop and frisk and Serrano should then write 250's for the stop and frisks.

117.     DI McCormack was upset that Serrano disagreed with him on this issue. He yelled at Serrano and stated that Serrano did not know how to do his job. He also ordered the Administrative Lieutenant to send Serrano on stop and frisk training. He did not allow Serrano an opportunity to address other issues raised on the appeal. He basically just

interrogated Serrano about stop and frisks. During this meeting, McCormack told Serrano that he was aware of Serrano's EEOC/OEEO complaint.

118.   Shortly after meeting with DI McCormack to adjudicate the appeal, Sergeant Gomez, on McCormack's orders, seized Serrano's memo book and Serrano was escorted by they Integrity Control Officer (ICO) from the meeting to his locker where his locker was searched by the ICO, a Lieutenant.

119.   In February 2013, Serrano had a discussion with DI McCormack where DI McCormack threatened Serrano by stating that he knew that Serrano was slated to testify in the ongoing Floyd (stop and frisk federal civil rights) law suit and swore that if Serrano testified, McCormack would go through Serrano's memo book and issue a command discipline for every mistake that Serrano made in his memo book.

120.   On March 20 and March 21, 2013, Officer Serrano testified in the trial of the Floyd action. The substance of his testimony was that he was compelled to racially profile blacks and latinos by his supervisors including DI McCormack and Capt. Materasso.

121.   Approximately one month later, on or about April 5, 2013, Serrano was abruptly transferred out of the 40th Precinct without warning, and sent to the 33rd Precinct. Serrano was on vacation when the transfer was announced. He had been in the 40th Precinct for nine years previous to the transfer and that was his home in the NYPD. Serrano had not requested a transfer. The only purpose of the transfer was to punish Serrano.

122.   At the 33rd Precinct, Serrano was assigned to the day tour rather than the midnight tour which was his tour in the 40th Precinct, therefore, he lost his night differential pay which amounted to about $5,000.00 annually.

**1st Cause of Action: Edreweene Raymond against Constantin Tsachas for Discrimination in Violation of The Civil Rights Act of 1866; The 14th Amendment to the United States Constitution; 42 U.S.C. Section 1981; 42 U.S.C. Section 1983 and 42 U.S.C. Section 1985**

123.    All previous allegations of this Complaint are incorporated herein as if fully set forth below.

124.    By unfairly subjecting Raymond to command discipline for untimely submission of a vacation request while two white officers were not disciplined for the same offense and for subjection Raymond to unfair command discipline for failure to meet the enforcement activity quota while a white officer with the same or a lower level of quota compliance was not punished in any way, defendant Tsachas purposefully and intentionally discriminated against Raymond on the basis of race and national origin, and thus violated the rights of Plaintiff Edreweene Raymond under the equal protection clause of the 14th Amendment and under 42 U.S.C. Section 1981, to be free from racial discrimination.

125.    As a result of this violation, plaintiff's Edreween Raymond is entitled to compensatory damages, punitive damages, and an award of attorney's fees.

**2nd Cause of Action: Edreweene Raymond against Constantin Tsachas for Discrimination in Violation of The New York States human rights law**

126.    All previous allegations of this Complaint are incorporated herein as if fully set forth below.

127.    By unfairly subjecting Raymond to command discipline for untimely submission of a vacation request while two white officers were not disciplined for the same offense and for subjection Raymond to unfair command discipline for failure to meet the

enforcement activity quota while a white officer with the same or a lower level of quota compliance was not punished in any way, defendant Tsachas purposefully and intentionally discriminated against Raymond on the basis of race and national origin, and thus defendant Tsachas violated the rights of plaintiff Raymond under New York State's Human Rights Law to be free from racial discrimination.

128.    As a result of this violation, plaintiff Raymond is entitled to compensatory damages, punitive damages and an award of attorney's fees.

