# EXHIBIT "D"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
In re:                              :
                                        Docket #15cv6885
RAYMOND, et al.,                    : 1:15-cv-06885-LTS-HBP

                    Plaintiffs,     :

  - against -                       :

THE CITY OF NEW YORK, et al.,       : New York, New York
                                      June 20, 2019
                    Defendants.      :

------------------------------------ :
```

PROCEEDINGS BEFORE
THE HONORABLE HENRY B. PITMAN
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


APPEARANCES:

For Plaintiffs:          LAW OFFICE OF JOHN A. SCOLA, PLLC
                         BY:  JOHN A. SCOLA, JR., ESQ.
                         120 MacDougal Street
                         New York, New York 10004


For Defendant:           NEW YORK CITY LAW DEPARTMENT
                         OFFICE OF CORPORATION COUNSEL
                         BY:  YUVAL RUBINSTEIN, ESQ.
                         100 Church Street, Room 2-115
                         New York, New York 10007


**Transcription Service:**    **Carole Ludwig,** *Transcription Services*
                         **141 East Third Street #3E**
                         **New York, New York 10009**
                         **Phone:  (212) 420-0771**
                         **Email:  transcription420@aol.com**


**Proceedings recorded by electronic sound recording;**
**Transcript produced by transcription service.**

**INDEX**

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|
| None | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| None | | | | |

THE CLERK:  This is Raymond versus the City of New York, docket 15cv6885.  Counsel, your appearances for the record, please.

MR. JOHN SCOLA:  John Scola for the plaintiffs.

MR. YUVAL RUBINSTEIN:  Good morning, Your Honor, Yuval Rubinstein for the defendants.

THE COURT:  Good morning, all.  We are here today to address some discovery issues. Let me start with the easy one first. I guess the issue with the assertion of privilege at the deposition the other day on Friday, that's no longer an issue?

MR. SCOLA:  That's correct Your Honor, I did some research and I withdrew that.

THE COURT:  All right, great.  All right, we are here to address the issues raised in the following letters. I have letters from plaintiffs' counsel dated June 1, two letters from plaintiffs' counsel dated June 1 and a responsive letter from the defendants dated June 7. I take it that's the universe of relevant correspondence, is there anything else I should have from plaintiff?

MR. SCOLA:  No, I think that's it for now, Your Honor.

THE COURT:  Okay, anything else I should have

1
2  from defendant?

3        MR. RUBINSTEIN:  There is one other issue I will

4  probably raise during our discussion.

5        THE COURT:  First answer my question, is there any

6  other correspondence I should have?

7        MR. RUBINSTEIN:  No, Your Honor.

8        THE COURT:  Go ahead, what did you want to

9  say?

10        MR. RUBINSTEIN:  Just in terms of the issue of

11  the memo book for Mr. Serrano, I do have additional

12  documentation but we can address that later on.

13        THE COURT:  All right, we're going to go

14  through those.  All right, Mr. Scola, what do you want

15  to talk about first, there's several issues raised in

16  your letter, which, by the way, both sides can remain

17  seated, you can be comfortable

18        MR. SCOLA:  Thank you, Your Honor.

19        THE COURT:  What do you want to talk about

20  first?

21        MR. SCOLA:  We can just go right from the

22  beginning with the electronically stored information,

23  the ESI search terms I think is a good place to start.

24        THE COURT:  All right, and your search terms

25  are the last names of each of the plaintiffs?

1

2          MR. SCOLA:  Yes, Your Honor.

3          THE COURT:  Do we know how many documents

4  that's going to retrieve, Mr. Rubinstein?  You can sit

5  --

6          MR. RUBINSTEIN:  I'm sorry. I had the

7  discussion with the e-discovery group, I think our

8  concerns really are for, it's difficult for us to conduct

9  a search and impress it upon them, but our concerns are --

10         THE COURT:  It's difficult, I just didn't hear

11 what you said, it's difficult what?

12         MR. RUBINSTEIN:  It's not how we usually run ESI

13 searches, so it's difficult to get a precise count. But

14 our concerns were Gonzalez and Raymond, simply because

15 Gonzalez is a very common last name and what they told me

16 is for Gonzalez they have well over 100,000, I believe it

17 was 121,354 just for Gonzalez.

18         THE COURT:  First of all, what custodians are we

19 talking about here?

20         MR. RUBINSTEIN:  There's four I believe, I think

21 it's just the four individual defendants.

22         THE COURT:  All right, so that's Bratton,

23 O'Neill, McCormack, and Tsachas?

24         MR. RUBINSTEIN:  Yes.

25         THE COURT:  Okay. I take your point about

 1

 2 Gonzalez being a very common name in New York, were test

 3 searches run with any of the defendants, any of the

 4 plaintiffs' names?

 5          MR. RUBINSTEIN:  The 121,000 does include, I

 6 mean, you mean the full name, Your Honor?

 7          THE COURT:  No, I mean my understanding is the

 8 plaintiff wants you to run the last names of the

 9 plaintiffs, is that right?

10          MR. SCOLA:  That's correct.

11          MR. RUBINSTEIN:  And that's what we did, Your

12 Honor, yes.

13          THE COURT:  Okay, and just give me that number

14 again, please.

15          MR. RUBINSTEIN:  Sure, for Gonzalez it's

16 121,354, and again, that's just with the last names.

17 The plaintiffs actually, if you look at exhibit A,

18 they actually wanted emails without the last names as

19 well for Gonzalez and we objected to that as well.

20          THE COURT:  All right.  And let me ask you

21 something, when the department, when there are emails

22 within the department referencing a police officer, is

23 the badge number ordinarily included?

24          MR. RUBINSTEIN:  That's a good question, I do

25 not know the answer to that.  I think the issues with

these searches is that it could be also not just the police officer but it could be a member of the public with the last name.

THE COURT: No, I understand that and I'm just wondering if the protocol for sending emails is to include the officer's name and badge number. I don't know if that's the case, I'm asking the question. I mean if the protocol is to include the badge number, that might be a more targeted search.

MR. RUBINSTEIN: That's a good question, Your Honor, I can discuss that with the client, I don't have an answer offhand today.

THE COURT: Okay. Well let me come back to Mr. Scola for a second, what's wrong with the search terms that have been produced by, have been suggested by defense counsel, what do you think they would not capture?

