UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EDREWEENE RAYMOND, et al.,

                    Plaintiffs,

        against                                    CIVIL ACTION NO.: 15 Civ. 6885 (LTS) (SLC)

                                                   **OPINION & ORDER**

THE CITY OF NEW YORK, et al.,

                    Defendants.

**SARAH L. CAVE,** United States Magistrate Judge.

Before the Court are the parties' numerous discovery motions.  Plaintiffs move: (i) to

compel two of the defendants to appear for depositions; (ii) to require compliance with the

Honorable Henry B. Pitman's June 21, 2019 Order (ECF No. 121) (the "June 2019 Order"); (iii) for

sanctions for spoliation and alleged wrongful action throughout the pendency of this case (ECF

Nos. 155–58); and (iv) for a discovery conference for an anticipated motion to compel production

of certain documents.  (ECF No. 169).  Defendants request: (i) reasonable expenses incurred in

opposing Plaintiffs' motion to compel (ECF No. 159); (ii) sanctions (Id.); and (iii)  a discovery

conference concerning an anticipated motion for a protective order against Plaintiffs' December

22, 2019 Document Requests ("December 2019 Request") and discovery described in Plaintiffs'

meet-and-confer letter dated December 21, 2019 (ECF No. 166) ("December 2019 Discovery

Letter").

For the reasons set forth below, Plaintiffs' (i) motion to compel depositions is DENIED;

(ii) motion to compel compliance with the June 2019 Order is GRANTED IN PART and DENIED IN

PART; (iii) motion for sanctions for spoliation and alleged wrongful action throughout the

pendency of this case is GRANTED IN PART and DENIED IN PART; and (iv) motion for a discovery conference for an anticipated motion to compel is DENIED. Defendants' (i) request for expenses is DENIED; (ii) request for sanctions is DENIED; and (iii) motion for a discovery conference for an anticipated protective order is DENIED.

## I. PROCEDURAL BACKGROUND

The parties have stalled in discovery in this nearly-five-year-old employment discrimination action. Plaintiffs seek compensatory damages to redress the alleged deprivation of rights under the United States Constitution, Federal, New York State, and New York City laws. (ECF No. 87 ¶ 1). Plaintiffs, Latino and African-American Police Officers, allege that their employer, the New York City Police Department ("NYPD"), violated their rights and discriminated in their employment based on their race and national origin. (Id. ¶ 2). Plaintiffs allege that they were

> under supervisory pressure to comply with the illegal quotas; . . . suffered negative employment consequences as a result of the failure to meet the illegal quotas; . . . racially discriminated against with respect to performance evaluations, the performance monitoring program, and the administration of discipline and punishment[;] . . . expressed [their] opposition to the illegal quotas and [have] been retaliated against[; and] penalized for reporting, opposing[,] and complaining about the illegal quotas and [their] racially discriminatory application . . .

(Id. ¶¶ 18–21).

On August 31, 2015, Plaintiffs filed their original Complaint (ECF No. 1), refiled it on September 1, 2015 (ECF No. 9), and on December 10, 2015, filed an Amended Complaint ("December 2015 Amended Complaint") (ECF No. 31). On January 11, 2016, Defendants moved to dismiss the Amended Complaint (ECF No. 32). The Honorable Laura Taylor Swain, United States District Judge, granted the motion but gave Plaintiffs leave to move to replead specific

claims and requests for relief in a second amended complaint (ECF No. 60). On June 27, 2018,

Judge Swain granted Plaintiffs leave to file a Second Amended Complaint (the "SAC") as to certain

claims ("Judge Swain's 2018 Order"). (ECF No. 86).[1] On July 11, 2018, Plaintiffs filed the SAC.

(ECF No. 87). On September 18, 2018 and January 28, 2019, Defendants answered the SAC. (ECF

Nos. 99, 110).

On January 21, 2019, Plaintiffs moved for a conference concerning an anticipated motion

to compel the depositions of Defendants, including former Police Commissioners William J.

---

[1] Judge Swain's 2018 Order granted Plaintiffs leave to file the SAC, including

> Raymond's federal discrimination claims relating to his punishment for submitting a late vacation request and for failing to meet quotas, as against Proposed Individual Defendant Tsachas only; Gonzalez's and Baez's federal discrimination claims relating to negative performance evaluations and placement on PMP, as against Proposed Individual Defendant McCormack only; Serrano's federal discrimination claim relating to his negative 2012 performance rating, as against Proposed Individual Defendant McCormack only; and Gonzalez's and Serrano's claims of retaliation for complaining of discrimination, as against proposed Individual Defendant McCormack only. Plaintiffs' motion is also granted as to their NYSHRL and NYCHRL claims that parallel the federal claims that are permitted to be asserted in the Second Amended Complaint. Plaintiffs' motion for leave to file a further amended complaint with respect to First Amendment retaliation claims is granted as to Raymond's claim against Proposed Individual Defendant Tsachas based on the 2015 performance evaluation, promotion denial and punitive posting actions that followed the November 22, 2014, meeting with the Platoon Commander; Gonzalez's First Amendment retaliation claim, to the extent he alleges retaliatory conduct from May to November 2015, against the City and Proposed Individual Defendants McCormack, O'Neill and Bratton; and Serrano's First Amendment retaliation claim against Proposed Individual Defendant McCormack.

(ECF No. 86 at 58–59).

Bratton[2] and James P. O'Neill,[3] and to compel production of related documents. (ECF No. 105). On February 14, 2019, the Honorable Henry B. Pitman denied Plaintiffs' motion without prejudice and directed all counsel to review the "current version of Rules 26, 33 and 34 of the Federal Rules of Civil Procedure." (ECF No. 112).

On June 2, 2019, Plaintiffs again moved for a conference concerning their anticipated motion to compel the depositions of Bratton and O'Neill, to compel discovery, and for sanctions against Defendant City of New York (the "City") for spoliation of evidence ("Plaintiffs' June 2019 Motion"). (ECF No. 117). Between July 21 and September 3, 2019, the parties briefed Plaintiffs' June 2019 Motion. (ECF Nos. 126–29,132–33, 136).

On October 2, 2019, the order of reference for general pretrial management of this action was reassigned to the undersigned. On November 25, 2019, the Court held a telephone conference with the parties to resolve outstanding discovery disputes, including those raised in raised in Plaintiffs' June 2019 Motion (the "November 25, 2019 Conference"). (See ECF Nos. 142–43, 145–7, 149). At the conclusion of the conference, the Court issued an order directing Defendants' counsel "to email Plaintiffs' counsel a list of the search terms, date ranges, and

---

[2] Bratton was Commissioner from January 1, 2014 to September 16, 2016. Azi Paybarah, What Bill Bratton changed in 990 days at the NYPD, POLITICO (Sep. 16, 2016, 4:54 PM), https:// www.politico.com/states/new-york/city-hall/story/2016/09/what-bill-bratton-changed-in-990-days-at-the-nypd-105552; Tom Hays, NYPD's champion of "broken windows" policing retires, BUSINESS INSIDER (Sep. 17, 2016, 12:43 AM), https://www.businessinsider.com/ap-nypds-champion-of-broken-windows-policing-retires-2016-9.

[3] O'Neill was Commissioner from September 16, 2016 until November 30, 2019. Dean Meminger & Spectrum News Staff, Police Commissioner O'Neill Stepping Down, Will be Replaced by the Chief of Detectives, SPECTRUM NEWS (Nov. 4, 2019, 7:41 PM), https://www.ny1.com/nyc/all-boroughs/news/2019/11/04/nypd-police-commissioner-james-o-neill-expected-to-step-down; Associated Press, Exiting NYC Police Commissioner to Take Security Job at Visa, U.S. NEWS (Nov. 6, 2019, 9:43 AM), https://www.usnews.com/news/us/articles/2019-11-06/nyc-police-commissioner-is-taking-security-job-at-visa.

custodians used in their search," otherwise denying the rest of Plaintiffs' motion to compel (the "November 25, 2019 Order").  (ECF No. 149).

On December 2, 2019, while Plaintiffs' June 2019 Motion was pending and just days after the conference with the Court, Plaintiffs filed motions seeking (i) leave to amend the motion for sanctions or for leave to file a new motion for sanctions (ECF No. 150); and (ii) a discovery conference (ECF No. 151), anticipating a second motion to compel and for sanctions on related matters ("December 2019 Motions").  To consolidate all of the pending discovery issues in one motion for more efficient resolution, the Court ordered Plaintiffs to file by December 13, 2019 a new, omnibus motion to compel and for sanctions, encompassing all allegations in Plaintiffs' June 2019 Motion and Plaintiffs' December 2019 Motions (the "Omnibus Motion"), which Plaintiffs purported to do.  (See ECF No. 152).  The parties then briefed what Plaintiffs represented as their Omnibus Motion, including a sur-reply and sur-sur-reply.  (ECF Nos. 155–64).

