15 Civ. 6885 (LTS)(SLC)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EDREWEENE RAYMOND, PEDRO SERRANO,
SANDY GONZALEZ, and RITCHIE BAEZ,

Plaintiffs,

-against-

THE CITY OF NEW YORK, WILLIAM J. BRATTON,
JAMES P. O'NEILL, CHRISTOPHER McCORMACK,
and CONSTANTIN TSACHAS,

Defendants.

**DEFENDANTS' MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT**

***JAMES E. JOHNSON***
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  Yuval Rubinstein*
*Tel:  (212) 356-2467*
*Matter No. 2015-044359*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 3

ARGUMENT ......................................................................................................................... 3

POINT I

       PLAINTIFFS' DISCRIMINATION CLAIMS
       UNDER 42 U.S.C. § 1983 ARE DEFICIENT AS
       A MATTER OF LAW ............................................................................. 3

       A. The Applicable Legal Standard Under 42
          U.S.C. § 1983 ................................................................................... 3

       B. Plaintiffs' Discrimination Claims Are
          Deficient As A Matter Of Law ......................................................... 4

          1.  Raymond ................................................................................... 4

          2.  Serrano ................................................................................... 13

          3.  Gonzalez ................................................................................ 17

          4.  Baez ........................................................................................ 21

POINT II

       THE RETALIATION CLAIMS OF SERRANO
       AND GONZALEZ UNDER THE EQUAL
       PROTECTION CLAUSE ARE DEFICIENT AS
       A MATTER OF LAW ........................................................................... 23

POINT III

       THE FIRST AMENDMENT RETALIATION
       CLAIMS OF RAYMOND, SERRANO, AND
       GONZALEZ ARE DEFICIENT AS A MATTER
       OF LAW ............................................................................................... 26

          1.  Raymond ................................................................................. 27

          2.  Serrano ................................................................................... 28

**Pages**

       3.  Gonzalez ................................................................. 29

POINT IV

      THE INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED ON THE BASIS OF QUALIFIED IMMUNITY ................................................31

      A.  The Applicable Legal Standard ......................................31

      B.  Defendants Did Not Violate Plaintiffs' Clearly Established Constitutional Rights, And Their Actions Were Objectively Reasonable ...............................32

POINT V

      PLAINTIFFS' SHRL AND CHRL CLAIMS ARE DEFICIENT AS A MATTER OF LAW ......................................34

CONCLUSION.................................................................................. 35

# TABLE OF AUTHORITIES

**Cases**                                                                                                   **Pages**

*Abdelal v. Kelly*,
   No. 13-4341 (ALC), 2020 U.S. Dist. LEXIS 56166 (S.D.N.Y. Mar. 30, 2020) ....................21

*Alali v. Debara*,
   No. 07-2916 (CS), 2010 U.S. Dist. LEXIS 164582
   (S.D.N.Y. Sept. 30, 2010) ................................................................................................29, 30

*Alleyne v. Four Seasons Hotel*,
   No. 99-3432 (JGK), 2001 U.S. Dist. LEXIS 1503 (S.D.N.Y. Feb. 15, 2001).........................9

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).................................................................................................................3

*Anemone v. Metro. Transp. Auth.*,
   629 F.3d 97 (2d Cir. 2011)....................................................................................................28

*Anyanwu v. City of New York*,
   No. 10-8498 (AJN)(THK), 2013 U.S. Dist. LEXIS 132138
   (S.D.N.Y. Sept. 16, 2013) ......................................................................................................8

*Ashcroft v. al-Kidd*,
   563 U.S. 731 (2011)...............................................................................................................31

*Bazile v. City of New York*,
   215 F. Supp. 2d 354 (S.D.N.Y. 2002)................................................................................8, 21

*Beharry v. City of New York*,
   No. 18-2042 (AJN), 2020 U.S. Dist. LEXIS 193161 (S.D.N.Y. Oct. 19, 2020)....................21

*Birch v. City of New York*,
   184 F. Supp. 3d 21 (E.D.N.Y. 2016),
   *aff'd*, 675 Fed. Appx. 43 (2d Cir. 2017) ..........................................................................9, 32

*Buckman v. Calyon Sec. (USA) Inc.*,
   817 F. Supp. 2d 322 (S.D.N.Y. 2011).....................................................................................9

*Bucknell v. Refined Sugars, Inc.*,
   82 F. Supp. 2d 151 (S.D.N.Y. 2000).....................................................................................20

*Burgess v. Howard County Police Dep't*,
   2013 U.S. Dist. LEXIS 140203 (D.Md. Sept. 30, 2013) ......................................................15

*Bush v. Fordham Univ.*,
   452 F. Supp. 2d 394 (S.D.N.Y. 2006)...................................................................................10

**Cases** <span style="float:right">**Pages**</span>

*Calhoun v. EPS Corp.*,
  36 F. Supp. 3d 1344 (N.D. Ga. 2014) ................................................................7

*Chen v. City Univ. of N.Y.*,
  805 F.3d 59 (2d Cir. 2015) ....................................................................12, 35

*Conway v. Microsoft Corp.*,
  414 F. Supp. 2d 450 (S.D.N.Y. 2006) ..........................................................16, 19

*D'Amico v. City of New York*,
  132 F.3d 145 (2d Cir. 1998) ......................................................................20

*Deanda v. Hicks*,
  137 F. Supp. 3d 543 (S.D.N.Y. 2015) ..............................................................14

*EEOC v. Bloomberg L.P.*,
  778 F. Supp. 2d 458 (S.D.N.Y. 2011) ............................................................2, 3

*EEOC v. Bloomberg L.P.*,
  967 F. Supp. 2d 186 (S.D.N.Y. 2013) ..........................................................25, 30

*Fairbrother v. Morrison*,
  412 F.3d 39 (2d Cir. 2005) ......................................................................13

*Fisher v. Vassar College*,
  114 F.3d 1332 (2d Cir. 1997) ....................................................................11, 12

*Fitchett v. City of New York*,
  No. 18-8144 (PAE), 2021 U.S. Dist. LEXIS 47763
  (S.D.N.Y. Mar. 15, 2021) .............................................................7, 8, 10, 18, 35

*Floyd v. City of New York*,
  959 F. Supp. 2d 540 (S.D.N.Y. 2013) ..............................................................16

*Garcetti v. Ceballos*,
  547 U.S. 410 (2005) .................................................................................32

*Giacalone v. Abrams*,
  850 F.2d 79 (2d Cir. 1988) ........................................................................31

*Gill v. Arab Bank, PLC*,
  893 F. Supp. 2d 542 (E.D.N.Y. 2012) ..............................................................14

*Goonewardena v. State Workers Comp. Bd.*,
  258 F. Supp. 3d 326 (S.D.N.Y. 2017) ..............................................................14

**Cases**                                                                                     **Pages**

*Graham v. Long Island R.R.*,
    230 F.3d 34 (2d Cir. 2000)............................................................................8

*Gross v. FBL Fin. Servs.*,
    557 U.S. 167 (2009)...................................................................................4

*Guzman v. City of New York*,
    93 F. Supp. 3d 248 (S.D.N.Y. 2015)................................................5, 8, 21

*Hamilton v. Mount Sinai Hosp.*,
    528 F. Supp. 2d 431 (S.D.N.Y. 2007).....................................................14

*Haskell v. Kaman Corp.*,
    743 F.2d 113 (2d Cir. 1984)....................................................................10

*Hazen Paper Co. v. Biggins*,
    507 U.S. 604 (1993)...................................................................................4

*Heil v. Santoro*,
    147 F.3d 103 (2d Cir. 1998)....................................................................28

*Holowecki v. Fed. Express Corp.*,
    644 F. Supp. 2d 338 (S.D.N.Y. 2009),
    *aff'd*, 382 Fed. Appx. 42 (2d Cir. 2010) .............................................7, 15

*Jackler v. Byrne*,
    658 F.3d 225 (2d Cir. 2011)....................................................................27

*Kaplan v. Multimedia Entm't, Inc.*,
    2005 U.S. Dist. LEXIS 40351 (W.D.N.Y. Oct. 27, 2005)........................5

*Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*,
    716 F.3d 10 (2d Cir. 2013)......................................................................24

*Lane v. Franks*,
    573 U.S. 228 (2014).................................................................................31

*Lanier v. IBM Corp.*,
    319 F. Supp. 2d 374 (S.D.N.Y. 2004).....................................................13

*Leibowitz v. Cornell Univ.*,
    584 F.3d 487 (2d Cir. 2009)....................................................................20

*Lewis v. Cowen*,
    165 F.3d 154 (2d Cir. 1999)....................................................................31

**Cases**                                                                                    **Pages**

*Littlejohn v. City of New York*,
   795 F.3d 297 (2d Cir. 2015) ................................................................................... 14

*Local 3621, Ems Officers Union v. City of New York*,
   No. 18-4476 (LJL)(SLC), 2021 U.S. Dist. LEXIS 86656
   (S.D.N.Y. Feb. 3, 2021) ......................................................................................... 17

*Looney v. Black*,
   702 F.3d 701 (2d Cir. 2012) ................................................................................... 31

*Macshane v. City of New York*,
   No. 05-06021 (RRM)(RML), 2015 U.S. Dist. LEXIS 36099
   (E.D.N.Y. Mar. 23, 2015) ...................................................................................... 12

*Matthews v. City of New York*,
   779 F.3d 167 (2d Cir. 2015) ........................................................................ 26, 27, 32

*McCullough v. Wyandanch Union Free Sch. Dist.*,
   187 F.3d 272 (2d Cir. 1999) ............................................................................ 30, 32

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) .............................................................................................. 4, 8

*McGuinness v. Lincoln Hall*,
   263 F.3d 49 (2d Cir. 2001) ..................................................................................... 15

*McPherson v. N.Y. City Dep't of Educ.*,
   457 F.3d 211 (2d Cir. 1996) ................................................................................... 23

