UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

EDREWEENE RAYMOND, PEDRO
SERRANO, SANDY GONZALEZ, and
RITCHIE BAEZ,

              Plaintiffs,

       -v-                                         No.  15-CV-6885-LTS-SLC

THE CITY OF NEW YORK, WILLIAM J.
BRATTON, JAMES P. O'NEILL,
CHRISTOPHER McCORMACK, and
CONSTANTIN TSACHAS,

              Defendants.

-------------------------------------------------------x

<u>MEMORANDUM OPINION AND ORDER</u>

            Plaintiffs Edreweene Raymond ("Raymond"), Pedro Serrano ("Serrano"), Sandy

Gonzalez ("Gonzalez"), and Ritchie Baez ("Baez") (collectively, "Plaintiffs") bring this civil

rights action, pursuant to 42 U.S.C. sections 1981, 1983, and 1985; the New York State Human

Rights Law ("NYSHRL"), New York Executive Law sections 290 and 296; and the New York

City Human Rights Law ("NYCHRL"), the New York City Local Law 59 of 1986 as amended

by Local Rule 39 of 1991, section 8-101 <u>et seq.</u>, against Defendants the City of New York ("the

City"), former New York City Police Department ("NYPD") Police Commissioner William J.

Bratton ("Commissioner Bratton"), former Police Commissioner and former Deputy

Commissioner James P. O'Neill ("Deputy Commissioner O'Neill"), Inspector and former

Commanding Officer of the 40th Precinct Christopher McCormack ("C.O. McCormack"), and

Deputy Inspector and former Commanding Officer of Transit District 32 Constantin Tsachas

("C.O. Tsachas") (collectively, "Defendants").[1]  The Court has jurisdiction of this action pursuant to 28 U.S.C. sections 1331, 1343, and 1367.

On March 6, 2017, this Court issued a Memorandum Opinion and Order granting Defendants' motion to dismiss Plaintiffs' Amended Complaint (docket entry no. 60 (the "Motion to Dismiss Opinion")), and granting Plaintiffs leave to move to file a Second Amended Complaint as to certain of their claims.  On June 27, 2018, the Court issued a Memorandum Opinion and Order granting in part and denying in part Plaintiffs' motion for leave to file their Second Amended Complaint (docket entry no. 86 (the "Motion to Amend Opinion")), which Plaintiffs filed on July 11, 2018 (docket entry no. 87 (the "SAC")).  Discovery ensued. Defendants now move, pursuant to Federal Rule of Civil Procedure 56, for summary judgment dismissing Plaintiffs' remaining claims in the SAC.  (Docket entry no. 275.)

The Court has considered the parties' submissions carefully.  For the following reasons, Defendants' motion for summary judgment is granted in part and denied in part.

BACKGROUND

Familiarity with the allegations animating this case, as summarized in the Court's Motion to Dismiss Opinion and Motion to Amend Opinion, is presumed.  The following summary focuses on facts of record that are relevant to the question of whether Defendants are entitled to summary judgment dismissing Plaintiffs' remaining claims.  Except as otherwise noted, the following material facts are undisputed.[2]

---

[1]     The Court refers to each individual plaintiff, and each individual defendant, by the rank he held at the time of the events at issue in this action.

[2]     The facts presented or recited as undisputed are drawn from the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1, or from evidence as to which there is no non-conclusory factual proffer.  Citations to Defendants' Local Civil Rule 56.1 Statement

Transit District 32 (Officer Raymond)

Officer Raymond self-identifies as a Black male of Haitian-American origin. (Def. 56.1 St. ¶ 38.)  He joined the NYPD in 2008 and, until January 2016, was "assigned to the evening platoon at Transit District 32."  (Id. ¶¶ 39-40.)  According to Officer Raymond's immediate supervisor from 2014 to 2016, Sergeant Martin Campbell (an African American male), there were "less than a handful of white officers" in Transit District 32.  (Id. ¶¶ 41-43 ("everyone in my whole squad was a minority").)

During his time at Transit District 32, Officer Raymond disagreed with certain NYPD policing strategies (such as "Broken Windows" policing), including some of those used by members of Transit District 32.  (Def. 56.1 St. ¶¶ 47-52.)  Officer Raymond believed that one strategy used by his fellow officers in Transit District 32—placing themselves out of view of persons entering subway stations through turnstiles, by "hiding" inside rooms used by transit staff and/or by "put[ting] [one]self off to the side," in order to watch for members of the public entering the subway station without paying the fare—underserved the public by removing police officers from where "police services are needed."  (Id.)  He also believed that the efforts of his commanding officer, C.O. Tsachas (who joined the District in July 2015), "to keep District 32 arrests numbers up" effectively constituted an unlawful quota in violation of New York State law.  (Id. ¶ 96.)

Approximately eight months before C.O. Tsachas's arrival in the District, on November 22, 2014, Officer Raymond had a conversation with a Lieutenant named Victoria Hayden, who was his second-level supervisor, to discuss his enforcement activities.  (Def. 56.1

_____

(docket entry nos. 277 & 281 ("Def. 56.1 St.")) and Plaintiff's Counterstatement (docket entry no. 298 ("Pl. 56.1 St.")) incorporate by reference citations to the underlying evidentiary submissions.

St. ¶ 108.)  During this meeting, according to Plaintiffs' Second Amended Complaint, Officer

Raymond "spoke out denouncing unlawful enforcement quotas that his superiors were imposing

on him, which he felt unfairly targeted [B]lack and [L]atino communities."  (Docket entry no.

278 ("Rubinstein Decl.") Ex. A ¶ 37.)  Officer Raymond testified during his deposition that,

during the conversation, Lieutenant Hayden—who is a Black woman—told Officer Raymond:

"As a young black man, if you don't get on board, it's not going to be good for your career."

(Def. 56.1 St. ¶¶ 45, 108.)

        In January 2015, Officer Raymond was issued an "interim evaluation" for the

period of March 1, 2014, to October 31, 2014.  (Id. ¶ 55.)  The "rater" on the evaluation was

Sergeant Campbell, and the "reviewer" was Captain Natalie Maldonado, a Hispanic woman who

served as C.O. Tsachas's predecessor as commanding officer of Transit District 32.  (Id.; docket

entry no. 403 ("Scola Decl.") Ex. 26 at 183:21-184:2.)  The "overall evaluation" score was a 2.5

out of 5—a below-average rating—and the comments explained that Officer Raymond "believes

that in handling specific offences he should talk to offenders or suspects and provide guidance,

he refuses to use enforcement to correct or address crime," was "unwilling to adapt or adjust to

new department policies and programs, such as addressing crime conditions," and "continue[d]

to perform under standards in comparison to his peers assigned to the same post."  (Def. 56.1 St.

¶ 55.)  Officer Raymond appealed the evaluation, although the appeal process never took place

due to Captain Maldonado's promotion and transfer.  (Id. ¶¶ 58-59.)

        Also in January 2015, Officer Raymond had a recorded conversation with

Sergeant Campbell to discuss the interim evaluation.  (Def. 56.1 St. ¶ 109.)  According to Officer

Campbell, Captain Maldonado demanded that he prepare the interim evaluation, and while an

initial draft of the interim evaluation was comparatively more positive, Captain Maldonado

requested that it be changed to be more negative before it was completed.  (Scola Decl. Ex. 26 at 52:3-55:5; Scola Decl. Ex. 28 at 14:6-15.)  Officer Raymond asked Sergeant Campbell, "what's her issue with me," "[j]ust activity and quota?"  After asking, "[y]ou really want me to tell you what I think it is," Sergeant Campbell said to Officer Raymond: "You're a young black man with dreads.  Very smart, very intelligent.  Have a loud [ ] say, meaning your words is loud."  (Scola Decl. Ex. 28 at 17:5-8.)[3]

In June 2015, Officer Raymond submitted a request for a leave of absence (a "28") one day after the deadline to do so.  (Def. 56.1 St. ¶¶ 66, 69.)  In response, Captain Carlos A. Fernandez—then the commanding officer of Transit District 32—instituted the process for issuing Officer Raymond a command discipline.  (Id. ¶ 68.)[4]

In July 2015, C.O. Tsachas was assigned to Transit District 32, as commanding officer of that District.  (Id. ¶ 62.)

At some point after C.O. Tsachas's arrival in Transit District 32, he asked Sergeant Campbell "where Raymond's 2014 annual evaluation was located," to which Campbell

---

[3]     Sergeant Campbell later testified that Officer Raymond was the only person for whom he ever completed an interim evaluation.  (Rubinstein Decl. Ex. I at 77:6-10.)  He also testified he does "not believe'" that Officer Raymond received this interim evaluation because he was Black, and that his explanation was related to the "ongoing fight for everyone . . . [o]f being a minority in the police department."  (Id. at 77:11-80:24.)

[4]     A "command discipline" is a form of punishment within the NYPD.  (Scola Decl. Ex. 54.)  See also Caines v. City of New York, No. 13-CV-676-VEC, 2015 WL 13021892, at *2 n.6 (S.D.N.Y. July 8, 2015) ("'a command discipline' is a '[n]on-judicial punishment available to a commanding/executive officer to correct deficiencies and maintain discipline within the command'" (quoting the NYPD Patrol Guide), aff'd, 649 F. App'x 74 (2d Cir. 2016); Olaechea v. City of New York, No. 17-CV-4797-RA, 2019 WL 4805846, at *12 (S.D.N.Y. Sept. 30, 2019) ("A command discipline is an intermediate form of discipline[.]"); Davis v. City of New York, No. 12-CV-3297-PGG, 2018 WL 10070540, at *10 (S.D.N.Y. Mar. 30, 2018) (citing authority for the proposition that a command discipline is "a more serious but non-judicial punishment that will be adjudicated at an informal hearing by a commanding officer," with resulting penalties ranging "'from a warning' to the loss of up to 10 vacation days" (citation omitted)).

responded that "he completed the evaluation and gave Raymond either a 2.5 or 2.0." (Def. 56.1 St. ¶ 76.) Tsachas then instructed Campbell, "it's not there so do another one"; Officer Raymond was then issued an annual evaluation of 2.5 for the year 2014, with Campbell listed as the rater and Tsachas as the reviewer. (Id. ¶ 77.) According to Campbell, he personally thought higher of Officer Raymond than was reflected in the 2014 evaluation but did not submit the evaluation with a 4.0 because of the "interim evaluation before," which "automatically" influenced the annual evaluation. (Scola Decl. Ex. 26 at 101:3-23.)

On or about August 19, 2015, Officer Raymond was issued an interim evaluation of 2.0 for the period of April 1, 2015, to June 30, 2015, again with Sergeant Campbell as the rater and C.O. Tsachas as the reviewer. (Id. ¶ 64.) The comments in the evaluation included that Officer Raymond was "unable to change approach to a problem even when that approach is not working," and that he had been "spoken to on many occasions about addressing his monthly conditions in regards to his enforcement," but had "shown very little improvement since his last counseling." (Rubinstein Decl. Ex. S.) C.O. Tsachas recalls that he probably directed Campbell to complete this evaluation (Pl. 56.1 St. ¶ 64), and Campbell recalls that he did not agree with many of the evaluation's negative comments, though it was the result of a "collaboration" with C.O. Tsachas. (Scola Decl. Ex. 26 at 53:21-24.)[5]

On September 24, 2015, Officer Raymond and C.O. Tsachas met to discuss the command discipline initiated by Captain Fernandez in June 2015 and "inherited" by C.O.

---

[5]     The NYPD's Patrol Guide provides that, when a reviewer disagrees with an immediate supervisor's rating of an officer, the proper action is for the reviewer to prepare a separate evaluation. (Scola Decl. Ex. 3.) Campbell testified that his early evaluations of Officer Raymond were his "first," that he had "never" done an evaluation before, and, accordingly, that he was "getting coached, basically, trained at the same time" as he completed them. (Scola Decl. Ex. 26 at 43:19-25.)

Tsachas.  (Id. ¶¶ 66, 70; see also Rubinstein Decl. Ex. V & Scola Decl. Ex. 71 (together, "Sept. 24 Tr.").)  Officer Raymond explained the circumstances of his late submission of his 28, but acknowledged that he did not submit it within the required time period.  (Sept. 24 Tr. at 17:8-13.)  C.O. Tsachas thereafter found Captain Fernandez's Command Discipline Report "[s]ubstantiated" and recommended a "1 day" penalty; Officer Raymond "[a]ccept[ed] the finding and proposed disciplinary action."  (Def. 56.1 St. ¶ 69; Rubinstein Decl. Ex. U.)

Most of the conversation between Officer Raymond and C.O. Tsachas on September 24 did not concern that command discipline, however, but instead concerned the men's disagreement about Officer Raymond's policing style, and, in particular, C.O. Tsachas's request that Officer Raymond increase his activity while on duty, including by "hiding" away from the subway turnstiles in order to increase his chances of observing persons not paying the subway fare.  (Def. 56.1 St. ¶¶ 70-76.)  Officer Raymond observed that his activity was lower than it might otherwise have been because he had "been to Clark Street," an undesirable post, "a lot," to which C.O. Tsachas responded: "I told you before, like I said last time, if you're not going to do anything I might as well put you at Clark Street."  (Id. ¶ 70.)  Toward the end of the meeting, Officer Raymond told C.O. Tsachas, "I just don't hide, that's it.  But if you're telling me to hide, not a problem."  (Id. ¶ 75.)

On October 15, 2015, Officer Raymond met with C.O. Tsachas, Sergeant Campbell, another Lieutenant, and Officer Raymond's union representative, to discuss his appeal of his 2.5 evaluation for the year 2014.  (Def. 56.1 St. ¶ 78.)  Officer Raymond stated that he agreed that his "numbers [are] low in comparison to my peers," but noted that "[t]he thing is when you don't hide, believe it or not, that's what the numbers look like" (id. ¶ 80); he acknowledged that he had not gone into any transit room since his last meeting with C.O.

