UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

PEDRO SERRANO and SANDY
GONZALEZ,

            Plaintiffs,

    -v-                                     No.  15-CV-6885-LTS-SLC

THE CITY OF NEW YORK, WILLIAM J.
BRATTON, and CHRISTOPHER
McCORMACK,

            Defendants.

--------------------------------------------------------x

### MEMORANDUM ORDER

Now before the Court is Defendants' motion to strike the September 1, 2020,

report of Plaintiffs' designated expert Edward Carrasco, Esq. (docket entry no. 272).

The Court has considered the parties' submissions carefully.  For the following

reasons, Defendants' motion to strike is granted in part and denied in part.

### BACKGROUND

Familiarity with the claims at issue in this case, as summarized in the Court's

Memorandum Opinion and Order issued today (docket entry no. 322), as well as in the Court's

prior orders referenced therein, is presumed.

Remaining Plaintiffs[1] Pedro Serrano and Sandy Gonzalez are two New York City

Police Department ("NYPD") officers who worked in the NYPD's 40th Precinct beginning in

---

[1]    In its Memorandum Opinion and Order issued today, the Court granted in part and denied
in part Defendants' motion for summary judgment, resulting in the dismissal of all of
Plaintiffs' claims except for the First Amendment retaliation claims (and their state and

2004 or 2005, and who perceived and reported inappropriate or unlawful conduct occurring in the Precinct in the early 2010s.  Officer Serrano claims that, beginning in or around February 2013, Defendant Christopher McCormack, then-commanding officer of the 40th Precinct ("C.O. McCormack"), retaliated against him in violation of the First Amendment in response to Officer Serrano's testimony as a lay witness in a section 1983 class action lawsuit against the City of New York and others alleging that the NYPD had implemented an official municipal policy of unconstitutional and racially discriminatory stops and frisks.   See Floyd v. City of New York, 959 F. Supp. 2d 540, 604-05 (S.D.N.Y. 2013).  Officer Gonzalez claims that, between May and November 2015, he was subject to a series of retaliatory actions, implicitly authorized and directed by then-NYPD Commissioner William J. Bratton ("Commissioner Bratton"), as a result of his having submitted internal NYPD complaints the year before, which apparently led to an internal investigation that garnered publicity in or around July 2015, and resulted in the disciplining and/or transferring of nineteen members of the force out of the 40th Precinct.

In support of these claims, Plaintiffs proffer the expert report of Edward Carrasco, Esq.  (Docket entry no. 274-1 ("Carrasco Report") ¶ 2.)  Mr. Carrasco is an "attorney, police trainer, and security consultant specializing in police policy and procedure," with twenty-two years of active service experience in the NYPD.  (Id.)  He also served on the Transition Team "[d]uring the 2014 transition between [former] Police Commissioner Raymond Kelly" and then-incoming Commissioner Bratton.  (Id.)[2]  Since his retirement with the rank of Deputy Inspector

---

local law counterparts, to the extent based on the same conduct) of Plaintiff Pedro Serrano and Plaintiff Sandy Gonzalez.  This Memorandum Order is therefore limited to Mr. Carrasco's opinions offered in support of those remaining retaliation claims.

[2]   Mr. Carrasco does not profess to have any personal knowledge concerning Commissioner Bratton's charged involvement in the actions forming the basis of Officer Gonzalez's

in 2017, Mr. Carrasco has been working as "a private consultant in regard to security and police

procedures."  (<u>Id.</u> ¶ 3.)   He has also worked in an organization called "Rising Star," which

teaches aspiring NYPD supervisors the NYPD's Patrol Guide, and is the "sole person" within

that organization "responsible for updating the NYPD Patrol Guide and synopsizing the Patrol

Guide for publication and commercial sale directly to police supervisor aspirants."  (<u>Id.</u>)[3]

Mr. Carrasco's proffered testimony in support of Officer Gonzalez's remaining

claims concerns two issues.  First, he comments on a statement purportedly made on August 26,