### 3rd Cause of Action: Raymond against Tsachas for discrimination in violation of New York City's Human Rights Law, Local Law 59 of 1986, as amended by Local Rule 39 of 1991, §§ 8-101, et seq.

129.    All previous allegations of this Complaint are incorporated herein as if fully set forth below.

130.    By unfairly subjecting Raymond to command discipline for untimely submission of a vacation request while two white officers were not disciplined for the same offense and for subjection Raymond to unfair command discipline for failure to meet the enforcement activity quota while a white officer with the same or a lower level of quota compliance was not punished in any way, defendant Tsachas purposefully and intentionally discriminated against Raymond on the basis of race and national origin, and thus defendant Tsachas violated the rights of plaintiff Raymond under New York City's human rights law, to be free from racial discrimination.

131.    As a result of this violation, plaintiff Raymond is entitled to compensatory damages, punitive damages, and an award of attorney's fees.

## 4th Cause of Action: Sandy Gonzalez against Christopher McCormack for Discrimination in Violation of The Civil Rights Act of 1866; The 14th Amendment to the United States Constitution; 42 U.S.C. Section 1981; 42 U.S.C. Section 1983 and 42 U.S.C. Section 1985

132.    All previous allegations of this Complaint are incorporated herein as if fully set forth below.

133.    By unfairly subjecting Gonzalez to low performance ratings and designation to the Performance Monitoring Program defendant McCormack purposefully and intentionally discriminated against Gonzalez on the basis of race and national origin, and thus violated the rights of Plaintiff Gonzalez under the equal protection clause of the 14th Amendment and under 42 U.S.C. Section 1981, to be free from racial discrimination.

134.    As a result of this violation, plaintiff's Sandy Gonzalez is entitled to compensatory damages, punitive damages, and an award of attorney's fees.

## 5th Cause of Action: Sandy Gonzalez against Christopher McCormack for Discrimination in Violation of The New York States human rights law

135.    All previous allegations of this Complaint are incorporated herein as if fully set forth below.

136.    By unfairly subjecting Gonzalez to low performance ratings and designations to the Performance Monitoring Program, defendant McCormack purposefully and intentionally discriminated against Gonzalez on the basis of race and national origin, and thus defendant McCormack violated the rights of plaintiff Gonzalez under New York State's Human Rights Law to be free from racial discrimination.

137.    As a result of this violation, plaintiff Gonzalez is entitled to compensatory damages, punitive damages and an award of attorney's fees.

**6th Cause of Action: Sandy Gonzalez against Christopher McCormack for discrimination in violation of New York City's Human Rights Law, Local Law 59 of 1986, as amended by Local Rule 39 of 1991, §§ 8-101, et seq.**

138.   All previous allegations of this Complaint are incorporated herein as if fully set forth below.

139.   By unfairly subjecting Gonzalez to low performance ratings and designations to the Performance Monitoring Program, defendant McCormack purposefully and intentionally discriminated against Gonzalez on the basis of race and national origin, and thus defendant McCormack violated the rights of plaintiff Gonzalez under New York City's human rights law, to be free from racial discrimination.

140.   As a result of this violation, plaintiff Gonzalez is entitled to compensatory damages, punitive damages, and an award of attorney's fees.

**7th Cause of Action: Ritchie Baez against Christopher McCormack for Discrimination in Violation of The Civil Rights Act of 1866; The 14th Amendment to the United States Constitution; 42 U.S.C. Section 1981; 42 U.S.C. Section 1983 and 42 U.S.C. Section 1985**

141.   All previous allegations of this Complaint are incorporated herein as if fully set forth below.

142.   By unfairly subjecting Baez to low performance ratings and designation to the Performance Monitoring Program defendant McCormack purposefully and intentionally discriminated against Baez on the basis of race and national origin, and thus violated the rights of Plaintiff Baez under the equal protection clause of the 14th Amendment and under 42 U.S.C. Section 1981, to be free from racial discrimination.

143.   As a result of this violation, plaintiff's Ritchie Baez is entitled to compensatory damages, punitive damages, and an award of attorney's fees.