MR. SCOLA: Well depending on how people word emails, it is not exactly clear what they would capture or they wouldn't capture at this point.

THE COURT: Well you never know for sure. I mean with all ESI searches one can never be sure that you're capturing everything, but the Federal Rules don't require capturing everything.

MR. SCOLA: Well I would like to know what the amount of responses were for the other names. I think Baez is a less common name, and I think Raymond is a less common name, at least for a last name.

THE COURT: Less common may mean you get 100,000 hits instead of 121,000 hits.

MR. SCOLA: Well 100,000 hits for Gonzalez seems, I mean that seems like crazy high to me.

THE COURT: One-hundred-twenty-one.

MR. SCOLA: Yeah, 121,000 hits for Gonzalez on an email. I mean specifically and email --

THE COURT: You're not suggesting Mr. Rubinstein is misstating the facts, are you?

MR. SCOLA: No, I'm not saying that, I'm just saying if there is 100,000 hits for just McCormack saying Gonzalez, I think that's a little bit different than if it's the total amount. Maybe we could lessen it for --

THE COURT: Is the 121,000 for all four custodians or just one?

MR. RUBINSTEIN: Just for Gonzalez, Your Honor.

THE COURT: No, custodians.

MR. RUBINSTEIN: oh, I'm sorry, that's for all

1

2 custodians, yes.

3        THE COURT:  For all four.

4        MR. RUBINSTEIN:  Yeah.

5        THE COURT:  Okay, go ahead.

6        MR. SCOLA:  I mean at this point I'm not sure

7 exactly how the emails worked within the department.

8 My sense is that if someone sends a retaliatory or a

9 discriminatory email it's not as clear cut as

10 Raymond's activity isn't enough so he should be put on

11 a punishment post. I think there would be more slang

12 in that and more conversational. I don't know exactly

13 how --

14        THE COURT:  I'm not even sure if somebody was

15 saying something that was discriminatory or illegal or

16 retaliatory for the exercise of First Amendment

17 rights, I am not even sure people would put that in an

18 email. It may be the kind of thing people would make a

19 phone call about.

20        MR. SCOLA:  I think you're right on that, Your

21 Honor.  And although I would like to see the emails

22 and obviously look for myself, and that includes the

23 phones and text messages that we'll get to I think in a

24 little bit, I --

25        THE COURT:  You still haven't come back to my

1   question, I mean what's wrong with the search terms

2   suggested by Mr. Rubinstein, these are in exhibit B to his

3   June 7 letter?

4   

5       MR. SCOLA:  Just the way that it's worded, the

6   Raymond and activity, I think it's vague in that --

7       THE COURT:  It's more specific than Raymond.

8       MR. SCOLA:  It's also, it's almost too specific in

9   a way because --

10      THE COURT:  No, but that is not the only one.

11      MR. SCOLA:  Right.

12      THE COURT:  There are multiple search terms

13  for Raymond and, so it's not as if Raymond and

14  activity is the only search term that he's suggesting

15  for Raymond.

16      MR. SCOLA:  Your Honor, I think we're focusing

17  on Gonzalez for the voluminous amount but we don't

18  have the numbers on Raymond, Baez or Serrano. If

19  Gonzalez is --

20      THE COURT:  You are still not answering my

21  question.  My question is what is wrong with the terms

22  suggested by Mr. Rubinstein? ESI searches are never

23  perfect, they are never 100 percent. But the Federal

24  Rules don't require 100 percent.

25      MR. SCOLA:  Just the way that they're worded

1   with the and. I mean --

2

3       THE COURT:  What additional terms would you

4   suggest?

5       MR. SCOLA:  I would have to look at it, I made

6   a list of additional --

7       THE COURT:  Well you've had it since June 7.

8       MR. SCOLA:  Okay, let me pull out my list.

9       THE COURT:  I mean, you know, when we have a

10  discovery conference I expect counsel to prepare for

11  it. You shouldn't be, if you are reading these for the

12  first time now, I am going to go back to my chambers

13  and we can reconvene on another day.

14      MR. SCOLA:  Your Honor, I have a list of

15  search terms that I thought were appropriate.  The

16  issue with the search terms --

17      THE COURT:  You have other terms you want to

18  propose?

19      MR. SCOLA:  Yeah, I have terms here.

20      THE COURT:  Where are they?

21      MR. SCOLA:  Arrest, numbers --

22      THE COURT:  Without Raymond?

23      MR. SCOLA:  No, no, with Raymond, before Mr.

24  Port, Central Personal Index, confidential performance

25  profile, CPI, CPP, PPR --

12

THE COURT: Have you run those by Mr. Rubinstein?

MR. SCOLA: We've run it, this is the first that we're hearing that the search terms for, say, Gonzalez, was 121,000. I didn't know about that.

THE COURT: There was an issue about the search terms before today.

MR. RUBINSTEIN: Your Honor, these were not shared with us, Your Honor, these search terms that are being discussed.

THE COURT: Why didn't you share them with Mr. Rubinstein before today?

MR. SCOLA: I believe that the search of just the last name of our clients was sufficiently --

THE COURT: You are not answering my question.

MR. SCOLA: Because we, any search terms would be limiting.

THE COURT: Pardon?

MR. SCOLA: Any of these search terms would have been limiting. I believe that --

THE COURT: Yes, well that's the purpose of having search terms so that you don't get every email between every employee of the police department between date X and date Y. That's why you have search terms to limit what you are

 1   looking at.

 2          MR. SCOLA:  Heading into this conference I

 3   believed that the last names of the plaintiffs was a

 4   sufficient search term --

 5          THE COURT:  You haven't answered my question

 6   though about why you haven't suggested your counter

 7   proposals with Mr. Rubinstein before getting here today.

 8          MR. SCOLA:  I didn't, I think -- I didn't

 9   recommend any search terms, I just made a list actually

10   coming into this.

11          THE COURT:  Have you ever been involved in a

12   litigation involving ESI before this one?

13          MR. SCOLA:  Not really.

14          THE COURT:  You know, usually search terms are the

15   subject of negotiation between counsel, usually the

16   plaintiff is the party seeking ESI, the plaintiff would

17   suggest search terms to defendant, the defendant looks at

18   them, the defendant consults with his IT people. If the

19   defendants has an objection to the search terms or thinks

20   they are too broad or they are not going to capture what's

21   relevant, defendant's attorney calls plaintiff's attorney,

22   they have a conversation, we think search terms one,

23   two and three are good, we think search terms four,

24   five and six are too broad, too narrow, they are not