On January 21, 2020, not two weeks after Plaintiffs' Omnibus Motion was fully briefed, Defendants moved for a discovery conference for yet another protective order precluding specific discovery material ("Defendants' Motion").  (ECF No. 166).  Then, a little over a week later, Plaintiffs moved for a discovery conference for an anticipated motion to compel ("Plaintiffs' January 2020 Motion").  (ECF No. 169).  The parties briefed both motions (ECF Nos. 166, 169, 171–74), and the Court scheduled an In-Person Status Conference for March 10, 2020 ("March 10 Conference") regarding the Defendants' Motion and Plaintiffs' January 2020 Motion (ECF No. 175).

Despite having been ordered to file an omnibus motion encompassing all issues raised in Plaintiffs' June 2019 Motion and Plaintiffs' December 2019 Motions, Plaintiffs did not comply,

instead presenting only some of the matters raised in those docket entries.  In addition, Plaintiffs and Defendants did not brief the issues in the Omnibus Motion, but rather referred the Court to their prior briefings at ECF Nos. 126–29, 132–33, and 136.  Accordingly, the Court must refer back to arguments made in Plaintiffs' June 2019 Motion and Plaintiffs' December 2019 Motions.  (ECF Nos. 126–29, 132–33, 136, 150–51, and 155–64).

## II.   DISCUSSION

As set forth above, Plaintiffs seek: (i) to compel two of the defendants to appear for depositions, (ii) to compel document production in compliance with the June 2019 Order; (iii) sanctions for spoliation and other alleged misconduct; and (iv) a discovery conference for an anticipated motion to compel production of additional documents.  Defendants request: (i) reasonable expenses incurred in opposing Plaintiffs' motions; (ii) sanctions; and (iii) a discovery conference concerning an anticipated motion for a protective order against Plaintiffs' December 2019 Requests and discovery described in Plaintiffs' December 2019 Discovery Letter.  The Court will address each request in turn.

### A.  Plaintiffs' Motion for Depositions of Bratton and O'Neill

#### 1.  Factual background relating to depositions

On February 6, 2014, Plaintiff Sandy Gonzalez submitted a written complaint to the NYPD's Internal Affairs Bureau ("IAB") and the Equal Employment Opportunity Commission ("EEOC") detailing three categories of perceived violations within the 40th Precinct:  the "enforcement of an illegal quota; the misclassification of offences and downgrading of felonies; and racial discrimination against minorities by virtue of a hostile work environment."  (ECF No. 87 ¶ 70).

In July 2015, the media reported that an NYPD internal investigation exposed cases of downgrading felonies in the 40th Precinct. (ECF No. 129 at 6). As a result, 19 officers in that precinct were charged with misconduct, faced disciplinary proceedings, and were transferred out of the precinct. (Id.) On July 20, 2015, Defendants Bratton and O'Neill visited the precinct to address the events during a roll call. (Id.) Plaintiffs allege that Bratton stated that "a disgruntled officer among them had dropped the dime on the entire precinct," and identified Plaintiff Gonzalez as the "disgruntled officer" by "looking pointedly at him while making that statement." (Id.) Plaintiffs allege that "[i]t was understood that plaintiff Gonzalez was the officer that the Commissioner was referring to, because of the complaint that Gonzalez had made in February 2014, which appeared to have started the initial investigation." (ECF No. 87 ¶ 78).

In the same July 2015 roll call, Defendant O'Neill asked "if anyone was recording the roll call." (ECF No. 129 at 6). Plaintiffs try to link O'Neill's statement to a May 2015 statement from Gonzalez's supervisor, Sergeant Tameika Goode, accusing "Gonzalez of tape recording his conversations with her." (ECF No. 87 ¶ 76). Plaintiffs allege on information and belief that Goode's accusation was based on information she received from Defendant Inspector Christopher McCormack and Lieutenant Andrew Hatki, who allegedly told Goode and Gonzalez's co-workers that Gonzalez was a "rat," "recording everyone in the precinct." (Id.) "Upon information and belief, DI McCormack had stated to multiple members of the 40th Precinct that Gonzalez was recording their conversations and had leaked the story to the media." (Id. ¶ 78).

Plaintiffs seek to depose Defendants Bratton and O'Neill pursuant to Rule 37(a)(3)(C) of the Federal Rules of Civil Procedure based on the allegation that they were both "personally involved in launching retaliatory actions against" Gonzalez by "tacitly" identifying Gonzalez as the

officer who exposed misconduct in the 40th Precinct.  (ECF Nos. 129 at 10; 155 at 1).  To show

Defendant Bratton's "personal involvement" in the retaliation against Gonzalez, Plaintiffs point

to a February 25, 2016 article in which Bratton dismissed the allegations in this action as

"bullshit."  (Id. at 6).  Plaintiffs allege that Defendants Bratton and O'Neill have

> unique first hand knowledge regarding whether they were aware of Gonzalez's
> identity as the whistleblower when they visited the 40th Precinct; whether or not
> Bratton meant to reveal Gonzalez's identity to the entire rank and file of the 40th
> Precinct and Bratton's intent when he informed the assembled members of the
> 40th Precinct that they faced a predicament because a disgruntled police officer
> had dropped the dime on the Precinct.

(Id. at 10; ECF Nos. 157 at 5; 162 at 6).

### 2.  Applicable legal standards

"As a general proposition, high ranking government officials are not subject to

depositions."  Marisol A. by Forbes v. Giuliani, No. 95 Civ. 10533 (RJW), 1998 WL 132810, at *2

(S.D.N.Y. Mar. 23, 1998).  Absent exceptional circumstances, a high-ranking government official

should not "be deposed or called to testify regarding the reasons for taking official action."

Lederman v. NYC Dep't of Parks and Recreation, 731 F.3d 199, 203 (2d Cir. 2013) (citing United

States v. Morgan, 313 U.S. 409, 422 (1941)).  The Lederman standard "applies to both current

and former high-ranking officials."  Moriah v. Bank of China Ltd., 72 F. Supp. 3d 437, 440 (S.D.N.Y.

2014).

Plaintiffs must show that each would-be deponent has "unique first-hand knowledge

related to the litigated claims or that the necessary information cannot be obtained through

other, less burdensome or intrusive means."  Lederman, 731 F.3d at 203; see Winfield v. City of

New York, No. 15 Civ. 05236 (LTS) (KHP), 2018 WL 4350246, at *2–3 (S.D.N.Y. Sept. 12, 2018)

(denying deposition of mayor where information sought "can be obtained from another source");

see Schulz v. United States, No. 15 Civ. 01299 (BKS/CFH), 2017 WL 4350521, at *2 (N.D.N.Y. Aug. 24, 2017) ("bald assertions" cannot justify deposition of high-ranking official); see Murray v. Cty. of Suffolk, 212 F.R.D. 108, 110 (E.D.N.Y. 2002) (denying deposition of police commissioner because plaintiff failed to establish that "the information sought from [the commissioner] is not available from other sources in the . . . Police Department" through depositions). The "party seeking the deposition must demonstrate that the official's testimony will likely lead to the discovery of admissible evidence essential to that party's case." Marisol, 1998 WL 132810, at *3 (internal citation omitted).

The purpose of this rule is "to leave officials free to conduct government business" and "protect the mental processes of executive and administrative officers in order promote open channels of communication within government." L.D. Leasing Corp. v. Crimaldi, No. 91 Civ. 2430 (EHN), 1992 WL 373732, at *1 (E.D.N.Y. Dec. 1, 1992) (internal citation omitted). In addition, "[s]ubjecting former officials decision-making processes to judicial scrutiny and the possibility of continued participation in lawsuits years after leaving public office would serve as a significant deterrent to qualified candidates for public service"; therefore, to have meaning, "the protections must continue upon the official's departure from public service." United States v. Wal-Mart Stores, No. 01 Civ. 152 JPM, 2002 WL 562301, at *3 (D. Md. Mar. 29, 2002) (cited in Moriah, 72 F. Supp. 3d at 441 n.22).

### 3. Plaintiffs have not shown that they are entitled to depose Bratton or O'Neill

Plaintiffs seek to depose Defendants Bratton and O'Neill regarding Gonzalez's retaliation claim. (See ECF No. 129 at 10). Specifically, Plaintiffs want to inquire whether:

they were aware of Gonzalez's identity as the whistleblower when they visited the 40th Precinct; whether or not Bratton meant to reveal Gonzalez's identity to the entire rank and file of the 40th Precinct and Bratton's intent when he informed the assembled members of the 40th Precinct that they faced a predicament because a disgruntled police officer had dropped the dime on the Precinct.

(Id.)  The Court finds that Plaintiffs have failed to show an exceptional circumstance necessitating the depositions of the former Commissioners.  Lederman, 731 F.3d at 203 (deponent must have "unique first-hand knowledge related to the litigated claim").