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
   715 F.3d 102 (2d Cir. 2013) ................................................................................... 34

*Monell v. Dep't of Soc. Servs.*,
   436 U.S. 658 (1978) ............................................................................................... 30

*Morales v. City of New York*,
   18-1573 (JGK), 2021 U.S. Dist. LEXIS 48149 (S.D.N.Y. Mar. 15, 2021) ............ 26

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
   429 U.S. 274 (1977) ............................................................................................... 28

*Naumovski v. Norris*,
   934 F.3d 200 (2d Cir. 2019) ........................................................... 4, 8, 26, 33, 34

*Nieves v. Bartlett*,
   139 S. Ct. 1715 (2019) ........................................................................................... 26

**Cases**                                                                                           **Pages**

*Norville v. Staten Island Univ. Hosp.*,
    196 F.3d 89 (2d Cir. 1999).......................................................................................11

*Nurse v. Lutheran Med. Ctr.*,
    854 F. Supp. 2d 300 (E.D.N.Y. 2012) .....................................................................20

*Odyssey Marine Exploration, Inc. v. Shipwrecked & Abandoned SS Mantola*,
    425 F. Supp. 3d 287 (S.D.N.Y. 2019)......................................................................14

*Payami v. City of New York*,
    No. 03-2785 (LAP), 2007 U.S. Dist. LEXIS 25851
    (S.D.N.Y. Mar. 28, 2007) .........................................................................................23

*Pierre v. City of New York*,
    No. 17-5782 (JGK), 2020 U.S. Dist. LEXIS 11543
    (S.D.N.Y. Jan. 21, 2020)...........................................................................................35

*Radice v. Eastport South Manor Cent. Sch. Dist.*,
    437 F. Supp. 3d 198 (E.D.N.Y. 2020) .....................................................................24

*Raspardo v. Carlone*,
    770 F.3d 97 (2d Cir. 2014).........................................................................................33

*Risco v. McHugh*,
    868 F. Supp. 2d 75 (S.D.N.Y. 2012).........................................................................9

*Robertson v. Bell Helicopter Textron*,
    863 F. Supp. 346 (N.D. Tex. 1993) ..........................................................................13

*Settle v. Baltimore County*,
    34 F. Supp. 2d 969 (D.Md. 1999) ........................................................................6, 13

*Shumway v. UPS*,
    118 F.3d 60 (2d Cir. 1997)................................................................................5, 6, 19

*Silva v. Peninsula Hotel*,
    509 F. Supp. 2d 364 (S.D.N.Y. 2007)...................................................................8, 18

*Slattery v. Swiss Reinsurance Am. Corp.*,
    248 F.3d 87 (2d Cir. 2001)....................................................................................28, 29

*Smith v. City of New York*,
    385 F. Supp. 3d 323 (S.D.N.Y. 2019).......................................................................21

**Cases**                                                                    **Pages**

*Sotomayor v. City of New York*,
    862 F. Supp. 2d 226 (E.D.N.Y. 2012),
    *aff'd*, 713 F.3d 163 (2d Cir. 2013) ..............................................................17, 18, 23

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502 (1993)..................................................................................11, 22

*Thomas v. City of New York*,
    953 F. Supp. 2d 444 (E.D.N.Y. 2013) ......................................................5

*Toussaint v. NY Dialysis Servs.*,
    230 F. Supp. 3d 198 (S.D.N.Y. 2017)..........................................................19

*Valenti v. Penn. Mut. Life Ins. Co.*,
    850 F. Supp. 2d 445 (S.D.N.Y. 2012)..........................................................14

*Varughese v. Mount Sinai Med. Ctr.*,
    No. 12-8812 (CM)(JCF), 2015 U.S. Dist. LEXIS 43758
    (S.D.N.Y. Mar. 27, 2015) ......................................................................35

*Vega v. Hempstead Union Free Sch. Dist.*,
    801 F.3d 72 (2d Cir. 2015).....................................................................23, 32

*Walczyk v. Rio*,
    496 F.3d 139 (2d Cir. 2007).....................................................................33

*Whitehead v. City of New York*,
    897 F. Supp. 2d 136 (E.D.N.Y. 2012) ......................................................27

*Wimmer v. Suffolk County Police Dep't*,
    176 F.3d 125 (2d Cir. 1999)...............................................8, 9, 16, 24, 33

*Wolf v. Time Warner, Inc.*,
    548 Fed. Appx. 693 (2d Cir. 2013) ...........................................................17

*Wright v. City of Syracuse*,
    611 Fed. Appx. 8 (2d Cir. 2015) ...............................................................34

*Zahorik v. Cornell University*,
    729 F.2d 85 (2d Cir. 1984)......................................................................13

**Statutes**

42 U.S.C. § 1983.................................................1, 3, 4, 11, 14, 23, 29, 31, 32, 33, 34

Fed. R. Civ. Proc. 56..............................................................................................1, 3

**Cases**                                                                                    **Pages**

Local Civil Rule 56.1 ................................................................................................................3, 5

**Statutes**                                                                                           **Pages**

New York State Labor Law §215-a ...........................................................................................3, 27

U.S. Const., First Amendment ......................................................................................26, 28, 31, 32

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x

EDREWEENE RAYMOND, PEDRO SERRANO,
SANDY GONZALEZ, and RITCHIE BAEZ,

                                        Plaintiffs,        15 Civ. 6885 (LTS)(SLC)

                        -against-

THE CITY OF NEW YORK, WILLIAM J. BRATTON,
JAMES P. O'NEILL, CHRISTOPHER McCORMACK,
and CONSTANTIN TSACHAS,

                                        Defendants.

------------------------------------------------------------------- x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT_____

### PRELIMINARY STATEMENT

Plaintiffs Edreweene Raymond, Pedro Serrano, Sandy Gonzalez, and Ritchie Baez ("plaintiffs") bring this action alleging claims of employment discrimination, retaliation for complaining of discrimination, and First Amendment retaliation against defendants City of New York, William J. Bratton, James P. O'Neill, Christopher McCormack, and Constantin Tsachas ("defendants") pursuant to 42 U.S.C. § 1983 and the New York State and City Human Rights Laws. Plaintiffs allege that the New York City Police Department ("NYPD") maintained a quota policy requiring plaintiffs to obtain a specific number of summonses and arrests each month, and punished plaintiffs for failing to meet the alleged quota because of their race, while also retaliating against plaintiffs for speaking out against the alleged quota. Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56.

For the past several years, plaintiffs have leveled a number of accusations against defendants and the NYPD both in court and in public. But at the summary judgment stage,

"'J'accuse!' is not enough in court. Evidence is required." *EEOC v. Bloomberg L.P.*, 778 F. Supp. 2d 458, 461 (S.D.N.Y. 2011). As detailed below, the meager evidence plaintiffs have mustered after more than two-and-a-half years of discovery falls well short of raising a genuine issue of material fact.

First, plaintiffs fail to proffer a scintilla of evidence that defendants Tsachas and McCormack were motivated by any discriminatory animus against them. Plaintiffs engage in an improper "slot machine" comparator analysis by cherry-picking a handful of white police officers, hoping that their summons and arrest statistics match up. But plaintiffs ignore the "elephant in the room": many of the officers in their squads and commands were *also* minorities, but did not incur any adverse employment actions. Nor can plaintiffs rely upon comments by Tsachas and McCormack suggesting that plaintiffs focus their enforcement activity on certain groups. The Second Circuit has squarely held that such comments cannot, as a matter of law, demonstrate employment discrimination. The subpar performance evaluations and discipline that plaintiffs received were well-deserved due to plaintiffs' defiant conduct and truly abysmal work ethic, and plaintiffs cannot show these decisions are a pretext for discrimination.

Plaintiffs' retaliation claims fare no better. Serrano and Gonzalez fail to establish a causal connection between their EEO complaints and any actions by McCormack. The First Amendment retaliation claims of Raymond, Serrano, and Gonzalez also fail, as they cannot establish that their complaints about the alleged quota were the determinative, "but-for" cause of any adverse action. The individual defendants are also entitled to qualified immunity, as their actions were objectively reasonable and did not violate clearly established law.

In sum, after "[c]onsidering the evidence, not the accusations," *Bloomberg*, 778 F.Supp.2d at 462, it is crystal clear that plaintiffs' surviving claims are woefully deficient as a matter of law. The Court should grant defendants' motion, and dismiss the Complaint.

## STATEMENT OF FACTS

For a full statement of the material facts as to which there is no genuine issue to be tried, the Court is respectfully referred to defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, dated May 17, 2021.

## ARGUMENT

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. With respect to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The materiality requirement is particularly important, as the Court's June 27, 2018 Order narrowed plaintiffs' surviving claims to employment discrimination, discrimination-based retaliation, and First Amendment retaliation. Dkt. 86. As discussed further below, any attempt by plaintiffs to re-litigate their New York State Labor Law §215-a claims that were dismissed on March 6, 2017, or to challenge allegedly discriminatory policies that are unrelated to employment discrimination, should be rejected as immaterial.

## POINT I

### PLAINTIFFS' DISCRIMINATION CLAIMS UNDER 42 U.S.C. § 1983 ARE DEFICIENT AS A MATTER OF LAW

**A.    The Applicable Legal Standard Under 42 U.S.C. § 1983**

Discrimination claims arising under the Fourteenth Amendment's Equal Protection Clause are governed by the familiar Title VII burden-shifting framework set forth in

3

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Naumovski v. Norris*, 934 F.3d 200, 212 (2d Cir. 2019). But the Second Circuit has cautioned that "§ 1983 and Title VII claims differ in important ways," particularly "the required degree of causation." *Id.* at 213. Unlike Title VII, which permits a "motivating factor" standard, Section 1983 requires a showing of "but-for" causation. *Id.* at 214; *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 176 (2009)("but-for" causation standard requires that "'the employee's protected trait actually played a role in [the employer's decisionmaking] process and *had a determinative influence on the outcome*'")(emphasis in original)(quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).