Tsachas.  (Id. ¶ 83.)  During the meeting, C.O. Tsachas also told Officer Raymond that he should

focus on giving "the right people the right collars," and that he had heard that "you collar the

wrong individual"; he then elaborated: "Yeah, if you come in . . . let's say female [Asian] 42, no

ID . . . That's not going to fly."  (Scola Decl. Ex. 10 at 66:24-67:6.)[6]

        In November 2015, Officer Raymond received an interim evaluation score of 3.0

for the period September to November, with Sergeant Paul Salcedo as the rater and Lieutenant

Haaziq Reid as the reviewer.  (Def. 56.1 St. ¶ 88.)  The review commented that "PO Raymond

has been spoken to about addressing his monthly conditions in regards to enforcement duties,"

and "has shown some improvement in his overall performance since his last evaluation."  (Id.)

        Later that month, C.O. Tsachas drafted a memorandum to the commanding officer

of Transit Borough Brooklyn regarding Officer Raymond's potential promotion to sergeant.  He

wrote:

> Since the undersigned has been assigned as the Commanding Officer of
> Transit District 32, PO Raymond's below standards performance has been
> addressed on several occasions. Po Raymond believes that a pro-active
> approach is not essential or a suitable strategy to address crime and
> conditions. He does not utilize the tools or methods available to him
> during his time on patrol and seems unwilling to change his approach.
> Officer Raymond's year to date enforcement is not on par with the rest of
> his squad or the district. He has shown an improvement during the 2nd
> half of the 2015 calendar year and as per his squad sergeant, Po Raymond
> is deserving of a satisfactory Interim evaluation.
>
> Although he is not recommended for promotion at this time, he should be
> reconsidered for future promotion if his performance continues to improve
> as seen during the 2nd half of 2015. Officer Raymond is respectful to his
> supervisors and peers and displays a positive demeanor when discussing
> his performance and evaluations.

---

[6]    Officer Raymond responded to C.O. Tsachas that "the 14th Amendment says we have to
be impartial," to which Tsachas replied that his comment would be "the same thing
whether it be black, female," and that it was "supposed to be about" the "no IDs."  (Id. at
67:12-68:4.)

(Rubinstein Decl. Ex. AA.)  Officer Raymond's promotion was thereafter delayed by approximately six months.  (Def. 56.1 St. ¶¶ 93-94.)

       In December 2015, Officer Raymond wrote an open letter protesting the decision not to promote him.  (Def. 56.1 St. ¶¶ 95-98.)[7]  In his letter, Officer Raymond proffered that, if asked, Sergeant Campbell would state that Officer Raymond should have received higher ratings than he did, that Sergeant Campbell lowered those ratings at the direction of his superiors for the "exclusive[ ]" reason that "the Commanding Officer wanted me to make more arrests to keep District 32 arrest numbers up, which is in violation of the 2010 Quota Bill," and that the "secondary purpose" was to:

> intentionally prevent me from getting promoted to sergeant—likely as a deterrent to all other police officers in District 32 who might otherwise dare to actually embrace the fundamental concepts of "Smart Policing" espoused by Commissioner Bratton as part of his new progressive strategy to build bridges with communities by problem solving while still maintaining public order and further reducing crime—only resorting to arrests for low level crimes and quality of life offenses when less restrictive means to problem-solve fail or are not likely to work.

(Rubinstein Decl. Ex. AD.)  Officer Raymond wrote that Sergeant Campbell would also attest that Officer Raymond, unlike his peers, declined to hide in transit rooms, and instead remained always visible to the public.  (Id.)  He also wrote that the "dirty little secrets" of the Transit Bureau included that the "bread and butter" of the Bureau was "to hide in an MTA transit room and jump out and arrest someone who fits the profile—a young black male—for jumping the turnstile or doubling up, etc."  (Id.)  Officer Raymond did not suggest, however, that he believed his negative evaluations were the result of discrimination based on his own race or ethnicity.

---

[7]     It is not known whether anyone actually received the open letter.  (Def. 56.1 St. ¶ 98.)

In January 2016, Officer Raymond was transferred out of Transit District 32 and to the 77th Precinct.  (Def. 56.1 St. ¶ 40.)

In early 2016, Officer Raymond received an annual evaluation of 2.5 for the year 2015, with Sergeant Salcedo as the rater and C.O. Tsachas as the reviewer.  (Def. 56.1 St. ¶ 100.) The evaluation included a comment from Sergeant Salcedo that "[i]n my three months as his immediate supervisor he did show some improvement on his overall performance but still has much more room for improvement."  (Id.)  C.O. Tsachas added: "I concur. PO Raymond continually, and it seems intentionally, refuses to take part in any self-motivated proactive strategies that result in any type of enforcement.  He is fixated with his personal beliefs of a nonintervention style of policing rather than a focused effort to identify and apprehend violators."  (Id.)

In June 2016 (notwithstanding Officer Raymond's 2015 annual evaluation score of 2.5), the NYPD's Career Advancement Review Board recommended that he be promoted to Sergeant.  (Def. 56.1 St. ¶ 104.)  He was promoted in the following class.  (Id. ¶ 105.)

In May 2018, Officer Raymond drafted a letter to Commissioner O'Neill recounting his experience with C.O. Tsachas.  Officer Raymond wrote that his below-average evaluations were "all because the Commanding Officer wanted to punish me for my use of discretion in the enforcement of Quality of Life conditions in favor of the Commanding Officer's numbers-driven desire that I simply increase enforcement activity for the sake of doing so, as he stated in front of witnesses to focus enforcement on Black and Hispanic males as the 'right' targets."  (Rubinstein Decl. Ex. AH.)

40th Precinct (Officers Serrano, Gonzalez, and Baez)[8]

      Officers Serrano, Gonzalez, and Baez each began working as an officer in the 40th Precinct, a Precinct in the Bronx with comparatively high levels of violent crime, beginning in 2004 or 2005.  (Def. 56.1 St. ¶¶ 144, 149, 224, 308.)  Officer Serrano identifies as Hispanic and Puerto Rican (id. ¶ 143), Officer Gonzalez identifies as Hispanic (SAC ¶ 20), and Officer Baez identifies at Black-Hispanic.  (Id. ¶ 307.)  Of the approximately 235 police officers assigned to the 40th Precinct during the time period relevant to this case, most officers were Hispanic and/or Black.  (Id. ¶ 150.)

      C.O. McCormack served as the commanding officer of the 40th Precinct from September 2011 to April 2014.  (Def. 56.1 St. ¶ 147.)  When McCormack arrived in the Precinct, he observed that certain "officers received extremely high evaluations for doing a lot less work" (Scola Decl. Ex. 61 at 6920), so he implemented a procedure whereby he met with the platoon commander and squad supervisors each year to go over each annual evaluation of every officer under his command.  (Id. at 6919-21.)  According to Officer Baez, this procedure led to lower evaluations for the "majority" of patrol officers.  (Rubinstein Decl. Ex. CD at 89:11-19 (Officer Baez testifying that McCormack thought all patrol officers were "useless," and he gave "the majority of patrol officers on patrol a very low eval.").)

      Plaintiffs submit that, upon arriving in the Precinct, C.O. McCormack also began pushing officers to issue more summonses and increase their arrests (Pl. 56.1 St. ¶ 149), and that

---

[8]    This Background section provides an overview of facts relevant to the discrimination claims of Officers Serrano, Gonzalez, and Baez.  Additional facts particular to each Officer's discrimination claims, and to each Officer's retaliation claims, are discussed in greater detail in the Discussion section below.

he punished officers (according to Plaintiffs, particularly minority officers) who failed to do so. (Pl. 56.1 St. ¶¶ 149, 169.)

As discussed in greater detail below and as relevant here, Officer Serrano received an annual evaluation rating of 3.0 for the year 2012, and Officers Baez and Gonzalez each received an annual evaluation rating of 2.5 for the year 2013.  (Def. 56.1 St. ¶¶ 161, 239, 321.)[9]  C.O. McCormack was neither the rater nor the reviewer for any of those evaluations, but in each case heard and denied the Officer's first-level appeal of his evaluation.  (Id. ¶¶ 161, 195, 239, 245, 321, 324.)  In part as a result of their 2013 evaluations, Officers Baez and Gonzalez were placed in Level 1 performance monitoring in 2014.  (Id. ¶¶ 250-51, 329-30.)

During the same period, Officer Serrano and Officer Gonzalez submitted a series of complaints, principally concerning the allegedly unlawful quotas they perceived as being imposed at the 40th Precinct.  In a complaint dated June 1, 2012, and received by the Equal Employment Opportunity Commission ("EEOC") on August 27, 2012, Officer Serrano charged that he was subject to an "unfair and unconstitutional" quota, and that he witnessed discriminatory enforcement against minority members of the public.  (Def. 56.1 St. ¶¶ 187-88; see also Rubinstein Decl. Ex. BD.)[10]  In March 2013, Officer Serrano testified (on behalf of the plaintiffs) as a lay witness in a section 1983 class action lawsuit against the City of New York and others alleging that the NYPD had implemented an official municipal policy of unconstitutional and racially discriminatory stops and frisks.  See Floyd v. City of New York,

---

[9]     In Officer Serrano's case, this was the same rating that he had received the previous year. (Rubinstein Decl. Ex. AS at 1223:17-24.)

[10]    Specifically, Officer Serrano reported an incident occurring in Spring 2012, in which C.O. McCormack allegedly pulled down the pants of a black man who had merely been standing against a wall in public and removed narcotics from that man's buttocks.  (Def. 56.1 St. ¶ 187.)

959 F. Supp. 2d 540, 604 (S.D.N.Y. 2013).  In February and March 2014, Officer Gonzalez submitted complaints to the NYPD's Internal Affairs Bureau ("IAB"), reporting an allegedly unlawful quota, the "downgrad[ing] of felonies, racism, retaliation, [and] stress."  (Def. 56.1 St. ¶¶ 287-88; Rubinstein Decl. Ex. BZ.)  Finally, in August and September 2015, Officer Gonzalez wrote letters to the IAB and the NYPD's internal Office of Equal Employment Opportunity ("OEEO"), reporting a series of allegedly retaliatory actions taken against him by one of his supervisors, Sergeant Tamara Goode, in response to a "malicious rumor" from the "winter of 2014" that he was "recording supervisors."  (Deft. 56.1 St. ¶ 306; Rubinstein Decl. Exs. CB & CC.)[11]

Officers Serrano and Gonzalez each assert that they suffered a series of retaliatory actions in response to the above complaints.  Those allegedly retaliatory actions are discussed in greater detail below, in the context of the Court's discussion of those Officers' retaliation claims.

<u>D</u>ISCUSSION

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is to be granted in favor of a moving party where that party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a); <u>see</u> <u>also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986). For the purposes of summary judgment motion practice, a fact is considered material "if it might affect the outcome of the suit under the governing law," and an issue of fact is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Holtz v. Rockefeller & Co. Inc.</u>, 258 F.3d 62, 69 (2d Cir. 2001) (internal quotation marks and

---

[11]     Plaintiffs have not named Sergeant Goode as a defendant in this action.

citations omitted).  The moving party bears the burden of demonstrating the absence of a

material fact, and the court must be able to find that, "after drawing all reasonable inferences in

favor of a non-movant, no reasonable trier of fact could find in favor of that party."  <u>Marvel

Entertainment, Inc. v. Kellytoy (USA), Inc.</u>, 769 F. Supp. 2d 520, 523 (S.D.N.Y. 2011) (quoting

<u>Heublein v. U.S.</u>, 996 F.2d 1455, 1461 (2d Cir. 1993)).

A party that is unable to "make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden of proof at

trial," will not survive a Rule 56 motion.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

Specifically, the party who bears the burden of proof at trial "must do more than simply show

that there is some metaphysical doubt as to the material facts and they may not rely on

conclusory allegations or unsubstantiated speculation."  <u>Jeffreys v. N.Y.C.</u>, 426 F.3d 549, 554

(2d Cir. 2005) (citations omitted).  "[M]ere conclusory allegations or denials . . . cannot by

themselves create a genuine issue of material fact where none would otherwise exist."  <u>Hicks v.

Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).

"[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations

of discrimination to defeat a motion for summary judgment."  <u>Schwapp v. Town of Avon</u>, 118

F.3d 106, 110 (2d Cir. 1997).

<u>Federal Discrimination Claims</u>

Each Plaintiff asserts a claim under 42 U.S.C. section 1983 that he was

discriminated against on the basis of his race, in violation of the Constitution's Equal Protection

Clause, by a person acting under the color of state law.  Such claims are evaluated under the

three-step burden-shifting analysis established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S.

792, 802 (1973); <u>see</u> <u>also</u> <u>Ruiz v. Cty. of Rockland</u>, 609 F.3d 486, 491-92 (2d Cir. 2010).  At the

first step, a plaintiff must proffer evidence establishing a prima facie case of discrimination by meeting his burden of production as to four elements: that (1) the plaintiff falls within a protected class, (2) he was performing his duties satisfactorily, (3) he was subject to an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination.  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000); Bermudez v. City of New York, 783 F. Supp. 2d 560, 575 (S.D.N.Y. 2011).  The second step shifts the burden to the employer to offer some legitimate, non-discriminatory reason for its actions.  McDonnell Douglas, 411 U.S. at 802.  At the third step of the McDonnell Douglas analysis, in the section 1983 context, a plaintiff must establish "that the employer's alternative, nondiscriminatory reason for the adverse employment action is 'pretextual,'" by establishing "that the employer's stated reason would not, alone, constitute a sufficient basis for pursuing an adverse action"—i.e., that "the employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action."  Naumovski v. Norris, 934 F.3d 200, 215 (2d Cir. 2019) (emphasis in original).