2015, by Sergeant Tameika Goode, one of Officer Gonzalez's supervisors:

> [T]he negative treatment of GONZALEZ remained unabated up to 2015;
> specifically, GONZALEZ receiving Command Disciplines (that were not
> adjudicated) for recording supervisors; also, another Command Discipline
> allegedly given by Sergeant Goode, which she denies. [ ] Although
> Sergeant Goode did not issue GONZALEZ a Command Discipline, she
> did punish him in her own, unofficial way: On August 26, 2015, while at
> roll call, in front of all of GONZALEZ's co-workers, Sergeant Goode, in
> her words, " . . . told everyone at roll call be careful Sandy Gonzalez is
> recording you . . ."  [ ]  This action was clearly retaliatory in nature;
> retaliatory and extremely dangerous as other officers would have been
> inclined [to] not assist an officer perceived to be a "rat."  GONZALEZ
> suffering a panic attack requiring hospitalization would have been
> understandable given the gravity of the accusation.  It is worth noting that
> nowhere in the materials I examined did I see Sergeant Goode being
> disciplined for her actions—likely because it was condoned by her
> supervisors/commanding officer.

(Carrasco Report ¶ 15(c).)  Second, Mr. Carrasco comments on a series of command disciplines

issued to Officer Gonzalez over a short period between August and November 2015:

> The multiple Command Disciplines is a way to justify giving an officer a
> more severe punishment, such as Charges and Specifications. Multiple
> Command Disciplines given over time can show a pattern of misbehavior;

---

First Amendment retaliation claim, or of any other events forming the basis of Plaintiffs'
claims in this case.

[3]    The NYPD Patrol Guide is "the main NYPD manual containing current NYPD policies
and procedures."  (Carrasco Report ¶ 3.)

> generally, these Command Disciplines should be from more than one supervisor (to neutralize an officer's defense that a particular supervisor is "out to get them"), which was likely the reason that an unknown person falsely signed Goode's name to a Command Discipline [dated August 22, 2015]. . . .
>
> [H]ad these Command Discipline been legitimate and found justified, termination of employment would have been a likely outcome.

(Id. ¶ 15(c)(i)-(ii).)[4]

       Mr. Carrasco's proffered testimony in support of Officer Serrano's remaining claims consists of Mr. Carrasco's opinion that Officer Serrano was "being targeted by supervisors in the 40th Precinct":

> SERRANO's locker was plastered with stickers calling hi[m] a "rat"; NB: a "rat" is someone perceived to have made a complaint, to IAB, EEO, or another supervisor.
>
> On February 07, 2013, SERRANO called Internal Affairs to file a complaint against McCormack; he then writes this in his Memo book and was instructed to cross it out by Internal Affairs. Within a few hours of the phone call he was visited by four (4) supervisors in one evening, including the Commanding Officer, McCormack. This is highly unusual, to be visited 4 times and to have your memo book "scratched" i.e. signed, this number of times. This is typically reserved for punishment posts when a/the supervisor/s are trying to send a message or show of force, in order to force the perceived wayward officer to comply or to intimidate him or her. Based on the timing of the phone call to Internal Affairs and the visits, it is difficult to find any other justification for the show of force other than retaliation.
>
> Based on the above, it appears that the retaliation of SERRANO was not stopped by the Commanding Officer, McCormack; in fact, it appears that he participated in the retaliation by condoning SERRANO being assigned to a fixed-post where he was visited multiple times and harassed, as evidenced by the supervisors' signature in his memo book—signatures which included that of the Commanding Officer—McCormack. It should be noted that at the time of the incident, SERRANO had approximately 9 years of seniority as a police officer; any argument that this fixed post was

---

[4]    Mr. Carrasco's other testimony concerning Officer Gonzalez—concerning his annual evaluation for the year 2013 and his placement into performance monitoring in 2014—is not relevant to Officer Gonzalez's remaining claims.

legitimate fails since these posts are typically reserved for the most junior officers; at the time of the incident, approximately 15 police academy classes had graduated after SERRANO, making him one the more senior officers in the command assigned to patrol. The only plausible explanation to what happened to SERRANO was that he was retaliated against.