**8th Cause of Action: Ritchie Baez against Christopher McCormack for Discrimination in Violation of The New York States human rights law**

144.   All previous allegations of this Complaint are incorporated herein as if fully set forth below.

145.   By unfairly subjecting Baez to low performance ratings and designations to the Performance Monitoring Program, defendant McCormack purposefully and intentionally discriminated against Baez on the basis of race and national origin, and thus defendant McCormack violated the rights of plaintiff Baez under New York State's Human Rights Law to be free from racial discrimination.

146.   As a result of this violation, plaintiff Baez is entitled to compensatory damages, punitive damages and an award of attorney's fees.

**9th Cause of Action: Ritchie Baez against Christopher McCormack for discrimination in violation of New York City's Human Rights Law, Local Law 59 of 1986, as amended by Local Rule 39 of 1991, §§ 8-101, et seq.**

147.   All previous allegations of this Complaint are incorporated herein as if fully set forth below.

148.   By unfairly subjecting Baez to low performance ratings and designations to the Performance Monitoring Program, defendant McCormack purposefully and intentionally discriminated against Baez on the basis of race and national origin, and thus defendant McCormack violated the rights of plaintiff Baez under New York City's human rights law, to be free from racial discrimination.

149.   As a result of this violation, Ritchie Baez is entitled to compensatory damages, punitive damages and an award of attorney's fees.

**10th Cause of Action: By Pedro Serrano against Christopher McCormack For Discrimination in Violation of the Civil Rights Act of 1866; The 14th Amendment to the United States Constitution, 42 U.S.C. Sections 1981, 1983 and 1985.**

150.   All previous allegations of this Complaint are incorporated herein as if fully set forth below.

152.   By unfairly giving Serrano a negative performance rating, defendant McCormack purposefully and intentionally discriminated against Serrano on the basis of race and national origin, and thus violated the rights of Plaintiff Serrano under the equal protection clause of the 14th Amendment and under 42 U.S.C. Section 1981, to be free from racial discrimination.

153.   As a result of this violation, plaintiff's Pedro Serrano is entitled to compensatory damages, punitive damages, and an award of attorney's fees.

**11th Cause of Action: Pedro Serrano against Christopher McCormack for Discrimination in Violation of The New York States human rights law**

154.   All previous allegations of this Complaint are incorporated herein as if fully set forth below.

155.   By unfairly giving Serrano a negative performance rating, defendant McCormack purposefully and intentionally discriminated against Serrano on the basis of race and national origin, and thus defendant McCormack violated the rights of plaintiff Serrano under New York State's Human Rights Law to be free from racial discrimination.

156.   As a result of this violation, plaintiff Serrano is entitled to compensatory damages, punitive damages and an award of attorney's fees.

### 12th Cause of Action: Pedro Serrano against Christopher McCormack for discrimination in violation of New York City's Human Rights Law, Local Law 59 of 1986, as amended by Local Rule 39 of 1991, §§ 8-101, et seq.

157.    All previous allegations of this Complaint are incorporated herein as if fully set forth below.

158.    By unfairly giving Serrano a negative performance rating, defendant McCormack purposefully and intentionally discriminated against Serrano on the basis of race and national origin, and thus defendant McCormack violated the rights of plaintiff Serrano under New York City's human rights law, to be free from racial discrimination.

159.    As a result of this violation, plaintiff Serrano is entitled to compensatory damages, punitive damages and an award of attorney's fees.