```
 1
 2   going to get responsive information. And there is a
 3   discussion back and forth about the issues regarding
 4   the search terms. And if you can't resolve it after
 5   you've had this back and forth, then you come to
 6   court, you tell me why your search terms are good, the
 7   defendant tells me why there's a problem with the search
 8   terms, the defendant tells me what the counterproposal is,
 9   but you have this back and forth process before you come to
10   court. And it sounds like that hasn't been done here, and
11   I'm not sure why it hasn't been done.
12           I mean Mr. Rubinstein sent you his counter
13   proposals back in March.  And I'm really kind of surprised
14   that in the last three months you haven't had a
15   conversation with him about what you think the problem
16   with his terms are and why you think your terms are
17   better.  You know, that really should have happened.
18   Did you respond to Mr. Rubinstein's March 8 email?
19           MR. SCOLA:  Yeah, I believe my partner did.
20           THE COURT:  Did you pick up the phone and call
21   him and say we think your terms are too limiting, we
22   think they are going to miss X, Y and Z classes of
23   documents?
24           MR. SCOLA:  Okay, so reading from a letter
25   drafted by my partner, basically we're under the
```

impression that adding the qualifiers to the last name would end up limiting the results of the search.

THE COURT: Well that's what you want to do, you want to limit the results of the search. That's the purpose of having search terms is to limit the results of the search. That's why we have search terms. Otherwise they'd back up the truck and give you every email sent between date X and date Y, you know, and you're busy for the next five years. Limiting what's produced is not a bad thing, it's a desirable thing.

MR. SCOLA: So I guess on that issue then, Your Honor, I guess we have to meet and confer and talk about that and then see what we can resolve.

THE COURT: Let me ask this, how burdensome is it, this is a question to Mr. Rubinstein, how burdensome is it to run just the plaintiff's names against the four custodians just to get the number of hits that would be recovered?

MR. RUBINSTEIN: We've already done that, Your Honor.

THE COURT: I though just did it for --

MR. RUBINSTEIN: Oh, I'm sorry, you mean in terms of their full names, Your Honor?