First, Plaintiffs have not shown that Bratton or O'Neill have unique first-hand knowledge likely to lead to admissible evidence essential to Gonzalez's retaliation claim.  Marisol, 1998 WL 132810, at *3.  To support their allegation that Defendants Bratton and O'Neill knew Gonzalez was the whistleblower, Plaintiffs point to:  (i) Bratton's characterization of the allegations in this case as "bullshit" in the February 25, 2016 article; and (ii) Bratton and O'Neill's statements during the roll call that there was a "rat" and a disgruntled officer who "dropped the dime" on the Precinct.  (ECF Nos. 87 ¶¶ 78–79; 129 at 6, 10; 122 at 22).  Neither Bratton nor O'Neill said a name, identified Gonzalez, or directed retaliation against Gonzalez during the roll call.  (Id.)  Nor do Plaintiffs allege that either of them knew Gonzalez or said anything about him to any individual officers before or after the roll call.  Therefore, Plaintiffs have not shown that Bratton or O'Neill had any first-hand knowledge of the alleged retaliation against Gonzalez.  See L.D. Leasing Corp., 1992 WL 373732, at *1–2 (granting protective order where mayor had no first-hand knowledge of property seizures at issue).  This case is therefore unlike Mikorenda v. Town of Brookhaven, where the court permitted the deposition of a high-ranking official whom the plaintiff alleged was directly involved with his termination, it was uncontested that the official knew who the

plaintiff was, and the plaintiff and the official had spoken on many occasions. No. 04 Civ. 1857 (TCP) (WDW), 2005 WL 8160874, at *2 (E.D.N.Y. May 23, 2005).

Second, a deposition of the former Commissioners on a topic they mentioned in a public statement would be improper. See Marisol, 1998 WL 132810, at *5. Defendants Bratton and O'Neill referenced a whistleblower, but their statements did not demonstrate that they knew that Gonzalez was the whistleblower, intended to target Gonzalez as the whistleblower for retaliation, or have any unique first-hand knowledge related to Gonzalez's retaliation claim. See Winfield, 2018 WL 4350246, at *2–3 (denying deposition of mayor whose defense of a policy in a public statement was consistent with the City's position in the case but his statement did "not mean he ha[d] unique knowledge or involvement in the administration of the policy").

Third and finally, Plaintiffs have not shown that the information they would solicit from the former Commissioners is unavailable from another source. Winfield, 2018 WL 4350246, at *2. During the February 12, 2019 hearing on the same requested depositions, Plaintiffs asserted—and Judge Pitman rejected—the same reason for these depositions: ascertaining whether Defendants Bratton and O'Neill directed Gonzalez's immediate supervisors to retaliate against him. (ECF No. 122 at 17–33). That information could be obtained through less burdensome means, including by deposing Gonzalez's supervisors. See Murray, 212 F.R.D. at 110; see also Winfield, 2018 WL 4350521, at *2.

Accordingly, Plaintiffs' motion to compel the depositions of Defendants Bratton and O'Neill is denied.

**B. Plaintiffs' Motion for Failure to Comply with Court Orders**

Alleging that Defendants have failed to preserve and have destroyed documents, and have failed to comply with the Court's orders, Plaintiffs seek sanctions to be determined by the Court, including striking Defendants' Answer or an entry of an adverse inference pursuant to Rules 37(b)(2)(A)(i) and 37(b)(2)(C). (ECF Nos. 155; 157 at 18).

### 1. Relevant background

The Court's June 2019 Order held that the Electronically Stored Information ("ESI") searches Defendants conducted with respect to Plaintiffs Edreweene Raymond, Ritchie Baez, and Pedro Serrano (assuming the yield for Serrano was not substantially more than 2,000) were sufficient. (ECF No. 121 at 1). He then directed the parties' counsel "to meet and confer in an effort to devise appropriate search terms with respect to" Gonzalez. (Id. at 1–2). Defendants were also ordered to produce "all [IAB] and Civilian Complaint Review Board [("CCRB")] documents for defendants [Constantin Tsachas, a Deputy Inspector and former Commanding officer of Transit District 32] and McCormack that involve allegations of discrimination based on race or Hispanic national origin." (Id. at 2; see ECF Nos. 86 at 1 n.1; 156-5 at 32–33).

### a. Plaintiffs' arguments

Plaintiffs argue that Defendants failed to comply with the June 2019 Order in three respects. (ECF No. 157 at 13–14).

First, Plaintiffs contend that Defendants' counsel unilaterally modified the date range of the searches required by the June 2019 Order, and failed to notify Plaintiffs' counsel of the modifications, despite several opportunities to do so.[4] (Id.)

Second, Plaintiffs argue that Defendants purposefully withheld damaging evidence until the eve of depositions, thwarting Plaintiffs' ability to properly prepare. (ECF No. 157 at 12). Plaintiffs point to Defendants' delayed production of IAB and CCRB documents for Tsachas and McCormack that involved allegations of discrimination based on race or Hispanic national origin, despite having been required to produce these materials in the June 2019 Order. (Id. at 12, 14–15)

Third, Plaintiffs argue that Defendants have failed to turn over evidence related to allegations by retired Police Officer Michael Birch that Tsachas told him to stop more "Blacks." (ECF No. 157 at 11–12). In support, Plaintiffs point to a letter by Officer Pierre Maximilien that supposedly triggered a 247-page IAB investigation into Defendant Tsachas.[5] (Id. at 10–11, 15).

Based on these three instances of non-compliance with the June 2019 Order, Plaintiffs request that the Court sanction Defendants and order them to use the search terms in the June 2019 Order and the date ranges requested in Plaintiffs' November 28, 2019 Initial Document Requests for productions of: (i) emails containing the word "Raymond" for custodians Tsachas,

---

[4] On November 14, 2019, the Court ordered the parties to meet and confer regarding their discovery disputes and file a joint status report listing any they were unable to resolve. (ECF No. 147). Defendants argue that during a November 18, 2019 meet and confer discussion, Plaintiffs' counsel refused to discuss search terms because they were a "technical issue beyond the scope of the November 14," 2019 Court Order. (ECF No. 159 at 7).

[5] Maximilien filed complaints with IAB and "ranking brass in the NYPD" alleging that Tsachas imposed a "collars for dollars" policy that rewarded officers with overtime for arrests, and punished officers who did not target young African-American and Hispanic males. (ECF No. 157 at 10–11).

Bratton, and O'Neill from January 2012 through January 2016; (ii) emails containing the word "Gonzalez" for custodians Bratton and O'Neill from December 2013 through November 2015; and (iii) racially-based complaints about McCormack and Tsachas, specifically evidence related to allegations by retired Officer Birch about Tsachas and any corresponding investigations. (ECF Nos. 157 at 14; 156-1 at 7, 16; 156-5 at 32; 162 at 10–11).

### b.  Defendants' arguments

Defendants respond that (i) they have not withheld internal documents involving Tsachas and McCormack, (ii) the NYPD "thoroughly investigated Officer Maximilien's allegations against Tsachas and deemed them meritless," and the CCRB "found the allegations against McCormack to be unfounded." (ECF No. 159 at 16). Defendants point out that "Tsachas and McCormack were both questioned extensively about these documents at their depositions," and therefore, Plaintiffs have not shown any prejudice. (Id.) Defendants also contend that Plaintiffs failed to raise this issue in their October 1, 2019 letters claiming Defendants failed to produce ESI, or during the November 25, 2019 Conference, and repeatedly refused to meet and confer concerning ESI search terms until the Court's November 25, 2019 Order. (ECF Nos. 159 at 10–12, 16; 160 ¶¶ 18–23). As a result, Defendants' counsel maintains that they had no other choice than to conduct an ESI search using their own ESI search terms. (ECF No. 160 ¶ 15).

Defendants maintain that what Plaintiffs are actually seeking is reconsideration of the November 25, 2019 Order, and reject Plaintiffs' assertion that they first learned that Defendants did not use the required search criteria until they received from Defendants' counsel the list of search terms Defendants had used. (ECF No. 159 at 7–8). Rather, Defendants note that Plaintiffs' counsel failed to identify any deficiencies in Defendants' email production when asked by the

Court during the November 25, 2019 Conference and, in the parties' meet-and-confer call after that conference, Plaintiffs' counsel was uncooperative and instead preemptively proceeded to file discovery motions.  (Id.)

### 2.  Legal standards

#### a.  The Court's authority

Subject to review by the District Judge, pretrial matters that do not dispose of a party's claim or defense may be referred to a Magistrate Judge for a decision.  Fed. R. Civ. P. 72(a); see also 28 U.S.C. § 636(b)(1)(A).  A motion seeking Rule 37(b) sanctions for failure to comply with a court order is non-dispositive and within the Magistrate Judge's Rule 72(a) authority, "unless the sanction employed disposes of the claim."  Seena Int'l Inc. v. One Step Up, Ltd., 15 Civ. No. 1095 (PKC) (BCM), 2016 WL 2865350, at *10 (S.D.N.Y. May 11, 2016) (internal citation omitted).  "The critical issue . . . is what sanction the magistrate judge actually imposes, not what sanction the moving party seeks."  Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Group, 328 F.R.D. 100, 118 (S.D.N.Y. 2018) (internal citation omitted).