Accordingly, "courts must account for a § 1983 plaintiff's higher burden of producing evidence from which a jury could infer that the individual's discriminatory intent was a 'but-for' cause of the adverse employment action." *Naumovski*, 934 F.3d at 214. Plaintiffs' discrimination claims must be assessed in light of this "higher burden" under Section 1983.

## B.   Plaintiffs' Discrimination Claims Are Deficient As A Matter Of Law

### 1.   Raymond

The June 27, 2018 Order dismissed many of Raymond's discrimination claims, and found Raymond's allegations "just sufficient" to "plead Raymond's individual discrimination claims against Tsachas based on the discipline for the late vacation request and discipline for failure to meet enforcement quotas." Dkt. 86 at pp. 17-18. For each of these surviving claims, Raymond must first establish "(1) [ ]he was within the protected class; (2) [ ]he was qualified for the position; (3) [ ]he was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Naumovski*, 934 F.3d at 214, n.39 (quotations omitted). But Raymond is unable, as a matter of law, to establish an inference of discrimination against Tsachas.

Raymond's late vacation request was submitted in June 2015, a month before Tsachas arrived at Transit District 32. *See* Defendants' Local Rule 56.1 Statement of Undisputed Material Facts ¶69. Raymond conceded that Tsachas "inherited" the Command Discipline ("CD") from his predecessor, Captain Carlos Fernandez, and the CD identifies Fernandez. ¶68. Tsachas's adjudication of the CD after Fernandez's departure is insufficient to establish "but-for" causation. *See Guzman v. City of New York,* 93 F. Supp. 3d 248, 260-61 (S.D.N.Y. 2015)(no inference of discriminatory intent where NYPD sergeants and lieutenants accused of discrimination were not plaintiff's supervisors at time of assignment); *Kaplan v. Multimedia Entm't, Inc.*, 2005 U.S. Dist. LEXIS 40351, at *22 (W.D.N.Y. Oct. 27. 2005)("The failure of [the decision-maker] to reverse a decision made by his predecessor is not evidence of discrimination by [the decision-maker].").

Raymond is unable to establish any discriminatory intent by Tsachas in any case. Raymond claims that an unnamed clerk showed him a list of officers who failed to submit a vacation request at all, which included two white officers, Reddan and Sawyer. ¶136. But Raymond is improperly cherry-picking these two white officers by ignoring minority officers on these same lists. *Id. See Thomas v. City of New York*, 953 F. Supp. 2d 444, 456 (E.D.N.Y. 2013)(plaintiff cannot "cherry-pick pieces of a database, using only those that support her case while ignoring those that would conclusively refute it"). The lists are also dated June 2015, prior to Tsachas's arrival. Not surprisingly, Raymond does not know whether Tsachas was aware of Reddan and Sawyer's alleged conduct. ¶137. *See Shumway v. UPS*, 118 F.3d 60, 64-65 (2d Cir. 1997)(plaintiff failed to establish she was treated differently than comparators "when there is no evidence [the employer] knew about any other violations of the…rule").

5

Nor can Raymond establish an inference of discrimination with respect to his alleged discipline for failing to meet enforcement quotas. There is not a shred of evidence that Tsachas – who was recorded by Raymond multiple times – imposed an enforcement quota in the first place. Raymond also faces a timing problem that is fatal to his discrimination claim against Tsachas: the minority commanders who preceded Tsachas had the *exact same issues* with Raymond's job performance. Lieutenant Victoria Hayden (now Perry), who was the Platoon Commander prior to Tsachas's arrival and is herself African-American, stated in a May 2020 interview that she believed Raymond was "lazy" and "just not engaged" at work. ¶45. The interim evaluation signed by Commanding Officer Natalie Maldonado in January 2015 noted disapprovingly that "Po Raymond believes that just being visible on his post is addressing his monthly conditions," which is the same criticism Tsachas made later on. ¶55. *See Settle v. Baltimore County*, 34 F. Supp. 2d 969, 977 (D.Md. 1999)(rejecting discrimination claim where African-American supervisor "also expressed criticisms of [plaintiff] for his below average enforcement activity…which criticisms are largely identical to criticisms leveled at [plaintiff] by white supervisors").

Raymond's assertion that a white police officer, Michael Desrosiers, was not punished despite having similar enforcement activity is insufficient to establish an inference of discrimination for several reasons. During the October 15, 2015 meeting to discuss his evaluation appeal, Raymond himself conceded that "[n]ow I agree, the numbers are low in comparison to my peers[.]" ¶80. Raymond cannot shift gears and now complain that he was treated less favorably than white officers with similar enforcement activity.

Desrosiers is also not "similarly situated in all material respects" to Raymond. *Shumway*, 118 F.3d at 64. Desrosiers was in a different squad than Raymond under a different

6

supervisor, which is a material difference. *See infra*. In addition, Desrosiers was not on the same list for promotion to sergeant. Raymond's theory of the case is that, after he appeared on the promotion list, Maldonado and then Tsachas repeatedly disciplined him to thwart his promotion to sergeant. It is absurd for Raymond, who was promoted twice and is now a lieutenant, to claim he was treated less favorably than a police officer who was not seeking promotion to sergeant. In any event, Desrosiers's 2015 evaluation demonstrates that he did not engage in the same type of insubordinate behavior as described below. ¶128. In addition, Tsachas denied Desrosiers's evaluation appeal in April 2016, ¶129, further undermining any inference that he treated Desrosiers more favorably than Raymond.

Raymond also engages in improper cherry-picking yet again by focusing solely upon Desrosiers. *See Holowecki v. Fed. Express Corp*., 644 F. Supp. 2d 338, 356 (S.D.N.Y. 2009)(criticizing plaintiff's selection of a "small handful of other cherry-picked" comparators who are a "a narrow and unrepresentative sample"), *aff'd*, 382 Fed. Appx. 42, 47 (2d Cir. 2010); *Fitchett v. City of New York*, No. 18-8144 (PAE), 2021 U.S. Dist. LEXIS 47763, at *46 (S.D.N.Y. Mar. 15, 2021)(rejecting NYPD detective's comparator analysis as "selectively presented and devoid of context"). Throughout this case, Raymond has ignored the "elephant in the room": that most of the police officers in Transit District 32 were *also* minority, as Sergeant Martin Campbell confirmed. ¶¶43-44. Raymond cannot simply narrow his focus to "one lonely comparator," *Calhoun v. EPS Corp.*, 36 F. Supp. 3d 1344, 1353 (N.D. Ga. 2014), and ignore the numerous minority officers in his own squad and other squads who received satisfactory evaluations.

For example, Tsachas awarded Commander's Days to 11 police officers and two sergeants in February 2016 in recognition of their outstanding job performance. ¶118.  All but

*three* of these officers were minorities. *Id.* ¶3. One of the African-American officers, Carl Daniels, received an outstanding performance evaluation for 2015, with Tsachas serving as the reviewer. *Id.* ¶4. These undisputed material facts eviscerate Raymond's contention that Tsachas treated him less favorably because of race. *See Silva v. Peninsula Hotel*, 509 F. Supp. 2d 364, 382-83 (S.D.N.Y. 2007)(award of overtime to another Hispanic employee "undercuts any argument that the Hotel discriminated on the basis of race" in awarding overtime); *Fitchett,* 2021 U.S. Dist. LEXIS 47763 at \*46 (promotion of four black detectives under inspector's command undermined inference of discrimination); *Guzman*, 93 F. Supp. 3d at 259-60; *Bazile v. City of New York*, 215 F. Supp. 2d 354, 379-80 (S.D.N.Y. 2002).[1]

Nor is there any evidence that Tsachas exhibited discriminatory animus towards Raymond or any other African-American officers, as confirmed by Campbell and Raymond's union delegate, Gentry Smith, both of whom are African-American. ¶¶111-14, 116, 120-24. Tsachas's offhand statement at the October 15, 2015 appeal evaluation that a "female Asian, 42, no ID" is "not going to fly" is "precisely the sort of 'stray remark' that is insufficient to support an inference of discriminatory intent." *Naumovski*, 934 F.3d at 216. In *Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125, 134-35 (2d Cir. 1999), a police officer complained that he was terminated for "having reported overhearing racial slurs made by police officers against black citizens and perhaps for questioning [an officer's] two stops of minority (Hispanic) motorists without cause." Because the officer's complaint "was not directed at an *unlawful employment*

---

[1] The Second Circuit has noted that "an employer may not escape liability for discriminating against a given employee on the basis of race simply because it can prove it treated other members of the employee's group favorably." *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000). But this consideration is "relevant only later in the *McDonnell Douglas* analysis, after an inference of discrimination against the individual employee has already been established." *Anyanwu v. City of New York*, No. 10-8498 (AJN)(THK), 2013 U.S. Dist. LEXIS 132138, at \*36 n.7 (S.D.N.Y. Sept. 16, 2013).

*practice* of his employer," *Id.* at 136 (emphasis in original), the officer did not engage in protected activity.

Even assuming, for purposes of this motion, that Tsachas was urging Raymond to focus his enforcement activity on certain demographic groups, it necessarily follows under *Wimmer* that Tsachas's comment cannot support an inference that he was subjecting Raymond to employment discrimination.[2] Likewise, Campbell's suggestion in January 2015 that Raymond was receiving a negative interim evaluation because he is a "young black man with dreads" is also a stray remark, as the comment was made several months before Tsachas arrived at Transit District 32. ¶109. *See Risco v. McHugh*, 868 F. Supp. 2d 75, 109 (S.D.N.Y. 2012); *Buckman v. Calyon Sec. (USA) Inc.*, 817 F. Supp. 2d 322, 336 (S.D.N.Y. 2011)(isolated comments made several months before adverse action were merely stray remarks).