Officer Raymond

Officer Raymond claims that he was discriminated against by C.O. Tsachas in connection with his receipt of a series of below-average performance evaluations, his assignment to an undesirable and solitary post at Clark Street, and his receipt of a command discipline for submitting a late vacation request in June 2015.  Defendants seek summary judgment on this claim, arguing that Plaintiffs have not met their burden of showing a proper basis for an inference of unlawful discrimination on the part of C.O. Tsachas, that Defendants have shown legitimate, non-discriminatory reasons for C.O. Tsachas's actions, and that Plaintiffs have not shown that those reasons were either false or inadequate to support those actions.

The direct evidence proffered by Plaintiffs in support of their prima facie showing that C.O. Tsachas took adverse employment actions against Officer Raymond under circumstances giving rise to an inference of discrimination is scant. Officer Raymond acknowledges that C.O. Tsachas never commented on Raymond's race in his presence. (Def. 56.1 St. ¶ 116.) Plaintiffs identify a single white officer whom they allege performed comparably to Officer Raymond yet received more positive evaluations, but the evidence before the Court reflects that the white officer—who worked under a different supervisor, and was evaluated by different reviewers than Officer Raymond—issued more than three times the number of summonses and made more arrests than did Officer Raymond during the same calendar year. (Id. ¶¶ 125-129.)[12] Similarly, Plaintiffs identify only one racially charged remark made directly by Tsachas to Raymond—the comment on October 15, 2015, when Tsachas said to Raymond (in the presence of others) that "if you come in . . . let's say female [Asian] 42, no ID . . . That's not going to fly." (Scola Decl. Ex. 10 at 66:24-67:6.) That comment, while possibly suggestive of a discriminatory policing policy, does not without more raise an inference of discrimination on the part of C.O. Tsachas against Officer Raymond.[13]

---

[12]    Plaintiffs suggest (without citation to evidence) that this white officer had "approximately 50" more days on patrol than Raymond, allowing him additional enforcement opportunities to issue summonses and make arrests, and that "[i]n order to properly compare their numbers, you have to compare the number of days they both have on patrol." (Pl. 56.1 St. ¶ 127.) Plaintiffs offer no evidence in aid of such a comparison, however, and, in any event, a sample size of one is insufficient in this context to support an inference of discrimination in this case. Fitchett v. City of New York, No. 18-CV-8144-PAE, 2021 WL 964972, at *19 n.19 (S.D.N.Y. Mar. 15, 2021) ("a sample size this small cannot ordinarily support an inference of discrimination on its own").

[13]    Plaintiffs also points to the comments about Officer Raymond's race made to him by Lieutenant Hayden (in December 2014) and Sergeant Campbell (in January 2015), but both comments occurred well before C.O. Tsachas arrived at Transit District 32 and are not evidence of discriminatory intent on Tsachas's part. (Def. 56.1 St. ¶¶ 108 & 109.)

Instead, Plaintiffs rely heavily on declarations from a group of officers supervised by C.O. Tsachas in a different district (Transit District 34), during a different time period, for the propositions that C.O. Tsachas encouraged his officers to meet an allegedly unlawful enforcement quota (including, according to some officers, by targeting their enforcement efforts on young men of color) and then punished minority officers who failed to meet that quota more severely than their white officer counterparts.  (Pl. 56.1 St. ¶ 114, 132; Scola Decl. Exs. 8, 12, 13, 35-39.)  While disturbing, those declarations do not identify specific white officers whom Tsachas reportedly treated more favorably than their minority counterparts, do not purport to speak to Tsachas's treatment of officers in Transit District 32, and do not purport to reflect personal knowledge of Tsachas's interactions with Officer Raymond.[14]

Even assuming that these factual proffers satisfy Plaintiff's minimal burden[15] to establish a prima facie case of discrimination as to the adverse actions taken against Officer Raymond, however, Defendants have met their burden to identify "alternative, nondiscriminatory reason[s] for the adverse employment action[s]," Naumovski, 934 F.3d at 214—in this case, C.O. Tsachas's view that Officer Raymond was not sufficiently proactive and did not comply with District policy or C.O. Tsachas's direction while on patrol.

---

[14]    Notably, personnel who were in Transit District 32 and worked with Officer Raymond and C.O. Tsachas did not testify to such incidents.  (See Rubinstein Decl. Ex. I at 157:5-8 (Sergeant Campbell testifying that, in his experience, Tsachas never told him to target a certain group of people); Rubinstein Decl. Ex. AJ at 85:11-25 (Gentry Smith, Officer Raymond's union representative, testifying that he "can't recall" white officers being punished less than black officers for failing to "meet the quota")).  Meanwhile, Plaintiffs do not dispute that C.O. Tsachas gave numerous other minority officers awards for outstanding job performance, as well as high annual evaluation scores, while in charge of Transit District 32.  (Def. 56.1 St. ¶¶ 118-119.)

[15]    "At summary judgment, a plaintiff's initial burden is 'minimal.'"  Arty v. New York City Health & Hosps. Corp., No. 09-CV-05982-AJN, 2013 WL 6246490, at *7 (S.D.N.Y. Dec. 3, 2013) (subsequent history omitted).

Even before C.O. Tsachas's arrival, Lieutenant Hayden reportedly perceived Officer Raymond as "lazy" and "not engaged." (Def. 56.1 St. ¶ 45.) Similarly, in January 2015, Officer Raymond's supervisors issued him an interim evaluation score of 2.5 for the period March 1, 2014, through October 31, 2014, writing that he "refuses to use enforcement to correct or address crime," "believes that his presence is all that's needed when addressing crimes or violations," and "continues to perform under standards in comparison to his peers assigned to the same post." (Rubinstein Decl. Ex. Q.)[16] Plaintiffs may dispute the accuracy of these conclusions (see Pl. 56.1 St. ¶ 55), but they are consistent with C.O. Tsachas's later evaluations of Officer Raymond. For example, the 2.0 interim evaluation covering the period April 1, 2015, through June 30, 2015, reported that "Raymond [had] been spoken to on many occasions about addressing his monthly conditions in regards to his enforcement" and had "shown very little improvement" (Rubinstein Decl. Ex. S); C.O. Tsachas's November 2015 memorandum regarding Officer Raymond's possible promotion reported that Officer Raymond "believes that a pro-active approach is not essential or a suitable strategy to address crime and conditions" and "seems unwilling to change his approach" (Rubinstein Decl. Ex. AA); and the 2.5 evaluation for the year 2015 reported that Officer Raymond "refuses to take part in any self-motivated proactive strategies that result in any type of enforcement," and was "fixated with his personal beliefs of a nonintervention style of policing rather than a focused effort to identify and apprehend violators." (Rubinstein Decl. Ex. AF.) The undisputed record reflects that, to the extent C.O. Tsachas assigned Officer Raymond to undesirable posts (such as Clark Street) more

---

[16]    Officer Raymond acknowledged that his "numbers are low in comparison to [his] peers." (Def. 56.1 St. ¶ 80; accord id. ¶ 81 (Sergeant Campbell stating that "[i]n terms of the squad's enforcement, [Officer Raymond is] on the bottom").)

than other officers, he did so due to these same concerns.  (Def. 56.1 St. ¶¶ 70, 138, 142; Pl. 56.1 St. ¶ 134.)

Officer Raymond's own accounts of his series of negative evaluations and undesirable postings also suggest that they were the result of C.O. Tsachas's disapproval of his preferred policing style and comparatively lower enforcement numbers.  In his December 2015 open letter, Officer Raymond wrote that, if asked, Sergeant Campbell would state that the reasons for these negative evaluations were because "the Commanding Officer wanted [Officer Raymond] to make more arrests to keep District 32 arrest numbers up," and because Officer Raymond "dare[d] to actually embrace the fundamental concepts of 'Smart Policing.'"  (Def. 56.1 St. ¶¶ 96-97.)  Similarly, in his May 2018 letter to Commissioner O'Neill, he wrote that C.O. Tsachas gave him negative evaluations to "punish [him] for [his] use of discretion in the enforcement of Quality of Life conditions in favor of the Commanding Officer's numbers-driven desire[.]"  (Id. ¶ 107.)

With this evidence, Defendants have met their burden of showing non-discriminatory reasons for C.O. Tsachas's negative evaluations of Officer Raymond and the less desirable postings to which C.O. Tsachas assigned Officer Raymond.[17]  In their response,

---

[17] Defendants have also met their burden as to C.O. Tsachas's adjudication of the command discipline he "inherited" from a prior commanding officer, stemming from Officer Raymond's submission of a late vacation request.  Initially, Plaintiffs have not shown an inference that any racial animus on the part of Tsachas caused the issuance of the command discipline, where Tsachas did not instigate the command discipline in the first place.  Kaplan v. Multimedia Ent., Inc., No. 02-CV-00447-JTC, 2005 WL 2837561, at *7 (W.D.N.Y. Oct. 27, 2005) ("The failure of Mr. Green to reverse a decision made by his predecessor is not evidence of discrimination by Mr. Green."), aff'd, 199 F. App'x 54 (2d Cir. 2006).  Plaintiffs' proffered comparators on this point (see Pl. 56.1 St. ¶ 66) are therefore not comparable, because there is no evidence Tsachas "inherited" command disciplines as to any of them.  Even if Plaintiffs had met their prima facie burden, however, Plaintiffs have not shown that the stated reason for the command discipline (a vacation request Officer Raymond acknowledges he submitted late (Def. 56.1 St. ¶ 69))

Plaintiffs have not met their burden at step three of the <u>McDonnell Douglas</u> analysis to proffer evidence that would permit a reasonable jury to conclude that C.O. Tsachas's reasons for his adverse actions were either false or insufficient to support his actions, and that Officer Raymond's race was the "but-for" cause of those actions.

Plaintiffs argue principally that C.O. Tsachas's directions to Officer Raymond to "hide" in transit rooms and increase his enforcement activity were unlawful orders, and that Tsachas violated the NYPD Patrol Guide when he influenced Campbell's evaluations rather than creating his own separate evaluations of Raymond.[18]

As to Plaintiffs' first argument, Plaintiffs have pointed to no law, rule, or regulation prohibiting a transit officer from going into an MTA transit room for the purpose of observing members of the public entering the station through turnstiles.  Plaintiffs instead cite C.O. Tsachas's deposition testimony (at 203:17) that "theoretically" a police officer could be given a command discipline for being in such a room, although C.O. Tsachas had no objection to the practice himself; indeed, he told Officer Raymond explicitly, "we're allowed to go into the rooms, there's no order against it."  (Scola Decl. Ex. 71 at 31:6-8.)  Meanwhile, Transit Bureau Chief Joseph Fox testified that discipline could be appropriate "[i]f your supervisor finds three cops sitting there in the room and determines they've been sitting in there for three hours," but

_____

was false or inadequate to support the command discipline and the relatively minor punishment Tsachas imposed in connection with it.

[18]   Plaintiffs also submit the testimony of Sergeant Campbell and two others who thought more highly of Officer Raymond than did C.O. Tsachas.  (<u>See</u>, <u>e.g.</u>, Pl. 56.1 St. ¶ 100.) Such differences of opinion do not carry Plaintiffs' burden at step three of the <u>McDonnell Douglas</u> analysis, especially given that Sergeant Campbell later testified that he does "not believe" Officer Raymond received the 2.5 interim evaluation on account of his race. (Rubinstein Decl. Ex. I at 80:17-19.)

that there would be nothing inappropriate about an officer being inside a room for a shorter time if he explains why he is there.  (Rubinstein Decl. Ex. P at 56:18-57:10.)

Similarly, while C.O. Tsachas asked Officer Raymond to increase his activity and observed that his arrest statistics were low, Plaintiffs have not submitted evidence that C.O. Tsachas required Officer Raymond to make a specific number of arrests or otherwise imposed an unlawful quota at Transit District 32.  Even if C.O. Tsachas's emphasis on activity did enter into a legal grey area under New York State law (a theory for which Plaintiffs proffer no legal authority), though, a reasonable jury could not conclude, on this record, that his emphasis on "activity" was an insincere pretext for racial discrimination against Officer Raymond.

Finally, C.O. Tsachas's influence on Officer Raymond's evaluation "raters," while apparently inconsistent with the NYPD Patrol Guide's direction that a supervisor create a separate evaluation in the event he or she disagrees with a rater's evaluation, does not suffice on this record to show that C.O. Tsachas's proffered reasons were a pretext for racial discrimination.  Nurse v. Lutheran Med. Ctr., 854 F. Supp. 2d 300, 319 (E.D.N.Y. 2012) ("To survive on a motion for summary judgment, however, [a] plaintiff must come forward with some evidence that [a defendant's] purported failure to follow its Policies was due to unlawful discrimination, not merely that [the defendant's] decision was unfair or unjustified.").

At this stage, it is Plaintiffs' burden to show "that the defendant's discriminatory intent was a 'but-for' cause of the adverse employment action."  Radice v. Eastport S. Manor Cent. Sch. Dist., 437 F. Supp. 3d 198, 210 (E.D.N.Y. 2020).  Against the backdrop of Plaintiffs' relatively minimal showing with respect to discriminatory intent on the part of C.O. Tsachas, the Court concludes that Plaintiffs have not met their burden of showing that "the employer's stated reason would not, alone, constitute a sufficient basis for pursing an adverse action[s]," and that

Officer Raymond's race—rather than his underlying policing policy disagreements with C.O. Tsachas—was the "but-for" cause of those actions.  Naumovski, 934 F.3d at 214.

### Officer Serrano

Officer Serrano's employment discrimination claim against C.O. McCormack arises from Officer Serrano's 2012 annual evaluation rating of 3.0.  Defendants seek summary judgment on that claim on several grounds, including principally that Officer Serrano's 3.0 evaluation was not a materially adverse employment action that could support a viable discrimination claim under section 1983.