(Carrasco Report ¶ 17(a)-(c).)


DISCUSSION

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  "Under Federal Rule of Evidence 702, lower courts perform a 'gatekeeping' function and are charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II), 982 F.3d 113, 122-23 (2d Cir. 2020) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993)).  "[E]xpert testimony is not admissible under Federal Rule of Evidence 702 if it 'usurp[s] . . . the role of the jury in applying th[e] law to the facts before it,' as such testimony 'undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's.'"  Callahan v. Wilson, 863 F.3d 144, 153 (2d Cir. 2017) (quoting Nimely v. City of N.Y., 414 F.3d 381, 397 (2d Cir. 2005)).  District courts have "broad discretion" to carry out their gatekeeping function with respect to expert testimony. Callahan, 863 F.3d at 153 (quoting In re Pfizer Inc. Sec. Litig., 819 F.3d 642, 658 (2d Cir. 2016)).

Defendants move to strike the Carrasco Report on the grounds that (1) Mr.

Carrasco is not qualified to testify as an expert in this case, (2) the report does not assist the trier

of fact, and (3) the report is unreliable.  (Docket entry no. 273 ("Def. Mem.") at 5-15.)

Qualification to Testify

"The threshold question under Rule 702 is whether the witness is qualified to

provide expert testimony on the subject matter at hand." Tardif v. City of New York, 344 F.

Supp. 3d 579, 595 (S.D.N.Y. 2018).  "To determine whether a witness qualifies as an expert,

courts compare the area in which the witness has superior knowledge, education, experience, or

skill with the subject matter of the proffered testimony." United States v. Tin Yat Chin, 371 F.3d

31, 40 (2d Cir. 2004); Nimely, 414 F.3d at 399 n.13 ("[I]t is worth emphasizing that, because a

witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no

means follows that he or she is qualified to express expert opinions as to other fields.").

The Court concludes that Mr. Carrasco is qualified to testify as to portions of his

proffered testimony but not others.  Mr. Carrasco's decades of experience within the NYPD

(including as a supervisor) and his experience with the NYPD's Patrol Guide adequately qualify

him to testify as to the implications of command disciplines for an officer's career, the unusual

nature of an officer's memo book being "scratched" by multiple superiors during a single shift,

and the typical posts an officer of a given seniority is generally assigned.  At least as to these

areas, "Plaintiffs' proposed expert witness has extensive experience in the field in which he

seeks to offer testimony." Packard v. City of New York, No. 15-CV-7130-AT-SDA, 2020 WL

1479016, at *4 (S.D.N.Y. Mar. 25, 2020).

Mr. Carrasco's experience does not qualify him to testify to other aspects of his

proffered testimony, however.  He does not profess to have any medical or psychological

training that would qualify him to testify, for example, that Officer Gonzalez "suffering a panic attack requiring hospitalization would have been understandable" on August 26, 2015.  (Carrasco Report ¶ 15(c).)  Moreover, he does not profess to have specialized training in First Amendment retaliation in particular—as opposed to standard procedures for NYPD discipline—in support of his conclusions that certain "action[s] [were] clearly retaliatory in nature" (conclusions which, as discussed below, are not helpful to the jury in any event).

<u>Reliability</u>

"If the expert is qualified, the district court must also ascertain whether his or her testimony is reliable."  <u>Tardif</u>, 344 F. Supp. 3d at 596 (citing <u>Nimely</u>, 414 F.3d at 396).  An expert's analysis must be reliable "at every step," and the court must examine "the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."  <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d 256, 267 (2d Cir. 2002).  "Furthermore, an opinion that is speculative or conjectural does not satisfy Rule 702 and should be excluded."  <u>Est. of Jaquez v. City of New York</u>, 104 F. Supp. 3d 414, 427 (S.D.N.Y. 2015), <u>aff'd</u>, 706 F. App'x 709 (2d Cir. 2017).