### 13th Cause of Action: Sandy Gonzalez against Christopher McCormack For Retaliation Regarding a Discrimination Complaint made on September 7, 2015, in Violation of The Civil Rights Act of 1866; The 14th Amendment to the United States Constitution; 42 U.S.C. Section 1981; 42 U.S.C. Section 1983 and 42 U.S.C. Section 1985

160.    All previous allegations of this Complaint are incorporated herein as if fully set forth below.

161.    By unfairly issuing a CD to Gonzalez on October 10, 2015, finding Gonzalez guilty on of the charge on the CD without providing him with an opportunity to defend himself, and issuing two underserved minor violations to Gonzalez, McCormack purposefully and intentionally retaliated against Gonzalez for filing a discrimination complaint, and thus violated the rights of Plaintiff Gonzalez under the equal protection clause of the 14th Amendment and under 42 U.S.C. Section 1981, to be free from such retaliation.

162.   As a result of this violation, plaintiff's Sandy Gonzalez is entitled to compensatory damages, punitive damages, and an award of attorney's fees.

## 14th Cause of Action: Sandy Gonzalez against Christopher McCormack for Retaliation Regarding a Complaint of Discrimination Made on September 7, 2015, in Violation of The New York State's Human Rights Law

163.   All previous allegations of this Complaint are incorporated herein as if fully set forth below.

164.   By unfairly issuing a CD to Gonzalez on October 10, 2015, finding Gonzalez guilty on of the charge on the CD without providing him with an opportunity to defend himself, and issuing two underserved minor violations to Gonzalez, McCormack purposefully and intentionally retaliated against Gonzalez for filing a discrimination complaint, and thus violated the rights of Plaintiff Gonzalez under New York State's Human Rights Law.

165.   As a result of this violation, plaintiff Gonzalez is entitled to compensatory damages, punitive damages and an award of attorney's fees.

## 15th Cause of Action: Sandy Gonzalez against Christopher McCormack for Retaliation Regarding a Complaint of Discrimination Made on September 7, 2015, in violation of New York City's Human Rights Law, Local Law 59 of 1986, as amended by Local Rule 39 of 1991, §§ 8-101, et seq.

166.   All previous allegations of this Complaint are incorporated herein as if fully set forth below.

167.   By unfairly issuing a CD to Gonzalez on October 10, 2015, finding Gonzalez guilty on of the charge on the CD without providing him with an opportunity to defend himself, and issuing two underserved minor violations to Gonzalez, McCormack

purposefully and intentionally retaliated against Gonzalez for filing a discrimination complaint, and thus violated the rights of Plaintiff Gonzalez under New York City's Human Rights Law.

168.    As a result of this violation, plaintiff Gonzalez is entitled to compensatory damages, punitive damages, and an award of attorney's fees.

**16th Cause of Action: Pedro Serrano against Christopher McCormack For Retaliation Regarding a Discrimination Complaint made on June 1, 2012, in Violation of The Civil Rights Act of 1866; The 14th Amendment to the United States Constitution; 42 U.S.C. Section 1981; 42 U.S.C. Section 1983 and 42 U.S.C. Section 1985**

169.    All previous allegations of this Complaint are incorporated herein as if fully set forth below.

170.    By removing Serrano from his usual patrol assignment, and re-assigning him to a fixed foot post, sending him outside the precinct on details, ransacking his locker and pasting stickers of rats to his locker, denying him leave despite his proper requests of days off in the usual manner, and giving him an unfair 3.0 out of 5.0 performance evaluation rating for the 2012 annual period, defendant McCormack intentionally and purposefully retaliated against Serrano for filing a discrimination complaint, and thus violated the rights of Plaintiff Serrano under the equal protection clause of the 14th Amendment and under 42 U.S.C. Section 1981 and 42 U.S.C. Section 1983, to be free from such retaliation.

171.    As a result of this violation, plaintiff's Pedro Serrano is entitled to compensatory damages, punitive damages, and an award of attorney's fees.