```
1
2          THE COURT:  Hold on, no, no, you did Gonzalez
3   for all four custodians and you got 121,354 hits,
4   right?
5          MR. RUBINSTEIN:  Yeah.
6          THE COURT:  Have you done the last names of
7   the other plaintiffs?
8          MR. RUBINSTEIN:  Yeah, we did. So for Raymond
9   we had, again, this is approximate because this is not
10  usually how we usually run our search terms.
11         THE COURT:  Fair enough.
12         MR. RUBINSTEIN:  But approximately for Raymond
13  2,200.
14         THE COURT:  Twenty-two-hundred, okay.
15         MR. RUBINSTEIN:  For Baez it was roughly 1,000.
16  And then Serrano, we haven't finished it yet because it's
17  a more difficult one, but it's on the order of a
18  little less than 400, 375 roughly. So it really was
19  Gonzalez that was our primary concern.
20         I will say --
21         THE COURT:  Well I mean if it's 2,200 for
22  Raymond, and this is across all four custodians,
23  right?
24         MR. RUBINSTEIN:  I believe so, yes.
25         THE COURT:  Okay. Well I mean is there an
```

1    issue then as to Raymond, Baez, and assuming Serrano

2    is less than 2,000, is there an issue with respect to

3    those three?

4

5          MR. RUBINSTEIN:  I did speak with our IT

6    department and they still have a concern in terms of

7    capturing emails just with last names. I understand

8    it's not as much as Gonzalez.

9          THE COURT:  Yes.

10         MR. RUBINSTEIN:  But in terms of capturing the

11   universe I think there was a technical concern. If you

12   want I can provide an affidavit --

13         THE COURT:  I'm not sure I understand what the

14   concern is.

15         MR. RUBINSTEIN:  Perhaps I'm not the best

16   person --

17         THE COURT:  Let me tell you what I understand

18   the issue to be and maybe that will focus the

19   discussion a little more.

20         MR. RUBINSTEIN:  Sure.

21         THE COURT:  My understanding is that the issue

22   here is drafting search terms that are not overly

23   inclusive, that don't, crafting search terms that do not

24   recover documents irrelevant, that are not relevant to this

25   action.

1

2          MR. RUBINSTEIN:  And that's one of our concerns,

3   yes.

4          THE COURT:  Okay. And you can never do that, you

5   can never craft search terms that are going to eliminate the

6   need for manual review.  I mean even if, I mean I'm looking

7   at the second search term in your March 8 email, Raymond and

8   Truancy Unit, I suppose, you know, you might, you know,

9   student Raymond Smith today was picked up by the Truancy

10  Unit by Officer Jones. You know, your search term would

11  capture that, that hypothetical would have nothing to do

12  with this action. So mean there always has to be a level of

13  manual review for relevance and for privilege, I supposed.

14  But the numbers for Raymond, Baez, and assuming

15  Serrano is less than 2,000, I know you told me Serrano

16  wasn't finished yet, you've got relatively modest

17  numbers for the world of ESI.  Do we need further

18  limiters for Raymond, Baez and Serrano?

19          MR. RUBINSTEIN:  Our preference, respectfully,

20  Your Honor, our preference would be to run the terms

21  that Mr. Scola wrote down. I mean we haven't been

22  provided them, but we are happy to run those terms and

23  they'll give us hopefully a more targeted universe of

24  documents as opposed to just the last name. For

25  example, Raymond is a common first name and last name.

1

2          THE COURT:  Right, but if the number if hits

3   is 2,200, that's not that huge a number.

4          MR. RUBINSTEIN:  Understood, Your Honor, but

5   our issue is we'd like a more targeted search to

6   provide more relevant emails. So what we would prefer

7   to do is to run the terms that Mr. Scola has written

8   down and see what we get and then perhaps we can

9   return to these original numbers if there's a problem

10  with Mr. Scola's terms. That would be our preference.

11         THE COURT:  Well I'm just wondering if you are

12  going to spend more time doing that than reviewing,

13  you know, the 3,000 to 5,000 emails that you are going

14  to get for Raymond, Baez and Serrano.

15         MR. SCOLA:  I would like to add that --

16         THE COURT:  Let me see your terms, Mr. Scola.

17         MR. SCOLA:  These are the terms that I wrote

18  down based on the deposition but I want to reiterate

19  that if the numbers are this low, 2,200, 1,000 and 400

20  --

21         THE COURT:  Let me see your search terms,

22  please.  Thanks.  Mr. Rubinstein, you don't want to

23  run --

24         MR. RUBINSTEIN:  Okay.

25         THE COURT:  Search term 1) arrest; number 2)

numbers; 3) monthly; 4) performance; 5) performance

report; 6), central personnel index; 7) confidential

performance profile; 8) CPI; 9) CPP; 10) PPR; 11)

quest for excellence. I mean the first page of these

are untethered to the plaintiffs, I presume you don't

want to run these terms.

MR. RUBINSTEIN: Understood, Your Honor.

Understood.

THE COURT: These are going to get a universe

of documents that have nothing to do with this case.

MR. SCOLA: Those are just words that came out

during depositions that seemed relevant. I didn't

speak with Yuval about those searches, they were just

notes that I took in the middle of the deposition. I

think that --

THE COURT: You're proposing them as search

terms.

MR. SCOLA: I wasn't actually proposing them,

I just had --

THE COURT: You just told me, you know, you

just told me they were your proposed search terms, now

you're telling me they're not your search terms.

MR. SCOLA: They were search terms I

considered. I wrote them down recent, I apologize,

Your Honor.

MR. RUBINSTEIN:  Your Honor, here's what I suggest. I can go back and discuss with my team and have a further meet and confer conversation regarding, this doesn't solve Gonzalez but at least for the other three custodians I can discuss with my colleagues at the police department if they have any other concerns about these three custodians and then I'll touch base for the three --

THE COURT:  These three plaintiffs and the four custodians.

MR. RUBINSTEIN:  Yeah, obviously that still leaves Gonzalez which is obviously a major concern. But at least for those three hopefully we can come to some agreement with Mr. Scola.

THE COURT:  Let me ask you this, I mean what's, look, there is going to have to be a manual review no matter what search terms you use. I mean usually what happens, my experience in the ESI cases has been after the search terms are run the documents that are recovered are manually reviewed for relevance and for privilege. And my understanding, my experience has been that always happens regardless of the search terms. You know, assuming that Serrano is under 2,000,

1

2   for Raymond, Baez and Serrano you are talking about

3   under 5,000 documents. You know, and I appreciate that

4   manual review is burdensome but it's inevitable in

5   these cases. You know, then manual review for 5,000

6   documents, I'm not sure, it doesn't sound to me that

7   it's unduly burdensome and I think you may wind up

8   spending more time trying to fine tune the search than

9   it would take to manually review those 5,000

10  documents.

11          MR. RUBINSTEIN:  Understood, Your Honor. So I

12  think at least for those three I think what I'll do is

13  I'll touch base with our team and if they say it's

14  not, if they confirm that it is not unduly burdensome

15  --

16          THE COURT:  Well the burden, they're not going

17  to know the burden of the manual review.

18          MR. RUBINSTEIN:  Well I mean what I'm saying,

19  if they identify the other technical issues that would

20  affect the burdensome of the review. But if they don't

21  identify those burdens, then I think we can come to an

22  agreement with Mr. Scola for those three. But before I

23  do come to an agreement, I do want to touch base one

24  more time with my colleagues at the police department

25  who handle this.  But I think for those three it

should be okay but I just want to touch base one more
time.

          MR. SCOLA:  I also want to add that I agree
with the three that we just mentioned and then when it
comes to Gonzalez we will have a phone call and then
figure out what search terms we can agree upon. I
didn't know until I got into this conference that the
documents that were being, that basically were
triggered by this search, were sort of voluminous, we