#### b.  Sanctions for noncompliance with court order

The party seeking sanctions must demonstrate the other party's noncompliance.  Oleg Cassini, Inc. v. Electrolux Home Prods., Inc., 11 Civ. No. 1237 (LGS) (JCF), 2013 WL 3056805, at *3 (S.D.N.Y. June 19, 2013).  Rule 37(b) provides a list of sanctions available to the court.  Fed. R. Civ. P. 37(b).  In addition, the court may issue a "just order[]" against a party that fails to provide or permit discovery pursuant to a court order.  Fed. R. Civ. P. 37(b)(2)(A); see also Daval Steel Prods. v. M/V. Fakredine, 951 F.2d 1357, 1363 (2d Cir. 1991) ("Provided that there is a clearly articulated order of the court requiring specified discovery, the district court has the authority to impose

Rule 37(b) sanctions for noncompliance with that order.").  Striking a pleading is a drastic sanction, generally used only when alternatives have been considered and the failure to comply was "due to willfulness, bad faith, or any fault of the party sanctioned."  Pelgrift v. 355 W. 51st Tavern Inc., 14 Civ. No. 8934 (AJN), 2016 WL 817470, at *2 (S.D.N.Y. Feb. 23, 2016) (internal citation omitted).

### c.  Standard for determining appropriate sanctions

The "court has broad discretion to determine the type of sanction to impose upon a party, based on all the facts of the case."  Scantibodies Lab., Inc. v. Church & Dwight Co., 14 Civ. No. 2275 (JGK) (DF), 2016 WL 11271874, at *18 (S.D.N.Y. Nov. 4, 2016) adopted by, 2017 WL 605303 (S.D.N.Y. Feb. 15, 2017) (internal citation omitted).  Federal Rule of Civil Procedure 37(b)(2) sets forth:

> two standards—one general and one specific—that limit a district court's discretion in determining which sanctions are appropriate.  First, any sanction must be 'just'; second, the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery.  Thus, the Court must select sanctions that are commensurate with the non-compliance such that they restore the prejudiced party as nearly as possible, to the position it would have occupied had the discovery been produced and the evidence disclosed."

Chevron Corp v. Donziger, 296 F.R.D. 168, 220 (S.D.N.Y. 2013) (internal citation omitted).

In this Circuit, when determining what sanctions to impose, the district court considers the following four non-exhaustive and non-exclusive factors: "(1) the willfulness of the noncompliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party had been warned of the consequences of noncompliance."  S. New England Tel. Co. v. Glob. NAPs Inc., 624 F.3d 123, 144 (2d Cir. 2010).  The court may also consider the full record in the case and any

prejudice to the moving party.  <u>Syntel Sterling Best Shores Mauritius Ltd.</u>, 328 F.R.D. at 120.  In analyzing prejudice to the moving party, "the Second Circuit has consistently rejected a 'no harm, no foul' standard for evaluating discovery sanctions."  <u>Id.</u> (Internal citation omitted).

### 3.  <u>Analysis</u>

#### a.  <u>Non-compliance with the Court's orders</u>

##### i.    <u>Email searches</u>

Judge Pitman's June 2019 Order held that the searches Defendants conducted with respect to Plaintiffs Raymond, Baez, and Serrano (assuming the yield for Serrano was not substantially more than 2,000), using the terms "Raymond," "Baez," and "Serrano" were sufficient.  (ECF No. 121 at 1).  Because of the large volume of results produced by the search terms regarding Gonzalez, Judge Pitman ordered the parties to confer and agree on appropriate search terms for Gonzalez.  (<u>Id.</u> at 1–2; <u>see</u> ECF No. 156-5 at 5, 23).  He added that the search terms suggested by Defendants' counsel in "[E]xhibit B to his June 7[, 2019] letter" were reasonable, and Plaintiffs' counsel agreed.  (ECF Nos. 156-5 at 10, 23–24; 118-2 at 2–3).

Instead of producing the Gonzalez emails resulting from the search terms Judge Pitman approved, Defendants' counsel conducted a search using their "own ESI search terms" with different terms, citing Plaintiffs' counsel's alleged refusal to meet regarding the terms for Gonzalez's search.  (ECF No. 160 ¶ 15; <u>compare</u> ECF No. 118-2 at 2–3 <u>with</u> ECF No. 156-14).  Defendants' counsel emailed the results of this revised search to Plaintiffs' counsel without advising of the changes to the search terms (ECF No. 160 ¶ 17), and it was not until the November 25, 2019 Order that Defendants' counsel revealed the search terms they in fact used.  If Plaintiffs' counsel had failed to confer as required by the June 2019 Order, Defendants could have, but did

not, request a further conference with the Court to resolve the issue.  Thus, the Court finds that although Defendants failed to comply with the June 2019 Order, so have Plaintiffs.

### ii.    IAB and CCRB documents

The June 2019 Order required Defendants to produce all IAB and CCRB documents concerning Defendants Tsachas and McCormack that involved allegations of discrimination based on race or Hispanic national origin.  (ECF No. 121. at 2; <u>see</u> ECF No. 156-5 at 32).  Defendants oppose production because the NYPD and CCRB investigated allegations against Tsachas and McCormack and found them meritless.  (ECF No. 159 at 16).  The June 2019 Order, however, did not limit production to IAB and CCRB documents involving allegations against Tsachas and McCormack that were found to have merit; rather, it required production of all IAB and CCRB documents "that involve allegations of discrimination based on race or Hispanic national origin." (ECF No. 121).  Therefore, the Court finds that Defendants have not complied with the June 2019 Order with respect to the IAB and CCRB documents.

### iii.    Appropriate sanctions for non-compliance

Having reviewed the "full record in the case in order to select the appropriate sanction," the Court finds that Plaintiffs and Defendants have both failed to comply with the June 2019 Order.  <u>S.New England Tel. Co.</u>, 624 F.3d at 144 (internal citation omitted).

At least with respect to the email searches, Plaintiffs' counsel's refusal to cooperate in meet and confer sessions contributed in part to the problem.  Therefore, neither of Plaintiffs' proposed orders—striking Defendants' Answer or an adverse inference—would be just in this instance, where one party failed to comply with the Court's Order, but the other party seems to have frustrated the compliance.

Instead, in an exercise of its authority to enter a just order, see Fed. R. Civ. P. 37(b)(2)(A); Scantibodies Lab., Inc., 2016 WL 11271874, at *18; Chevron Corp., 296 F.R.D. at 220, the Court orders the following:

(1) within 30 days of this order, Defendants must perform ESI searches for custodians Bratton, O'Neill, and specific to Raymond, Tsachas, using the search terms approved by the June 2019 Order: (a) for Raymond, for the period January 2012 through January 2016; and (b) for Gonzalez for the period December 2013 through November 2015;

(2) Within 30 days of this Order, Defendants must produce documents concerning Defendants Tsachas and McCormack involving allegations of discrimination based on race or Hispanic national origin, including documents related to Officer Birch, or submit a declaration attesting that such documents do not exist; and,

(3) Plaintiffs' counsel, Mr. Nwokoro and Mr. Scola, must both attend all future Court conferences and meet-and-confers in this action.

## C. **Spoliation**

### 4. **Legal standards**

A party is required to produce documents and other tangible objects within the party's "'possession, custody, or control.'" Coventry Capital US LLC v. EEA Life Settlements Inc., 333 F.R.D. 60, 64 (S.D.N.Y. 2019) (quoting Fed. R. Civ. P. 34(a)(1)). Documents and tangible objects "are considered to be under a party's control when that party has the right, authority, or practical ability to obtain" them. Bank of New York v. Meridien BIAO Bank Tanzania Ltd., 171 F.R.D. 135, 146 (S.D.N.Y. 1997). Once a "party has notice that the evidence is relevant to litigation or when

a party should have known that the evidence may be relevant to future litigation," it has an obligation to preserve that evidence. Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001); see Creative Res. Grp. of N.J., Inc. v. Creative Res. Grp., Inc., 212 F.R.D. 94, 106 (E.D.N.Y. 2002) (finding that the duty to preserve arose when the problems that led to filing of the lawsuit first surfaced). The filing of a charge of discrimination with the EEOC can trigger a duty to preserve evidence. See Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003). This is so because "[t]he duty to preserve arises, not when litigation is certain, but rather when it is 'reasonably foreseeable.'" Alter v. Rocky Point School Dist., No. 13 Civ. 1100 (JS) (AKT), 2014 WL 4966119, at *8 (E.D.N.Y. Sept. 30, 2014) (citing Byrnie v. Town of Cromwell, 243 F.3d 93, 107 (2d Cir. 2001), superseded on other grounds by, Szewczyk v. Saakian, 774 F. App'x 37 (2d Cir. 2019)). To fulfill its obligation to preserve evidence "a litigant must take affirmative steps to prevent inadvertent spoliation." R.F.M.A.S., Inc. v. So, 271 F.R.D. 13, 24 (S.D.N.Y. 2010). Discovery from "key players" in the litigation should be preserved. See Alter, 2014 WL 4966119, at *9 (key players included individuals mentioned in the complaint as present during critical events and to whom plaintiff reported discriminatory behavior).