Raymond's "me too" evidence also fails to raise a genuine issue of material fact. Raymond points to Michael Birch, a former police officer at Transit District 34 who made similar allegations against Tsachas. ¶130. Although Birch self-identifies as biracial, Birch's unsuccessful federal lawsuit did *not* allege race discrimination against Tsachas, focusing on First Amendment retaliation. *See Birch v. City of New York*, 184 F. Supp. 3d 21 (E.D.N.Y. 2016)(granting Tsachas's motion to dismiss), *aff'd*, 675 Fed. Appx. 43 (2d Cir. 2017).

Raymond's union trustee, Corey Grable, confirmed that Raymond and Birch are the only officers he is aware of who complained at all about Tsachas. ¶132. Any attempt by Raymond to introduce cookie-cutter testimony from disgruntled former officers at Transit District 34, none of whom complained about discrimination by Tsachas either, also fails to establish discriminatory intent. *See also Alleyne v. Four Seasons Hotel*, No. 99-3432 (JGK),

---

[2] To the extent plaintiffs might cite a CD issued to Tsachas in December 2020, this CD is by definition immaterial under Rule 56, as the NYPD determined that Tsachas's comment was not EEO-related.

2001 U.S. Dist. LEXIS 1503, at *36-40 (S.D.N.Y. Feb. 15, 2001)(affirmations from three employees and one hotel guest are "too small a sample size to create an inference of discrimination")(citing *Haskell v. Kaman Corp.*, 743 F.2d 113, 121 (2d Cir. 1984)); *Fitchett*, 2021 U.S. Dist. LEXIS 47763 at *46 n. 19 (same).

Even if Raymond could establish a *prima facie* case, Tsachas easily satisfies his burden to articulate legitimate, non-discriminatory reasons for his actions. *See Bush v. Fordham Univ.*, 452 F. Supp. 2d 394, 411 (S.D.N.Y. 2006)(employer's burden of production is "light" and "can involve no credibility assessment"). The September 2015 CD noted that Raymond's late vacation request violated the NYPD Patrol Guide, and Raymond concedes that his vacation request was late. ¶¶66-69.

Although there is no evidence that Tsachas ever imposed any "quota" on Raymond, Tsachas's actions taken against Raymond were well-justified. As Tsachas aptly put it, Raymond was "fixated with his personal beliefs of a nonintervention style of policing." ¶101. For example, Raymond made the breathtaking assertion at his deposition that Broken Windows policing is not "empirically supported." ¶47. Because the NYPD is a paramilitary organization, it is potentially dangerous for a rank-and-file police officer to usurp the authority of the Commanding Officer and the Police Commissioner. Raymond acknowledged being told that "[i]f you want to change the department, you have to become chief," ¶48, but clearly failed to heed this advice.

Raymond's brazen defiance exasperated the African-American, Hispanic, and white commanders at Transit District 32. The January 2015 interim evaluation signed by Maldonado, coming on the heels of Raymond's November 22, 2014 counseling by Hayden, noted that Raymond believed his mere presence is sufficient to address criminal behavior, and

that Raymond stated he would check offenders for warrants and ID only "when the department gets rid of the transit recidivist program." ¶55. In June 2015, the month before Tsachas arrived at Transit District 32, Raymond recorded no activity *at all*, and excused his lax performance by claiming his "omnipresence" deterred criminal behavior. ¶60. Given Raymond's conduct, it was sensible for Tsachas to issue Raymond another negative interim evaluation in August 2015 and then put Raymond in the Clark Street Omega Booth for 11 days in September, as Raymond was disinterested in stopping criminal behavior on the subways even when he was on patrol. ¶¶51-54, 70, 141-42.

Raymond's defiant conduct came to a head during a September 24, 2015 meeting with Tsachas. Raymond explained that, unlike other officers, he refused to hide in transit rooms to apprehend fare evaders. ¶72. But as Tsachas and Transit Bureau Chief Joseph Fox explained, Raymond's mere presence in subway stations was insufficient, as fare evaders would simply go to another turnstile where an officer was not present. ¶¶51-54. Although Raymond promised Tsachas that he would station himself in transit rooms going forward, Raymond soon reneged on this promise, admitting on October 15 that "[h]onestly, I haven't gone in the room." ¶83. Raymond capped off the meeting by issuing a threat to his commanding officer, warning that if he was not promoted, "it's on you." ¶85.

Because Tsachas satisfies his burden of production, Raymond bears the ultimate burden of persuasion to demonstrate "*both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)(emphasis in original); *Norville v. Staten Island Univ. Hosp*., 196 F.3d 89, 98 (2d Cir. 1999)(Sotomayor, J.); *Fisher v. Vassar College*, 114 F.3d 1332, 1337 (2d Cir. 1997)(*en banc*). Raymond falls well short of meeting the "higher burden" under Section 1983. The crux of Raymond's claim is that he was

11

pressured to fulfill a quota for summonses and arrests, with the NYPD using code words like "proactive" and "self-initiated." Raymond has defiantly asserted that, unlike other officers, he refused to play the "numbers game" and focused on quality rather than quantity. Raymond's December 2015 open letter and May 2018 letter to O'Neill summarize Raymond's viewpoints. But in both letters, which were written after this lawsuit was filed, Raymond makes no mention *at all* of employment discrimination. ¶¶95-98; 106-07.

It is abundantly clear that Raymond – who has been promoted twice since 2016, and is now a lieutenant – is merely using this lawsuit as a high-profile vehicle to vent his longstanding grievances about the NYPD's policing practices. The Second Circuit, however, has firmly stated that such disagreements over policy cannot establish pretext. *See Chen v. City Univ. of N.Y.,* 805 F.3d 59, 73 (2d Cir. 2015)(court should not "sit as a super-personnel department that reexamines employers' judgments")(quotations omitted); *see also Macshane v. City of New York*, No. 05-06021 (RRM)(RML), 2015 U.S. Dist. LEXIS 36099, at *43 (E.D.N.Y. Mar. 23, 2015)(rejecting challenge to decisions made by NYPD's Counseling Services Unit, noting that "it is not for courts to second-guess the quality or wisdom of the reason, so long as it is not unlawfully discriminatory"). Even if Raymond was correct that Tsachas imposed a quota and punished Raymond for failing to meet the quota – which is not supported by a shred of evidence in any case – Tsachas is *still* entitled to summary judgment. *Fisher*, 114 F.3d at 1337.[3]

Raymond will likely rely upon Campbell's statements that Raymond deserved a 4.0 rating. But Tsachas specifically asked Campbell at the October 15, 2015 meeting if he felt any different about the 2.5 score. Campbell explained to Tsachas that the score needed to reflect

---

[3] Raymond was apparently not given quarterly points in December 2015 because he had transferred to the 77 Precinct shortly before the end of the month. ¶99. Any argument by Raymond that his total points for 2015 were lowered based upon what he was earlier projected to receive for the fourth quarter is therefore baseless.

the "negative interim evaluation" from Maldonado and could not be changed. ¶79. Thus, Tsachas never overruled Campbell with respect to the 2014 annual evaluation score.

Even if Raymond could establish that Tsachas overruled Campbell, it is plainly immaterial. Chief Fox noted it is common for new supervisors, like Campbell, to disagree with their supervisors about evaluation scores. ¶110. *See also Zahorik v. Cornell University*, 729 F.2d 85, 95 (2d Cir. 1984)(dean's decision to "override departmental decisions" is "not itself evidence of discrimination"); *Robertson v. Bell Helicopter Textron*, 863 F. Supp. 346, 352-53 (N.D. Tex. 1993)(second-level supervisor's decision to lower rating given by immediate supervisor did not establish pretext). More importantly, Campbell mentioned that he was ordered by Maldonado to give Raymond a negative interim evaluation in January 2015 following Raymond's meeting with Hayden. ¶109. Campbell's disagreement with his own African-American and Hispanic supervisors about Raymond's evaluation score once again eviscerates any inference that Tsachas's explanation for giving Raymond negative evaluations was a pretext for discrimination. *Settle*, 34 F. Supp. 2d at 977.

### 2. Serrano

Serrano's discrimination claim against McCormack is limited to his 2012 evaluation rating. Dkt. 86 at p. 21. This claim fails at the outset because Serrano's 3.0 rating was not materially adverse. The Second Circuit has consistently held that a negative evaluation is not an adverse employment action unless it "negatively altered…compensation, benefits, or job title." *Fairbrother v. Morrison*, 412 F.3d 39, 56-57 (2d Cir. 2005)(citing cases). But in this case, a 3.0 score is not a negative evaluation at all. Serrano grudgingly admitted at the *Floyd* trial that his 3.0 score "meets expectations" under the Patrol Guide, while McCormack and Martine Materaso confirmed that Serrano's rating was not considered negative. ¶¶164-66. *See Lanier v. IBM Corp.*, 319 F. Supp. 2d 374, 384 (S.D.N.Y. 2004)("positive evaluations, which are 'not as

positive' as previous performance evaluations do not constitute adverse employment actions"). Serrano, to be sure, was placed on dismissal probation and suspended in April 2013. But this decision was completely unrelated to the 2012 evaluation rating, and instead resulted from the disposition of the 2011 disciplinary charges to which Serrano plead guilty. ¶¶176-85.

Even if the 3.0 evaluation was materially adverse, Serrano's claim against McCormack still fails.[4] The Second Circuit has held that for individuals to be liable under Section 1983, they must not only be personally involved in the challenged decision but must also be the "proximate cause of the plaintiff's constitutional deprivation." *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015)(quotation omitted). But there is no evidence that McCormack himself was personally involved in determining Serrano's 3.0 rating and was the proximate cause. Sergeant Stephen Monroe, who was Serrano's immediate supervisor and is himself African-American, testified in detail during the *Floyd* trial about why he gave Serrano a 3.0 rating. ¶¶162-63. The mere fact that McCormack denied the appeal is insufficient to impose individual liability. Although Monroe allegedly stated to Serrano that he was being pressured "from the top" to target certain people, ¶196, this vague hearsay statement is insufficient to establish that McCormack specifically ordered Monroe to give Serrano a 3.0 rating.