"Negative performance evaluations qualify as adverse employment actions only if they are 'accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss.'"  Smith v. City of New York, 385 F. Supp. 3d 323, 334 (S.D.N.Y. 2019) (quoting Siddiqi v. N.Y.C. Health & Hosp. Corp., 572 F. Supp. 2d 353, 367 (S.D.N.Y. 2008)). "[N]egative evaluations, standing alone without any accompanying adverse results, are not cognizable under the anti-discrimination laws."  Id. (citation and internal quotation marks omitted).

In this case, most of the evidence submitted by the parties suggests that a 3.0 rating is an average rating which meets expectations.  (Def. 56.1 St. ¶¶ 89, 164-166; cf. Pl. 56.1 St. ¶ 164.)  Even assuming that the 3.0 rating is adverse in some respects, however, Plaintiffs have not met their burden of showing that the evaluation Officer Serrano received was "accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss."  Smith, 385 F. Supp. 3d at 334.  Plaintiffs argue that "[t]he score of 3.0 awarded to Serrano is a materially adverse employment action because as a result Serrano does not qualify for special assignments and the higher pay and bonuses that go with the special

assignments" (docket entry no. 300 ("Opp.") at 14), but the record contains no evidence that

Officer Serrano was seeking out such assignments in 2013, or that his 3.0 annual evaluation

frustrated any such efforts.[19]  Absent such evidence, Officer Serrano has failed to show that his

3.0 annual evaluation constitutes a materially adverse employment action, and Defendants are

entitled to summary judgment as to his employment discrimination claim premised on that

evaluation.  Harge v. City of New York, No. 16-CV-5160-LJL, 2021 WL 3855305, at *11

(S.D.N.Y. Aug. 26, 2021) (granting summary judgment on police officer's section 1983

discrimination claim premised on negative annual evaluations where "there were no tangible

negative consequences associated with his ratings on his annual evaluations"); Smith, 385 F.

Supp. 3d at 335 (same).  See also Beharry v. City of New York, No. 18-CV-2042-AJN, 2020

WL 6135147, at *8 (S.D.N.Y. Oct. 19, 2020) ("Plaintiff must show something more than that he

was disciplined and that he received an average performance evaluation."); Farid v. City of New

York, No. 19-CV-03463-DLI-RLM, 2021 WL 2012425, at *6 (E.D.N.Y. May 20, 2021)

("Plaintiff's allegations that Defendant Noonan gave him a command discipline and forced a

lieutenant to give him a negative evaluation may constitute adverse employment actions, but not

---

[19]     Plaintiffs also rely on the declaration of non-party police officer Michael Soto, who states
that "3.0 is considered sub-par and hinders your ability to transfer into specialized units
within the NYPD."  (Scola Decl. Ex. 15 ¶¶ 10-11.)  Officer Soto does not speak to (or
profess to have personal knowledge as to) whether Officer Serrano was seeking or was
otherwise eligible for such a transfer.

As discussed in greater detail below, Officer Serrano claims to have experienced a series
of allegedly retaliatory actions in early 2013 (including, ultimately, his transfer from the
40th Precinct), in retribution for his speaking against certain NYPD policies.  Plaintiffs
do not argue that any of those adverse actions resulted from or are related to Officer
Serrano's 3.0 evaluation, rather than embodying that alleged retribution.  (See, e.g., SAC
¶ 121 ("The only purpose of the transfer was to punish Serrano.").)

under the circumstances presented here."), appeal withdrawn, No. 21-1505, 2021 WL 4267831 (2d Cir. July 15, 2021).[20]

Officers Gonzalez and Baez

Officers Gonzalez and Baez each claim that C.O. McCormack discriminated against him in connection with a negative performance evaluation for the year 2013 (in each case, a 2.5 out of 5) and in each Officer's subsequent placement into the NYPD's performance monitoring program.  Defendants seek summary judgment as to each Officer's claim on the grounds that Plaintiffs have not met their burden of showing that C.O. McCormack was personally involved in those evaluations or performance monitoring decisions, that he was the proximate cause of those actions, or that any discriminatory intent on the part of C.O. McCormack, to the extent established by Plaintiffs, was the but-for cause of those actions.

Plaintiffs Gonzalez and Baez concede that C.O. McCormack was neither the "reviewer" or the "rater" on their 2013 annual evaluations.  (Pl. 56.1 St. ¶¶ 239, 321.)  Officer Gonzalez's evaluation was completed by Sergeant Jonathan Blatt as the rater and Captain Louis Deceglie as the reviewer.  (Def. 56.1 St. ¶ 239.)  Sergeant Blatt wrote, among other things, that Officer Gonzalez "lacks conducting community visits to build relationships within the community," "lacks the knowledge to relay the proper information to victims," "needs constant supervision and tries to pass his work to others," that his "reports are usually inaccurate and often illegible" and that his "actions appear to contradict the veracity of the circumstances that he

---

[20]     Because Defendants are entitled to summary judgment as to Officer Serrano's employment discrimination claim on this basis, the Court does not reach Defendants' other arguments as to that claim.  (See docket entry no. 276 ("Def. Mem.") at 14-17.)

relates[.]"  (Rubinstein Decl. Ex. BK.)[21]  He concluded that Officer Gonzalez's "performance lags behind all other members of the platoon[.]"  (Id.)  Officer Gonzalez appealed his 2.5 evaluation (to C.O. McCormack, who denied the appeal) and then filed a further, borough-level appeal.  (Def. 56.1 St. ¶¶ 248-49.)  A personnel lieutenant from the Bronx Patrol Borough found "no cause for amend[ing] [the] evaluation."  (Id.)

In March 2014, three members of the NYPD's Performance Monitoring Unit recommended that Officer Gonzalez be placed in Level 1 Performance Monitoring based in part on his 2.5 annual evaluation, with a notation to "request plan of action from 40 pct C.O."  (Def. 56.1 St. ¶¶ 250-51.)  On March 31, 2014, a Captain from the NYPD Performance Analysis Section wrote to McCormack to inform him that a decision had been made to place Officer Gonzalez in Level 1 Performance Monitoring.  (Id. ¶ 252.)[22]

Officer Baez's evaluation was completed by Sergeant Pawel Lachowski as the rater and Captain Deceglie as the reviewer.  (Pl. 56.1 St. ¶ 321.)  Sergeant Lachowski wrote that Officer Baez "fails to meet the standards of his peers," "lacks drive and only initiates community

---

[21]     Sergeant Blatt echoed this commentary at his deposition in this case, testifying, for example, that Officer Gonzalez's reports "were very hard to read" and "there were always notes leaving for Officer Gonzalez to have him correct it or rewrite things over again."  (Rubinstein Decl. Ex. B at 155:21-156:8.)  He did not suggest that his 2.5 evaluation of Officer Gonzalez was unwarranted.  (Id. at 154:22-24 ("Unfortunately, as a supervisor, we have to evaluate officers on an evaluation.  A 2.5 is just that.").)

[22]     It is not clear that an officer's placement on Level 1 Performance Monitoring is a materially adverse employment action for purposes of Plaintiffs' federal discrimination claims.  See Smith, 385 F. Supp. 3d at 334 ("Because placement in Level I does not carry any tangible negative consequences, it does not constitute an adverse employment action."), Birch v. City of New York, 184 F. Supp. 3d 21, 26 (E.D.N.Y. 2016) ("[A] Title VII action alleging racial discrimination cannot be premised on a negative performance review, performance monitoring, or a within-grade transfer."), aff'd, 675 F. App'x 43 (2d Cir. 2017).  Given the Court's conclusion that Defendants are entitled to summary judgment as to these claims on other grounds, and the lack of briefing from the parties on this point, the Court need not resolve that question on this motion.

contact and activity when told to do so," had "shown lack of improvement over the rating

period," and was designated "Chronic A" sick.  (Rubinstein Decl. Ex. K.)  Officer Baez testified

that Sergeant Lachowski only saw him on patrol for "maybe [ ] two [ ] months" out of the year.

(Rubinstein Decl. Ex. CD at 95:23-96:1.)  The record before the Court contains no testimony

from Sergeant Lachowski or Captain Deceglie.

   In February 2014, three members of the NYPD's Performance Monitoring Unit

recommended that Officer Baez be placed in Level 1 Performance Monitoring based in part on

his 2.5 annual evaluation.  (Def. 56.1 St. ¶ 329.)  The final recommendation, dated March 2014,

included a notation that the final recommender had "conferred with DE McCormack who is in

agreement with level (1) perf monitoring."  (Id.)

   Plaintiffs argue that C.O. McCormack was personally involved in and the

proximate cause of their negative evaluations in several respects.  First, Plaintiffs point to

McCormack's acknowledgment that, when he arrived at the 40th Precinct, he implemented a

procedure whereby he met with the platoon commander and squad supervisors each year to go

over each annual evaluation of every officer under his command, resulting in lower ratings for

the "majority" of patrol officers.  (Scola Decl. Ex. 61 at 6920-21; see also Rubinstein Decl. Ex.

CD at 89:11-19 (Officer Baez testifying that, while he lacked direct evidence of any impact of

C.O. McCormack on his annual evaluation, he knew that McCormack thought all patrol officers

were "useless," and he gave "the majority of patrol officers on patrol a very low eval.").)

Second, as the relevant commanding officer, McCormack was required to sign off on any

evaluation of an officer in his command who received a below competent (2.5 or below) or

extremely competent (5.0) evaluation.  (Def. 56.1 St. ¶ 35; Scola Decl. Ex. 54.)  Third, as

discussed above, C.O. McCormack denied each Officer's first appeal of his evaluation.[23]

As to their placement in Performance Monitoring, Plaintiffs proffer the testimony

of Officer Gonzalez, who was informed by a union delegate that it is a commanding officer who

recommends placement in performance monitoring (Def. 56.1 St. ¶ 254), and the testimony of

Sergeant Blatt, who responded "[c]orrect" during his deposition when asked, "And the final

recommendation [to put Gonzalez in performance monitoring] would be done by the

commanding officer at the time, correct?"  (Scola Decl. Ex. 9 at 215:2-13.)

Construing the record in the light most favorable to Plaintiffs, the Court concludes

that they have met their minimal burden to come forward with evidence which would allow a

reasonable jury to conclude that C.O. McCormack was personally involved in and the proximate

cause of their 2013 annual evaluation scores and, because those evaluations appear to have led

directly to each Plaintiff's placement in performance monitoring, their placements in

performance monitoring as well.  Moffitt v. Town of Brookfield, 950 F.2d 880, 886 (2d Cir.

1991) (referring to the burden to show personal involvement at summary judgment as

"minimal").

Nevertheless, taking into account C.O. McCormack's limited level of

involvement in these evaluations and performance monitoring decisions, the Court concludes

that Defendants have met their burden to show legitimate, non-discriminatory reasons for those

---

[23]     Plaintiffs also point to Sergeant Blatt's testimony that Lieutenant Andrew Hatki
approached him for the purpose of changing Officer Gonzalez's 2014 annual evaluation
(a 4.0), stating: "you're going to be addressed by the CO and explain yourself if you
don't change it."  (Scola Decl. Ex. 9 at 220:14-221:7.)  However, C.O. McCormack left
the 40th Precinct in 2014, before Officer Gonzalez's 2014 annual evaluation would have
been completed, and Plaintiffs point to no similar evidence concerning Officer
Gonzalez's 2013 annual evaluation.

actions, and that Plaintiffs have not met their burden of showing that C.O. McCormack's discriminatory animus was the "but-for" cause of the low ratings and performance monitoring placements.

Initially, Defendants have evidenced non-discriminatory reasons for each Officer's 2.5 evaluation and resulting placement into performance monitoring.  As to Officer Gonzalez, Defendants supplement the comments in the evaluation itself with Sergeant Blatt's testimony explaining that evaluation, as well as the testimony of Sergeants Goode and Hatki concerning Officer Gonzalez's performance compared to his peers (see Def. 56.1 St. ¶¶ 230-37), each of which is generally consistent with the evaluation's notations that Officer Gonzalez needed greater supervision and was less responsive to crime than his peers.  Defendants also submit evidence that two of Officer Gonzalez's purportedly comparable white colleagues who received 4.0 evaluations issued substantially more summonses and made approximately double the arrests he did in 2013 (id. ¶¶ 279-85), which is consistent with the evaluation's report that Officer Gonzalez's "performance lags behind all other members of the platoon[.]"  (Rubinstein Decl. Ex. BK.)[24]

As to Officer Baez, Defendants corroborate the comments in his 2.5 evaluation through the testimony of Sergeant Blatt, who testified that in his experience Officer Baez needed significant supervision and was afraid to make a decision (Def. 56.1 St. ¶ 319), and through the testimony of Sergeant Goode, who testified that Officer Baez "basically doesn't want to do

---

[24]    Plaintiffs claim that "Gonzalez's arrests numbers were low compared to some other police officers because Gonzalez was not on patrol as often as those officers," relying on a conclusion in the expert report of Edward Carrasco (Scola Decl. Ex. 11 ("Carrasco Report")) that Officer Gonzalez was only on patrol 41.5% of the time.   The Carrasco Report neither explains the basis for this figure nor compares it to that of any other officers in the 40th Precinct, except when it states that Officer Baez was assigned to patrol approximately 31% of the time.  (Carrasco Report ¶¶ 13(f), 14(c), 16(b).)

anything." (Id. ¶ 320.) Defendants also submit the summons and arrest statistics of Officer

Baez's proffered comparator from his squad, a white officer named Pellegrino, who also

received a 2.5 annual evaluation for 2013 but who was not placed in performance monitoring;

Officer Pellegrino's records reflect that he issued more than three times the number of

summonses as Officer Baez, and made double the arrests, in 2013, and was not designated

"Chronic A sick" for that year. (Id. ¶¶ 344-46.)[25]

        Defendants having met their burden to show legitimate non-discriminatory

reasons for the 2013 evaluations and resulting performance monitoring decisions, the burden

shifts to Plaintiffs to submit evidence which would permit a reasonable jury to find that "the

employer's stated non-discriminatory reason is either false or inadequate to support the adverse

employment action," and that racial discrimination was the "but-for" cause of that action.