Mr. Carrasco's proffered testimony regarding the "likely" reason that "unknown person falsely signed Goode's name to a Command Discipline" on August 22, 2015, is speculative and conjectural, and is insufficiently reliable for purposes of Rule 702.  Though Sergeant Goode testified that the signature on that command discipline was not hers (docket entry no. 304-1 at 88:23-89:17), neither the record nor Mr. Carrasco's report provides any foundation for Mr. Carrasco's speculation about an unknown person's intention in signing the August 22, 2015, command discipline (docket entry no. 278-72), or whether the signing was done with or without Sergeant Goode's authorization.  Absent any such foundation or further

explanation, Mr. Carrasco's conjecture on this point is insufficiently reliable and will be excluded.

Similarly, Mr. Carrasco's observation that "nowhere in the materials [he] examined did [he] see Sergeant Goode being disciplined for her actions" on August 26, 2015, "likely because it was condoned by her supervisors/commanding officer," is speculative and insufficiently reliable to be presented to the jury. Mr. Carrasco does not explain what materials he viewed in this connection, whether he was made aware of any particular supervisors or commanding officer who learned of Sergeant Goode's comments but took no action in response, or whether he made any independent investigation into the question before concluding that those "supervisors/commanding officer" "likely" condoned her comments. At least absent such indicia of reliability, Mr. Carrasco's speculation on this point, too, must be excluded.

<u>Assisting the Trier of Fact</u>

"Even after determining that a witness is 'qualified as an expert' to testify as to a particular matter, Fed. R. Evid. 702, and that the opinion is based upon reliable data and methodology, Rule 702 requires the district court to make a third inquiry: whether the expert's testimony (as to a particular matter) will 'assist the trier of fact.'" <u>Nimely</u>, 414 F.3d at 397. The Court must assure that expert testimony is "helpful to, but [does] not usurp the province of, the trier of fact." <u>Est. of Jaquez</u>, 104 F. Supp. 3d at 428 (citing <u>U.S. v. Bilzerian</u>, 926 F.2d 1285, 1294 (2d Cir. 1991)). The testimony must not be "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." <u>Tardif</u>, 344 F. Supp. 3d at 596.

Here, Mr. Carrasco's report usurps the role of the factfinder in a significant respect, by opining that specific discipline imposed upon Officer Serrano and Officer Gonzalez

amounted, or likely amounted, to retaliation.  As the Second Circuit held in <u>Lore v. City of Syracuse</u>, "[w]hile the matter of whether a given defendant impermissibly retaliated against [a plaintiff] ha[s] several components," "those components are relatively straightforward," and admission of an expert's testimony as to what does and does not constitute retaliation under the law does "not seem likely to help 'the trier of fact to understand the evidence or to determine a fact in issue[.]'"  670 F.3d 127, 155-56 (2d Cir. 2012).  <u>Accord</u> <u>Bazile v. City of New York</u>, 215 F. Supp. 2d 354, 365 (S.D.N.Y. 2002) ("The Court finds that his conclusions will be of little value to the finder of fact. The average jury can assess whether or not the NYPD acted with a discriminatory animus without the assistance of Levine's testimony."); <u>Valentin v. New York City</u>, No. 94-CV-3911-CLP, 1997 WL 33323099, at *24–25 (E.D.N.Y. Sept. 9, 1997) ("Dr. Leinen's conclusions that these alleged incidents are consistent with a pattern of sexual harassment or retaliation are not admissible.").  Though an opinion is not necessarily "objectionable just because it embraces an ultimate issue," Fed. R. Evid. 704(a), Mr. Carrasco's opinions that Plaintiffs were or were likely subject to "retaliation" does "not <u>aid</u> the jury in making a decision, but rather attempts to substitute [Mr. Carrasco's] judgment for the jury's." <u>Rieger v. Orlor, Inc.</u>, 427 F. Supp. 2d 99, 104 (D. Conn. 2006) (citation omitted, emphasis in original).