**17th Cause of Action: Pedro Serrano against Christopher McCormack for Retaliation Regarding a Complaint of Discrimination Made on June 1, 2012, in Violation of The New York State's Human Rights Law**

172.    All previous allegations of this Complaint are incorporated herein as if fully set forth below.

173.    By removing Serrano from his usual patrol assignment, and re-assigning him to a fixed foot post, sending him outside the precinct on details, ransacking his locker and pasting stickers of rats to his locker, denying him leave despite his proper requests of days off in the usual manner, and giving him an unfair 3.0 out of 5.0 performance evaluation rating for the 2012 annual period, defendant McCormack intentionally and purposefully retaliated against Serrano for filing a discrimination complaint, and thus violated the rights of Plaintiff Serrano under New York State's Human Rights Law, to be free from such retaliation.

174.    As a result of this violation, plaintiff Serrano is entitled to compensatory damages, punitive damages and an award of attorney's fees.

**18th Cause of Action: Pedro Serrano against Christopher McCormack for Retaliation Regarding a Complaint of Discrimination Made on June 1, 2012, in violation of New York City's Human Rights Law, Local Law 59 of 1986, as amended by Local Rule 39 of 1991, §§ 8-101, et seq.**

175.    All previous allegations of this Complaint are incorporated herein as if fully set forth below.

176.    By removing Serrano from his usual patrol assignment, and re-assigning him to a fixed foot post, sending him outside the precinct on details, ransacking his locker and pasting stickers of rats to his locker, denying him leave despite his proper requests of

days off in the usual manner, and giving him an unfair 3.0 out of 5.0 performance

evaluation rating for the 2012 annual period, defendant McCormack intentionally and

purposefully retaliated against Serrano for filing a discrimination complaint, and thus

violated the rights of Plaintiff Serrano under New York City's Human Rights Law, to be

free from such retaliation.

177.    As a result of this violation, plaintiff Serrano is entitled to compensatory damages,

punitive damages and an award of attorney's fees.

### 19th Cause of Action: Edreweene Raymond against Constantin Tsachas for Retaliation in Violation of The 1st Amendment to the United States Constitution for Protected Speech made on November 22, 2014

178.    All previous allegations of this Complaint are incorporated herein as if fully set

forth below.

179.    By unfairly passing Raymond over for promotion, reducing his performance

evaluation score, assigning him to a punitive posting, and giving him underserved failing

and low evaluation scores from November 2014 to January 2015 and continuing,

defendant Tsachas retaliated against Raymond, in violation Raymond's  rights under the

1st Amendment to the United States Constitution.

180.    As a result of this violation, plaintiff's Edreween Raymond is entitled to

compensatory damages, punitive damages, and an award of attorney's fees.

### 20th Cause of Action: Edreweene Raymond against Constantin Tsachas for Retaliation, in Violation of New York State's Human Rights Law, for Protected Speech made on November 22, 2014

181.    All previous allegations of this Complaint are incorporated herein as if fully set

forth below.

182.    By unfairly passing Raymond over for promotion, reducing his performance evaluation score, assigning him to a punitive posting, and giving him underserved failing and low evaluation scores from November 2014 to January 2015 and continuing, defendant Tsachas retaliated against Raymond, in violation of Raymond's rights under New York State's Human Rights Law.

183.    As a result of this violation, plaintiff Raymond is entitled to compensatory damages, punitive damages and an award of attorney's fees.

### 21st Cause of Action: Raymond against Tsachas for retaliation, in Violation of New York City's Human Rights Law, Local Law 59 of 1986, as amended by Local Rule 39 of 1991, §§ 8-101, et seq.

184.    All previous allegations of this Complaint are incorporated herein as if fully set forth below.

185.    By unfairly passing Raymond over for promotion, reducing his performance evaluation score, assigning him to a punitive posting, and giving him underserved failing and low evaluation scores from November 2014 to January 2015 and continuing, defendant Tsachas retaliated against Raymond, in violation of Raymond's rights under New York City's Human Rights Law.

186.    As a result of this violation, plaintiff Raymond is entitled to compensatory damages, punitive damages, and an award of attorney's fees.