can work that out on the phone or at any date they
come back.

          THE COURT:  That's why there should be a meet
and confer. I mean, look, presumptively it seems to me
that Raymond, Baez and Serrano should be the search
terms for those three plaintiffs and I think the
parties need to consult with regarding Gonzalez.  And
I'll tell you right now, look, if you come back, the
limitations that are contained in Mr. Rubinstein's
March 8 email for Gonzalez seem reasonable. You know,
again, in New York City Gonzalez is a fairly common
name and, you know, these seem like reasonable
limiters.

          MR. SCOLA:  I tend to agree with you, Your
Honor. I think a couple of the searches that I had,

1

2 Gonzalez and CPI or some internal police lingo, I

3 would like to add to, but I can speak with Mr.

4 Rubinstein and then hopefully come to a consensus on

5 that.

6         THE COURT: Believe me, you don't want every

7 email with the word Gonzalez in it, you really don't.

8 All right, what's your next issue, Mr. Scola?

9         MR. SCOLA: I guess it would be discovery

10 related to Constantin Tsachas, one of the named

11 defendants.

12         THE COURT: All right, and what are you

13 looking for?

14         MR. SCOLA: We would like to see his full

15 employment file, his EPR, which I'm not exactly sure

16 what it is, but it's referenced in several documents.

17         THE COURT: Start by telling me, what do you

18 have for Tsachas?

19         MR. SCOLA: Basically, I don't really think I

20 have much. I don't have any OEO complaints, I don't

21 have --

22         THE COURT: Start with, tell me what you have

23 and then tell me what you want, okay, let's do it that

24 way.

25         MR. SCOLA: Okay, I believe, I don't believe I

25

have anything in terms of --

      THE COURT:  You have no documents regarding Tsachas?

      MR. SCOLA:  No.  I don't have his personnel file --

      THE COURT:  Nothing.

      MR. SCOLA:  Not that I, I went through all the discovery myself, I don't believe there was anything there, if I missed it in the 4,000 pages I went through, then maybe I did, but I don't think so.  I have no CCRB complains, I don't have --

      THE COURT:  Do you have the document request for Tsachas?

      MR. SCOLA:  I believe so.

      THE COURT:  May I see it, please.

      MR. SCOLA:  I have defendant's response, number two, I believe.

      THE COURT:  All right.  Thank you.  All right, the complete personnel file for defendant Constantin Tsachas including all documents relating to his disciplinary records, promotions records, performance evaluations, performance monitoring, CCRB and IAB histories and underlying investigatory files for any allegations regarding employment discrimination.

1

2  Objection in response to request number two.

3  Defendants object to this request, defendants object

4  to this document request on the grounds it is overly

5  broad in scope and time and requested information is

6  not relevant to any party's claim or defense.  It is

7  not proportional to the needs of the case and is

8  confidential pursuant to Civil Rights Law 50(A).

9        MR. RUBINSTEIN:  Your Honor, that sounds like

10  that was our initial, we ended up amending our

11  responses, that does not sound like our amended

12  response.

13        THE COURT:  Well what was your amended

14  response?

15        MR. RUBINSTEIN:  It just provided more detail

16  pursuant to Your Honor's order from March.  I don't

17  know if that matters for purposes of today's

18  discussion.

19        THE COURT:  Well tell me why, but Mr. Scola is

20  correct, you haven't produced anything for Tsachas?

21        MR. RUBINSTEIN:  Well I said at the outset I

22  was not prepared to discuss this. My understanding was

23  the motion to compel was limited to three issues, but

24  I can --

25        THE COURT:  Hold on, let me see, was this

raised in one of your letters, Mr. Scola?

MR. SCOLA:  Yeah, in the letter for an extension of discovery it talks about several outstanding discovery issues.

MR. RUBINSTEIN:  But there was a separate letter on the motion to compel, that's what I was responding to, Your Honor.

THE COURT:  Why are not prior discrimination complaints against Tsachas relevant here?

MR. RUBINSTEIN:  They are, we just don't have any. We looked through his --

THE COURT:  There are none?

MR. RUBINSTEIN:  In terms of employment discrimination claims, for the other defendant we did find some and we produced those, but we did not find any for Deputy Inspector Tsachas.

THE COURT:  How does he pronounce it?

MR. RUBINSTEIN:  Tsachas.  And if this helps, Your Honor, exhibit E to our opposition was my email summary of a meet and confer discussion, that might help in terms of, again, I didn't know this was going to be discussed at today's conference but I believe exhibit E might help Your Honor to discuss --

THE COURT:  All right.  Defendant advised with

1

2  respect to Tsachas there are no EEO complaints made

3  against Tsachas.  What else would be relevant with

4  respect to Tsachas, Mr. Scola?

5           MR. SCOLA:  Well I think, okay, so basically

6  in a deposition that took place about two weeks ago we

7  had a PBA trustee come in and say that he made

8  complaints on behalf of about six minority officers

9  about Tsachas, one of them --

10          THE COURT:  Made complaints to whom?

11          MR. SCOLA:  He spoke directly to Tsachas about

12 it, he went over Tsachas' head to Inspector Giantassio

13 (phonetic), and even spoke to a chief two levels above

14 regarding Tsachas specifically telling officers two of

15 the times on tape and two other officers that they needed

16 target black males 14 and 21. We also heard at deposition

17 that he specifically ordered plaintiff's direct supervisor

18 to give him a lower evaluation when the direct supervisor

19 specifically testified that the evaluation was a 4.0.

20 There's at least, from these depositions there's at least

21 six other officers that were basically accusing Tsachas of

22 the same type of discriminatory actions. It just seemed

23 hard to believe that none of these were ever investigated

24 and ultimately he was promoted.

25          THE COURT:  Request number two, so you're saying

that there are, there is reason to believe that Tsachas

directed that people of color be targeted for arrest?

MR. SCOLA:  There's no reason to believe, Your

Honor, there's a recording of it where he said you

need to target black males 14 to 21, there's another

recording --

THE COURT:  All right, but request number two

doesn't ask for that, does it?  Request number two

reads as follows: ''The complete personnel file for

defendant of Constantin Tsachas, including all

documents relating to his disciplinary record,

promotions record, performance evaluations,

performance monitoring, CCRB and IAB history, and

underlying investigatory files for any allegations

regarding employment discrimination.''

MR. SCOLA:  I mean the performance

evaluations, the CPI, the promotions, would be his

individual employee record, like his record.

THE COURT:  No, but I mean what you are

looking for here is employment discrimination. Now I

would agree with you that if there is reason to

believe or if there is evidence that Tsachas thought

it appropriate to target individuals of color, that

would be relevant because intent is an issue in this

1

2 action, and that would be relevant as similar act

3 evidence. But my issue is whether or not document

4 request number two asks for it.

5          MR. SCOLA:  Maybe request number two is

6 written kind of vaguely.  The files, like the

7 performance evaluations, that wouldn't be specifically

8 tied to employment discrimination, basically we're

9 requesting --

10          THE COURT:  I don't see how the performance

11 evaluations are relevant unless they reference

12 employment, allegations against him of employment

13 discrimination.

14          MR. SCOLA:  I think it speaks to a larger

15 culture within the department where all the --

16          THE COURT:  The issue here are the allegations

17 in the second amended complaint, not --

18          MR. SCOLA:  Correct, Your Honor.  Okay, so but

19 for instance, the recording of him telling them to

20 target black males 14 to 21 was out in the media. We

21 had deposition testimony which said that that should

22 have triggered an IAB investigation into this and

23 subsequent to that he received a discretionary

24 promotion.

25          So I would like to know A) whether he was ever