The Second Circuit has defined spoliation as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999). Spoliation sanctions are not warranted where "the information was preserved in other locations." GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc., 282 F.R.D. 346, 359 (S.D.N.Y. 2012); see Paluch v. Dawson, No. 06 Civ. 01751, 2009 WL 3287395, at *3 (E.D. Pa. Oct. 13, 2019) (plaintiff not prejudiced by absence of videotape where plaintiff "has a number of other

resources" to prove his claim, including his own and other witnesses' testimony).  "In situations where sanctions are warranted, district courts have broad discretion in 'crafting an appropriate sanction for spoliation.'"  <u>Alter</u>, 2014 WL 4966119, at *5 (quoting <u>West</u>, 167 F.3d at 779).

Where spoliation has occurred, a court may impose the sanction of an adverse inference, which is "an inference that the evidence would have been unfavorable to the party responsible for its destruction."  <u>Zubulake</u>, 220 F.R.D. at 216.  A party seeking an adverse inference sanction for spoliation must establish

> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a "culpable state of mind"; and (3) that the missing evidence is "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

<u>Residential Funding Corp. v. DeGeorge Fin. Corp.</u>, 306 F.3d 99, 107 (2d Cir. 2002).

The mental culpability element requires that the party breached a discovery obligation knowingly in bad faith, through gross negligence, or through ordinary negligence.  <u>Residential Funding Corp.</u>, 306 F.3d at 108, 113.  "In the discovery context, negligence is a failure to conform to the standard of what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding."  <u>In re Pfizer Inc. Sec. Litig.</u>, 288 F.R.D. 297, 314 (S.D.N.Y. 2013) (internal quotation omitted).  Failing to institute a litigation hold is not gross negligence <u>per</u> <u>se</u>, but a factor the court should consider, along with "whether the party implemented good document or evidence preservation practices."  <u>Alter</u>, 2014 WL 4966119, at *11.

Relevance is construed broadly, and the requested discovery must be more than a mere "fishing expedition."  <u>Alter</u>, 2014 WL 4966119, at *5.  Although

a litigant is under no duty to keep or retain every document in its possession . . . it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request.

Zubulake, 220 F.R.D. at 217.  (internal quotation omitted).

To prevail on their request for sanctions, then, Plaintiffs here must

set forth with any degree of specificity, the materials which would have been helpful in prosecuting [their] claims.  Relevance cannot be established solely on the basis of conjecture.  Nor can a finding of relevance be grounded solely on the basis that some evidence in the custody of key witnesses no longer exists. Plaintiff[s] ha[ve] the burden of articulating what that evidence is with some degree of factual detail.

Alter, 2014 WL 4966119, at *12.  Plaintiffs bear the burden of adducing "sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction."  Chan v. Triple 8 Palace, No. 03 Civ. 6048 (GEL) (JCF), 2005 WL 1925579, at *7 (S.D.N.Y. Aug. 11, 2005) (citing Residential Funding Corp., 306 F.3d at 108–09).

Finally, "a court should never impose spoliation sanctions of any sort unless there has been a showing—inferential or otherwise—that the movant has suffered prejudice."  In re Pfizer Inc. Sec. Litig., 288 F.R.D. at 316 (internal quotation omitted).  This is so because an adverse inference instruction is "an extreme sanction and should not be imposed lightly."  Treppel v. Biovail Corp., 249 F.R.D. 111, 120 (S.D.N.Y. 2008).  "The noncompliant party bears the burden to demonstrate that the other parties did not suffer any prejudice from spoliation."  R.F.M.A.S., Inc., 271 F.R.D. at 24–25.  "Where the discovery violation involves spoliation or withholding of evidence, the absence of prejudice can be shown by demonstrating, for example, that the other parties were able to obtain the same evidence from another source, or that during discovery they

never asked for the evidence later shown to have been spoliated.  Id. at 25.  The adverse inference is meant to restore a prejudiced party to the "position he would have been in absent the wrongful destruction of evidence by the opposing party."  Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998).

### 5.  Analysis

Plaintiffs seek the sanction of an adverse inference against Defendants based on the alleged spoliation of (i) the NYPD-issued cell phones of Defendants McCormack and Tsachas, and (ii) Plaintiff Serrano's February 17, 2013 memo book (the "Memo Book").  The Court will address the two types of evidence separately.

### a.  Cell phones

### i.  Background relevant to cell phones

Plaintiffs allege that between late 2014 and early 2015, the NYPD issued cell phones to all supervisors and "substantial official communications between members of service were made using these cell phones."  (ECF No. 129 at 9).  On August 31, 2015, Plaintiffs filed this action, and "McCormack and Tsachas were first named as individual defendants in the Proposed Second Amended Complaint filed on April 7, 2017."  (ECF No. 132 at 18 n.3).  Although the original complaint did not name McCormack and Tsachas as defendants, Plaintiffs' allegations in that pleading describe McCormack's discriminatory behavior.[6]  (ECF No. 1 ¶¶ 52, 63).  In their December 2015 Amended Complaint, Plaintiffs alleged "that communications related to quotas were occurring on the Defendants' cell phones."  (ECF No. 162 at 9; see ECF No. 31 at 8–9).

---

[6] Plaintiffs referred to McCormack as "defendant Christopher McCormack" three times.  (ECF No. 1 ¶ 63).

In their discovery requests dated November 28, 2018 ("Plaintiffs' November 2018 Requests"), "each of the four plaintiffs" requested production of "copies of text messages sent by the defendants where the subject matter is the plaintiff." (ECF No. 129 at 8). Defendants objected but stated they would "search for and produce any such text messages." (Id. at 8–9). During a May 24, 2019 meet and confer, Defendants' counsel stated for the first time that Defendants McCormack and Tsachas "returned their NYPD issued cell phones that were used for text messages, and therefore the text messages could not be retrieved." (Id. at 9). The parties do not specify when the cell phones were returned.

Although their discovery requests asked for text messages, not cell phones, Plaintiffs now seek an adverse inference sanction for the missing cell phones, not the missing text messages, arguing that the failure to preserve the cell phones for two key Defendants constitutes per se bad faith. (ECF Nos. 129 at 8, 13–14; 136 at 10). During the November 25, 2019 Conference with the Court, Plaintiffs' counsel confirmed that they seek sanctions only for the missing cell phones. At the same conference, Defendants agreed to help Plaintiffs access the text messages by providing "to Plaintiffs' counsel the cell phones' subscriber, service provider, phone numbers, and an authorization to obtain phone records from the service provider." (ECF No. 149 at 1). Defendants have confirmed that they have provided McCormack and Tsachas' cell phone numbers to Plaintiffs to permit Plaintiffs to obtain text messages directly from the service provider, Verizon. (ECF No. 159 at 9).

Defendants oppose sanctions on the ground that there "is not a scintilla of evidence that the NYPD failed to preserve the cell phones" and "there is no evidence whatsoever that either defendant sent or received any relevant text messages on these cell phones pertaining to

plaintiffs' allegations."  (ECF Nos. 132 at 17) (internal citation omitted).  Defendants argue that the "spoliation doctrine is predicated on evidence actually existing and being destroyed" (id.) (internal citation omitted), but "Tsachas and McCormack do not believe they sent any text messages relating to plaintiffs during the applicable time period" (ECF No. 127-11 at 2).  Defendants point out that, although Gonzalez testified that Sergeant Blatt sent a group text to officers in a patrol car, Plaintiffs do not state that McCormack or Tsachas were copied on that alleged text.  (ECF Nos. 159 at 9; 156-17 at 2).  Defendants maintain that, "[e]ven if plaintiffs could establish that relevant text messages existed . . . there is no evidence that McCormack or Tsachas intended to deprive plaintiffs of these text messages" because "[t]he cell phones were returned in the ordinary course," not destroyed or lost.  (ECF No. 132 at 18; ECF No. 159 at 9).