---

[4] The adverse inference imposed by the Court in March 2020 based on the City's loss of Serrano's memo books has no effect on this motion for several reasons. First, plaintiffs' July 2019 motion for spoliation sanctions only sought an adverse inference against the City, not McCormack. Dkt. 126. McCormack had no involvement in the loss of the memo books, and it would violate McCormack's constitutional right to due process to impose an adverse inference upon him. Second, the overwhelming weight of authority in this Circuit holds that an adverse inference is insufficient to withstand summary judgment. *See, e.g., Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 553 (E.D.N.Y. 2012)("an adverse inference, without more, cannot satisfy a non-moving party's burden on summary judgment"); *see also Odyssey Marine Exploration, Inc. v. Shipwrecked & Abandoned SS Mantola*, 425 F. Supp. 3d 287, 296 (S.D.N.Y. 2019); *Goonewardena v. State Workers Comp. Bd.*, 258 F. Supp. 3d 326, 350 n.12 (S.D.N.Y. 2017); *Deanda v. Hicks*, 137 F. Supp. 3d 543, 558-59 (S.D.N.Y. 2015)(citing *Valenti v. Penn. Mut. Life Ins. Co.*, 850 F. Supp. 2d 445, 453 (S.D.N.Y. 2012)); *Hamilton v. Mount Sinai Hosp.*, 528 F. Supp. 2d 431, 445 (S.D.N.Y. 2007). Third, Serrano himself produced in discovery several pages from a notebook purporting to document McCormack's conduct. Serrano can hardly maintain that he lacks sufficient documentation to oppose defendants' motion.

Serrano is unable to establish an inference of discriminatory intent even if he could establish McCormack's involvement. During his deposition, Serrano rattled off the names of 11 white officers with supposedly similar or worse enforcement activity who received higher evaluation scores. ¶190. But these purported comparators are not similarly situated for three reasons. First, Serrano himself admitted during the *Floyd* trial that his evaluation score was *not* based solely on summonses and arrests. ¶167. The Court previously dismissed plaintiff Olayokun Olagoke's claim on the ground that "raw enforcement numbers" are insufficient to establish disparate treatment (Dkt. 78 at p. 23), and the same holds true based on Serrano's own testimony. *See also Burgess v. Howard County Police Dep't*, 2013 U.S. Dist. LEXIS 140203, at *14 (D.Md. Sept. 30, 2013)("Based on the several different criteria upon which [plaintiff] was evaluated…it is clear another officer's traffic and arrest numbers are insufficient to establish that he was similarly situated.").

Serrano is also cherry-picking his alleged comparators just like Raymond. McCormack testified at trial that well over 200 officers were assigned to the 40 Precinct, while Monroe testified that most of these officers were African-American or Hispanic. ¶150. Serrano, like Raymond, cannot resort to a "slot machine" comparator analysis that plucks a handful of white officers while ignoring the numerous minority officers both in his squad and in the precinct. *Holowecki*, 644 F. Supp. 2d at 356. Indeed, McCormack identifies other minority officers and supervisors who excelled, which undermines any inference of discriminatory animus by McCormack. ¶198.

Third, none of the alleged comparators Serrano named were in Serrano's squad in 2012 under Monroe's supervision. Although it is not dispositive that a comparator reports to a different supervisor than the plaintiff, *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53-54 (2d Cir.

2001), the Court has frequently noted that "whether or not co-employees report to the same supervisor is an important factor" in determining whether the employees are similarly situated. *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 465 (S.D.N.Y. 2006). The squad supervisor played an important role in determining officer's quarterly points based on six subjective factors, while the officer's scores in 28 behavioral categories formed the basis of the supervisor's written comments in the annual evaluation. ¶¶21, 31. Serrano's attempted comparison with officers outside his squad is not an "apples-to-apples" comparison. The only alleged comparator in Serrano's squad in 2012 is Mark Lebrini, and there is no evidence that either Monroe or McCormack treated Lebrini more favorably than Serrano because of his race. ¶¶192, 194.

McCormack's comment at the February 14, 2013 appeal meeting that Serrano should focus his enforcement activity on black males aged 14 to 21 is a stray remark under *Wimmer* for the same reasons noted above. It makes little sense to infer that McCormack's comment about African-American youth, based upon descriptions of suspects from crime victims in Mott Haven, evinces discriminatory intent against Hispanic officers. Judge Scheindlin actually *praised* McCormack in *Floyd*, noting that McCormack "does not display…contempt or hostility toward the local population" and "emphasizes his belief 'that 99 percent of these people in this community are great, hardworking people,' and makes clear that he has no interest in targeting blacks or Hispanics as such: his goal is to focus stop activity on 'whatever group' is committing targeted crimes." *Floyd v. City of New York*, 959 F. Supp. 2d 540, 604 n.288 (S.D.N.Y. 2013)(quoting transcript of February 14, 2013 meeting).

Even if Serrano could establish a *prima facie* case, McCormack had legitimate, non-discriminatory reasons for re-affirming the "mediocre" but not below-average rating that Monroe gave Serrano. ¶160. Monroe testified at trial that Serrano had "regressed" in 2012 by

16

requiring Monroe's supervision and "wanted me to go there and solve the problem." ¶¶160-63. McCormack and Materaso likewise testified that Serrano was failing to address crime conditions in a high-crime precinct. ¶¶158, 159.[5]

Serrano does not come close to establishing that these reasons are a pretext for discrimination. Serrano began the February 14, 2013 meeting by asserting that he deserved a higher rating because he had doubled his enforcement activity in 2012. ¶172. Of course, Serrano's assertion is belied by his admission at trial that evaluation scores are not based solely on enforcement activity. In any event, Serrano's self-assessment is plainly insufficient to establish pretext. *See Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 259 (E.D.N.Y. 2012)("While plaintiff disagrees with her performance ratings, a plaintiff's subjective disagreement with [performance] reviews is not a viable basis for a discrimination claim.")(quotation omitted), *aff'd*, 713 F.3d 163 (2d Cir. 2013); *see also Wolf v. Time Warner, Inc.*, 548 Fed. Appx. 693, 694-95 (2d Cir. 2013).

### 3.  Gonzalez

Gonzalez's discrimination claim against McCormack is limited to his 2013 annual evaluation rating and his placement in Performance Monitoring. Dkt. 86 at p. 18. As with Serrano, there is no evidence McCormack himself was both personally involved and the proximate cause of the 2.5 annual evaluation rating. Gonzalez's immediate supervisor in 2013, Sergeant Jonathan Blatt, testified in detail about why he gave Gonzalez a 2.5 rating and there is no evidence that McCormack ordered Blatt to give Gonzalez the rating. ¶¶227-29. McCormack cannot be personally liable merely because he "signed off" on the evaluation score.

---

[5] The NYPD subsequently learned that Serrano had falsified memo book entries in 2012, resulting in the issuance of disciplinary charges in 2014. In the event that defendants' motion is denied, defendants reserve the right to preclude Serrano's claim for damages based on this after-acquired evidence. *See Local 3621, Ems Officers Union v. City of New York*, No. 18-4476 (LJL)(SLC), 2021 U.S. Dist. LEXIS 86656 (S.D.N.Y. Feb. 3, 2021).

Likewise, the NYPD's Performance Monitoring Unit made the unanimous decision in March 2014 to place Gonzalez into Performance Monitoring, not McCormack. ¶¶250-52. Gonzalez speculates that McCormack recommended he be placed in Performance Monitoring based on what Gonzalez's union explained to him. ¶254. But this hearsay testimony is wholly insufficient to sufficiently establish McCormack's involvement. Even assuming McCormack did make the initial recommendation, the affirmance of this recommendation weighs against any inference of discriminatory intent. *Sotomayor*, 862 F.Supp.2d at 259 ("A discriminatory inference can be rebutted when multiple evaluators all express dissatisfaction with the plaintiff's performance.").

Gonzalez is also unable to establish that he was subjected to disparate treatment. Gonzalez's own partner in 2013, Jorge Gonzalez, is also Hispanic but did *not* assert the same claims as Gonzalez. It is evident that Lieutenant Andrew Hatki and other supervisors held Jorge Gonzalez in higher regard than his underachieving partner. ¶238. This alone eviscerates any inference of disparate treatment. *Silva*, 509 F. Supp. 2d at 382-83; *Fitchett*, 2021 U.S. Dist. LEXIS 47763 at *46-47.

Gonzalez testified that white officers with similar enforcement activity were not given 2.5 evaluation ratings and placed in Performance Monitoring, although he did not know their specific numbers. ¶278. But Gonzalez, like Serrano, cannot argue he should have received a higher score merely by comparing his enforcement activity to a handful of cherry-picked white officers. The only alleged comparators in Gonzalez's squad that Blatt supervised are Stephen Carey and Ivan Reidy, and there is no evidence that Blatt or McCormack treated them more favorably than Gonzalez because of their race. ¶¶279-285.

Nor can Gonzalez compare himself to Andrew Pellegrino. Pellegrino was in a different squad than Gonzalez and was evaluated by a different supervisor, Sergeant Pawel Lachowski. *Conway*, 414 F. Supp. 2d at 465. It is wholly misleading for Gonzalez to compare himself to one white comparator out of a heavily-minority precinct. *Fitchett*, 2021 U.S. Dist. LEXIS 47763 at *46 ("That some white detectives were promoted and some Black detectives were not does not, without more, support the inference that the non-promotion of any one Black detective resulted from discrimination.").