Naumovski, 934 F.3d at 214. Plaintiffs have not done so. Plaintiffs submit a handful of

declarations from non-party officers describing their experiences that C.O. McCormack

pressured the officers in his command to increase their summonses and arrests, with a particular

emphasis on targeting certain groups ("any black male who had jeans and a t-shirt on," as one

officer writes), and that minority officers who failed to do so were punished more than white

officers who failed to do so. (Scola Decl. Exs. 7, 15, 16.) While these allegations are again

troubling, however, none of the affiants nor Plaintiffs themselves identify any comparable white

---

[25]    Officer Baez's testimony that C.O. McCormack thought patrol officers were "do-nothings" and "useless," and that he "gave the majority" of them low evaluations, further suggests that McCormack's involvement in lowering the evaluations of Officers Gonzalez and Baez, if any, was motivated not by racial animus but by his opinion about officers on patrol as opposed to "specialized units." (Rubinstein Decl. Ex. CD at 89:11-90:24.)

officers in the 40th Precinct who they claim were punished less harshly than their minority

counterparts for failing to meet C.O. McCormack's desired level of activity.  (Id.)[26]

      Moreover, the comments Officers Gonzalez and Baez testify to having heard C.O.

McCormack make during their tenure are the type of stray remarks which do not assist Plaintiffs

in meeting their burden at step three of the McDonnell Douglas analysis.  For example, Officer

Baez testified that he once mentioned to C.O. McCormack that an arrested individual was sick

with sickle cell anemia, to which McCormack replied "don't all black people suffer from that?"

(Def. 56.1 St. ¶ 338.)  On another occasion, Baez witnessed McCormack knock on two

apartment doors and state, in response to the question "who is it?", "it's the po, po, po, po, po,

police."  (Id. ¶ 339.)  These isolated comments may be ignorant and offensive, but do not provide

evidence from which a reasonable jury could conclude, on this record, that discrimination was

the "but-for" cause of Plaintiffs' 2.5 evaluations in 2013, especially given that it is undisputed

that C.O. McCormack never made any racially offensive comments directly to either Officer

Gonzalez or Officer Baez about his race.  (Id. ¶¶ 275, 340.)[27]

      Finally, Plaintiffs have not provided evidence that Defendants' proffered non-

discriminatory reasons were insufficient or false by virtue of alleged irregularities in the

evaluators' conclusion that Officer Baez was "Chronic A" sick in 2013 and in their calculation of

---

[26]    Plaintiffs submit the declaration of Officer Baez's white partner the year before 2013, Officer Arie Froimovich, who also received an annual evaluation of 2.5 for 2013 but was not placed on performance monitoring.  (Opp. at 29; Scola Decl. Ex. 66.)  However, Plaintiffs do not submit evidence that Officer Froimovich and Officer Baez were still partners or were otherwise comparable in 2013.

[27]    The unrelated complaints about C.O. McCormack from 2008 (by a member of the public) and 2015 (by an anonymous officer), which were found either unsubstantiated or unfounded, likewise do not assist Plaintiffs in framing a question of fact on this issue. (See Scola Decl. Exs. 64, 65; Rubinstein Decl. Ex. CM.)

Officer Gonzalez's 2.5 rating.  Plaintiffs' conclusory assertion that "Baez was not actually Chronic A" sick in 2013 (Opp. at 30) is without evidentiary support in the record (see Rubenstein Decl. Ex. K), and their claim that "being monitoring" (Opp. at 30) does not undermine the Chronic Sick is not a valid criteria when it comes to placement into performance undisputed facts that being Chronic A sick is a legitimate factor to consider in an annual performance evaluation, and that performance evaluations are a permissible criterion to consider in an officer's placement into performance monitoring.  (Def. 56.1 St. ¶ 316; Scola Decl. Ex. 52.) As to Officer Gonzalez, Plaintiffs proffer evidence that he had accumulated 45 points in his quarterly evaluations for 2013, entitling him to an annual rating of 3.0, but that his point total was lowered to 39 in order to instead give him a 2.5 evaluation.  (Scola Decl. Ex. 19; see also Scola Decl. Ex. 17 (portion of NYPD Patrol Guide providing that the sum or quarterly points should generally correspond to the annual total, although there are "exceptions" to this rule which should be justified in the annual evaluation).)  Even to the extent that Sergeant Blatt's allocation of 39 points to Officer Gonzalez was a violation of the Patrol Guide—as opposed to, for example, a reflection of the increasingly negative commentary in his quarterly monthly conditions reports and the corresponding decline in his quarterly point totals throughout the year (from 13 to 12 to 11 to 9, see Scola Decl. Ex. 19)—that failure to follow procedure is not, without more, sufficient to show pretext in this case.  Bucknell v. Refined Sugars, Inc., 82 F. Supp. 2d 151, 159 (S.D.N.Y. 2000) ("[A]n employer's failure to follow its own regulations and procedures, alone, may not be sufficient to support the conclusion that its explanation for the promotion is pretextual.") (citation and internal quotation marks omitted), aff'd, 225 F.3d 645 (2d Cir. 2000)).  Even if it were, Plaintiffs have proffered no evidence that C.O. McCormack, rather than Sergeant Blatt, was responsible for this calculation of points.

Particularly in light of C.O. McCormack's relatively limited role in the decisions to issue Officers Gonzalez and Baez annual evaluations of 2.5 in 2013, and to place them in Level 1 Performance Monitoring in 2014, the Court concludes that Plaintiffs have not met their burden of showing that "the employer's stated reason would not, alone, constitute a <u>sufficient</u> basis for pursing an adverse action[s]," and that C.O. McCormack's racial animus was the "but-for" cause of those actions.  <u>Naumovski</u>, 934 F.3d at 214.

Equal Protection Retaliation Claims

Plaintiffs Serrano and Gonzalez each assert a claim of retaliation under the Equal Protection Clause against C.O. McCormack.  Such claims are also assessed under the three-step burden-shifting framework set forth in <u>McDonnell Douglas</u>.

To establish a prima facie retaliation claim, "an employee must show '[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'"  <u>Wimmer v. Suffolk Cty. Police Dep't</u>, 176 F.3d 125, 134 (2d Cir. 1999) (quoting <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 769 (2d Cir. 1998)).  If a plaintiff establishes that prima facie case, the burden shifts to the employer to "articulate a legitimate, non-retaliatory reason for the adverse employment action."  <u>Gonzalez v. City of New York</u>, 845 F. App'x 11, 14 (2d Cir. 2021) (quoting <u>Hicks v. Baines</u>, 593 F.3d 159, 164 (2d Cir. 2010)).  "Provided the employer proffers such a reason, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretext for retaliation," <u>Gonzalez</u>, 845 F. App'x at 14, and, in the section 1983 context, "that the adverse action would not have taken place 'but-for' the retaliatory motive."  <u>Id.</u> (citing <u>Nieves v. Bartlett</u>, 139 S. Ct. 1715, 1722 (2019)).

Officer Gonzalez

Officer Gonzalez's Equal Protection retaliation claim is based on allegedly retaliatory actions—including a series of command disciplines and other punishment for apparently minor violations—which occurred in the wake of his August and September 2015 complaints to the IAB and OEEO.  (See Def. 56.1 St. ¶¶ 260-73.)  It is asserted against C.O. McCormack only.

Defendants seek summary judgment principally on the ground that there is no evidence that C.O. McCormack was personally involved in the proffered retaliatory actions occurring in the Fall of 2015.  The Court agrees.  Plaintiffs concede that C.O. McCormack departed the 40th Precinct in April 2014 (Pl. 56.1 St. ¶ 147), but argue that "the totality of the circumstances show that McCormack was personally involved in the retaliation and was the proximate cause of the retaliation because McCormack had stated to multiple members of the 40th Precinct that Gonzalez was recording conversations and Gonzalez had leaked the story[28] to the media."  (Opp. at 34.)  However, the only evidence cited by Plaintiffs for those propositions is Officer Gonzalez's testimony from his deposition, at which he testified that it was his "belief" that C.O. McCormack had made those statements but that he did not know if he had.  (Pl. 56.1 St. ¶ 291; Rubinstein Decl. Ex. BJ at 141:5-16.)  Even assuming that C.O. McCormack's statements at an unspecified time in 2014 could otherwise be sufficient to show his personal involvement in the proffered retaliatory actions suffered by Officer Gonzalez in the second half of 2015, Officer Gonzalez's mere belief does not frame a genuine dispute of material

---

[28]     As discussed in greater detail below, Plaintiffs' reference to "the story" is to a series of media reports in July 2015 that "an NYPD internal investigation had revealed multiple cases of downgrading of felonies in the 40th Precinct," which investigation resulted in nineteen police and ranked officers being charged with misconduct, subjected to disciplinary proceedings, and transferred out of the 40th Precinct.  (SAC ¶ 77.)

fact as to those statements sufficient to withstand summary judgment.   See, e.g., Great Minds v. John Wiley & Sons, Inc., 204 F. Supp. 3d 507, 514 (S.D.N.Y. 2016) ("conclusory statement of belief is insufficient to create a genuine dispute of material fact"); Littlejohn v. City of New York, 795 F.3d 297, 314 (2d Cir. 2015) ("An individual may be held liable under [section 1983] only if that individual is 'personally involved in the alleged deprivation.'" (citation omitted)).

Officer Serrano

Officer Serrano's Equal Protection retaliation claim is premised on a series of adverse actions, occurring beginning in February 2013, purportedly in retaliation for Officer Serrano's submission of his EEOC complaint dated June 1, 2012, and received by the EEOC on August 27, 2012.  (Rubinstein Decl. Ex. BD.)  It is asserted against C.O. McCormack only. Defendants seek summary judgment on this claim on the grounds that the EEOC complaint was not "known" to C.O. McCormack, and that, even if it was, there was no causal connection between that complaint and the proffered retaliatory actions beginning in February 2013.

Plaintiffs submit that Officer Serrano began experiencing a series of retaliatory actions beginning on February 7, 2013, when he claims to have received multiple text messages reporting that C.O. McCormack was upset with him and talking about retribution, and when he was visited by five high-ranking officials (including C.O. McCormack) during his assignment at a "strike post."  (Rubinstein Decl. Ex. AQ at 112:18-25; Scola Decl. Ex. 43 at 113:1-114:24; Rubinstein Decl. Ex. AQ at 120:22-121:21.)[29]  Such a high number of visits by superiors on a single shift is apparently a highly unusual occurrence.  (Id.)  On or around the same day, Officer Serrano called the NYPD's Internal Affairs department to report this incident.  (Rubinstein Decl.

---

[29]    Officer Serrano did not preserve the text messages, and does not remember who sent them.  (Rubinstein Decl. Ex. AQ at 114:8-16.)

Ex. AQ at 122:17-25.)[30]  After February 7, 2013, Officer Serrano continued to experience a

series of reportedly unwarranted disciplinary actions and unfavorable assignments, some at the

direction of C.O. McCormack.  (Scola Decl. Ex. 43 at 126:4-127:24; Def. 56.1 St. ¶¶ 205-08,

214.)

Plaintiffs' opposition brief, echoing the allegations in Plaintiffs' pleading, argues

that "McCormack first found out about" Officer Serrano's EEOC complaint on February 7,

2013.  (Opp. at 31; see also id. ("The evidence shows that it is very likely that McCormack found

out about the EEO complaint on February 7, 2013.").)  However, Officer Serrano's own

testimony reflects that the text messages he received on February 7, 2013, reported that C.O.

McCormack was upset with Officer Serrano due to his role as a testifying witness in the ongoing

Floyd lawsuit, not because of any complaint to the EEOC.  (Rubinstein Decl. Ex. AQ at 112:18-

25 ("The lawsuit you're testifying was brought up and he is very upset with you."); Scola Decl.

Ex. 43 at 113:1-114:24 ("Q: What do you mean lawsuit?  Which lawsuit?  A: I was testifying in

the Floyd versus the City of New York.  Stop and frisk.  And because I was one of the key

witnesses and I was in his precinct I was his problem.  Him, being McCormack.").)  Even

assuming the admissibility of Officer Serrano's account of text messages he claims to have

received about C.O. McCormack's statements on February 7, 2013, that account is not evidence

---

[30]     Plaintiffs' counsel writes that "[o]n February 7, 2013, Serrano called internal affairs to
file a complaint about McCormack" (Pl. 56.1 St. ¶ 159), but cite to no admissible
evidence in support of that characterization of Officer Serrano's February 7, 2013, call,
and those portions of Officer Serrano's deposition testimony before the Court do not shed
light on what precisely Officer Serrano reported to internal affairs.  Accordingly,
Plaintiffs submit no admissible evidence for the proposition that Officer Serrano's
February 7, 2013, call to internal affairs (which apparently occurred after C.O.
McCormack was already upset with Officer Serrano over his testimony in Floyd), might
constitute a separate predicate for his Equal Protection retaliation claim.

of C.O. McCormack's having learnt of Serrano's June 1, 2012, EEOC complaint, on that date or

any other.[31]

The only suggestion in the record that C.O. McCormack may have been aware of

Officer Serrano's 2012 EEOC complaint came a week later, on February 14, 2013, at the

conclusion of a recorded conversation between the two men (and others) about Officer Serrano's

appeal of his 2012 annual evaluation.  (Def. 56.1 St. ¶¶ 202-03.)  Near the end of that meeting,

C.O. McCormack stated to Officer Serrano:

> Uh, listen, I didn't want your delegate to hear this. I'm not sure if they're
> asking you for your paperwork. They're asking you for your memo books
> and stuff like that. That's regarding the lawsuit.  So I don't think it's about
> anything else. It's about what you alleged, and we have to pull that
> paperwork. The lawyers want it. So if you--I didn't want to say that in
> front of the delegate, because I don't know if he knows that you're suing
> whatever. Okay?