Similarly, Mr. Carrasco's proffered testimony that Officer Serrano's locker was plastered with stickers of rats, and that a "rat" is someone "perceived to have made a complaint," is testimony which does not assist the jury, which is capable of understanding the implications of a locker covered by rat stickers in the context of a First Amendment retaliation claim.

Summary

   For the reasons set forth above, the Court grants in part and denies in part Defendants' motion to strike.  The motion is denied to the extent that it seeks to strike the portions of paragraphs 15(c)(i) and (ii) of the Carrasco Report that are reproduced here in non-strikethrough text:

> The multiple Command Disciplines is a way to justify giving an officer a more severe punishment, such as Charges and Specifications. Multiple Command Disciplines given over time can show a pattern of misbehavior; generally, these Command Disciplines should be from more than one supervisor (to neutralize an officer's defense that a particular supervisor is "out to get them"), ~~which was likely the reason that an unknown person falsely signed Goode's name to a Command Discipline [dated August 22, 2015]~~. . . .

> [H]ad these Command Discipline been legitimate and found justified, termination of employment would have been a likely outcome.

The motion is further denied to the extent that it seeks to strike the following portions of paragraphs 17 of the Carrasco Report that are reproduced here in non-strikethough text:

> ~~As it relates to Plaintiff SERRANO, it appears that SERRANO was being targeted by supervisors in the 40th Precinct. Specifically:~~

> ~~a. SERRANO's locker was plastered with stickers calling his a "rat"; NB: a "rat" is someone perceived to have made a complaint, to IAB, EEO, or another supervisor.~~

> b. On February 07, 2013, SERRANO called Internal Affairs to file a complaint against McCormack; he then writes this in his Memo book and was instructed to cross it out by Internal Affairs. Within a few hours of the phone call he was visited by four (4) supervisors in one evening, including the Commanding Officer, McCormack. This is highly unusual, to be visited 4 times and to have your memo book "scratched" i.e. signed, this number of times. This is typically reserved for punishment posts when a/the supervisor/s are trying to send a message or show of force, in order to force the perceived wayward officer to comply or to intimidate him or her. ~~Based on the timing of the phone call to Internal Affairs and the visits, it is difficult to find any other justification for the show of force other than retaliation.~~

~~Based on the above, it appears that the retaliation of SERRANO was not stopped by the Commanding Officer, McCormack; in fact, it appears that he participated in the retaliation by condoning SERRANO being assigned to a fixed post where he was visited multiple times and harassed, as evidenced by the supervisors' signature in his memo book signatures which included that of the Commanding Officer McCormack.~~ It should be noted that at the time of the incident, SERRANO had approximately 9 years of seniority as a police officer; any argument that this fixed post was legitimate fails since these posts are typically reserved for the most junior officers; at the time of the incident, approximately 15 police academy classes had graduated after SERRANO, making him one the more senior officers in the command assigned to patrol. ~~The only plausible explanation to what happened to SERRANO was that he was retaliated against.~~

The motion is granted in all other respects.[5]

CONCLUSION

Defendants' motion to strike the expert report of Edward Carrasco, Esq. (docket entry no. 272) is granted in part and denied in part, as set forth above.

This Memorandum Order resolves docket entry no. 272.

SO ORDERED.

Dated: New York, New York
July 7, 2022

                                         /s/ Laura Taylor Swain____
                                        LAURA TAYLOR SWAIN
                                        Chief United States District Judge

---

[5]   The first sentence of Mr. Carrasco's proffered testimony in paragraph 17(c) merely reiterates the proffered testimony in paragraph 17(b), with the additional conclusions that the conduct described was retaliatory.