### 22nd Cause of Action: By Sandy Gonzalez against The City of New York, William J. Bratton, James O'Neill, and Christopher McCormack, for Retaliation in Violation of The 1st Amendment to the United States Constitution, for Protected Speech made beginning on or about February 6, 2014

187.    All previous allegations of this Complaint are incorporated herein as if fully set forth below.

188.    By labeling Gonzalez a "rat" who was recording everyone in the precinct, falsely

accusing him of recording his supervisor Sergeant Tameika Goode, informing the entire

40th Precinct that Gonzalez was the person who had complained about corruption in the

precinct leading to an official investigation, issuing two CD's to Gonzalez without giving

him an opportunity to defend himself, denying Gonzalez a line of duty designation after

he fainted during roll call and destroying necessary paperwork in order to achieve this

denial, unfairly issuing Gonzalez with two minor violations, all beginning on or about

May 2015, defendant's the City of New York, Bratton, O'Neill and McCormack,

intentionally retaliated against Gonzalez's for protected speech, in violation of

Gonzalez's  rights under the 1st Amendment to the United States Constitution.

189.    As a result of this violation, plaintiff's Sandy Gonzalez is entitled to

compensatory damages, punitive damages, and an award of attorney's fees.


**23rd Cause of Action: By Sandy Gonzalez against The City of New York, William J.  Bratton, James O'Neill and Christopher McCormack, for Retaliation, in Violation of New York State's Human Rights Law, for Protected Speech made beginning from on or about February 6, 2014**


190.    All previous allegations of this Complaint are incorporated herein as if fully set

forth below.

191.    By labeling Gonzalez a "rat" who was recording everyone in the precinct, falsely

accusing him of recording his supervisor Sergeant Tameika Goode, informing the entire

40th Precinct that Gonzalez was the person who had complained about corruption in the

precinct leading to an official investigation, issuing two CD's to Gonzalez without giving

him an opportunity to defend himself, denying Gonzalez a line of duty designation after

he fainted during roll call and destroying necessary paperwork in order to achieve this denial, unfairly issuing Gonzalez with two minor violations, all beginning on or about May 2015, defendant's the City of New York, Bratton, O'Neill and McCormack, intentionally retaliated against Gonzalez's for protected speech in violation of Gonzalez's rights under New York State's Human Rights Law.

192.     As a result of this violation, plaintiff Sandy Gonzalez is entitled to compensatory damages, punitive damages and an award of attorney's fees.

### 24th Cause of Action: By Sandy Gonzalez against The City of New York, William J. Bratton, James O'Neill, and Christopher McCormack, For Retaliation in Violation of New York City's Human Rights Law, Local Law 59 of 1986, as amended by Local Rule 39 of 1991, §§ 8-101, et seq, regarding protected Speech made beginning on or about February 6, 2014

193.     All previous allegations of this Complaint are incorporated herein as if fully set forth below.

194.     By labeling Gonzalez a "rat" who was recording everyone in the precinct, falsely accusing him of recording his supervisor Sergeant Tameika Goode, informing the entire 40th Precinct that Gonzalez was the person who had complained about corruption in the precinct leading to an official investigation, issuing two CD's to Gonzalez without giving him an opportunity to defend himself, denying Gonzalez a line of duty designation after he fainted during roll call and destroying necessary paperwork in order to achieve this denial, unfairly issuing Gonzalez with two minor violations, all beginning on or about May 2015, defendant's the City of New York, Bratton, O'Neill and McCormack, intentionally retaliated against Gonzalez's for protected speech in violation of Gonzalez's rights under New York City's Human Rights Law.

195.    As a result of this violation, plaintiff Gonzalez is entitled to compensatory

damages, punitive damages, and an award of attorney's fees.

**25ᵗʰ Cause of Action: By Pedro Serrano against Christopher McCormack, for Retaliation in Violation of The 1ˢᵗ Amendment to the United States Constitution, for Protected Speech made beginning on or about June 1, 2012 and March 2013**

196.    All previous allegations of this Complaint are incorporated herein as if fully set

forth below.