```
 1
 2    investigated and what were the results of that
 3    investigation, why was he not punished for that, and
 4    why was he ended up being promoted.
 5          THE COURT:  Well let me come back to Mr.
 6    Rubinstein, were there any IAB investigations of
 7    Tsachas relating to discrimination?
 8          MR. RUBINSTEIN:  Usually those, if that
 9    happens it would be referred to OEEO in terms of the
10    NYPD's policy. I can double check --
11          THE COURT:  No, I mean discrimination against,
12    not discrimination with respect to employees, but
13    discrimination with respect to members of the public?
14          MR. RUBINSTEIN:  I don't know the answer to
15    that. I don't believe it would be within the scope of
16    this case, but I think --
17          THE COURT:  Well, no, I mean intent, similar
18    act evidence is relevant when intent is an issue.
19          MR. RUBINSTEIN:  Towards other employees, I
20    agree with that.
21          THE COURT:  Well, no, I mean if one, if, and
22    look, I'm not saying Tsachas harbors discriminatory
23    animus or not, but if a police officer harbors
24    discriminatory animus toward members of the public who
25    are people of color, that would be relevant with
```

respect to a claim brought by a subordinate who is an

individual of color alleging discrimination.

MR. RUBINSTEIN: Respectfully, Your Honor, I

don't think under the case law as I understand it, I

don't believe that the other act evidence extends that

far. But what I can do --

THE COURT: Well it certain does. It certainly

does in Federal Court.

MR. SCOLA: I also want to add, Your Honor --

THE COURT: It certainly is relevant,

sufficiently relevant for discover purposes.

MR. RUBINSTEIN: (inaudible) can double check,

Your Honor, I don't know the answer, but I can double

check if there are any other claims of discrimination

by the public against Deputy Inspector Tsachas. I do

agree with Your Honor, I don't believe that's

encompassed by this request which only discusses his

personnel file, but to move the case along I can

certainly touch base with my client on that.

MR. SCOLA: Your Honor --

THE COURT: With respect to Tsachas, I'm going

to order the defendant to produce any IAB or CCRB

files regarding Tsachas that involve allegations of

discrimination based on race or Hispanic national

1

2 origin. What did you want to say, Mr. Scola?

3          MR. SCOLA:  I'd also like to add that we also

4 have a recording of the other defendant, Christopher

5 McCormack, at the 40th Precinct also saying target

6 black males 14 --

7          THE COURT:  What, let's focus on discovery

8 here. The merit, we're not going to resolve the merits

9 today.

10          MR. SCOLA:  No, no, I am asking that the same

11 order be given for defendant McCormack.

12          THE COURT:  Where's the request for McCormack?

13 What number is it?

14          MR. SCOLA:  I believe two, but that's a

15 different plaintiff, Your Honor.  I believe it would

16 be, it's the same request for the other three

17 plaintiffs, it's just Christopher McCormack instead of

18 Constantin Tsachas on a different request.  And

19 through the discovery it's been clear that there's --

20          THE COURT:  Where's the request for McCormack?

21 Thank you.  It's the same request, the same request

22 was drafted for McCormack.

23          MR. SCOLA:  Just to add to that, Your Honor,

24 through the discovery that's been provided, there was

25 a reference to defendant McCormack's personnel file.

1

2  In that file it said he had 32 incidents with the CCRB

3  and 94 charges.  And we also have a same recording

4  with him in a different borough.

5          THE COURT:  CCRB charges are for things like

6  excessive force or false arrest, I'm not sure they're

7  relevant here.

8          MR. SCOLA:  I think they might be Your Honor,

9  because basically this is a case based on quotas --

10          THE COURT:  Based on what?

11          MR. SCOLA:  On quotas, arrest quotas, and how

12  the quotas are disproportionately applied to --

13          THE COURT:  So an individual who's arrested says

14  McCormack used excessive force in effecting the arrest,

15  what do you do with that?

16          MR. SCOLA:  So for the deposition testimony of

17  my clients, it's clear that McCormack has a history of

18  specifically targeting individuals and also conducting

19  unlawful searches which he tried to get my clients to do.

20  And when they refused to target minorities and then

21  illegally search them, they were punished. I would like to

22  see the history of that.

23          THE COURT:  Well, I think the same limitation

24  applies to McCormack, that it should be limited to IAB and

25  CCRB files regarding allegations of discrimination based

on race or Hispanic national original.

MR. SCOLA:  How can you, how can you determine what type of CCRB complaint was based on race if the --

THE COURT:  Well, presumably because the complaint is going to say McCormack targeted me because I'm an X, or a Y, or a Z.

MR. SCOLA:  But that's not how CCRB claims work, Your Honor.  If someone comes up to me and falsely arrests me, I am not going to say I got falsely arrested because I was black, I'm going to say I got falsely arrested because I got falsely arrested.

THE COURT:  Well if someone is, if it's not tied to racial discrimination or discrimination based on Hispanic national origin, how is it relevant?

MR. SCOLA:  It goes to the culture of how they're manufacturing these arrests and then forcing minority officers to hunt minority civilians. It goes to everything that preached on our clients, which is essentially you have to target black males, you need to unlawfully search them, you need to unlawfully stop them, and if you don't, you're punished.  And his past history --

THE COURT:  Hold on a second, hold on a second.

MR. SCOLA: Sorry.

THE COURT: What kind of door though does that open, I mean let's assume that you are correct and you are permitted to introduce evidence concerning X numbers of arrests where there was a CCRB complaint filed or an IAB complaint filed where the arrestee says I was arrested illegally without probable cause, does that then, and if you are going to offer that to show some impropriety on the part of McCormack or Tsachas, does that then open the door for the defendant in response to say, okay, fine, but in the Course of his career, McCormack made X arrests which resulted in conviction?

MR. SCOLA: It may open the door for that, I don't know at this time, Your Honor.

THE COURT: And if the number in the latter category is substantially higher than the number in the former category, how has the analysis been advanced?

MR. SCOLA: All I know is that I have an affidavit from a witness who specifically said that they tried to force them to --

THE COURT: That wasn't my question, whether you have an affidavit from a witness. You are not

1

2    answering my questions here, Mr. Scola, and when an

3    attorney does not answer my questions directly, the

4    inference I draw is that he or she doesn't have a good

5    answer.

6          MR. SCOLA:  I don't know the answer, Your

7    Honor.

8          THE COURT:  What are your thoughts, Mr.

9    Rubinstein?

10          MR. RUBINSTEIN:  I strongly agree that this is

11    an employment discrimination case.  This was, our

12    office handles many cases involving excessive force

13    and false arrests, this is not one of them.  So I just

14    don't see in terms of relevance and proportionality

15    under Rule 26, I don't see how these kinds of claims

16    are relevant. And I disagree with Mr. Scola. I think

17    if a member of the public alleged discrimination that

18    should be reflected in the CCRB complaint. And I can

19    look into that pursuant to Your Honor's order, if

20    there are complaints by the public based on

21    discrimination.

22          THE COURT:  Let me ask you this, I mean if

23    someone, how drafts the CCRB complaints, is it drafted

24    by someone in the police department, is it drafted by

25    the complainant, or is there some other process?

MR. RUBINSTEIN:  I don't know who drafts it, but it's certainly, I mean I usually see lists of CCRB complaints, I usually, because I work in the labor and employment division I'm not really involved often with CCRB complaints. But from what I see, usually when I see a list of an officer's CCRB complaints, it identifies, you know, false arrest, discrimination, et cetera, et cetera.

THE COURT:  All right, that's a summary prepared by the police department?

MR. RUBINSTEIN:  Correct. Yeah, again, because I do employment law, I'm not really involved often with CCRB complaints, so unfortunately I don't have an answer to that. I could look into that, Your Honor, but I do agree with Your Honor's point that if it's beyond discrimination, if it just says I was submitted to excessive force, I just don't see how an EEO case like this, how does that fall within Rule 26?

MR. SCOLA:  I could answer the --

THE COURT:  The one concern I have here is if, you know, the CCRB summaries I've seen, if I recall correctly, I think they were prepared by the police department and I'm not sure what level of detail they capture. I mean if somebody calls the CCRB and says,

you know, Officer X arrested me without probable

cause, the charges were dropped, I think he arrested

me because I'm a person of color, I'm not sure if that

would be logged as a false arrest complaint or as a

discrimination complaint, or as something else.

MR. SCOLA:  I can answer this question, Your

Honor.

THE COURT:  Go ahead.

MR. SCOLA:  For CCRB the complaint is made by

the complainant, you call a number or you appear in

person and then either, I guess that complaint is

memorialized and then it's investigated.  I used to do

a lot of civil rights cases, a lot of false arrests, I

got out of them for a host of reasons. But when a

victim of a false arrest makes a CCRB complaint, I've

never seen a complainant say it's because they're

black or Hispanic or any type of race. They're not

focused on that, it's implied. They think that the

arrest is false --

THE COURT:  Well, it's not, when you say it's

implied, it's not always implied. I've had 1983 false

arrest cases, some of which involved plaintiffs who

are individuals of color, some of which involved

plaintiffs who were Caucasian, I mean it's, false

arrest cases are not limited to individuals of color.
You say it's implied, I think it's just --

MR. SCOLA:  I think it's, to my clients who I
represented who would live in the 40th Precinct in the
Bronx, I think they wouldn't know to say that they
were being discriminated against. I think they were
just making a complaint for either police brutality or
illegal search or false arrest.  I don't think that
they would say that they were being discriminated
against because I don't think that's the most
immediate concern. I think the most immediate concern
was the taking of the liberty or whatever happened
that led to the false arrest.  I just don't, I don't
have any experience with any CCRB complaint with
discrimination.

THE COURT:  If the CCRB report does not
reflect a charge of discrimination, what do you do
with it?

MR. SCOLA:  Well I think, okay, so --

THE COURT:  How is it relevant?  How is it
relevant to prove discriminatory animus here?

MR. SCOLA:  Well I don't know how it's
relevant at this point.

THE COURT:  If you can't explain a theory of

1    relevance, why are you getting --

2           MR. SCOLA:  Okay, so essentially, once I get

3    into the CCRB complaints and I see, well, all of these

4    are from people of color, and they're all the same --

5           THE COURT:  I don't think the complaint form

6    is going to tell you whether the complainant is a

7    person of color or not. It will probably be illegal to

8    have that information in there.

9           MR. SCOLA:  It may be, Your Honor, and I'm not

10   100 percent sure. I just know that from my client's

11   testimony and from speaking with many witnesses, as a

12   way to effectuate this quota, Christopher McCormack

13   specifically ordered minority officers, mine included,

14   to go stop minority officers and then illegally search

15   the people that they stopped. And if there's a history

16   of him doing that, I think it adds to my client's

17   testimony that that's what they were ordered to do and

18   then when they refused, minority officers were

19   disproportionately punished. If there's a history of

20   these types CCRB complaints, which we know there are

21   --

22          THE COURT:  I don't know that there are.

23          MR. SCOLA:  Well from the testimony of my

24   clients, and after speaking to other members of the