### ii.  Analysis

#### a)  Duty to preserve

In late 2014 and early 2015, the NYPD issued to officers department cell phones for official communication.  (ECF No. 129 at 9).  On August 31, 2015, Plaintiffs filed this action, and "McCormack and Tsachas were first named as individual defendants in the Proposed Second Amended Complaint filed on April 7, 2017."  (ECF No. 132 at 18 n.3).  Although the original complaint did not name McCormack and Tsachas as defendants, Plaintiffs' allegations in that pleading describe McCormack's discriminatory behavior.  (ECF No. 1 ¶¶ 52, 63).  The record to date does not indicate when Defendants McCormack and Tsachas returned their cell phones, but Defendants represent that they searched for them between February 19, 2019, when Plaintiffs requested them, and May 24, 2019, when Defendants stated that they did not have them.  (See ECF Nos. 129 at 8–9).  This suggests that the cell phones existed, or should have existed, during

that time period.  See Byrnie, 243 F.3d at 108 (concluding that the defendants' promise to make available destroyed information suggests that that information existed at the time the promise was made).  Because McCormack and Tsachas were named defendants and "key players," the City was required to preserve the cell phones on which official communications were made, as relevant evidence since at least April 7, 2017, and arguably as early as August 31, 2015, when the pleading referencing their conduct was filed.  See Alter, 2014 WL 4966119, at *9.

### b) Culpable state of mind

Although McCormack and Tsachas returned their NYPD-issued cell phones during this lawsuit and the City had a duty to preserve and produce them, the record does not contain evidence that the City intended to destroy material evidence.  Plaintiffs fail to point to any evidence that the cell phones were returned with intent to thwart the litigation or in bad faith. In addition, Plaintiffs are ultimately seeking the text messages from the cell phones, the parties have been working to retrieve the text messages through a third party, and Defendants have provided McCormack's and Tsachas' cell phone numbers to Plaintiffs to obtain information from Verizon.  At worst, the City failed to implement carefully a litigation hold that reasonably would have captured the cell phones as they were returned in the ordinary course, but such negligent conduct does not rise to the level of intent to destroy evidence.  See Alter, 2014 WL 4966119, at *11 (failure to implement a litigation hold does not prove intent or even gross negligence but is one factor the court should consider).  Therefore, despite the failure to preserve the official cell phones of two named Defendants, the Court does not find that the City failed to "conform to the standard of what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding."  In re Pfizer Inc. Sec. Litig., 288 F.R.D. at 314.

### c) **Relevance to Plaintiffs' claims**

Plaintiffs' argument that the cell phones "may" contain text messages that are "potentially relevant" to Plaintiffs' retaliation claims is pure conjecture. Alter, 2014 WL 4966119, at *12. The Court cannot find relevance "solely on the basis that some evidence" in the City's custody no longer exists. Id. Plaintiffs have failed to point to other evidence in the record showing that the two cell phones contained relevant text messages. Residential Funding Corp., 306 F.3d at 107.

Even if they did, the parties are working to retrieve the text messages through another source. GenOn Mid-Atl, LLC, 282 F.R.D. at 359 (spoliation sanctions are not warranted where "the information was preserved in other locations"). Accordingly, the Court finds that the cell phones themselves are not relevant to Plaintiffs' claims. Because the cell phones were not relevant, that ends the Court's spoliation analysis with the conclusion that an adverse inference is not warranted.

### b. **Plaintiff Serrano's Memo Book**

#### i. **Background relevant to Memo Book**

On June 1, 2012, Plaintiff Serrano made a written complaint to the EEOC alleging racial discrimination by Defendants McCormack and "Capt[ain] Materasso." (ECF No. 129 at 6–7). Captain Materasso and Defendant allegedly found out about Serrano's complaint at a meeting and retaliated against him. (Id. at 7). On February 1, 2013, Serrano filed a discrimination and retaliation charge with the EEOC and told the NYPD that he had "retained an attorney." (ECF No. 128 ¶¶ 2, 4). On February 7, 2013, allegedly as punishment, Serrano was "assigned to a solitary fixed foot post at 339 Exterior Avenue," off his usual patrol assignment, and during that night,

five different supervisors went to his post to make sure he was there and sign his Memo Book. (ECF No. 129 at 7).  On February 16, 2013, Serrano gave six memo books, including the Memo Book at issue, to "Integrity Control Officer Gomez" and they were not returned to him.  (ECF No. 128 ¶ 8).  Plaintiffs allege that the Memo Book was "confiscated by the NYPD" at Corporation Counsel's request.  (ECF Nos. 129 at 7–8; 127-3 at 2).  Serrano alleges that he wrote everything down in his memo books, including information regarding the quota, downgrading felonies, a hostile work environment, general corruption, and retaliations against him in the 40th Precinct. (ECF No. 128 ¶¶ 9–18).

On November 28, 2018, Plaintiffs requested a copy of the Memo Book.  (ECF No. 129 at 7).  Defendants first objected to the demand, then agreed to produce it, but later stated that they did not have it.  (Id. at 7–8).  Plaintiffs allege that the daily contemporaneous records of Serrano's "assignments, posting, radio runs, activity, and occurrences" recorded in the Memo Book are relevant to Serrano's claims of "adverse employment action and retaliation."  (Id. at 13).

Plaintiffs allege that Defendants were on notice to preserve the Memo Book as of February 7, 2013, as evidenced by "Corporation Counsel['s] request[] [for] Serrano's Memo Books and Monthly Activity Reports with a view to litigation"; and again on October 15, 2013, when "Serrano's memo books were confiscated at the request of Corporation Counsel."  (ECF Nos. 129 at 8; 127-3 at 2).  Even earlier, in fact, on August 3, 2012 and September 10, 2012, the EEOC had sent a Notice to the City to preserve "all records relating to Serrano's claims of discrimination and retaliation."  (ECF Nos. 127 ¶¶ 7–8; 127-5; 127-6; 129 at 8; 157 at 9).  Plaintiffs allege that Defendants' failure to preserve the Memo Book equates bad faith or gross negligence. (ECF No. 129 at 13).  They argue for an inference that the "City acted with intent to deprive

plaintiffs of" the Memo Book because due to 2012 EEOC notices to preserve documents related to Serrano's discrimination claim, the City was "very much aware of its duty to preserve" the Memo Book and secured it as of October 15, 2013 when the Memo Book was confiscated at Corporation Counsel's request.  (ECF No. 136 at 9–10).  Therefore, Plaintiffs contend, the City's failure to preserve and produce the Memo Book "raises an inference of intent to deprive."  (Id. at 10).  Plaintiffs seek an adverse inference sanction for spoliation of the Memo Book.  (ECF No. 129 at 16).

Defendants allege that a spoliation sanction should not be imposed absent a showing of prejudice, which Plaintiffs have not shown.  (ECF No. 132 at 19).  Defendants contend they preserved the Memo Book through photographs, including the February 7, 2013 entry showing signatures from numerous supervisors, which Defendants' counsel shared with Plaintiffs' counsel on June 14, 2019.  (Id.; ECF Nos. 133 ¶4; 133-3; 159 at 9).  In addition, during Serrano's deposition, he testified extensively about the February 7, 2013 entry.  (ECF No. 132 at 19–20).  Therefore, Defendants claim, even without the Memo Book, Serrano can "testify at trial about the Memo Book's contents based on his personal knowledge."  (Id.)

Plaintiffs reply that Serrano is prejudiced because photographs of the Memo Books are not the same as producing the Memo Book and the photographs omit large portions of the Memo Book.  (ECF No. 136 at 8–9).  Even though Serrano was able to testify without the Memo Book in front of him, he "is still prejudiced because the [Memo Book] would have served as a contemporaneous record of the facts recorded, not subject to the vagaries of memory,

corroborating the testimony of [] Serrano and rendering such testimony more credible to a trier of fact." (Id. at 9).

### ii. Analysis

#### a) Duty to preserve

In the October 15, 2013 internal investigation report, Sergeant Tiffany Crawford noted that "Counsel Cooke" knew Serrano had filed the EEOC complaint in August 2012 and assumed Serrano had already commenced civil litigation, or would do so soon. (ECF No. 127-3). Therefore, as of August 2012, the City had a duty to preserve the Memo Book. See Zubulake, 220 F.R.D. at 216.

#### b) Culpable state of mind

Serrano's Memo Book was in Defendants' custody as of February 16, 2013, when Plaintiff Serrano gave it to "Integrity Control Officer Gomez." (ECF No. 128 ¶ 8). On February 19, 2019, Defendants agreed to produce the Memo Book, but then reversed course and stated that they did not have it to produce. (ECF No. 129 at 7–8). The Court finds that in failing to preserve such a fundamental record from Serrano, a Plaintiff who memorialized the alleged acts at issue in this litigation, Defendants failed to "conform to the standard of what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding" that rises to the level of grossly negligent spoliation. In re Pfizer Inc. Sec. Litig., 288 F.R.D. at 314–15 (gross negligence can be found where a party failed to preserve paper records from key players); see Ottoson v. SMBC Leasing & Fin., Inc., 268 F. Supp. 3d 570, 581 (S.D.N.Y. 2017) (gross negligence found where party "had control over the evidence and an obligation to preserve it").