Even if Pellegrino was a proper comparator, which defendants do not concede, Pellegrino received a higher score than Gonzalez in several behavioral categories noted in the annual evaluation. ¶346. A comparison of Lachowski's comments for Pellegrino with Blatt's comments for Gonzalez makes clear the two officers are not "similarly situated in *all* material respects." *Shumway*, 118 F.3d at 64 (emphasis added) ¶¶346, 239. Indeed, Gonzalez accumulated numerous command disciplines even while on Performance Monitoring, ¶¶256-73, further demonstrating his dissimilarity to Pellegrino and the other alleged comparators. *See Toussaint v. NY Dialysis Servs.*, 230 F. Supp. 3d 198, 215 (S.D.N.Y. 2017)("Courts in the Second Circuit have routinely recognized that a materially dissimilar disciplinary history may disqualify a peer employee from being deemed similarly situated to a plaintiff.")(collecting cases).

Gonzalez's 2.5 evaluation rating and placement into Performance Monitoring were also justified by compelling reasons. Gonzalez's truly abysmal work ethic is plainly evident from the record. Blatt testified about Gonzalez's inability to write legible reports, and recalled an incident on the Bruckner Expressway where Gonzalez was reluctant to arrest an aggressive panhandler causing backups, requiring Blatt to make the arrest. ¶227. Goode noticed that

19

Gonzalez did not want to go to 911 calls, and recalled a family dispute in which Gonzalez stated to the woman in Spanish that her husband had not hit her, and told her to write something different in Spanish about what had happened. ¶232. Hatki noted that other officers were required to perform double the work because of Gonzalez's poor work ethic. ¶¶233-37. The large stack of CD's Gonzalez was issued further attest to his chronic underperformance on the job.

Gonzalez cannot establish that these piercing critiques of his job performance are merely a pretext for discrimination. Gonzalez will likely complain that the 45 points he accumulated in 2013 were reduced to 39 so that he could be given a 2.5 rating and placed in Performance Monitoring. But there is no "hard evidence" that McCormack himself lowered Gonzalez's points. *See D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). ¶243.

To the extent Gonzalez may argue that the NYPD did not follow the procedure in Patrol Guide Sections 205-56 and 205-57 for changing an evaluation score, such an argument must fail. It is well-settled that "an employer's failure to follow its own regulations and procedures, alone, may not be sufficient to support the conclusion that its explanation…is pretextual." *Bucknell v. Refined Sugars, Inc.*, 82 F. Supp. 2d 151, 159 (S.D.N.Y. 2000); *Nurse v. Lutheran Med. Ctr.*, 854 F. Supp. 2d 300, 319 (E.D.N.Y. 2012)("plaintiff must come forward with some evidence that [the employer's] purported failure to follow its Policies was due to unlawful discrimination, not merely that [the employer's] decision was unfair or unjustified")(collecting cases); *see also Leibowitz v. Cornell Univ.*, 584 F.3d 487, 507-08 (2d Cir. 2009). There is not a scintilla of evidence that the change to Gonzalez's score was the result of discriminatory animus by McCormack or anyone else.

Nor can Gonzalez complain that he was not provided sufficient days on patrol to generate enforcement activity. The record is clear that the administrative lieutenant, not the

commanding officer, is ultimately responsible for daily assignments. ¶7. *Guzman*, 93 F. Supp. 3d at 260-61. Moreover, there is no evidence whatsoever that daily assignments in the 40 Precinct, which was predominantly minority, were made on the basis of race.

### 4. Baez

Baez's discrimination claim, like Gonzalez, is limited to his 2013 evaluation rating and placement in Performance Monitoring. Dkt. 86 at pp. 18-19. As with Gonzalez, there is no basis to hold McCormack personally liable for the evaluation rating, which was issued by Pawel Lachowski, or Baez's placement in Performance Monitoring. The individuals in the Performance Monitoring Unit who placed Baez in Performance Monitoring "conferred" with McCormack, but that is insufficient to hold McCormack liable. ¶330. In fact, when Baez asked Lieutenant Alfred Batelli why he was being placed in Performance Monitoring, Batelli responded it was "not coming from us" but was instead coming from "Downtown," which Baez interpreted to mean One Police Plaza. ¶334.

Baez also fails to establish an inference of discriminatory intent for the reasons noted above. The only alleged comparator in Baez's squad for 2013 was Andrew Pellegrino, who also received a 2.5 rating from Lachowski. The similar rating given to a white officer undermines any inference of disparate treatment. Although Pellegrino was not placed in Performance Monitoring, there are material differences between Pellegrino and Baez. Pellegrino was not designated Chronic A sick and scored higher than Baez in several behavioral categories, including Drive and Initiative. ¶346. The Court has frequently held that such material differences amongst NYPD officers defeat any inference of discriminatory intent.[6]

---

[6] *See Beharry v. City of New York,* No. 18-2042 (AJN), 2020 U.S. Dist. LEXIS 193161, at *35-40 (S.D.N.Y. Oct. 19, 2020); *Abdelal v. Kelly*, No. 13-4341 (ALC), 2020 U.S. Dist. LEXIS 56166, at *24-25 (S.D.N.Y. Mar. 30, 2020); *Smith v. City of New York*, 385 F. Supp. 3d 323, 339 (S.D.N.Y. 2019); *Guzman*, 93 F. Supp. 3d at 260; *Bazile*, 215 F. Supp. 2d at 379-80.

To the extent Baez may argue that his partner, Arie Froimovich, was not given a 2.5 rating or placed in Performance Monitoring, the NYPD's records do not show that Froimovich was in the same squad as Baez in 2013 under Blatt's supervision. Baez himself testified that Froimovich was his partner the year before 2013, further undermining his attempted comparison. ¶347.

Baez also testified about two alleged statements by McCormack that he believed were discriminatory. When Baez mentioned that an arrested individual had sickle cell anemia, McCormack allegedly responded "don't all black people suffer from that?" Baez also testified that on New Year's Eve 2012, he and McCormack went to the third floor of a building. After McCormack knocked on the apartment door and was asked "who is it?" McCormack responded "it's the po, po, po, po, po, police." ¶¶338-39. These two stray remarks however, do not even come close to establishing any discriminatory intent by McCormack against Baez.

Baez's 2.5 evaluation and placement in Performance Monitoring was well-justified. Lachowski wrote in the annual evaluation that Baez "lacks drive and only initiates community contact and activity when told to do so," and also wrote Baez "has shown lack of improvement over the rating period. He lacks self initiated activity while addressing precinct/sector conditions. Officer is designated Chronic A category." ¶321. Blatt, who was Baez's direct supervisor in 2014, echoed Lachowski's assessment, noting that Baez needed constant supervision because he was afraid to make a decision, and always wanted a supervisor at the scene when there was no justification. ¶319.

Baez's complaints about his evaluation rating do not come close to establishing "*both* that the reason was false, *and* that discrimination was the real reason.*" Hicks*, 509 U.S. at 515. For example, Baez complained in his evaluation appeal that Lachowski was "biased"

because he did not see Baez on patrol for the entire year. ¶323. But this complaint is completely immaterial to the issue of discriminatory intent. *Sotomayor*, 862 F. Supp. 2d at 259. Nor can Baez complain that he was not provided sufficient days on patrol. As noted above, McCormack himself was not responsible for issuing daily assignments, and Baez testified that his problems with patrol days began in 2008 or 2009, well before McCormack was assigned to the 40 Precinct. ¶311.

Baez also suggested that he was incorrectly classified as Chronic A sick because a line of duty injury request was not submitted on time, causing Baez to be misclassified as "regular sick." ¶323. Baez, however, does not provide any facts showing that this purported misclassification occurred in 2013. This alleged error is also immaterial. The Second Circuit has emphatically stated that "[i]n a discrimination case…we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what <u>motivated</u> the employer." *McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 1996)(emphasis in original); *see also Payami v. City of New York,* No. 03-2785 (LAP), 2007 U.S. Dist. LEXIS 25851, at *3-4 n. 5 &6 (S.D.N.Y. Mar. 28, 2007)(NYPD officer's assertion that he should not have been designated Chronic Sick A or B failed to demonstrate pretext). Because there is no evidence that Baez's designation was motivated by discriminatory intent, he fails to establish pretext.

<u>POINT II</u>

**THE RETALIATION CLAIMS OF SERRANO AND GONZALEZ UNDER THE EQUAL PROTECTION CLAUSE ARE DEFICIENT AS <u>A MATTER OF LAW</u>**

Plaintiffs Serrano and Gonzalez each assert retaliation claims against McCormack under the Equal Protection Clause. "[T]he elements of a retaliation claim based on an equal protection violation under § 1983 mirror those under Title VII." *Vega v. Hempstead Union Free*

23

*Sch. Dist.,* 801 F.3d 72, 91 (2d Cir. 2015). Serrano and Gonzalez must establish "(1) [they] engaged in protected activity, (2) defendant was aware of that activity, (3) defendant took adverse employment action against plaintiff, and (4) there is a causal connection between the protected activity and the adverse employment action." *Radice v. Eastport South Manor Cent. Sch. Dist.*, 437 F. Supp. 3d 198, 213 (E.D.N.Y. 2020). Both plaintiffs fall well short of establishing a *prima facie* case.

The Court's June 27, 2018 Order permitted Serrano to allege a retaliation claim against McCormack based on Serrano's claim that McCormack only learned of Serrano's June 2012 EEOC charge on February 7, 2013, and then engaged in a series of retaliatory actions. Dkt. 86 at pp. 31-32. But Serrano's EEOC charge does not constitute protected activity in the first place. It is well-settled that not every EEO complaint is actionable. Rather, the plaintiff is "required to have had a good faith, reasonable belief that [he] was opposing an employment practice" that is unlawful. *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013)(quotation omitted).