(Id. ¶ 203.)[32]  Without more, however, C.O. McCormack's reference on February 14, 2013, to

what Officer Serrano "alleged" in a lawsuit does not frame a genuine issue of material fact as to

---

[31]    Other of the allegedly retaliatory actions proffered in Plaintiffs' pleading as stemming
from Officer Serrano's June 2012 EEOC complaint also occurred, according to Officer
Serrano's own testimony, in direct response to his testimony in Floyd rather than in
response to that EEOC complaint.  (Compare SAC ¶ 111 ("That week, Serrano returned
from his posting one day to find that his locker had been ransacked and someone had
pasted rat stickers on his locker.") with Rubinstein Decl. Ex. AQ at 130:20-25 ("Q: This
incident with the locker why do you believe this was retaliatory? A: This happened after I
testified. . . .").)

[32]    Integrity Control Officer Gomez then asked Officer Serrano to turn over his all his memo
books from July 2010 and from January to December 2012.  (Id. ¶ 204.)  On March 5,
2020, upon a finding that Defendant the City of New York had a duty to preserve certain
of those memo books but failed to do so with a culpable state of mind, the Court found
that Officer Serrano was entitled to an adverse inference that there is a likelihood that the
destroyed memo book(s) would have supported his claims of adverse employment action
and retaliation.  (Docket entry no. 178.)  Even to the extent considered in connection with
Officer Serrano's claims against C.O. McCormack individually, that adverse inference is
insufficient, by itself, to frame a genuine issue of material fact at summary judgment,
absent some "not insubstantial" evidence in support of Officer Serrano's claims against
McCormack.  Valenti v. Penn Mut. Life Ins. Co., 850 F. Supp. 2d 445, 453 (S.D.N.Y.

a causal connection between Officer Serrano's June 2012 EEOC complaint and the allegedly retaliatory acts beginning on February 7, 2013.  Officer Serrano's own testimony in <u>Floyd</u> reflects that he understood C.O. McCormack's reference to "the lawsuit" to refer to the <u>Floyd</u> lawsuit itself.  <u>See</u> March 20, 2013, Trial Transcript, <u>Floyd v. City of New York</u>, No. 08-CV-01034-SAS (S.D.N.Y. May 30, 2013), ECF No. 286 at 722:12-723:9.  Even assuming C.O. McCormack's reference to a "lawsuit" was a reference to an investigation resulting from the EEOC complaint and not to <u>Floyd</u>—an assumption Plaintiffs neither argue nor submit evidence in support of on this motion—such a reference does not reveal when C.O. McCormack learned of that complaint, whether he had any knowledge of its contents (as opposed to the mere fact of an investigation resulting from it), or that his knowledge of it had any causal connection with actions beginning in a flurry one week earlier, the cause of which, according to Officer Serrano's own testimony, was Officer Serrano's anticipated testimony in <u>Floyd</u> rather than his EEOC complaint from the previous summer.[33]

Defendants are therefore entitled to summary judgment on each of Officer Gonzalez's and Officer Serrano's Equal Protection retaliation claims.

<u>First Amendment Retaliation Claims</u>

Plaintiffs Raymond, Serrano, and Gonzalez each assert a First Amendment retaliation claim pursuant to section 1983.  To meet his or her prima facie burden for such a

2012) ("an adverse inference alone would not preclude granting summary judgment to the defendants in this case"), <u>aff'd</u>, 511 F. App'x 57 (2d Cir. 2013).

[33]   Because Defendants are entitled to summary judgment on Officer Serrano's Equal Protection retaliation claim for the reasons set forth above, the Court does not reach the separate question of whether Officer Serrano's June 2012 EEOC complaint constituted protected speech under <u>Wimmer</u>, 176 F.3d 125.  (<u>See</u> Def. Mem. at 24-25.)

claim, a plaintiff must proffer evidence establishing that "(1) his or her speech or conduct was

protected by the First Amendment; (2) the defendant took an adverse action against him or her;

and (3) there was a causal connection between this adverse action and the protected speech."

Quinones v. City of Binghamton, 997 F.3d 461, 466 (2d Cir. 2021) (quoting Montero v. City of

Yonkers, 890 F.3d 386, 394 (2d Cir. 2018)).

> "A court conducts a two-step inquiry to determine whether a public employee's

speech is protected:

>> The first requires determining whether the employee spoke as a citizen on
>> a matter of public concern.  This step one inquiry in turn encompasses two
>> separate subquestions: (1) whether the subject of the employee's speech
>> was a matter of public concern and (2) whether the employee spoke 'as a
>> citizen' rather than solely as an employee.  If the answer to either question
>> is no, that is the end of the matter.

Matthews v. City of New York, 779 F.3d 167, 172 (2d Cir. 2015) (internal citations and

quotation marks omitted).  "[W]hen a public employee whose duties do not involve formulating,

implementing, or providing feedback on a policy that implicates a matter of public concern

engages in speech concerning that policy, and does so in a manner in which ordinary citizens

would be expected to engage, he or she speaks as a citizen, not as a public employee." Id. at

174.  However, when a public employee's motivation in speaking is personal, such as "to protect

his own career," his speech does not touch a matter of public concern.  Quinones, 997 F.3d at

467.

> Even if a plaintiff meets his or her prima facie burden, a defendant may

nonetheless be entitled to summary judgment if it can show that the adverse action would have

occurred notwithstanding the protected speech.  Morales v. City of New York, 525 F. Supp. 3d

463, 480 (S.D.N.Y. 2021) ("[S]ummary judgment may be granted for an employer that can

demonstrate by a preponderance of the evidence that it would have taken the same adverse

employment action even in the absence of the protected conduct.") (citation and internal

quotation marks omitted); Gonzalez, 845 F. App'x at 14 ("In the context of a Section 1983

retaliation claim, a plaintiff must prove pretext by showing that the adverse action would not

have taken place 'but-for' the retaliatory motive.").

Officer Raymond

Officer Raymond asserts a First Amendment retaliation claim against C.O.

Tsachas based on Officer's Raymond's "2015 performance evaluation, promotion denial and

punitive posting actions that followed" his November 22, 2014, meeting with Lieutenant

Hayden, during which Raymond claims to have "denounce[ed] unlawful enforcement quotas that

his supervisors were imposing on him, which he felt unfairly targeted [B]lack and [L]atino

communities." Raymond v. City of New York, 317 F. Supp. 3d 746, 775 (S.D.N.Y. 2018).

C.O. Tsachas seeks summary judgment on the grounds that there was no causal

connection between Officer Raymond's November 22, 2014, speech and any action taken by

C.O. Tsachas (who arrived in the District in July 2015) beginning in the second half of 2015, and

that Defendants have shown that the proffered adverse actions would have occurred

notwithstanding Officer Raymond's speech.

Plaintiffs have not met their burden to frame a question of fact as to any causal

connection between Officer Raymond's protected speech and any allegedly retaliatory actions by

C.O. Tsachas.  Initially, Plaintiffs submit no evidence that C.O. Tsachas was aware of Officer

Raymond's protected speech about enforcement quotas from November 22, 2014.[34]  Instead,

---

[34]     Plaintiffs argue that "Raymond testified that he learnt from Campbell that when Tsachas
         arrived at Transit District 32, in July 2015, Tsachas was given a tour and told about
         Raymond's stance and Tsachas, as well as the Transit Chiefs Fox and Coogan,
         formulated an intention to prevent Raymond's impending promotion to Sergeant."  (Opp.
         at 35-36.)  That testimony is both vague and hearsay (as Defendants correctly argue, see

Plaintiffs assert that C.O. Tsachas was "aware of the sum and substance" of Officer Raymond's position on the issue of "hiding in transit rooms to catch people jumping the turnstiles." (Opp. at 35-36.)

Even assuming Officer Raymond's comments to C.O. Tsachas about hiding in transit rooms constituted speech protected by the First Amendment,[35] however, Plaintiffs have not proffered evidence from which a reasonable jury could conclude that those comments—which generally occurred in the context of conversations resulting from discipline or negative evaluations of Officer Raymond, rather than preceding them (see Def. 56.1 St. ¶¶ 76-87)—caused the allegedly retaliatory actions.

Defendants have also met their burden of showing that the adverse actions proffered by Officer Raymond would have occurred notwithstanding his protected speech, in that C.O. Tsachas's negative evaluations of Officer Raymond were based at least principally on C.O. Tsachas's view of Officer Raymond's performance of his duties, rather than on Officer Raymond's own remarks describing his reasons for performing his duties the way he did. (Rubinstein Decl. Ex. T ("I discussed and documented PO Raymond's performance with him on 3 occasions since assigned to the district. PO Raymond repeatedly states that he does not have to be proactive and his uniform presence is sufficient to combat crime. . . . PO Raymond was given

_____

docket entry no. 312 ("Reply") at 14), and does not raise a triable question of fact as to whether C.O. Tsachas was aware of Officer Raymond's speech from November 22, 2014.

[35]   Plaintiffs proffer no authority for this proposition, and the circumstances of Officer Raymond's comments to C.O. Tsachas about "hiding"—i.e., an officer speaking with his supervisor about his own performance of his duties in the context of discussing discipline or negative evaluations of that officer arising from that performance (see Def. 56.1 St. ¶¶ 72, 82-83, 87)—differ materially from the facts of Matthews, in which the speech at issue was an officer's report to multiple superiors, including superiors with whom the plaintiff did not regularly meet, report to, or even communicate with, of the existence of an alleged illegal quota system. Matthews, 779 F.3d at 174.

the opportunity to improve his overall performance but was fixated on his beliefs . . . [and] continued to refuse to change his ways and tactics."); id. ("During the previous meeting he was advised and agreed to use the TA rooms [to] conduct TOS operations. As of this date he has not done so."); Scola Decl. Ex. 71 ("I told you before, like I said last time, if you're not going to do anything I might as well put you at Clark Street.")[36].)  Indeed, Officer Raymond acknowledged that his preferred style of policing drove C.O. Tsachas's evaluations of him when he wrote in his May 22, 2018, letter to Commissioner O'Neill, that his negative evaluations and the delay in his promotion occurred "because" C.O. Tsachas "wanted to punish me for my use of discretion in the enforcement of Quality of Life conditions in favor of [his] numbers-driven desire that I simply increase enforcement activity for the sake of doing so[.]"  (Rubinstein Decl. Ex. AH.)

       To be sure, Officer Raymond also testified that C.O. Tsachas scoffed at his potential promotion with reference to his "attitude and mentality," stating: "[n]o, no, . . . there's no way you're going to get promoted, no way you're going to get promoted with these numbers and this attitude and mentality."  (Rubinstein Decl. Ex. M at 125:6-13.)  However, even if Officer Raymond's expressed policing philosophy played some role in C.O. Tsachas's

---

[36]    Plaintiffs highlight testimony from C.O. Tsachas's deposition in which C.O. Tsachas responded to hearing the audio recording of this comment:

Q:    So Raymond says he's been at Clark Street a lot and you go, do you know why and you say that's because he's not doing anything, is that why you put him there?

A:    Because of his comments where he just stands there so that's an appropriate post. He can just stand there.

(Scola Decl. Ex. 2 at 360:3-9.)  C.O. Tsachas's re-characterization of his own statement to Officer Raymond years earlier as having been "because of [Raymond's] comments" would not allow a reasonable jury to find that Raymond's "comments" about "just stand[ing] here," rather than his conduct "not [doing] anything," were the but-for cause of C.O. Tsachas's assignment decisions.

evaluations of him in 2015 and 2016, Defendants have met their burden of showing that C.O. Tsachas would have made those evaluations regardless of Officer Raymond's professed philosophical stance, based on his disapproval of Officer Raymond's underlying performance of his duties, and Plaintiffs have not proffered evidence from which a reasonable jury could conclude that C.O. Tsachas's reliance on Officer Raymond's performance in those evaluations was either false or pretextual.  Gonzalez, 845 F. App'x at 18.  Absent such evidence, Defendants are entitled to summary judgment dismissing Officer Raymond's First Amendment retaliation claim.

Officer Serrano

Officer Serrano's First Amendment retaliation claim against C.O. McCormack is premised on the same allegedly retaliatory actions as his Equal Protection retaliation claim (occurring beginning on or about February 7, 2013), as well as his transfer from the 40th Precinct to the 33rd Precinct in April 2013.  Defendants seek summary judgment as to this claim on the grounds that C.O. McCormack was not personally involved in Officer Serrano's transfer, and that the only "but-for" cause of Officer Serrano's transfer from the Precinct was an unrelated disciplinary charge adjudicated against Officer Serrano in March and April 2013.  (Def. Mem. at 28-29.)

Construed in the light most favorable to Officer Serrano, the record before the Court would permit a reasonable jury to conclude that C.O. McCormack was personally involved in adverse actions against Officer Serrano for which the "but-for" cause was retaliation in response to Officer Serrano's testimony in Floyd.[37]

---

[37]     The Court is mindful that what constitutes an "adverse action" in the context of a First Amendment retaliation claim is broader than what is considered materially adverse in the discrimination context.  Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 227 (2d Cir.