197.    By re-assigning Serrano from his usual patrol assignment to a solitary fixed foot

post, inspections by multiple supervisors during a single shift, sending him outside the

precinct on details, denying proper leave requests, and punitively transferring Serrano to

another precinct where he was assigned to the day tour and lost his night differential pay,

all beginning on or about February 7, 2013, defendant McCormack, intentionally

retaliated against Serrano for protected speech, in violation of Serrano's  rights under the

1ˢᵗ Amendment to the United States Constitution.

198.    As a result of this violation, plaintiff Serrano is entitled to compensatory damages,

punitive damages, and an award of attorney's fees.

**26ᵗʰ Cause of Action: By Pedro Serrano against Christopher McCormack, for Retaliation, in Violation of New York State's Human Rights Law, for Protected Speech made beginning from on or about June 1, 2012 and March 2013**

199.    All previous allegations of this Complaint are incorporated herein as if fully set

forth below.

200.    By re-assigning Serrano from his usual patrol assignment to a solitary fixed foot

post, inspections by multiple supervisors during a single shift, sending him outside the

precinct on details, denying proper leave requests, and punitively transferring Serrano to another precinct where he was assigned to the day tour and lost his night differential pay, all beginning on or about February 7, 2013, defendant McCormack, intentionally retaliated against Serrano for protected speech, in violation of Serrano's rights under New York State's Human Rights Law.

201.    As a result of this violation, plaintiff Serrano is entitled to compensatory damages, punitive damages and an award of attorney's fees.

## 27th Cause of Action: By Pedro Serrano against Christopher McCormack, For Retaliation in Violation of New York City's Human Rights Law, Local Law 59 of 1986, as amended by Local Rule 39 of 1991, §§ 8-101, et seq. regarding protected Speech made beginning on or about June 1, 2012 and in March 2013

202.    All previous allegations of this Complaint are incorporated herein as if fully set forth below.

203.    By re-assigning Serrano from his usual patrol assignment to a solitary fixed foot post, inspections by multiple supervisors during a single shift, sending him outside the precinct on details, denying proper leave requests, and punitively transferring Serrano to another precinct where he was assigned to the day tour and lost his night differential pay, all beginning on or about February 7, 2013, defendant McCormack, intentionally retaliated against Serrano for protected speech, in violation of Serrano's rights under New York City's Human Rights Law.

204.    As a result of this violation, plaintiff Serrano is entitled to compensatory damages, punitive damages, and an award of attorney's fees.

WHEREFORE, Plaintiffs, pray that the Court will:

1).    Award compensatory damages to the plaintiffs against the defendants for the unlawful negative employment actions taken against them including loss of benefits, loss of earned time off, loss of upgrades and promotions, and loss of overtime.

2).    Issue an order for damages requiring the defendants to reimburse and make whole, the plaintiffs for any and all benefits they would have received had it not been for defendant's illegal actions including, back pay with interest, benefits and seniority from the time of the Defendant's illegal actions taken against them.

3).    Issue an order for an award of compensatory damages to the plaintiffs for the pain, suffering, emotional distress, loss of dignity, humiliation and damages to reputation and livelihood endured by the plaintiffs in amounts that are fair, just and reasonable, to be determined at trial;

4).    Awards of compensatory damages to plaintiffs Raymond, Serrano, and Gonzalez, for violations of their rights to free speech pursuant to the First Amendment of the United States and pursuant to the Article 1, §8 of the New York State Constitution.

5).    An award of punitive damages to plaintiffs against all defendants except the City of New York in an amount to be determined at trial.

6).    Award plaintiffs all costs of this action and reasonable attorneys' fees, as provided for in 42 U.S.C. § 1988 and 42 U.S.C. § 1920.

New York, New York
July 11, 2018

NWOKORO & SCOLA, ESQUIRES

By: _____ /S/ _____
       Chukwuemeka Nwokoro (CN-1038)
       30 Broad Street – Suite 1424
       New York, New York 10004
        (212) 785-1060