```
 1   40th Precinct who are now --

 2          THE COURT:  There was testimony about the

 3   number of CCRB complaints about McCormack and Tsachas?

 4          MR. SCOLA:  No, in the discovery it

 5   specifically said that there were stops for illegal

 6   searches referenced --

 7          THE COURT:  You keep contradicting yourself.

 8          MR. SCOLA:  I apologize, Your Honor.  Okay,

 9   there's two things here. The testimony says that --

10          THE COURT:  Right now we're talking about what

11   documents you get concerning McCormack and Tsachas.

12          MR. SCOLA:  I understand, Your Honor.

13          THE COURT:  Okay, not something, so let's

14   focus on that issue.

15          MR. SCOLA:  You got it.  In the discovery

16   which I went through, there was references in an IAB

17   document about --

18          THE COURT:  IAB file of whom?

19          MR. SCOLA:  It was into the investigation and

20   my client testifying about the Floyd stop in the first

21   trial. There were references --

22          THE COURT:  In the IAB file of which

23   plaintiff?

24          MR. SCOLA:  I guess it would be Serrano.
```

THE COURT:  Okay, and what was in Serrano's IAB file?

MR. SCOLA:  In the IAB file, by bit of background, Serrano was one of the main witnesses in the Floyd stop and frisk trial that broke the blue line and testified against the department regarding McCormack and the quota. In those papers, there's references to McCormack being, giving CCRB complaints or some type of punishment or some type, or some type of investigation into illegal stops and searches. Which is also what my clients testified to, that they were ordered to do, and when they did not comply with these unlawful orders, they were disproportionately punished as minority officers.

So I think it goes to a broader picture of whether or not my clients are telling the truth, which I obviously think they are, and whether or not there's this culture of illegally stopping minorities in the 40th Precinct. I don't know if any of this would be admissible at trial, but in terms of discovery I would like to see what's there.

THE COURT:  Well, all right, look, I'm going to adhere to my ruling with respect to Tsachas and McCormack. I'm going to direct the defendant to

```
 1
 2   produce any IAB or CCRB files regarding either Tsachas
 3   or McCormack where there is an allegation of
 4   discrimination based on race or Hispanic national
 5   origin.  There are, people file excessive false
 6   complaints, false arrest complaints, some of, you
 7   know, unless there is an element of, unless there's a
 8   claim of discrimination in the complaint, I don't
 9   think it's relevant here.
10        I disagree with your characterization, Mr.
11   Scola, that discrimination is implicit in a false
12   arrest complaint or an excessive force complaint.
13        MR. SCOLA:  Well I think it is, in this
14   situation it is --
15        THE COURT:  I've seen them brought by
16   individuals who are not individuals of color against
17   police officers who are not individuals of color. I
18   don't think, you know, the statement that
19   discriminatory animus is implicit is I just think
20   wrong.
21        MR. SCOLA:  Well I understand what you are
22   saying in general, but I think in this case where you
23   have the defendant on tape specifically saying target
24   black males 14 to 21, and then there are CCRB
25   complaints maybe from African-Americans, maybe from
```

 1

 2   Caucasians, I dong know, but I think in this issue if

 3   he is specifically saying target a specific minority

 4   group, then it is implicit.

 5           THE COURT:  Well if he's saying target a

 6   minority group, the officer who effected the arrest is

 7   not going to be McCormack.

 8           MR. SCOLA:  That's true, Your Honor.

 9           THE COURT:  So there's not going to be a CCRB

10   complaint against McCormack.

11           MR. SCOLA:  Not in that instance --

12           THE COURT:  No.

13           MR. SCOLA:  But there could be ones where he

14   is the arresting officer.

15           THE COURT:  Well if there are and if they

16   reference discrimination, you'll get them, okay? I

17   think unless there is a reference to discriminatory,

18   to discrimination, I just don't think it's relevant.

19           All right, what else do you want to talk

20   about?

21           MR. SCOLA:  If you want to go through the ones

22   that were the names that were currently at a

23   disagreement over, we can.

24           THE COURT:  Tell me what you want to talk

25   about?

```
 1
 2          MR. SCOLA:  All right, number four, I guess,
 3   is all documents referring to or relating to
 4   defendant's document retention or destruction policy.
 5   Now if you recall, when we were here --
 6          THE COURT:  Hold on, hold on, I'm just looking
 7   at Mr. Rubinstein's May 24 email.  Did he already
 8   address this?
 9          MR. RUBINSTEIN:  We did, Your Honor, in the
10   context of a deposition.
11          MR. SCOLA:  Yes, and you said if they could
12   provide documents on this that we wouldn't need to
13   have a deposition.  But no documents --
14          THE COURT:  (inaudible) a transcript of that
15   conference?
16          MR. SCOLA:  I don't.
17          MR. RUBINSTEIN:  That's not my recollection of
18   the last hearing, Your Honor, I don't have the
19   transcript. As we point out in this email --
20          THE COURT:  Let me, you know, Mr. Scola, are
21   these issues that are really teed up in your letters?
22          MR. SCOLA:  In the letter for, in the letter
23   for the discovery extension there's a list of numbers
24   that are, responses are outstanding for document
25   requests. And on the third page of document 116 --
```

1

2      THE COURT:  Have you had a meet and confer on

3  these issues?

4      MR. SCOLA:  Yes --

5      MR. RUBINSTEIN:  In fact, Mr. Nwokoro

6  (phonetic), I resolved many of these issues that are

7  reference on page three of this extension request,

8  that's why I'm a little surprised that plaintiffs'

9  counsel is raising these issues. Two and four are in

10  dispute, but many of these other ones that are listed

11  here were resolved by myself and the colleague for Mr.

12  Scola during our call.

13      MR. SCOLA:  And I apologize for my partner not

14  being here, he's on jury duty in Jersey right now.

15      THE COURT:  Well I'd presume he briefed you

16  before you got here and you know what he knows.

17      MR. SCOLA:  That's correct, Your Honor.

18      THE COURT:  All right, well, tell me why you

19  think the document retention policies are appropriate,

20  Mr. Scola?

21      MR. SCOLA:  Well, we would like to know -- one

22  second.  I believe that the information basically on

23  their retention and destruction policy of these

24  documents is relevant to potential issues of document

25  destruction and spoliation and is relevant.

```
 1

 2          THE COURT:  With respect to potential issues

 3   or actual issues?

 4          MR. SCOLA:  We don't know, there's certain

 5   things that are outstanding that we don't have.  For

 6   instance, Serrano's memo book.

 7          THE COURT:  Yes, my understanding, though, is

 8   that the response to that is that it's lost.  Not that

 9   it was destroyed pursuant to a policy.  Am I correct

10   in that, Mr. Rubinstein?

11          MR. RUBINSTEIN:  Yes, Your Honor, I don't

12   believe it was destroyed per some retention policy.

13          THE COURT:  It was mislaid.

14          MR. RUBINSTEIN:  Correct.

15          THE COURT:  That may be the subject of further

16   litigation here --

17          MR. RUBINSTEIN:  Right.

18          THE COURT:  But there is no claim here that

19   this was destroyed because it was X years old and our

20   policy is to destroy memo books that are more than X

21   years old.  So I'm not sure how it's relevant.

22          MR. SCOLA:  I mean we don't really know

23   exactly what's missing at this point, I think --

24          THE COURT:  Well what did you ask for that you

25   didn't get?  I mean it's not so much a question of
```

1

2   what's missing as much as it's a question of what did

3   you ask for that you didn't get or what are the

4   obvious holes in the production in response to your

5   requests?

6          MR. SCOLA:  I don't have a list of those

7   documents at this time, Your Honor.

8          THE COURT:  Nothing like preparation.  What

9   are your thoughts, Mr. Rubinstein?

10          MR. RUBINSTEIN:  As referenced, Your Honor, we

11   addressed this issue back in January regarding the

12   deposition.

13          THE COURT:  Is it in the patrol guide?

14          MR. RUBINSTEIN:  I don't offhand know if it's

15   in the patrol guide.  I have a January 23 letter where

16   we already addressed this in the context of a 30(B)(6)

17   deposition, that we argue that it was improper

18   discovery on discovery and Your Honor ruled in our

19   favor in terms of the depositions.  So we're

20   essentially addressing the same issue in terms of

21   documents rather than deposition testimony.  And I

22   just think this issue has already been decided, even

23   if it wasn't relating to documents about retention.

24          THE COURT:  All right.

25          MR. RUBINSTEIN:  That was docket number 117,