### c) Relevance to Plaintiffs' claim

Plaintiffs allege that the Memo Book is relevant to Serrano's claims of "adverse employment action and retaliation." (ECF No. 129 at 13). Serrano alleges that he wrote everything down in his memo books, including information regarding the quota, downgrading felonies, a hostile work environment, general corruption, and retaliations against him in the 40th Precinct. (ECF No. 128 ¶¶ 9–18). Defendants confiscated the Memo Book as part of their internal investigation related to Serrano's EEOC claim on the same issues (ECF No. 127-4), and Defendants deposed Serrano about its contents (ECF No. 132 at 19), demonstrating their understanding that the Memo Book was relevant. The Court finds that the Memo Book, containing Serrano's contemporaneous observations of the facts giving rise to his claims of adverse employment action and retaliation, is relevant. Although Defendants are not under a duty to retain every document they possess, they are under a duty to retain documents they know or reasonably should know is relevant in the action. Zubulake, 220 F.R.D. at 217. Here, that included Serrano's Memo Book.

### d) Prejudice

Serrano alleges that he "wrote down each time [he] was retaliated against and in what ways," and threats made against him by defendant McCormack and the punishments he received for not making the quota." (ECF No. 128 ¶¶ 10–19). Serrano timely requested the Memo Book during discovery, but Defendants have not produced it. (ECF No. 129 at 7). Serrano is not able to obtain the same evidence—his own contemporaneous written observations—from another source.

The Court is not persuaded by Defendants' argument that that they preserved the Memo Book through photographs. (See ECF Nos. 132 at 19; 159 at 9). Defendants only provide photographs of five pages of the Memo Book, two of which are blank and one of which has only three lines of information. (ECF No. 133-3 at 5–9). Given the breadth of information that and frequency with which Serrano wrote in his memo books, the photographs obviously omit large portions of the Memo Book. (See ECF Nos. 128 ¶¶ 10–19; 136 at 8–9). Accordingly, the Court finds that the same evidence is not available from another source. See R.F.M.A.S., Inc., 271 F.R.D. at 24–25 (absence of prejudice can be shown by demonstrating that the other party can obtain the same evidence from another source).

Contrary to Defendants' argument, the fact that Serrano was able to testify at his deposition about the contents of the Memo Book does not mitigate the prejudice from the absence of the document itself. The incomplete set of photographs and Serrano's testimony as to his recollections concerning those few pages is insufficient to replace the Memo Book itself, in contrast to Paluch, where several other resources were available in the absence of the destroyed evidence. 2009 WL 3287395, at *3. The Memo Book was plainly a contemporaneous record of the events that led Serrano to file his complaint with the EEOC and this action. (ECF No. 136 at 8–9). The Court therefore agrees with Plaintiffs that the recorded information could prove more persuasive than Serrano's memory alone or help him refresh his memory for testimony. (Id. at 9). Accordingly, the Court finds that the City's failure to preserve the Memo Book has prejudiced Serrano.

### e) **Adverse inference**

Because the Court finds that Plaintiffs have established that: (i) the City had a duty to preserve the Memo Book and failed to preserve it with a culpable state of mind; (ii) the destroyed Memo Book is relevant to Serrano's claims of adverse employment action and retaliation; and (iii) Serrano has been prejudiced by its destruction, the Court concludes that an adverse inference is warranted.  Residential Funding Corp., 306 F.3d at 107–08, 113; see Lyondell-Citgo Refining, LP v. Petroleos de Venez., S.A., 02 Civ. No. 795 (CBM), 2005 WL 1026461, at *4 (S.D.N.Y. May 2, 2005) (affirming grant of an adverse inferences resulting from discovery lapses throughout the course of the action and noting that it "makes little difference to the party victimized by the destruction of evidence whether the act was done willfully or negligently").  While an adverse inference is a serious sanction, Treppel, 249 F.R.D. at 120, it serves to deter the destruction of evidence, placing the "risk of an erroneous judgment on the party that wrongfully created the risk" and "restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence."  Kronisch, 150 F.3d at 126; see Lyondell-Citgo Ref., 2005 WL 1026461, at *4.

Accordingly, Plaintiffs are entitled to an inference that there is a likelihood that the destroyed Memo Book would have supported Serrano's claims of adverse employment action and retaliation.  Because the Court has determined that Plaintiffs are entitled to an adverse inference, Defendants' request for reasonable expenses incurred in opposing Plaintiffs' motion and for sanctions (ECF No. 159 at 18) is denied.  See Fed. R. Civ. P. 37(a)(5)(B).

**D.** **The Parties' Letter-Motions for Discovery Conferences**

As discussed above, despite the Court's Order to file the Omnibus Motion encompassing all issues raised in ECF Nos. 126, 150, and 151, Plaintiffs did not comply, instead presenting only some of the matters raised in those docket entries.  (See supra Section I).  Then, not even two weeks after Plaintiffs' motion was fully briefed, Defendants requested a discovery conference concerning an anticipated protective order.  (ECF No. 166).  Then, a little over a week later, Plaintiffs moved for a discovery conference for an anticipated motion to compel.  (ECF No. 169). The parties briefed both motions for a conference.  (ECF Nos. 166, 169, 171–74).

**1.** **Defendants' anticipated motion for a protective order**

On January 21, 2020, Defendants filed a letter-motion pursuant to Local Civil Rule 37.2 and paragraph II(C)(2) of the Court's Individual Practices, requesting a discovery conference concerning their anticipated motion for a protective order pursuant to Rule 26(c) with respect to Plaintiffs' December 2019 Requests, or in the alternative, seeking 30 days from the date of the denial of a protective order to respond to Plaintiffs' December 2019 Requests.  (ECF No. 166 at 1).  Plaintiffs' December 2019 Requests seek, inter alia, emails from six individuals:  Sergeant Blatt, Lieutenant Hatki, Sergeant Goode, Sergeant Martin Campbell, Chief Joseph Fox, and Inspector Vincent Giantasio.  (ECF No. 166-1).

Defendants argue that because, on December 3, 2019, the Court denied Plaintiffs' motions for a discovery conference for an anticipated motion to compel and for sanctions, instead granting Plaintiffs' motion to amend their motion for sanctions within the Omnibus Motion (ECF No. 152), Plaintiffs should have included the email requests for the six individuals above in the Omnibus Motion, but did not.  (ECF No. 166).  Defendants argue that Plaintiffs'

December 2019 Requests are unreasonably cumulative or duplicative under to Rule 26(b)(2)(C)(i).  (Id. at 2).

Defendants also seek to forbid disclosure or discovery of the NYPD's specialized units, pursuant to Rule 26(c)(1)(A), on the grounds that Plaintiffs failed to raise this discovery issue: (i) in Plaintiffs' October 24, 2019 letter addressing Defendants' August 21, 2019 discovery responses; (ii) during the meet and confer held in response to the Court's November 14, 2019 order directing the parties to meet and confer regarding all of their discovery disputes; (iii) during the November 25, 2019 Conference with the Court; or (iv) what was supposed to be their Omnibus Motion on all remaining discovery disputes.  (ECF Nos. 166 at 2–3; 173 at 3).

Critical to the question whether this discovery is permissible is Judge Swain's 2018 Order specifying which claims were dismissed and which claims could proceed in the SAC (ECF No. 86; see supra n.1).  (ECF No. 166 at 3).  Defendants argue that even if Plaintiffs' request for these documents was timely, information concerning the NYPD's specialized units goes beyond the scope of Judge Swain's 2018 Order and is therefore not relevant to Plaintiffs' factual allegations in the SAC.  (Id.)

Plaintiffs argue that the discovery requested is relevant and timely because not until October 22, 2019 did they receive the transcript of Tsachas's deposition in which he testified about the metrics by which officers were promoted into specialized units, the alleged "collars for dollars" program, and awards of overtime.  (ECF No. 171 at 3).  Plaintiffs' counsel admits, however, that over a month later, at the time of the November 25, 2019 Conference, he had not read the transcript, and had not recognized the importance of the specialized units.  (Id.)

### 2. Plaintiffs' anticipated motion to compel

On January 30, 2020, Plaintiffs filed a letter-motion requesting a discovery conference concerning their anticipated motion a compel the Police Officer's Monthly Conditions Impact Measurement Reports (the "Monthly Reports") for the named Plaintiffs and their white comparators, and overtime records that reflect misappropriation of federal funds earmarked for overtime (the "Overtime Records"). (ECF No. 169 at 1–3).