Serrano's charge alleged that he was being subjected to quotas, and recounted an alleged incident in the spring of 2012 in which he observed McCormack stop a black male, remove his clothing and then remove narcotics from the individual's buttocks. ¶187. Serrano concluded his charge by writing that "I don't believe that just because a person is black or Hispanic, that they deserve to be arrested or summons." ¶188.

It is clear that Serrano was not complaining about *employment* discrimination by McCormack or anyone else. Serrano was instead complaining about alleged conduct toward the public that, under *Wimmer*, is not an "unlawful employment practice" of the employer. 176 F.3d at 136. Nor does Serrano's reference to a "hostile work environment" in the EEOC charge save

24

his retaliation claim. *Id.* ("It is inherent in the definition of a racially hostile work environment…that the person against whom the hostility is directed must be in an employment relationship with the employer.").

Serrano also fails to establish a causal connection between his EEOC charge and any subsequent adverse employment action. Serrano alleged that McCormack became aware of his June 2012 EEOC charge during a February 7, 2013 Compstat meeting, and soon commenced a series of retaliatory actions such as assigning him to a fixed solitary post, ransacking his locker, and assigning him to details outside the precinct. The Court's June 27, 2018 Order determined that this allegation was sufficient to allege a causal connection. Dkt. 86 at p. 21.

But now that discovery is completed, it is clear that Serrano's allegation is devoid of any supporting evidence. Serrano testified that he purportedly received text messages from unnamed individuals on February 7, 2013 claiming that the *Floyd* lawsuit was brought up at the Compstat meeting, and that McCormack was upset with Serrano. ¶¶151-53. Serrano failed to preserve these purported texts, and his testimony is inadmissible. Defendants also produced a recording of the February 7, 2013 Compstat meeting, and there is no evidence that Serrano's name or his EEOC charge were even mentioned.

Serrano also appears to be confusing February 7 with February 14, the date of Serrano's evaluation appeal meeting. McCormack did mention at the meeting that "the lawyers want" Serrano's memo books "regarding the lawsuit," in reference to the Law Department attorneys defending the City in *Floyd*. ¶203. But McCormack never referenced Serrano's EEOC charge, and there is no evidence demonstrating that McCormack was ever aware of the charge. *See EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 859 (S.D.N.Y. 2013)("lack of evidence indicating knowledge of particular individual agents can doom a plaintiff's ability to show"

causation). Nor is there evidence that McCormack, as the Commanding Officer, was personally involved and the proximate cause of the allegedly retaliatory actions that occurred in February 2013.

As for Gonzalez, the Court's June 27, 2018 Order restricted his discrimination-based retaliation claim against McCormack to alleged retaliation stemming from his September 7, 2015 complaint. Dkt. 86 at p. 30. But this retaliation claim is clearly meritless, as McCormack left the 40 Precinct more than a year earlier, in April 2014, and had no involvement in the allegedly retaliatory actions occurring after September 7, 2015. Gonzalez's August 19, 2015 letter to the NYPD's Office of Equal Employment Opportunity and September 7, 2015 letter to IAB did not even mention McCormack. ¶306.

## POINT III

### THE FIRST AMENDMENT RETALIATION CLAIMS OF RAYMOND, SERRANO, AND GONZALEZ ARE DEFICIENT AS A MATTER OF LAW

"A plaintiff asserting a First Amendment retaliation claim must establish that: (1) [the plaintiff's] speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against [the plaintiff]; and (3) there was a causal connection between this adverse action and the protected speech." *Morales v. City of New York*, 18-1573 (JGK), 2021 U.S. Dist. LEXIS 48149, at *24 (S.D.N.Y. Mar. 15, 2021)(quoting *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015)). The "but-for" causation standard also applies to First Amendment retaliation claims. *Naumovski,* 934 F.3d at 213 n. 37; *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019)(retaliatory motive "must be a 'but-for' cause" of the injury). The surviving claims of Raymond, Serrano and Gonzalez are clearly deficient as a matter of law.

### 1.  Raymond

Raymond's First Amendment retaliation claim is limited to "the 2015 performance evaluation, promotion denial and punitive posting actions that followed the November 22, 2014, meeting with the Platoon Commander," and is against Tsachas only. Dkt. 86 at p. 43. Raymond is unable to establish a *prima facie* case for several reasons. First, it was Raymond's insubordinate *conduct* described above that was the determinative, "but-for" cause of Maldonado's and Tsachas's actions, not Raymond's speech.

Raymond himself believes his failure to *meet* the alleged quota was the "but-for" cause of any retaliatory act, not his *complaints* about the alleged quota. For example, in his December 2015 open letter, Raymond wrote that Campbell "was informed that the reason given to reduce my ratings was *exclusively* because the Commanding Officer wanted me to make more arrests to keep District 32 arrest numbers up, which is in violation of the 2010 Quota Bill." ¶96. (emphasis added). Although there is no evidence that Tsachas imposed a quota upon Raymond in the first place, "refusing to comply with [an] illegal quota policy is not expressive conduct because it has no communicative impact on the public." *Whitehead v. City of New York*, 897 F. Supp. 2d 136, 143 (E.D.N.Y. 2012).[7] The Court's March 6, 2017 decision already dismissed plaintiffs' claims under New York State Labor Law § 215-a, and Raymond cannot re-litigate this claim in the guise of a "retaliation" claim.

Raymond's claim also fails because Tsachas was not assigned to Transit District 32 until July 2015, and there is no evidence Tsachas was even aware of Raymond's November

---

[7] In *Matthews*, the Second Circuit's focus was upon the officer's complaints about an alleged quota policy, and there is no suggestion by the Circuit that any conduct by the officer akin to Raymond was a factor in any adverse employment action, much less the "but-for" cause. This case is therefore more similar to *Whitehead* than to *Matthews*. Defendants are also unaware of any Second Circuit decision holding that insubordinate conduct by a public employee constitutes protected speech. In *Jackler v. Byrne*, 658 F.3d 225 (2d Cir. 2011), the Second Circuit held that a police officer's refusal to retract a report and make false statements was protected speech, but the court's focus was still on the officer's speech, not pure conduct.

22, 2014 meeting with Hayden. The record is also clear that Raymond's subpar job performance and his willful defiance preceded Tsachas's arrival at Transit District 32. Raymond is thus unable to establish a causal connection against Tsachas. *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)(where "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise").

Even if Raymond could establish a *prima facie* case, Tsachas would have made the "same decision" to place Raymond in the Clark Street Omega booth, give him a negative evaluation, and recommend against his promotion even if Raymond had not engaged in protected speech. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Nor can Raymond insulate himself from disciplinary action by asserting that his insubordinate conduct was connected to his speech. *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 118 (2d Cir. 2011)(application of *Mt. Healthy* defense "is not altered by the fact that [plaintiff's supervisor] has acknowledged that [plaintiff's speech] affected his decision to terminate [plaintiff]"); *Heil v. Santoro*, 147 F.3d 103, 111 (2d Cir. 1998)("The fact that [plaintiff] had engaged in speech that arguably touched on a matter of public concern did not immunize him from discipline for his subsequent insubordination[.]").

### 2. Serrano

Serrano's First Amendment retaliation claim against McCormack largely overlaps with his discrimination-based retaliation claim and fails for the reasons noted above, even assuming that Serrano's EEO complaint constitutes protected speech under the First Amendment.[8] The Court's June 27, 2018 Order also permitted Serrano to allege that McCormack transferred Serrano to the 33 Precinct in April 2013 in retaliation for Serrano's

---

[8] The June 27, 2018 Order granted Serrano leave to allege a First Amendment claim based on a letter to a union delegate about quotas (Dkt. 86 at p. 54), but there is no evidence McCormack was even aware of this letter.

testimony in *Floyd* the month before. Dkt. 86 at pp. 55-56. But there is no evidence McCormack was personally involved in this transfer decision and was the proximate cause. Serrano conceded that McCormack never made reference to the *Floyd* trial in discussing his transfer, ¶¶220-21, and Serrano's guesswork about McCormack's state of mind is insufficient to withstand summary judgment.

The record clearly shows that Serrano was administratively transferred, placed on dismissal probation, and suspended by the NYPD on April 10, 2013, a few days after the 2011 disciplinary charges against Serrano for fixing tickets – to which Serrano plead guilty - were adjudicated by then-Commissioner Raymond Kelly. ¶¶176-85. Because Serrano's admitted misconduct occurred well before his testimony in *Floyd*, there can be no causal connection. *Slattery*, 248 F.3d at 95. Likewise, the NYPD would also have made the "same decision" even if Serrano had not testified in the *Floyd* trial.

### 3. Gonzalez

Gonzalez's First Amendment retaliation claims against the City, McCormack, then-Commissioner Bratton, and then-Chief of Department O'Neill are limited to "the alleged retaliatory conduct from May to November 2015." Dkt. 86 at p. 52. As noted above, McCormack had already left the 40 Precinct well before May 2015, and there is no evidence linking McCormack to any alleged action in 2015.

Nor is there any evidence that Bratton and O'Neill were personally involved in any allegedly retaliatory actions in 2015. *See Alali v. Debara,* No. 07-2916 (CS), 2010 U.S. Dist. LEXIS 164582, at *12 (S.D.N.Y. Sept. 30, 2010)("a plaintiff seeking to hold an individual personally liable for retaliation under…[Section] 1983 must demonstrate that the defendant was 'personally involved' in the retaliatory conduct at issue"). Gonzalez's speculation that he was singled out based on Bratton's comment at a July 20, 2015 roll call about an officer "dropping a

dime" and O'Neill asking if anyone was recording the roll call is wholly insufficient to demonstrate personal involvement or retaliatory animus. ¶289. There is no evidence Bratton and O'Neill were even aware of Gonzalez's prior complaints, and Gonzalez's resort to speculative mind-reading based on their alleged comments is wholly insufficient to raise a genuine issue of material fact. ¶¶290-91. *Bloomberg*, 967 F. Supp. 2d at 859; *Alali*, 2010 U.S. Dist. LEXIS 164582, at *13. There is also no evidence that Bratton and O'Neill ever communicated with Goode or any other supervisor in the 40 Precinct, or that any supervisor understood Bratton's comment at the July 20, 2015 roll call as an implicit signal to retaliate against Gonzalez.[9] ¶304. Because there is no evidence of retaliatory intent by Bratton and O'Neill, neither defendant can be personally liable.