As noted above, <u>Floyd</u> was a section 1983 class action lawsuit alleging that the NYPD had implemented an official municipal policy of unlawful stops and frisks on the basis of race.  <u>See Floyd</u>, 959 F. Supp. 2d at 556.  A bench trial was held between March 18 and May 20, 2013.  <u>Id.</u> at 572.  At trial, the parties called as witnesses several members of the 40th Precinct, including Officer Serrano, who was called by the plaintiffs, and C.O. McCormack, who was called by the defendants.  The <u>Floyd</u> plaintiffs reportedly disclosed Officer Serrano as a witness on or about December 31, 2012.  <u>See</u> Letter, <u>Floyd v. City of New York</u>, No. 08-CV-1034 (S.D.N.Y. March 5, 2013), ECF No. 266.  Officer Serrano testified in <u>Floyd</u> on March 20 and 21, 2013.  <u>Floyd</u>, 959 F. Supp. 2d at 599 n.252; <u>id.</u> at 622 n.417.  <u>See also</u> Transcripts, <u>Floyd</u>, No. 08-CV-1034 (S.D.N.Y. May 30, 2013), ECF Nos. 284 & 286.  The <u>Floyd</u> plaintiffs also introduced into evidence one or more secret recordings that Officer Serrano had made of conversations between himself and C.O. McCormack, including a conversation in which C.O. McCormack had referred to focusing enforcement in a certain area on "male blacks 14 to 20, 21," apparently based on suspect descriptions from victims.  <u>Floyd</u>, 959 F. Supp. 2d at 604.

In this case, as discussed above, Officer Serrano testified that he heard indirectly, on February 7, 2013, that C.O. McCormack was upset with him about his prospective testimony in <u>Floyd</u>, and that he thereafter began to experience harassment and to be assigned to undesirable posts.  At one point, according to Officer Serrano, C.O. McCormack stated that he knew Serrano was "going to testify in the Floyd case" and that if he did so McCormack "would go through [his] memo book and issue a command discipline."  (Docket entry no. 319-3 at 152:23-153:4.) He further testified that, during or immediately after Officer Serrano's testimony in <u>Floyd</u>, C.O.

---

2006) ("This Court has never held that a public employee plaintiff alleging retaliation in violation of the First Amendment must demonstrate a material change in employment terms or conditions.").

McCormack would "blurt[ ] out different threats" at him, would "yell[ ] behind" him, and assign

him "weird foot posts" (such as "at the corner facing a wall").  (Rubinstein Decl. Ex. AQ at 153-

156.)  Officer Serrano claims that, one day shortly after he testified in <u>Floyd</u>, he returned from

his post to find his locker at the 40th Precinct ransacked and covered with sticker images of rats.

(Def. 56.1 St. ¶¶ 216-217; <u>see also</u> Scola Decl. Ex. 69 (photograph of locker with rat stickers).)

When asked when he had last spoken with C.O. McCormack, Officer Serrano testified:

> While I was testifying he was—when I was signing out or signing in he'd
> follow me around. I would come to signing out and his door would open.
> He would do a bee line to me. In fact the guy that did the movie was there
> with me and he saw that as soon as I walked in, there was nobody there.
> Once I started talking to the desk officer he jumps out of his office. He bee
> lines and goes right behind me and starts yelling and screaming about my
> signing out. I'd finished testifying and still had another day. So I told him
> you see what I have to go through and he witnessed it.

(Rubinstein Decl. Ex. AQ at 157:3-13.)  Officer Serrano characterized C.O. McCormack's

conduct during this period as "stalk[ing]."  (<u>Id.</u> at 158:1-8.)

On or about April 10, 2013—approximately three weeks after his testimony in

<u>Floyd</u>—Officer Serrano was informed that he was being transferred out of the 40th Precinct and

sent to the 33rd Precinct.  (Rubinstein Decl. Ex. AQ at 156:1-12; Def. 56.1 St. ¶¶ 181-183.)  He

was not provided a reason for the transfer.  (Rubinstein Decl. Ex. AQ at 157:14-18.)

A reasonable jury could construe these facts, taken in the light most favorable to

Plaintiffs, to establish C.O. McCormack's personal involvement in the retaliatory acts alleged by

Officer Serrano in February through April 2013, including Officer Serrano's transfer out of the

40th Precinct in early April 2013.  Though there is no direct evidence linking C.O. McCormack

to that transfer, the above-summarized facts, the fact of C.O. McCormack's status as the

commanding officer of the 40th Precinct during the period leading to the transfer, and the short

duration of time between Officer Serrano's testimony in <u>Floyd</u> and his transfer would allow a reasonable factfinder to conclude that C.O. McCormack played a causal part in that transfer.

Defendants argue that they have shown a legitimate, non-retaliatory reason for Officer Serrano's transfer, relying on evidence that, on April 4, 2013, then-Commissioner Raymond W. Kelly issued a memorandum disciplining Officer Serrano for engaging in "conduct prejudicial to the good order, efficiency or discipline of the Department" by "assist[ing] in the prevention of the processing and adjudication of two (2) summonses issued to two (2) motorists" in 2010.  (Rubinstein Decl. Ex. AX.)[38]  As punishment, Commissioner Kelly imposed the forfeiture of five suspension days to be served, twenty-five vacation days, a total of thirty penalty days, and one year of dismissal probation.  (<u>Id.</u>)

By its own terms, Commissioner Kelly's disciplinary memorandum did not mandate (or mention) Officer Serrano's transfer out of the 40th Precinct.  Nor did the letter sent the following day, on April 5, 2013, from the Deputy Commissioner of Trials, notifying C.O. McCormack of Officer Serrano's punishment.  (Rubinstein Decl. Ex. AY.)[39]  Aside from the timing of the disposition, Defendants have not met their burden to proffer evidence in support of the proposition that Officer Serrano's administrative transfer was a necessary result of the punishment imposed by Commissioner Kelly or that it would have occurred regardless of his testimony in <u>Floyd</u>.

---

[38]    The charged conduct is detailed at greater length in Exhibit AW to the Rubinstein Declaration.

[39]    The Deputy Commissioner's letter provided that "[i]f for any reason, this member of the service is transferred prior to the disposition, please notify the member's new Commanding Officer of the imposed penalty."  Without more, this reference to Officer Serrano's potential transfer ("for any reason") is not evidence that Commissioner Kelly's punishment mandated or caused that transfer.

The Court therefore denies Defendants' motion to the extent it seems summary judgment as to Officer Serrano's First Amendment retaliation claim against C.O. McCormack.

Officer Gonzalez

Officer Gonzalez's First Amendment retaliation claim arises from the series of actions taken against him between May and November 2015, and is asserted against C.O. McCormack, Commissioner O'Neill, Commissioner Bratton, and the City.  Defendants seek summary judgment on the grounds that Plaintiffs have failed to proffer evidence that the individually-named defendants were personally involved in the proffered retaliatory actions, or that they "were even aware of Gonzalez's prior complaints."  (Def. Mem. at 30.)

Officer Gonzalez's claim is that he incurred a series of unwarranted disciplines and assignments between May and November 2015, allegedly as retaliation for the complaints he filed with the IAB in February and/or March 2014 about the existence of an unlawful quota system and "downgrad[ing] of felonies" within the department.  (Def. 56.1 St. ¶¶ 287-288; Rubinstein Decl. Ex. BZ.)[40]  According to Plaintiffs' theory of the case, those complaints led at least in part to an internal investigation within the department, which ultimately resulted in publicity about that investigation in or around July 2015, and nineteen members of the force being disciplined and transferred out of the 40th Precinct.  (Rubinstein Decl. Ex. BJ at 134:2-135:1.)[41]  Meanwhile, in May 2015, Sergeant Goode asked Officer Gonzalez whether he was

---

[40]    Defendants do not argue that the series of proffered actions are insufficiently adverse to serve as the predicate for a First Amendment retaliation claim; the Court therefore will not recount all of those actions, which are summarized in the parties' submissions.  (See Def. 56.1 St. ¶¶ 288-306; Pl. 56.1 St. ¶¶ 288-306.)

[41]    The Court takes judicial notice of the existence of such media reports.  See, e.g., "19 Police Officers in the Bronx Are Charged With Downgrading Crimes," The New York Times, https://www.nytimes.com/2015/07/18/nyregion/19-police-officers-in-the-bronx-are-charged-with-downgrading-crimes.html (last visited July 7, 2022) ("The current

recording conversations with other members of the force (Def. 56.1 St. ¶ 257), apparently in response to a "rumor" started in the "winter of 2014" that he had been doing so.  (Id. ¶ 258; Rubinstein Decl. Ex. BZ.)

On July 25, 2015, Officer Gonzalez attended a roll call at the 40th Precinct at which then-Commissioner Bratton and then-Deputy Commissioner O'Neill appeared and which was attended by both the day and midnight tours—an unusual occurrence.  (Def. 56.1 St. ¶ 289; Rubinstein Decl. Ex. BJ at 135:18-136:11.)  Officer Gonzalez was in the first row of the "really, really packed" audience.  (Rubinstein Decl. Ex. BJ at 136:2-24.)  Commissioner Bratton spoke about "the recent scandal at the 4-0," including the audit into the downgrading of felonies, and told the officers present that "we need to do our jobs and that is to take complaints accurately." (Id. at 137:11-18.)

According to Officer Gonzalez's testimony, Commissioner Bratton also told those present that the reason the department conducted that audit was "because there was an allegation made by a disgruntled officer who dropped the dime."  (Id. at 138:10-14.)  Officer Gonzalez further testified that when Commissioner Bratton made this comment, he was "staring at" him, and proceeded to "stare at [him] for a few seconds," then scan the room, then "stare at [him] for a few more seconds," effectively "marking" him "as the one" who was the disgruntled officer who caused the audit.  (Id. at 138:19-139:15.)  Finally, Officer Gonzalez testified that Deputy Commissioner O'Neill asked the crowd whether anyone was recording the roll call, but that O'Neill was not staring at Gonzalez or otherwise indicating he intended that question to target Gonzalez in particular.  (Id. at 142:11-24.)

---

inquiry into the 40th Precinct crime data grew out of an anonymous tip to the Internal Affairs Bureau . . . .").

Plaintiffs proffer that, after the roll call with Defendants Bratton and O'Neill, Officer Gonzalez's superiors (including in particular Sergeant Goode, who was present at the roll call) began to be more aggressive towards him, and that he began to incur additional unwarranted discipline. (Id. at 143:5-153:3.) Officer Gonzalez attributes this development to Sergeant Goode interpreting Commissioner Bratton's comments at the roll call as an implicit authorization to retaliate, and claims that she wanted "to gain points" or be "a super star for, you know, retaliating against me successfully." (Id. at 152:21:153:3.)

Plaintiffs have not met their burden of showing the personal involvement of Defendants McCormack or O'Neill in the proffered retaliatory actions against Officer Gonzalez between May and November 2015. As to C.O. McCormack, who left the 40th Precinct in April 2014, Plaintiffs offer nothing but Officer Gonzalez's "belief" that C.O. McCormack had known of Officer Gonzalez's complaints, had shared that knowledge with others at the Precinct, and that by doing so he had caused the actions occurring beginning in May 2015. (Rubinstein Decl. Ex. BJ at 141:5-12.) As to Commissioner O'Neill, the only evidence of record is that he asked the audience at the July 2015 roll call whether anyone was recording that roll call. According to Officer Gonzalez himself, however, "[p]eople recorded all the time," (id. at 137:21-25), and there is no indication in the record that Commissioner O'Neill intended to target Gonzalez by asking the question.[42]

---

[42] Sergeant Goode's statement a month later accusing Officer Gonzalez of tape recording does not raise an inference that she surmised the suspicion underlying that accusation from Defendant O'Neill's comment, where Sergeant Goode raised the same question with Officer Gonzalez in May 2015, months before the July 2015 roll call, based on her perception that Officer Gonzalez was recording her. (Def. 56.1 St. ¶¶ 256-257.) Plaintiffs dispute that Officer Gonzalez ever recorded Sergeant Goode (Pl. 56.1 St. ¶ 256), but do not dispute that she learned of his recordings (or others, at least) prior to the July 25, 2015, roll call.

Plaintiffs have met their burden, however, of showing Commissioner Bratton's personal involvement in the retaliation charged by Officer Gonzalez.  Drawing all reasonable inferences in Officer Gonzalez's favor, his testimony suggests that Commissioner Bratton used his speech to the 40th Precinct on July 20, 2015, to "mark" Officer Gonzalez as the "disgruntled" officer who had "dropped a dime" on the Precinct, leading to the transfer of nineteen members of the force, and that other members of the Precinct interpreted this comment as authorization to increase their acts of retaliation against Officer Gonzalez.  Indeed, Plaintiffs submit the declaration of another member of the 40th Precinct who reports that he was present during the July 20, 2015, roll call, that he heard Commissioner Bratton refer to an officer "dropping the dime," that he interpreted that to mean that "someone had ratted on the precinct," and that "it became well known within the precinct that Sandy Gonzalez was the person who had spoken to the media regarding the misclassification of felonies in the precinct."  (Scola Decl. Ex. 15 ¶¶ 59-61.)  Together with Officer Gonzalez's testimony that the retaliation against him increased substantially after the July 2015 roll call, these facts are sufficient to meet Plaintiffs' burden at summary judgment to show Commissioner Bratton's personal involvement in that retaliation.

Accordingly, Defendants' motion for summary judgment in their favor on Officer Gonzalez's First Amendment retaliation claim based on lack of personal involvement is granted as to C.O. McCormack and Commissioner O'Neill, but denied as to Commissioner Bratton and the City of New York.[43]

---

[43]   Defendants proffer no other basis for judgment in favor of the City beyond Commissioner Bratton's proffered lack of personal involvement in the charged retaliatory conduct.