```
 1                                                      50
 2  Your Honor, I'm sorry.
 3            THE COURT:  117.
 4            MR. RUBINSTEIN:  Yes.
 5            THE COURT:  117 was your letter?
 6            MR. RUBINSTEIN:  That was my response to,
 7  yeah, I don't have the docket number for their letter,
 8  but my response was at docket 117.  I'm sorry --
 9            THE COURT:  118, I think.
10            MR. RUBINSTEIN:  No, yeah, I might have
11  misspoken, my letter is dated January 23rd, Your Honor.
12  And I have another copy of Your Honor would like to
13  see it.
14            THE COURT:  Let me see your copy, it's going
15  to be faster.  Thank you.  My understanding, correct
16  me if I'm wrong, Mr. Rubinstein, but is there any
17  claim here that the absence of Serrano's memo book is
18  the product of a document retention policy?
19            MR. RUBINSTEIN:  That's not my, I don't
20  believe that claim was ever made, Your Honor, no.
21            THE COURT:  I'm not sure how it's relevant
22  then, Mr. Scola.
23            MR. SCOLA:  To be candid with you, I'm not
24  really sure either.
25            THE COURT:  All right, well then I don't think
```

1

2  you get it, okay.  So I'm going to sustain the

3  objection to, you know, at least on the record that

4  currently exists, the objection to the request for the

5  document retention policy is sustained.

6          What else do you want to talk about today, Mr.

7  Scola?

8          MR. SCOLA:  I would like to talk about having

9  a briefing schedule for the spoliation motion --

10          THE COURT:  Okay.

11          MR. SCOLA:  As well as --

12          THE COURT:  When do you want to make your

13  motion?

14          MR. SCOLA:  I think thirty days would be

15  sufficient. I also would --

16          THE COURT:  One second.

17          MR. SCOLA:  Sorry.

18          THE COURT:  Let's take it one thing at a time,

19  okay?

20          MR. SCOLA:  Sure.

21          THE COURT:  You want to make your motion on,

22  July 20 is a Saturday, so do you want to make it on

23  Monday, July 22?

24          MR. SCOLA:  That's great, Your Honor.

25          THE COURT:  All right, how much time do you

1

2 want to respond, Mr. Rubinstein?

3          MR. RUBINSTEIN:  We would request I guess

4 three weeks, so maybe 20 or 21 days for opposition.

5          THE COURT:  All right, three weeks is going to

6 be August 12. How much time do you want for a reply,

7 Mr. Scola?

8          MR. SCOLA:  Would August 26 work?

9          THE COURT:  Fine.  All right, so that will be

10 the schedule for the spoliation motion, July 22 for

11 the opening round, opposition August 12, the reply on

12 August 26.

13          MR. SCOLA:  Also included in that motion I

14 imagine we'll have to brief the depositions of

15 Commissioner O'Neill and Bratton?

16          THE COURT:  If you want to make that motion at

17 that time, too, that's fine.

18          MR. SCOLA:  I mean we might as well.

19          THE COURT:  Fine.  If you want to make one

20 motion with both, that's fine.

21          MR. SCOLA:  Okay.  Now I guess the last issue

22 would be --

23          THE COURT:  Does that reply schedule, does the

24 opposition schedule still work if it's going to

25 include the motion to compel the depositions of

```
 1
 2   Commissioners Bratton and O'Neill.
 3            MR. SCOLA:  That works for me.
 4            THE COURT:  Well my question is to Mr.
 5   Rubinstein.
 6            MR. RUBINSTEIN:  Yes, that works for the City.
 7            THE COURT:  All right, what else, Mr. Scola?
 8            MR. SCOLA:  I guess the other issue, the last
 9   outstanding issue would be when we are going to extend
10   discovery till. I believe I have, I made a note, I
11   have, I've already conducted four nonparty
12   depositions, I know all plaintiffs have been deposed.
13   I have two other nonparty depositions already noticed,
14   I believe I am going to have to do two more. The
15   defendants have not yet been deposed yet and I know we're
16   going to wait on some discovery before we schedule those
17   again. And then we're going to have to wait on the ruling
18   for Bratton and O'Neill. I think my partner suggested four
19   months, but put five months in the date by accident, so I
20   guess I would propose extending discovery till October 9, I
21   believe, which is four months from June 9 when discovery was
22   set to end.  I think that should be sufficient.
23            THE COURT:  So the proposed order that was sent
24   with the June 1 letter proposes a deadline for the
25   completion of fact discovery to November 9, you are seeking
```

1

2  a month less than that now?

3          MR. SCOLA:  Well, I mean, I would take the

4  November 9, I think that might not be, I think if we did

5  October 9 it might get extended, I think November 9 might

6  work, I just wanted to note that in my partner's letter he

7  put four months but noted five.  I think --

8          THE COURT:  Do you want October 9 or November 9?

9          MR. SCOLA:  I'll take November if that's offered.

10          THE COURT:  Any objection to that, Mr. Rubinstein?

11          MR. RUBINSTEIN:  Given this briefing schedule I

12  guess I don't object to November 9.

13          THE COURT:  okay.  All right, I'll extend the fact

14  discovery deadline to November 9 and the follow-on dates

15  accordingly, okay?

16          MR. SCOLA:  Thank you, Your Honor.

17          MR. RUBINSTEIN:  Thank you, Your Honor.

18          THE COURT:  All right, what else would you

19  like to talk about today, Mr. Scola?

20          MR. SCOLA:  I think that's it.

21          THE COURT:  All right, look, I strongly

22  suggest that, I'm not going to strongly suggest, I'm

23  going to order it, that with respect to any other

24  discovery disputes before, and this applies to both

25  sides, if you, if plaintiff has a discovery dispute

```
 1
 2   with defendant or if defendant has a discovery dispute
 3   with plaintiff, I am directing you to have a viva voce
 4   conversation about that. You ought to speak to each
 5   other. Not exchange letters, not exchange emails,
 6   either talk face to face or pick up the phone and have
 7   a conversation. I am directing that you do that before
 8   you bring it to the Court's attention.  Okay?
 9            MR. SCOLA:  Yes, Your Honor.
10            THE COURT:  All right, okay.  All right, Mr.
11   Scola, anything else you want to talk about today?
12            MR. SCOLA:  No, believe that's it.
13            THE COURT:  Okay.  Mr. Rubinstein, anything
14   else you want to talk about today?
15            MR. RUBINSTEIN:  Nothing for the defendants,
16   Your Honor.
17            THE COURT:  All right, let me ask my clerk to
18   return Mr. Rubinstein's January 23 letter to Mr.
19   Rubinstein, and there are two copies, copies of two
20   document requests that Mr. Scola handed up, I'm going
21   to ask that they be returned to Mr. Scola. Adam, one
22   second.  There is also a list of search terms that Mr.
23   Scola handed up, I'm going to ask that those go back to Mr.
24   Scola.
25            MR. RUBINSTEIN:  Thank you.
```

56

1

2          MR. SCOLA:  Thank you, Your Honor.

3          THE COURT:  All right, thank you both.

4          MR. RUBINSTEIN:  Thank you, Your Honor.

5          THE COURT:  Thanks, have a good afternoon.

6          (Whereupon the matter is adjourned.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the United States District

Court, Southern District of New York, Raymond, et al.

versus The City of New York, et al., Docket No. 15cv6885,

was prepared using digital electronic transcription

equipment and is a true and accurate record of the

proceedings.

Signature_____
*Carole Ludwig*

Carole Ludwig

Date:  July 8, 2019