### a. Monthly Reports

Defendants oppose this discovery on the ground that Plaintiffs' request for the Monthly Reports is untimely and improper for three reasons. First, Plaintiffs requested the same documents in December 2018, to which Defendants objected. (ECF No. 173 at 1). Second, the Monthly Reports are beyond the scope of the Judge Swain's 2018 Order because the Order permits allegations of assignments to punitive posts as a retaliatory measure, but it does not permit allegations that Defendants "engaged in disparate treatment by assigning posts in a discriminatory manner." (Id. at 2). Third, during a May 23, 2019 meet and confer, Defendants produced summons and arrest statistics for Plaintiffs and the alleged comparators as an alternative to the Monthly Reports, and neither of Plaintiffs' counsel objected to the substitution even though they could have in the meet and confer, in a response to Defendants' counsel's follow-up email memorializing their understanding, or during the discovery conference that occurred after the substitution. (Id. at 1–2; see ECF No. 117). Defendants have already produced the summons and arrest statistics for both Plaintiffs and the alleged comparators to support Plaintiffs' race discrimination claims. (ECF No. 173 at 1–2). Defendants have also produced roll call records Plaintiffs requested showing each officer's daily tour. (Id. at 2).

Plaintiffs respond that (i) Defendants never produced any roll call related to Transit District 32 where Raymond was stationed; (ii) "the Monthly Reports show a broader picture" of Defendants' alleged "retaliatory and discriminatory actions"; (iii) the "[w]hite comparators['] Monthly Reports are necessary to act as a control to compare their assignments to Plaintiffs"; and (iv) their decision not to object to Defendants' counsel's email offering to produce arrest and summons statistics did not waive or withdraw their "demands for all other records." (ECF No. 174 at 2).

### b. Overtime Records

Defendants argue that the request for Overtime Records is beyond the scope of the Judge Swain's 2018 Order and an improper fishing expedition. (ECF No. 173 at 3). Defendants contend that the Court previously determined that Plaintiffs "are not entitled to documents involving defendants Tsachas and McCormack that have no bearing on discriminatory intent" (ECF No. 124 at 29, 34–35, 40–41) and the same limitation should apply to the Overtime Records. (ECF No. 173 at 2).

Plaintiffs respond that because lack of overtime is part of Plaintiffs' alleged damages, as stated in the SAC, Plaintiffs have a right to the seek the overtime records. (ECF No. 174 at 3). Tsachas even testified to letting officers use the overtime code even when they were not working in a post affording its use. (ECF No. 169-5 at 6).

### 3. Analysis

Because the requested conferences involve overlapping issues, the Court will analyze both conferences together.

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: . . . the party seeking discovery has had ample opportunity to obtain the information by discovery in the action . . ." Fed. R. Civ. P. 26(b)(2)(C). Plaintiffs even quote a case agreeing with the notion that "district court has wide latitude to determine the scope of discovery." (ECF No. 171 at 1) (quoting In re Agent Orange Prod. Liab. Litig., 517 F.3d 76, 103 (2d Cir. 2008)). However, Plaintiffs have not taken advantage of the ample opportunity the Court has given them to obtain the information they seek in their discovery requests.

Plaintiffs have utterly failed to comply with the Court's December 3, 2019 Order directing them to file the Omnibus Motion including **all of** their discovery disputes from three separate requests to the Court. Instead of minimizing the burden on the Court, they have only increased it. The timeline of the parties' most recent disputes concerning the Overtime Records, December 2019 Requests, specialized units, and Monthly Reports demonstrates that although Plaintiffs were aware of these disputes before they filed their Omnibus Motion, they chose not to include these issues.

First, in their **December 2019 Requests**, Plaintiffs sought emails from six individuals from whom they previously requested emails and sought to compel in their December 2, 2019 letter-motion—a discovery matter that they were ordered to include in the Omnibus Motion. (ECF Nos. 151–52). In October 2019, Plaintiffs' counsel had the Tsachas transcript that led to their subsequent request for discovery relating to the NYPD's **specialized units** but did not raise that

issue until after they filed their Omnibus Motion.  (See ECF Nos. 147, 171).  In addition, Plaintiffs first raised the issue of **Monthly Reports** in 2018 and participated in a meet and confer without objecting to Defendants' alternative production of summons and arrest statistics, but made no mention of the issue again in subsequent meet-and-confers nor in the discovery conferences with the Court.  (ECF Nos. 173 at 1–2; 127-7; 127-12).

Given the dates on which a dispute seems to have emerged regarding the specialized units and Monthly Reports, Plaintiffs failed to comply with the Court's November 14, 2019 Order that the parties meet and confer regarding their discovery disputes and file a joint status report listing each dispute they were unable to resolve.  (See ECF No. 147).  Given the date on which the dispute emerged regarding the December 2019 Requests, Plaintiffs failed to comply with the Court's December 3, 2019 Order.  (See ECF No. 152).

Plaintiffs' request to compel production of the **Overtime Records** also fails as a result of Plaintiffs' delays and recalcitrance, as well as on the merits.  The only remaining claim against the City as a result of the Judge Swain's 2018 Order was "Gonzalez's First Amendment retaliation claim, to the extent he alleges retaliatory conduct from May to November 2015, against the City and Proposed Individual Defendants McCormack, O'Neill and Bratton."  (ECF No. 86 at 58).  Judge Swain's 2018 Order does not mention a misappropriation or fraud claim.  Plaintiffs cannot seek damages or documents relative to a claim not asserted in this action.

Given the lengths to which the Court implored Plaintiffs to raise all of their discovery disputes in a timely manner, Plaintiffs' belated submission seeking this discovery fails to make a compelling case for their production.  Nevertheless, Defendants are, surprisingly, amenable to producing documents responsive to the December 2019 Requests within 30 days of this Order.

In addition, Judge Swain's 2018 Order did grant Plaintiffs leave to include in the SAC: (i) Gonzalez, Baez, and Serrano's[7] federal discrimination claims relating to negative performance evaluations against McCormack; and (ii) Raymond's claim against Tsachas based on the 2015 performance evaluation. (ECF No. 86 at 58). To the extent that the Monthly Reports are in fact performance evaluations, Plaintiffs are entitled to their production as limited by the claims permitted by Judge Swain's 2018 Order.[8]

Accordingly, the Court (i) denies Defendants' request for a protective order with respect to the December 2019 Requests; (ii) grants Defendants' request for a protective order with respect to documents concerning the specialized units; (iii) grants Plaintiffs' request to compel production of the Monthly Reports; and (iv) denies Plaintiffs' request to compel production of the Overtime Records.

### III. CONCLUSION

For the reasons set forth above, Plaintiffs' (i) motion to compel depositions is DENIED; (ii) motion to compel compliance with the June 2019 Order is GRANTED IN PART and DENIED IN PART; (iii) motion for sanctions for spoliation and alleged wrongful action throughout the pendency of this case is GRANTED IN PART and DENIED IN PART; and, (iv) motion for a discovery conference for an anticipated motion to compel is DENIED. Defendants' (i) request for expenses

---

[7] Serrano's claim is limited to his negative 2012 performance rating only. (ECF No. 86 at 58).

[8] The Court notes that on March 2, 2020, without leave, Plaintiffs filed a supplement to their letter-motion to compel the Monthly Reports, seeking sanctions against Defendants for attorney's fees and costs. (ECF No. 176 at 1). The Court does not welcome such sporadic submissions, particularly without the meet-and -confer required by the Court's Individual Practices. Because the relief Plaintiffs seek in their supplement is otherwise addressed in this Opinion and Order, Plaintiffs' request for a conference is denied as moot.

is DENIED; (ii) request for sanctions is DENIED; and (iii) motion for a discovery conference for an anticipated protective order is DENIED.

The parties are ORDERED as follows:

i. Within 30 days of this order, Defendants are ordered to:

    a. use the search terms approved by the June 2019 Order related to Raymond from January 2012 through January 2016 and Gonzalez from December 2013 through November 2015, for custodians Bratton, O'Neill, and specific to Raymond, Tsachas, and produce any responsive, non-privileged documents (see ECF No. 118-2);

    b. produce documents concerning Defendants Tsachas and McCormack that involved allegations of discrimination based on race or Hispanic national origin, including documents related to Officer Birch, or submit an affidavit stating that such documents do not exist;

    c. produce non-privileged documents responsive to the December 2019 Requests;

    d. produce the Monthly Reports related to Gonzalez's, Baez's, and Serrano's federal discrimination claims relating to negative performance evaluations against McCormack, limiting production for Serrano to Monthly Reports relative to his 2012 performance rating; and

    e. produce the Monthly Reports related to Raymond's claim against Tsachas, limited to his 2015 performance evaluation.

ii. Defendants are not required to produce the Monthly Reports, except as ordered above, or Overtime Records.

iii. Mr. Nwokoro and Mr. Scola are ordered to attend all future conferences and meet-and-confers in this action together.

iv. Plaintiffs are entitled to an inference that there is a likelihood that the destroyed Memo Book would have supported Serrano's claims of adverse employment action and retaliation.

At the March 10 Conference, the parties must be prepared to discuss steps, in compliance with this Opinion and Order, to bring any remaining discovery to a close. The Clerk of Court is respectfully directed to close ECF Nos. 166, 169, and 176.

Dated:     New York, New York
           March 5, 2020

                                   _____
                                   SARAH L. CAVE
                                   United States Magistrate Judge