The Court's June 27, 2018 Order granted Gonzalez leave to allege a claim under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) because Bratton was the "chief policy maker" and O'Neill "exercised significant influence" over NYPD policy. Dkt. 86 at p. 52. Because there is no evidence that either defendant gave an "implicit instruction to crack down or retaliate against" Gonzalez based upon his prior complaints, *Id.*, Gonzalez's *Monell* claim is deficient as a matter of law.

---

[9] The Court denied plaintiffs' request to depose Bratton and O'Neill because, among other things, plaintiffs could obtain the same information by first deposing Gonzalez's supervisors. Dkt. 138 at p. 11. Even after deposing Blatt, Goode and Hatki, all of whom were supervisors in July 2015, plaintiffs have failed to adduce a scintilla of evidence that Bratton and O'Neill explicitly or implicitly instructed these supervisors to retaliate against Gonzalez.

## POINT IV

## THE INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED ON THE BASIS OF QUALIFIED IMMUNITY

**A.     The Applicable Legal Standard**

"A government agent enjoys qualified immunity when he or she performs discretionary functions if either (1) the conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that the conduct did not violate clearly established rights." *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 277 (2d Cir. 1999). "A right is clearly established if the law (1) was defined with reasonable clarity, (2) has been affirmed by the Supreme Court or the Second Circuit[,] and (3) where the conduct at issue would have been understood by a reasonable defendant to be unlawful under the existing law." *Looney v. Black*, 702 F.3d 701, 706 (2d Cir. 2012)(internal quotation omitted).

The Supreme Court has repeatedly emphasized that the qualified immunity analysis should not "define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Qualified immunity should be granted unless it is "beyond debate" that the constitutional right is clearly established. *Lane v. Franks*, 573 U.S. 228, 246 (2014)(quoting *Al-Kidd*, 563 U.S. at 741). The Second Circuit has reiterated this principle. *Lewis v. Cowen*, 165 F.3d 154, 166-67 (2d Cir. 1999)("The relevant inquiry is not whether the defendants should have known that there was a federal right, in the abstract, to 'freedom of speech,' but whether the defendants should have known that the *specific actions complained of* violated the plaintiff's freedom of speech.")(emphasis added); *Giacalone v. Abrams*, 850 F.2d 79, 85 (2d Cir. 1988)(district court's determination that "a public employee retains First

31

Amendment rights and…may not generally be discharged for the exercise of those rights" is "too general to be controlling in the qualified immunity inquiry").

## B.     Defendants Did Not Violate Plaintiffs' Clearly Established Constitutional Rights, And Their Actions Were Objectively Reasonable

Tsachas and McCormack are both entitled to qualified immunity for several reasons. First, it was certainly not "beyond debate" that Serrano could bring an Equal Protection-based retaliation claim against McCormack in February 2013.[10] The Second Circuit did not expressly hold that retaliation claims were cognizable under the Equal Protection Clause until September 2015. *Vega*, 801 F.3d at 80-82. In fact, *Vega* acknowledged "considerable confusion surrounding the viability of retaliation claims under § 1983," and that "[w]e have sent conflicting signals in that respect." *Id.* at 80-81.

Serrano's First Amendment retaliation claim against McCormack similarly fails. It was not until February 2015 when the Second Circuit held, in *Matthews*, that an NYPD police officer's complaint about quotas constituted protected speech under *Garcetti v. Ceballos*, 547 U.S. 410 (2005).  Prior to that decision, the Court twice dismissed Matthews's claims under existing First Amendment precedent. *Matthews*, 779 F.3d at 170 (noting that district court twice dismissed Matthews's claim). Indeed, Tsachas was granted qualified immunity in Michael Birch's lawsuit because Tsachas's alleged conduct in 2012 predated the 2015 decision in *Matthews*. *Birch*, 184 F. Supp. 3d at 31 ("[U]ntil the *Matthews* decision, defendants in this case had no clearly established reason to know that their conduct would be subjected to scrutiny under the First Amendment."). McCormack is similarly entitled to qualified immunity based upon alleged events occurring in February 2013, well before the *Matthews* decision.

---

[10] Because McCormack left the 40 Precinct in April 2014, McCormack is obviously entitled to qualified immunity with respect to Gonzalez's retaliation claims based upon events occurring in 2015.

Tsachas, meanwhile, is entitled to qualified immunity with respect to Raymond's First Amendment retaliation claim. Although *Matthews* was decided shortly before Tsachas's assignment to Transit District 32 in July 2015, it was nonetheless "objectively reasonable to believe that [his] conduct did not violate clearly established rights." *McCullough*, 187 F.3d at 277. As noted above, Raymond's defiant *conduct* was the "but-for" cause of Tsachas's actions, as well as Maldonado before him. *Matthews*, however, did not factor an officer's insubordinate behavior into its First Amendment analysis. Because "officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context," *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007)(quotation omitted), Tsachas is entitled to qualified immunity.

Tsachas and McCormack are also entitled to qualified immunity with respect to plaintiffs' discrimination claims under the Equal Protection Clause. Raymond and Serrano contend that Tsachas and McCormack improperly instructed them to focus their enforcement activity upon certain racial groups. Although *Wimmer* held that such conduct was not an unlawful employment practice under Title VII, there is no reasonable basis to conclude the Second Circuit would apply a more permissive standard under Section 1983 given *Naumovski*. In any event, it was not "beyond debate" that their comments can support an inference of employment discrimination under the Equal Protection Clause.

McCormack is entitled to qualified immunity for additional reasons. There is no record evidence that McCormack expressly ordered Monroe, Blatt, and Lachowski to give Serrano, Gonzalez, and Baez specific evaluation scores, and he was primarily involved in their evaluation appeals. The Second Circuit has decided a number of Section 1983 cases examining whether the discriminatory animus of a subordinate can be imputed to a supervisor. *See, e.g.*, *Raspardo v. Carlone*, 770 F.3d 97, 122-25 (2d Cir. 2014). But defendants are unaware of any

Second Circuit decision addressing the converse situation where only the commanding officer is accused of discriminatory intent, yet no evidence demonstrates the commanding officer improperly influenced a subordinate to effectuate the allegedly discriminatory act.

Finally, the placement of Gonzalez and Baez into Performance Monitoring raises novel legal issues that are not clearly established in the case law. Both plaintiffs claim that McCormack made the initial recommendation to place them in Performance Monitoring, and effectively argue that the Performance Monitoring Unit was McCormack's "cat's paw." In *Naumovski*, the Second Circuit held that the *employer* cannot be held liable under a "cat's paw" theory. 934 F.3d at 219-220 (school cannot be liable based on discriminatory intent of students circulating rumors about the plaintiff). But it remains undetermined whether the individual defendant accused of "impermissible bias" can be personally liable under Section 1983 when the ultimate decision is made by individuals who are not accused of discriminatory animus. Once again, such uncertainty weighs in favor of qualified immunity.

Bratton and O'Neill are also entitled to qualified immunity. Gonzalez's sole "evidence" is Bratton's reference to an unnamed officer "dropping a dime" and O'Neill asking if anyone was recording the roll call. ¶¶289-91. Defendants, however, are unaware of any Second Circuit case clearly establishing that such ambiguous public comments from high-ranking officials can alone establish retaliatory intent under Section 1983.

## POINT V

## PLAINTIFFS' SHRL AND CHRL CLAIMS ARE DEFICIENT AS A MATTER OF LAW

The Court's June 27, 2018 Order exercised supplemental jurisdiction over only plaintiffs' SHRL and CHRL claims that "parallel the…surviving federal claims" and declined to exercise supplemental jurisdiction over the remainder of plaintiffs' state-law claims as well as

34

their vicarious liability claims. Dkt. 86 at p. 33. Because the Court's jurisdiction is limited only to the SHRL and CHRL claims involving the same allegations as the surviving federal claims, these claims are ripe for dismissal.

Even assuming that plaintiffs' SHRL claims mirror Title VII, *Wright v. City of Syracuse*, 611 Fed. Appx. 8, 10 n.1 (2d Cir. 2015), these claims should be dismissed for the reasons noted above. Although the CHRL is interpreted more liberally than Title VII, *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013), CHRL claims are frequently dismissed on summary judgment where, as here, there is still no evidence of any discriminatory or retaliatory intent. *See Pierre v. City of New York*, No. 17-5782 (JGK), 2020 U.S. Dist. LEXIS 11543, at *30-34 (S.D.N.Y. Jan. 21, 2020)(dismissing CHRL claims that parallel Section 1983 claims); *see also Chen*, 805 F.3d at 76-77; *Fitchett*, 2021 U.S. Dist. LEXIS 47763 at *39-41; *Varughese v. Mount Sinai Med. Ctr.*, No. 12-8812 (CM)(JCF), 2015 U.S. Dist. LEXIS 43758, at *102-08 (S.D.N.Y. Mar. 27, 2015).

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court grant their motion, enter judgment in favor of defendants, and grant defendants costs and disbursements, together with such further other and further relief as the Court deems just and proper.

Dated:      Brooklyn, New York
            May 17, 2021

                              **JAMES E. JOHNSON**
                              Corporation Counsel of the
                                City of New York
                              Attorney for Defendants
                              100 Church Street, Room 2-115
                              New York, New York 10007-2601
                              (212) 356-2467

By: _____/s/_____

Yuval Rubinstein
Assistant Corporation Counsel