Qualified Immunity

        Each of the individual defendants moves for summary judgment, on all of Plaintiffs' section 1983 claims against him, on the basis of qualified immunity.  Because the Court has granted summary judgment in favor of Defendants on all but Officer Serrano's First Amendment retaliation claim stemming from his testimony in <u>Floyd</u>, and Officer Gonzalez's First Amendment retaliation claim against Defendants Bratton and the City, the Court limits its qualified immunity analysis to those claims.

        Qualified immunity shields individual government officials acting in the discharge of their duties from liability unless "[1] the official violated a statutory or constitutional right that [2] was clearly established at the time of the challenged conduct."  <u>Horn v. Stephenson</u>, 11 F.4th 163, 168-69 (2d Cir. 2021) (citation omitted).  "A right is clearly established if, at the time of the challenged conduct, it was 'sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right."  <u>Id.</u> (citation omitted).  Courts must exercise caution "not to define clearly established law at [too] a high level of generality," <u>Kisela v. Hughes</u>, 138 S. Ct. 1148, 1152 (2018) (citations and internal quotation marks omitted); "clearly established law must be 'particularized' to the facts of the case," <u>White v. Pauly</u>, 137 S. Ct. 548, 552 (2017) (citation omitted), although a case "directly on point" is not required.  <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741 (2011).  "In determining the state of the law," this Court may consider "Supreme Court and Second Circuit precedent existing at the time of the alleged violation."  <u>Horn</u>, 11 F.4th at 169.

        Defendants argue that "Serrano's First Amendment retaliation claim against McCormack [ ] fails" because "[i]t was not until February 2015 when the Second Circuit held, in <u>Matthews</u>, that an NYPD police officer's complaint about quotas constituted protected speech

under Garcetti v. Ceballos, 547 U.S. 410 (2005)."  (Def. Mem. at 32.)  See also Birch, 184 F.

Supp. 3d at 30 ("Matthews thus establishes that an officer engages in protected speech when he

protests quotas, but it did not do so until 2015, well after the retaliation about which plaintiff is

complaining here.").  But Matthews concerned "the narrow question of whether Matthews spoke

as a citizen or as a public employee" when he complained about quotas internally to members of

his precinct.  779 F.3d at 170.  In this case, the only remaining claim of Officer Serrano stems

from his lay witness testimony, in open court, in Floyd, a case involving the NYPD's

unconstitutional policing practices.  It has long been clearly established law that "[v]oluntarily

appearing as a witness in a public proceeding or a lawsuit is a kind of speech that is protected by

the First Amendment."  Kaluczky v. City of White Plains, 57 F.3d 202, 210 (2d Cir. 1995).

Accord Lane v. Franks, 573 U.S. 228, 238 (2014) ("Sworn testimony in judicial proceedings is a

quintessential example of speech as a citizen for a simple reason: Anyone who testifies in court

bears an obligation, to the court and society at large, to tell the truth."); Frisenda v. Inc. Vill. of

Malverne, 775 F. Supp. 2d 486, 522 (E.D.N.Y. 2011) ("[I]t is axiomatic that the right that

plaintiff asserts—namely, his right under the First Amendment to be free from retaliation for his

union activities and for testifying in a lawsuit [brought by a fellow police officer]—is clearly

established."); Mullins v. City of New York, 634 F. Supp. 2d 373, 390 (S.D.N.Y. 2009) ("the

form and context of the speech at issue—descriptions of officers' duties and responsibilities

given in depositions and on the witness stand at trial—cries out for protection from retaliation by

a government defendant in order to secure access to the courts"), aff'd, 626 F.3d 47 (2d Cir.

2010).  The Court therefore denies Defendants' motion for summary judgment to the extent it

challenges Officer Serrano's First Amendment retaliation claim arising from his testimony in

Floyd on qualified immunity grounds.

Defendants also argue that Commissioner Bratton is entitled to qualified immunity as to Officer Gonzalez's First Amendment retaliation claim, arguing that Defendants are "unaware of any Second Circuit case clearly establishing that such ambiguous public comments from high-ranking officials can alone establish retaliatory intent under Section 1983." (Def. Mem. at 34.)  Yet the absence of a case "directly on point" is not determinative, and Matthews, which was decided months before Commissioner Bratton's comments, clearly established that retaliation in response to a police officer's internal complaints about NYPD policies impacting the public may constitute a violation of the First Amendment.  Moreover, Defendants have pointed to no authority for the proposition that retaliation resulting from "public comments from high-ranking officials" is any less clearly prohibited in response to a public employee's exercise of his or her First Amendment rights than any other form of retaliation.  The Court therefore denies Defendants' motion for summary judgment to the extent it challenges Officer Gonzalez's First Amendment retaliation claim against Commissioner Bratton on qualified immunity grounds.

NYSHRL and NYCHRL Claims

Defendants seek summary judgment on each of Plaintiffs' state and local law claims, arguing that any claims under the NYSHRL "should be dismissed for the reasons noted" in Defendants' brief concerning Plaintiffs' federal claims, and that Plaintiffs' claims under the NYCHRL should be dismissed because "there is still no evidence of any discriminatory or retaliatory intent."  (Def. Mem. at 34-35.)

The parties have not fully briefed the appropriateness of dismissal of Plaintiffs' state and local law claims on this motion, though, and several of those claims are subject to significantly different standards than their federal counterparts.  For instance, Plaintiffs' federal

claims under section 1983 are subject to a more demanding causation standard than their state

and local law counterparts, see Naumovski, 934 F.3d at 212, and "the NYCHRL does not require

[ ] materially adverse employment actions" in support of a discrimination claim.  Mihalik v.

Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 114 (2d Cir. 2013).

   The Court therefore proceeds to determine whether to continue to exercise

supplemental jurisdiction of Plaintiffs' state and local law claims that parallel their federal claims

as to which the Court has granted summary judgment in Defendants' favor.[44]  Generally, "in any

civil action of which the district courts have original jurisdiction, the district courts shall have

supplemental jurisdiction over all other claims that are so related to claims in the action within

such original jurisdiction that they form part of the same case or controversy under Article III of

the United States Constitution."  28 U.S.C.A. § 1367(a) (Westlaw through P.L. 117-159).

"Although federal courts may exercise jurisdiction over related state-law claims where an

independent basis of subject-matter jurisdiction exists . . . such a court may, for various reasons,

nonetheless 'decline to exercise supplemental jurisdiction over a claim, 28 U.S.C. § 1367(c).'"

Oneida Indian Nation v. Madison Cty., 665 F.3d 408, 436-37 (2d Cir. 2011) (citation omitted).

Two such reasons may be that the state or local "claim[s] substantially predominate[ ] over the

claim or claims over which the district court has original jurisdiction," or that "the district court

has dismissed all claims over which it has original jurisdiction."  28 U.S.C.A. § 1367(c)(2), (3).

---

[44] Though the parties have not explicitly addressed this question, "an opportunity to be
heard on whether to exercise supplemental jurisdiction may be inherent in the course of
pre-trial proceedings such as those resolving motions to dismiss or for summary
judgment," Catzin v. Thank You & Good Luck Corp., 899 F.3d 77, 84 (2d Cir. 2018),
and the parties have long been on notice of the question in this case.  See Raymond, 317
F. Supp. 3d at 771.  To the extent either party seeks a further opportunity to be heard as to
this Court's exercise of supplemental jurisdiction, that party shall confer with all other
parties and file a letter, within seven days of this Memorandum Opinion and Order,
notifying the Court of its request and of the other parties' positions as to that request.

In "determining whether to continue to maintain supplemental jurisdiction when one of the four prongs of 28 U.S.C. § 1367(c) is applicable," the Court must evaluate "the familiar factors of judicial economy, convenience, fairness, and comity." <u>Catzin</u>, 899 F.3d at 81.

In this case, the Court has concluded that Defendants are entitled to summary judgment on all of those federal claims asserted by Plaintiffs Raymond and Baez.  As to those Plaintiffs, there are no remaining federal claims of which the Court has original jurisdiction and, to the extent the Court is authorized to continue to exercise supplemental jurisdiction under section 1367(a), it declines to do so given that those Plaintiffs' state and local law claims substantially predominate over the claims over which the district court has original jurisdiction. <u>See</u> <u>Giordano v. City of New York</u>, 274 F.3d 740, 754 (2d Cir. 2001) ("While the statute governing supplemental jurisdiction, 28 U.S.C. § 1367, does not require dismissal of pendent state-law claims where all of the federal claims have been dismissed, [ ] 'if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals.'" (citations omitted)); <u>Vargas v. St. Luke's-Roosevelt Hosp. Ctr.</u>, No. 16-CV-5733-JPO, 2020 WL 2836824, at *11 (S.D.N.Y. June 1, 2020) (explaining that declining supplemental jurisdiction is particularly appropriate "where the remaining non-federal claims are analyzed under different legal frameworks and standards than the dismissed federal claims").

As to the state and local law discrimination claims of Officer Gonzalez (which concern racial discrimination and Officer Gonzalez's performance in the year 2013, and are asserted against C.O. McCormack) the Court concludes that those claims are distinct in terms of proof and scope from Officer Gonzalez's remaining federal claim (retaliation occurring from

May to November 2015 against Commissioner Bratton and the City), such that the interests of judicial economy, convenience, fairness, and comity do not weigh in favor of continuing to exercise supplemental jurisdiction as to those state and local law claims.  See, e.g., Kaplan v. Cnty. of Orange, 528 F. Supp. 3d 141, 160 (S.D.N.Y. 2021) (declining to exercise supplemental jurisdiction of a plaintiff's claim against two defendants as to whom the Court had dismissed the plaintiff's federal claims).  Similarly, the legal and factual underpinnings of the state and local law discrimination claims asserted by Officer Serrano (based on his receipt of a 3.0 evaluation for the calendar year 2012) are distinct in terms of proof and scope from those of his remaining federal claim (retaliation in 2013 from his testimony in Floyd) such that judicial economy, convenience, fairness, and comity do not weigh in favor of exercising supplemental jurisdiction—particularly given that the Court is not exercising such jurisdiction over the quite similar state and local law discrimination claims asserted against C.O. McCormack by Officers Baez and Gonzalez, who are represented by the same counsel as Officer Serrano.  To the extent those three Officers' state and local law discrimination claims against C.O. McCormack form part of the same case or controversy as Officer Serrano's and Gonzalez's surviving federal retaliation claims for purposes of section 1367(a), the Court concludes that they substantially predominate over the claims as to which the Court has original jurisdiction, and will be most efficiently, fairly, and consistently adjudicated together in another forum of competent jurisdiction.

As to the state and local law counterparts of Officer Serrano's and Officer Gonzalez's Equal Protection retaliation claims, however, the Court concludes that the state and local law claims form part of the same case or controversy of the federal claims and do not substantially predominate over their federal counterparts, and therefore addresses them on the

merits.  Although the parallel state and local claims are subject to different standards in some

respects, the NYSHRL and NYCHRL, like the federal causes of action, each require a plaintiff

asserting a retaliation claim to establish that he or she participated in protected activity, that the

defendant knew of that protected activity, and that there is a causal connection between the

defendant's knowledge of that protected activity and some degree of disadvantageous action

taken against the plaintiff.  Venezia v. Luxoticca Retail N. Am. Inc., No. 13-CV-4467-RJS, 2015

WL 5692146, at *11-12 (S.D.N.Y. Sept. 28, 2015), aff'd, 699 F. App'x 53 (2d Cir. 2017);

Boonmalert v. City of New York, 721 F. App'x 29, 33 (2d Cir. 2018).  Here, Officer Serrano and

Officer Gonzalez have each failed to meet his prima facie burden of showing that C.O.

McCormack was aware of the claimed protected activity (i.e., Officer Serrano's June 2012

EEOC complaint and Officer Gonzalez's internal complaints in 2014), or that there was a causal

connection between such knowledge and any resulting actions disadvantaging Officer Serrano or

Officer Gonzalez.  The Court therefore exercises supplemental jurisdiction of, and concludes that

Defendants are entitled to summary judgment as to, the state and local law claims of Officer

Serrano and Officer Gonzalez to the extent those claims parallel their Equal Protection retaliation

claims.

Except as to those state and local law claims discussed in the preceding paragraph

and those paralleling Plaintiffs' surviving federal claims, the Court declines to exercise

supplemental jurisdiction of Plaintiffs' remaining claims under the NYSHRL and NYCHRL, and

dismisses them without prejudice.


CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted

in part and denied in part.  The motion is denied to the extent Defendants seek summary

judgment as to Plaintiff Pedro Serrano's First Amendment retaliation claim (and parallel state

and local law claims) stemming from Officer Serrano's testimony in <u>Floyd</u>, and as to Plaintiff

Sandy Gonzalez's First Amendment retaliation claim (and parallel state and local law claims)

against Commissioner Bratton and the City.  The motion is further denied to the extent

Defendants seek dismissal with prejudice of each Plaintiff's state and local law discrimination

claims (and of Plaintiff Raymond's state and local law retaliation claims), of which the Court

declines to exercise supplemental jurisdiction and which the Court dismisses without prejudice to

litigation in another forum of competent jurisdiction.

The motion is granted in all other respects.

By **July 15, 2022**, the remaining parties are directed to file a joint letter regarding

whether they request the opportunity to participate in a settlement conference before Magistrate

Judge Cave, and in what timeframe they would seek such a conference, bearing in mind the

deadlines associated with the final pretrial conference scheduled for October 14, 2022.  (<u>See</u>

docket entry nos. 269 & 321.)

The Clerk of Court is respectfully directed to terminate Plaintiffs Edreweene

Raymond and Ritchie Baez as Plaintiffs on the docket sheet of this action.

This Memorandum Opinion and Order resolves docket entry no. 275.

SO ORDERED.

Dated: New York, New York
      July 7, 2022

                                        /s/ Laura Taylor Swain
                                    LAURA TAYLOR SWAIN
                                    Chief United States District Judge